Filer's Name, Address, Phone, Fax, Email:

RUSH MOORE LLP A Limited Liability Law Partnership
SUSAN TIUS  2873-0
737 Bishop Street, Suite 2400, Honolulu, Hawaii  96813-3862
Tel. No. 521-0406;  Fax No. 521-0497;  E-mail: Stius@rmhawaii.com

SHEPPARD MULLIN RICHTER & HAMPTON LLP
CARREN B. SHULMAN
30 Rockefeller Plaza
New York, NY 10112-0015
Tel. No. (212) 634-3040; Fax No. (212) 655-1740;
E-mail: CShulman@sheppardmullin.com
Attorneys for MARRIOTT INTERNATIONAL, INC. and MARRIOTT HOTEL SERVICES, INC.



**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF HAWAII**
1132 Bishop Street, Suite 250
Honolulu, Hawaii 96813

hib_4001-1cs  (12/09)

| | |
|---|---|
| *Debtor:*  **M WAIKIKI LLC** | *Case No.:* **11-02371** |
| *Joint Debtor:*<br>*(if any)* | *Chapter:* **11** |

**COVER SHEET - MOTION FOR RELIEF FROM STAY**

*Instructions:*  Complete A. for all motions.  Complete B. if seeking to enforce security interest.  Complete C. if motion concerns a lease.  Complete D. for other types of relief.  Complete E. if seeking extraordinary relief.

**A. Relief sought under**  ☑ 11 U.S.C. § 362(d) – Automatic Stay   ☐ 11 U.S.C. § 1301(c) – Chapter 13 Codebtor Stay

Movant:  **MARRIOTT INTERNATIONAL, INC. and MARRIOTT HOTEL SERVICES, INC.**

Role (mortgagee, lessor, agent, plaintiff, etc.): Manager under Management Agreement   ☐ Debtor's principal residence

Subject Matter (real/personal property, litigation, etc.): Personal property, including intellectual property, trade secrets, and
(use address/TMK/vehicle ID, etc.)  confidential business information at the Hotel (defined below).

If pending litigation, last major prepetition event: Order to Show Cause entered 8/30/11, NY State Supreme Court, M
(decree of foreclosure, writ of possession, etc.)  Waikiki LLC v. Marriott Hotel Services, Inc., etal,  Index No. 651457/2001

**B. Security Interest (mortgage, lien, etc.)** | Movant's lien position (1st, 2nd, etc.):

| | |
|---|---|
| Date of loan: | Maturity date: |
| Original amt: $ | Principal bal: $ | Interest, late fees, etc.: $ |
| Monthly pmt: $ | Prepetition arrears: $ | Postpetition arrears: $ |
| Debtor's valuation in schedules: $ | Movant's valuation (if different): $ |

| List all encumbrances: | Sr. lien: | $ |
|---|---|---|
| | 2nd lien: | $ |
| | Total other liens: | $ |
| | Add all liens ........................................................................ | $ |

| **C. Lease** | Date of lease: | Payment: $           per |
|---|---|---|
| Prepetition arrears: $ | | Postpetition arrears: $ |

**D. Other**  Describe relief sought, title of action and court of any litigation, and any applicable insurance:
Comfort Order allowing Marriott Hotel Services, Inc. ("Marriott") to recover its personal property, including intellectual property, trade secrets and confidential business information pursuant to a temporary restraining order issued in the NY State Supreme Court, M Waikiki LLC v. Marriott, I.S. International, LLC and Ian Schrager (Index No. 651457/2011).

**E. Extraordinary relief requested:**   ☐ Retroactive relief    ☐ "in rem" relief    ☑ No stay of order

The above information summarizes allegations in attached motion.     /s/ _____ Susan Tius
                                                                                                                        For Movant

UNITED STATES BANKRUPTCY COURT

DISTRICT OF HAWAII

In re                             ) Case No. 11-02371
                                   ) (Chapter 11)
M WAIKIKI LLC,                 )
                                   ) MOTION FOR RELIEF FROM STAY TO
        Debtor.         ) ENFORCE SPECIFIC PROVISION IN
                                   ) TEMPORARY RESTRAINING ORDER;
                                   ) MEMORANDUM IN SUPPORT OF
                                   ) MOTION; DECLARATION OF MICHAEL
                                   ) L. ROCK IN SUPPORT OF MOTION;
                                   ) EXHIBITS "1", "2" AND "3";
                                   ) TRANSCRIPT PAGES
                                   )
                                   ) Date: _____
                                   ) Time: _____
_____) Judge:  Honorable Robert J. Faris

MOTION FOR RELIEF FROM STAY TO ENFORCE
<u>SPECIFIC PROVISION IN TEMPORARY RESTRAINING ORDER</u>

MARRIOTT INTERNATIONAL, INC. and MARRIOTT HOTEL
SERVICES, INC. (collectively "Marriott") move this Court as
follows:

(1) For relief from the automatic stay to enforce the
provision in the TRO (defined below) that restrains M WAIKIKI LLC
("Debtor"), the above-named Debtor, from using and compels it to
return to Marriott all confidential and proprietary information,
including all Intellectual Property (as defined in the Management
Agreement), which is the exclusive property of Marriott.
Intellectual Property, as defined in the Management Agreement,
includes, among other things, (i) all software including all data
and information processed thereby (including all future upgrades,
enhancements, additions, substitutions, modifications and

including the property management system, the reservation system
and all other electronic systems used by Marriott in connection
with the operation of or provision of services to the hotel),
(ii) all manuals, brochures, directives, policies, programs and
other information issued by Marriott to its employees at the
hotel or otherwise used in the operation of the hotel of any
other hotel in the Edition Hotel System or Boutique System, (iii)
all customer information, (iv) all Marriott, Edition Hotel System
or any other Marriott trade secrets, confidential information and
all other information, materials and copyrightable or patentable
subject matter developed, acquired, licensed or used by any
Marriott company in the operation of the hotel or any other hotel
in the Edition or Boutique System, including without limitation ,
materials relating to sales and marketing programs, revenue and
inventory management programs, processes or systems, brand and
pricing strategies, business and technology plans, and research
and development reports.  All of the foregoing shall apply
regardless of the form or medium involved -- whether paper,
electronic, tape, tangible or intangible.  Furthermore, the
Debtor shall return to Marriott all items marked with any of
Marriott's Intellectual Property (including the EDITION
Trademarks and Boutique Trademarks, as defined in the Management
Agreement) including all inventories, fixed asset supplies, signs
or similar identification, or shall render such signs or other
similar identification not visible to the public, and all

U.S. Bankruptcy Court - Hawaii  #11-02371  Dkt # 13  Filed  09/01/11  Page 3 of 25

computer equipment that are not owned by the Debtor or which are utilized as part of Marriott's centralized reservation or property management system.  Under the TRO, the Debtor was ordered to immediately turn over to Marriott all such proprietary materials and the Debtor is currently in contempt of the TRO.

Marriott further requests that the fourteen day stay imposed by Fed. R. Bankr. P. 4001(a)(3) not apply, and that any Order granting this Motion be enforceable immediately upon its entry because of the risk to and deterioration of Marriot's interest in the Property with the passage of time.

This Motion is made pursuant to 28 U.S.C. § 157(a), Rule 4001(a)(1) of the Federal Rules of Bankruptcy Procedure and 11 U.S.C. §§ 362(d)(1), LBR 40014, the Memorandum in Support of Motion, Declaration o in Support of Motion; the records and files in the case; and such other and further matters as may be presented herein.

DATED:  Honolulu, Hawaii, September 1, 2011.


/s/Susan Tius
SUSAN TIUS
Attorney for MARRIOTT INTERNATIONAL,
 INC. and MARRIOTT HOTEL SERVICES, INC.

DATED: New York, New York, September 1, 2011.


/S/Carren B. Shulman
CARREN B. SHULMAN
Attorney for MARRIOTT INTERNATIONAL,
INC. and MARRIOTT HOTEL SERVICES, INC.

# UNITED STATES BANKRUPTCY COURT

## DISTRICT OF HAWAII

In Re

M WAIKIKI LLC

    Debtor.

Case No. 11-02371
(Chapter 11)

MEMORANDUM IN SUPPORT OF
MOTION

## MEMORANDUM IN SUPPORT OF MOTION

   Marriott Hotel Services, Inc. ("Marriott") submits this Memorandum in support of Marriott motion for relief from stay (the "Motion") to recover valuable proprietary information and intellectual property located at 1775 Ala Moana Boulevard, Honolulu, Hawaii 96815 (the "Hotel"), which the Debtor was obligated to return under a temporary restraining order ("TRO") entered yesterday, August 31, 2011 in *M Waikiki LLC v. Marriott Hotel Services, Inc.*, *et al*, before the Supreme Court of the State of New York, County of New York ("State Court"), Index No. 651457/2011 ("State Court Case").

## SUMMARY AND INTRODUCTION

   Upon information and belief, the Debtor's sole asset is the Hotel, which Marriott has been actively managing under the terms of a Management Agreement, dated July 9, 2008 by and between the Debtor and Marriott (the "Management Agreement").

   In May, 2011, the Debtor commenced the State Court Case seeking to terminate the Management Agreement, a 30-year branding and management contract. Marriott vigorously opposed the State Court Case and filed a motion to dismiss on August 1, 2011.

   On or about August 28, 2011, the Debtor physically and under cover of darkness, literally in the middle of the night, escorted Marriott's managers at the Hotel off

W02-WEST:1MNJ1\403865242.1

of the premises requiring them to leave everything behind, including personal items. In Marriott's place, the Debtor installed a competitor of Marriott, Aqua Hotels & Resorts ("Aqua"), allowing Aqua access to computers and documents, including payroll information, customer information and other proprietary data of Marriott as more completely detailed herein and in the accompanying Declaration of Michael Rock, the General Manager of the Hotel.

In response to the Debtor's wrongful, covert actions, Marriott immediately sought the TRO in State Court, to, among other things, protect its valuable intellectual property and proprietary information, including but not limited to, customer lists, standard operating manuals, trademarks, secure financial data of Marriott, and other similar information (the "Confidential and Proprietary Information"), from the Debtor and competitors. The State Court granted the TRO, August 31, 2011, *inter alia,* restraining the Debtor from using, and compelling the Debtor to return to Marriott its Confidential and Proprietary Information. The Debtor failed and refused to return the Confidential and Proprietary Information in contempt of the TRO, physically barring Marriott from recovering its property. While physically barring Marriott from entering the Hotel, the Debtor filed this bankruptcy case, touting to the local press, through its counsel, that its actions were intended to avoid complying with the TRO.

A hearing on this Motion is sought before this Court on an expedited basis to prevent the wrongful use, dissemination, destruction, and misuse of the Marriott Proprietary Information and to compel its return to Marriott.

# I.

## STATEMENT OF FACTS

### A.    Pending Litigation Between Marriott and the Debtor

The Hotel opened on September 28, 2010.  Eight months later, the Debtor commenced the State Court Case asserting, *inter alia,* that Marriott breached its Management Agreement with the Debtor by not generating as much money as the Debtor anticipated.  The Debtor provided no notice prior to filing the State Court Case, and sent Marriott a notice of default under the Management Agreement the day after its filing. Marriott continued to manage the Hotel in accordance with its Management Agreement.

In July 2011, Marriott filed a Motion to Dismiss the State Court Case.  No response has been filed.

### B.    Owner's Raid of the Hotel Under Cover of Darkness

On August 28, 2011, Mr. Rock, received a call at approximately 3:30 a.m. Hawaiian time from the Hotel's Director of Finance and the Front Office Manager that at approximately 2:30 a.m. Hawaiian time, the Debtor showed up at the Hotel in the middle of the night with a large group of people, including security, to seize the Hotel from Marriott.  The Debtor brought police and escorted managers off the property.

Employees exiting the building informed Mr. Rock that they had seen the Debtor removing or covering up EDITION signage inside and outside of the Hotel, cutting the EDITION logo out of the Hotel's towels and bathrobes, and slipping notes under the door of every guest room advising guests that the Hotel was no longer an EDITION.

### C.    Marriott's Temporary Restraining Order Against the Debtor

On August 30, 2011, Marriott filed a motion for the TRO with the State Court.  On August 31, 2011, following a hearing at which many of these issues were raised, the State Court granted Marriott's motion and entered the TRO, specifically noting

the concern for protecting Confidential and Proprietary Information (See Transcript of Hearing, pp. 84-85, annexed). The court ordered that:

> (1) Owner is restrained and enjoined from unilaterally declaring and installing as the Hotel's manager a party other than Marriott; and
>
> (2) Owner must allow Marriott to, and is restrained and enjoined from taking any actions that in any way interfere with Marriott's ability to, (a) fully perform its role as the Hotel's Manager in accordance with the Management Agreement, and (b) undo the harm and damage that resulted from Owner's purported ouster of Marriott; and
>
> (3) Restraining [the Debtor] from using, and directing [the Debtor] to return to Marriott, any and all copies of Marriott proprietary or confidential information or data.

It was further ordered that "Marriott shall be allowed to return to its management role at the Hotel by 2:30 p.m. on Wednesday, August 31, 2011 (Hawaii time; 8:30 p.m. EST)."

## D.   Debtor's Refusal to Comply with the TRO

At approximately 7:30 a.m. EST, 90 minutes after the TRO was issued, Marriott employees arrived at the front door of the Hotel, but entry was barred by a line of security guards. Vittal Calamur, the Vice President of Operations of BOND HD, the Debtor's asset management group, told the Marriott employees to "get with their lawyers." After an hour and a half, Vittal returned with Paul Guccinni (CFO of BOND HD), Ben Rafter (President and CEO of Aqua Hotels & Resorts), and Mike Paulin (Founder of Aqua Hotels & Resorts). They all informed Marriott of their desire for a mutually cooperative transition but said that they would not allow Marriott in until 2:30 p.m. At 2:30 p.m. the Debtor again blocked Marriott's entry and at or about 2:40 p.m. its lawyer announced this bankruptcy case was filed.

**E. Debtor's and Aqua's Access to Confidential and Proprietary Information**

At the Hotel right now, the Debtor has access to an enormous amount of Marriott's confidential information, including:

(i) attorney-client privileged correspondence and information regarding the State Court Case,

(ii) employee personnel files (Marriott's employees are NOT employees of the Debtor and, therefore, the Debtor would otherwise not have access to or be entitled to such information), which contain employee salary, social security, private family and beneficiary information, medical history, and other private information of a personal nature;

(iii) Marriott Standard Operating Procedures and other business processes, which contain the operational strategy and trade secrets of the company;

(iv) proprietary information about EDITION's brand strategy for operation, marketing, and development;

(v) confidential information about other EDITION and Marriott hotels and owners;

(vi) confidential guest and customer information.

Marriott does not disseminate the foregoing information to the public, and imposes extra measures to guard the secrecy of the information. Specifically, Marriott limits access to the information, and do not provide copies to owners or other third parties – and certainly not to its competitors. Much of the Confidential and Proprietary Information clearly states that it is "Marriott Confidential & Proprietary Information: The contents of this material are confidential and proprietary to Marriott International Inc. and may not be reproduced, distributed or used without the express permission of an authorized representative of Marriott. Any other use is expressly prohibited." In short, Marriott considers this information to be proprietary trade secrets, and they have always been protected as such.

Aqua is a competitor of Marriott. The Debtor has essentially handed Marriott's competitor all of its Confidential and Proprietary Information. The harm to Marriott is irreparable, as it is impossible, even if recovered, to remove such information from the minds of competitors. Once lost, no amount of money can remedy Marriott for the harm after Marriott has invested years and millions of dollars to develop these proprietary practices.

The employee salary information in the possession of the Debtor and Aqua is proprietary and confidential to Marriott. A competitor with information about Marriott employees salaries, including benefits, could outbid Marriott for the best employees.

Marriott's Standard Operating Procedures are proprietary and confidential. Marriott has invested substantial resources over a number of years creating and refining its Standard Operating Procedures, which are essentially "How To" manuals governing virtually every aspect of how Marriott operates hotels.

The information at the Hotel about EDITION's brand strategy for operation, marketing, and development is clearly proprietary and confidential. Aqua claims to be a leading hospitality manager in the lifestyle hotel sector, which, if true, makes it a direct competitor of the EDITION brand.

The confidential information about other EDITION and Marriott hotels and owners is also proprietary and Marriott has obligations to retain the confidentiality of the information of its business partners.

The confidential guest and customer information at the Hotel is proprietary to Marriott. Marriott has spent years developing relationships with guests and customers, and this information belongs to Marriott, not the Debtor and certainly not Aqua. No business would ever hand its customer lists over to a competitor.

## F.    <u>Misappropriation of Confidential and Proprietary Information</u>

That the Debtor and Aqua have this confidential and proprietary information is not merely a hypothetical threat. EDITION employees who have continued working

under Modern Management LLC ("Modern"), Aqua's special-purpose company created for the takeover, upon information and belief, have accessed and reviewed confidential and proprietary information belonging to Marriott International.

On August 29, 2011, upon information and belief, the Debtor attempted to access Marriott's servers to download information onto laptops they brought with them into the Hotel. The computers located in the EDITION's Sales & Marketing and Human Resources Offices, which contain Confidential and Proprietary Information, were labeled with post-it notes that say "cracked" or "cracked and inventoried." It appears that Modern has accessed and reviewed the contents of the computers' hard drives (and potentially other drives as well).

Other detailed accounts of wrongful access to Confidential and Proprietary Information is contained in the accompanying Declaration of Mr. Rock.

## II.

## <u>GOOD CAUSE EXISTS FOR LIFTING THE AUTOMATIC STAY</u>

Marriott should be granted immediate relief from the automatic stay in order to protect its interest in the proprietary and confidential information and materials and to allow Marriott to force the Debtor to comply with the TRO. "Cause" exists to grant relief from stay pursuant to 11 U.S.C. § 362(d)(1) for two main reasons, among others.

Section 362(d)(1) of the Bankruptcy Code allows secured creditors to obtain relief from the automatic stay "for cause." "Cause" is not defined in the Bankruptcy Code, so it must be assessed on a case-by-case, fact-specific basis. *In re Mac Donald*, 755 F.2d 715, 717 (9th Cir. 1985). Thus, when considering a relief from stay motion, bankruptcy courts, as courts of equity, will consider the individual circumstances of the parties and weigh the so-called "balance of hurt" that will result from their decision to grant or deny the motion at issue. *In re San Clemente Estates*, 5 B.R. 605, 611 (Bankr. S.D. Cal. 1980) (referring to the equitable role of bankruptcy courts when considering relief from stay motions). Importantly, the ***debtor has the burden*** of proving "absence of cause" under

Section 362(d)(1).  *In re Gauvin*, 24 B.R. 578, 580 (B.A.P. 9th Cir. 1982); 11 U.S.C. § 362(g).

## A.  Cause Exists Because Proprietary Information Is Not Property Of The Estate

The Propriety Information is not the Debtor's property – it is Marriott's property.  As a general rule, the automatic stay does not apply to property that is not property of the estate.  *See In re Downey Financial Corp.*, 428 B.R. 595 (Bankr. D. Del. 2010) (granting relief from stay because debtor's interests in property not belonging to the bankruptcy estate would not cause prejudice); *In re Moore*, 410 B.R. 439, 441 (Bankr. E.D. Va. 2009) (noting that the automatic stay does not "stay actions against property that is not property of the bankruptcy estate".); *In re Brettschneider*, 322 B.R. 606 (Bankr. D.S.C. 2005) (ordering a relief from the automatic stay because the property at issue was not part of the bankruptcy estate).

As set forth above, Marriott is being prevented from entering into the Hotel and recovering this Property.  As a result, a comfort order is needed to allow Marriott to simply recover what is theirs.

## B.  Cause Can Be Found From the Failure of the Debtor to Comply with TRO

Bankruptcy courts across the country generally agree that in certain circumstances it makes sense to liquidate bankruptcy claims in non-bankruptcy courts to avoid duplicative litigation, to prevent waste of scant federal judicial resources, or to allow a court of special expertise to resolve a dispute within its purview.  *See, e.g., In re MacDonald*, 755 F.2d 715 (9th Cir. 1985) (relief from stay granted to avoid incursion into family law matters "out of consideration of court economy, judicial restraint, and deference to our state court brethren and their established expertise in such matters"); *In re Holtkamp*, 669 F.2d 505 (7th Cir. 1982) (holding that relief from stay was properly granted to liquidate claims but not to enforce judgment because allowing pending state court action to proceed merely determined debtor's liability in relation to other creditors); *In re*

*Borbridge*, 81 B.R. 332 (Bankr. E.D. Pa. 1988) (granting relief from stay because the matter in dispute would be resolved more economically, conveniently, and quickly in nonbankruptcy forum); *In re Davis*, 91 B.R. 470, 471 (Bankr. N.D. Ill. 1988) (granting stay relief to allow the lawsuit against the debtor to proceed "principally because of the risks, if the stay is not lifted, of inconsistent results in two forums, of a conflict in the interpretation of state law between this court and the state court, and of duplication of lawyer and judicial effort.").

Here, Marriott specifically sought a state court TRO that would allow it to recover its Property. The Order was issued by the New York State court. The Debtor's flagrant refusal to comply with this Court order is grounds for terminating the stay.

## C.     <u>Cause Exists Due To The Debtor's Bad Faith Bankruptcy Filing</u>

Bad faith commencement of a bankruptcy case is cause for granting relief from the automatic stay pursuant to section 362(d). <u>See</u> <u>Duvar Apt., Inc. v. F.D.I.C. (In re Duvar Apt., Inc.)</u>, 205 B.R. 196, 200 (9th Cir. B.A.P. 1996). In addition, the use of chapter 11 to create and organize a new business, not to reorganize or rehabilitate an existing enterprise, is a misuse of the reorganization process. <u>See</u> <u>*In re Powers,*</u> 135 B.R. 980, 996 (Bankr. C.D. Cal. 1991)(quoting <u>*In re Victory Construction Co., Inc.,*</u> 9 B.R. 549, 565 (Bankr. C.D. Cal. 1981).

Once again, the Debtor's actions clearly demonstrate that the purpose of the bankruptcy filing was to prevent Marriott from entering the Property, in complete disregard of the TRO. As a result, cause exists to the lift the stay.

V.

<u>CONCLUSION</u>

In light of the foregoing, Marriott respectfully requests that this Court grant its

motion for relief from the automatic stay. .

        DATED:  Honolulu, Hawaii, September 1, 2011.


                */s/Susan Tius*
                SUSAN TIUS
                Attorney for MARRIOTT INTERNATIONAL,
                 INC. and MARRIOTT HOTEL SERVICES, INC.

        DATED: New York, New York, September 1, 2011.


                */S/Carren B. Shulman*
                CARREN B. SHULMAN
                Attorney for MARRIOTT INTERNATIONAL, INC. and
                MARRIOTT HOTEL SERVICES, INC.

**Declaration of Michael Rock**

1. My name is Michael L. Rock and I am the General Manager of the Waikiki EDITION Hotel in Honolulu, Hawaii (the "Hotel"). As General Manager, I am the highest-ranking employee of Marriott International, Inc. at the Hotel, overseeing all aspects of the Hotel, including the operational, human resources, financial, and sales and marketing departments. I direct the Hotel's guidance team, each of whom in turn leads up his or her own department. As General Manager, I am also the primary Marriott employee at the Hotel responsible for executing Marriott's responsibilities under the Management Agreement with the Hotel's Owner, M Waikiki LLC ("Owner").

2. I assumed my responsibilities as General Manager in July 2009. Prior to becoming General Manager of the Hotel, I was General Manager of the JW Marriott in Mexico City, Mexico. I have been employed by Marriott for over 25 years.

**History of the Litigation Between Marriott and M Waikiki LLC**

3. The Hotel opened on September 28, 2010. Eight months later, the Owner filed a lawsuit against Marriott asserting that Marriott breached its Management Agreement with the Owner by not making as much money as Owner would have liked. The Owner provided no notice prior to filing its lawsuit, and sent a notice of default the day after it filed its lawsuit.

4. In July 2011, Marriott filed a Motion to Dismiss the Owner's lawsuit. Again, that filing did not change our approach to managing the Hotel, which has been business as usual. We have not yet received a response from the Owner to that Motion to Dismiss.

**Owner's Raid of the Hotel Under Cover of Darkness**

5. On August 28, 2011, I received a call at approximately 3:30 a.m. Hawaiian time from Roula McCann, our Director of Finance, and Cristiano Buono, our Front Office Manager.

McCann and Buono told me that at approximately 2:30 a.m. Hawaiian time, the Owners had showed up at the Hotel in the middle of the night with a large group of people, including security, to seize the Hotel from Marriott. The Owners also apparently brought police with them because McCann told me that there was a police car parked in front the Hotel that arrived when the Owners showed up and a sheriff was present. McCann told me that the Owners were escorting managers off the property, including Laura Modica (our director of nightlife) and Mark Aldridge (our director of sales and marketing). I did not receive any notice from the Owners or their representatives before they showed up at the Hotel.

    6. After my initial call with McCann and Buono, I went to the Hotel. I noticed Paul Guccini, who works with the Owner's asset manager, standing by the employee entrance. I approached Paul and asked for a copy of the paperwork that was apparently "served" to Marriott and asked who it was presented to. He said that he would get us a copy and returned shortly with the two letters, one addressed to Arne Sorenson and one to the Hotel. There was no court order. When I asked who these had been presented to, he told me that they were presented to the security supervisor. When I started listing names, asking if it was a security supervisor named Tarrant, Paul said yes, it was him. I also Paul for an electronic copy of the letters, which he later provided via email. I asked Paul about to personal items inside the Hotel in case employees wished to receive them, and he said yes, but told me that if myself or McCann or other managers wanted to retrieve their things, they would need to contact him personally. I did not try to enter the Hotel.

    7. Upon getting the documents from Paul, I gave them to Buono to fax to our lawyers. I then saw multiple employees of the Hotel arriving for work. Several of them shared with me that they had arrived and were being told by the owners and their representatives that they would

need to be escorted to the Hotel's ballroom, which was now a "processing center." They were being told that they could either sign on with Aqua Hotels & Resorts, the new management company apparently selected by the Owner to operate the Hotel, or they would be immediately fired. Employees told me that they felt coerced and placed in a difficult or impossible position. Many of the employees were in tears and clearly emotionally distraught. They asked me over and over, "How can they do this? How can they treat us like this?"

8. Employees exiting the building shared with me that they had seen the Owner removing or covering up EDITION signage inside and outside of the Hotel. They appeared to be removing all evidence of the EDITION brand. I was informed that the Owners were even cutting the EDITION logo out of the Hotel's towels and bathrobes. I also learned that the Owner had slipped a note under the door of every guest room that informed the guests that the hotel was no longer an EDITION and was now being operated by Aqua Hotels & Resorts.

**Marriott's Temporary Restraining Order Against M Waikiki LLC**

9. On August 30, 2011, Marriott filed a motion for a temporary restraining order with the New York Supreme Court. On August 31, 2011, at approximately 6:00 am Hawaiian time, the court granted Marriott's motion. The court ordered that "(1) Owner is restrained and enjoined from unilaterally declaring and installing as the Hotel's manager a party other than Marriott; and (2) Owner must allow Marriott to, and is restrained and enjoined from taking any actions that in any way interfere with Marriott's ability to, (a) fully perform its role as the Hotel's Manager in accordance with the Management Agreement, and (b) undo the harm and damage that resulted from Owner's purported ouster of Marriott." See Ex. 1 (N.Y. Court Order Granting TRO) (attached). It was further ordered that "Marriott shall be allowed to return to its management role at the Hotel by 2:30 p.m. on Wednesday, August 31, 2011 (Hawaii time; 8:30 p.m. EST)."

**M Waikiki's Refusal to Comply with the Temporary Restraining Order**

10. At approximately 7:30 a.m. EST, 90 minutes after the court order was issued, I arrived at the front door of the Hotel with my attorneys and approximately 10 colleagues to begin the orderly transition to Marriott returning as manager. We were stopped at the front desk by a line of security guards, who banded together and barred our entry. *See* Ex. 2 (Photograph) (attached). Eventually, Vittal Calamur, the Vice President of Operations of BOND HD, the Owner's asset mgmt group, came to tell us that they needed to "get with their lawyers" before they could speak with us. We told them that we would wait outside while they consulted with their lawyers. We awaited news from them as they were contacting counsel for an extended period of time. After an hour and a half, Vittal returned with Paul Guccinni (CFO of BOND HD), Ben Rafter (President and CEO of Aqua Hotels & Resorts), and Mike Paulin (Founder of Aqua Hotels & Resorts). They all informed us of their desire for a mutually cooperative transition but said that they would not allow us in until 2:30 p.m. Both Mike and Ben from Aqua professed to me their desire for mutually work together on a smooth transition with little guest interference/confrontation

11. Our lawyers returned to court with the lawyers for the Owner and I understand that the Owners were told that we had to be completely in the Hotel, and them out, by 2:30 p.m. Hawaiian time. Damian McKinney, Owner's representative, telephoned me to express his desire to meet to discuss turnover steps in order to keep it as smooth as possible, and I agreed to meet with the operations representatives from BOND HD at 12:00 p.m.

12. At noon, I met with Vittal Calamur and Robert Watson (CEO of BOND and the Hotel's asset manager). We discussed the terms and requirements for a smooth turnover. Robert explicitly expressed their desire for a smooth turnover. We presented our requests (for example,

we needed a list of what rooms were occupied by guests) and all seemed to be received favorably. Robert and Vittal left to "share these" with Aqua.

13. At approximately 2:00 pm Robert Watson stated they were "waiting on a call from their lawyers" but were otherwise ready to transition back to Marriott. I observed that Owner's security guards were increasing in number and surrounding all of the exits and entrances, so I expressed to Robert a concern over an apparent increase in their temporary security. He stated he had no idea what that was about and would look into it.

14. I went with Marriott's lawyers and members of my management and security team outside the employee entrance at 2:25 pm in preparation for the retaking the Hotel. Several media personnel were present.

15. Robert Watson phoned me at 2:28 pm to state he was "on the way down." At approximately 2:34 pm, I observed Owner's security team withdrawing. At approximately 2:38, we entered the security office. Mike Paulin, Ben Rafter, Damian Mckinney met us there and asked for some time and appeared to be waiting on something.

16. At approximately 2:45pm I approached Damian requested entry for our people per the court order. He then presented my with a letter stating the Owner had filed for bankruptcy (filed at 240pm). At that point, our lawyers spoke with each other. We called our lawyers from the security office, and after extended conversations and calls with our lawyers, we left the building around 5:00 pm.

**M Waikiki and Aqua Hotels' Access to Marriott's Confidential and Proprietary Information**

17. At the Hotel right now, the Owner has access to an enormous amount of Marriott's confidential information. For example, the Owners now have access to attorney-client privileged information sent from our lawyers to myself and Roula McCann in connection with the pending

litigation in New York. Both she and I have printed out communications with our lawyers in our offices that are now accessible by Owners and Aqua.

18. The Owner also has access to a tremendous amount of proprietary and confidential information, including but not limited to: all of our employee personnel files, which contain employee salary, social security, private family and beneficiary information, medical history, and other private information of a personal nature; Marriott Standard Operating Procedures and other business processes, which contain the operational strategy and trade secrets of the company; proprietary information about EDITION's brand strategy for operation, marketing, and development; confidential information about other EDITION and Marriott hotels and owners; confidential guest and customer information , including names, addresses, phone records, and credit card information. I observed some of this information in the security office where we were led by owners on August 31, 2011, including Marriott's Standard Operating Procedures, Engagement Surveys, EDITION brand standards, and much more. In an abundance of caution, I did not remove the information at that time but my lawyers took photographs to document that it was there. See Ex. 3 (Photographs of proprietary information taken in the security office).

19. Marriott does not disseminate the foregoing information to the public, and we impose extra measures to guard the secrecy of the information. Specifically, we limit access to the information, and do not provide copies to owners or other third parties – and certainly not to our competitors. Much of our proprietary information clearly states that it is "Marriott Confidential & Proprietary Information: The contents of this material are confidential and proprietary to Marriott International Inc. and may not be reproduced, distributed or used without the express permission of an authorized representative of Marriott. Any other use is expressly prohibited."

In short, Marriott considers this information to be proprietary trade secrets, and as long as I have been with the company, they have always been protected as such.

20. Aqua Hotels is a competitor of Marriott. The Owners have essentially handed our competitor all of our proprietary information. The harm to Marriott is irreparable, as it is impossible to remove such information from the minds of competitors. Once lost, no amount of money can remedy Marriott for the harm after Marriott has invested years and millions to develop these proprietary practices.

21. The employee salary information in the possession of Owner and Aqua is proprietary and confidential to Marriott. If a competitor knew how much Marriott paid to each of its employees or provided in benefits, it could easily try to outbid us for our best employees.

22. Marriott's Standard Operating Procedures are proprietary and confidential. Marriott has invested substantial resources over a number of years creating and refining their Standard Operating Procedures, which are essentially "How To" manuals governing virtually every aspect of how Marriott operates hotels. Marriott has decades of experience in the hotel industry, and this experience is embodied in our proprietary systems and methods, including the SOPs. The SOPs are periodically expanded and updated as we gain more experience and refine our policies and practices. These documents, especially when taken as a whole, represent an extremely valuable asset – our knowledge of how to manage hotels efficiently and profitably, with appropriate controls at the individual hotels and appropriate oversight by regional and corporate-level officials. The SOPs cover virtually every aspect of hotel operations, including but not limited to human resources management, financial controls, revenue forecasting and profitability analyses. I do not believe that anyone – even someone with considerable hospitality industry experience – could effectively re-create our SOPs, because they reflect the cumulative

knowledge and experience of a large number of Marriott personnel, covering every aspect of hotel operations, gathered over a long period of time and reflecting lessons learned from operating many hotels (currently over 1,000) all around the world.

23. Marriott, of course, competes with other companies (Hilton, Starwood, and many others) for its management contracts. Hotel owners contract with Marriott for many reasons, but certainly in part because our expertise and systems are, I believe, the best in the business. That experience and those systems are reflected in the documents currently residing at the Hotel.

24. If we allowed asset managers to copy the SOPs, they could use that highly proprietary information about Marriott systems to benefit their other clients in the hospitality industry. That would be detrimental to Marriott, which has built all of their brands – including EDITION -- on providing highly specialized customer service.

25. The information at the Hotel about EDITION's brand strategy for operation, marketing, and development is clearly proprietary and confidential. Aqua Hotels claims to be a leading hospitality manager in the lifestyle hotel sector. We would never hand our strategy over to a competitor because it would allow them to capture our methodologies.

26. The confidential information about other EDITION and Marriott hotels and owners is also considered to be proprietary. I understand that we have confidentiality obligations to our other business partners not to share their information with third parties.

27. The confidential guest and customer information at the Hotel is proprietary to Marriott. Marriott has spent years developing relationships with guests and customers, and this information belongs to Marriott, not the Owner and certainly not Aqua. No business would ever hand its customer lists over to a competitor for reasons that should be obvious – it would allow

them to steal customers, but even if all Aqua or Owner did was call these customers, they could be offended that we handed over their information and blame Marriott for the intrusion.

### M Waikiki LLC and Aqua Hotels Are Reviewing and Misappropriating Marriott's Confidential and Proprietary Information

28. That Owner and Aqua have this confidential and proprietary information is not merely a hypothetical threat.  I have been informed by EDITION employees who have continued working under Modern Management LLC ("Modern"), Aqua's special-purpose company created for the takeover, that Modern's managers have accessed and reviewed confidential and proprietary information belonging to Marriott International.

29. At some point in the late morning of August 29, 2011, I was told by an employee that the Owners were attempting to access Marriott's servers to download information onto laptops they brought with them into the Hotel.  I also was told by employees the Owners and Aqua employees were trying to access all of Marriott's confidential and proprietary systems, such as Micros (our food & beverage point of sale system), Opera (our property management system), and Saflock (our key system).

30. Numerous employees have advised me that computers located in the EDITION's Sales & Marketing and Human Resources Offices, which contain confidential and proprietary information, have been labeled with post-it notes that say "cracked" or "cracked and inventoried."  I understand this to mean that Modern has accessed and reviewed the contents of the computers' hard drives (and potentially other drives as well), including the confidential and proprietary information contained therein.

31. Other employees who have personally observed Modern's representatives access and review Marriott's confidential and proprietary information have shared their accounts with me.  These employees have relayed the following:

a.  At the time Modern raided the EDITION and forcibly took control of the property, Modern representatives accessed Opera, the EDITION's property management system, and reviewed and printed the EDITION's old folios and various corporate rate information. Modern representatives also reviewed other confidential and proprietary information belonging to Marriott, including emergency evacuation processes and procedures.

b.  At the time Modern raided the EDITION, a Modern representative also reviewed confidential and proprietary information contained in the Food & Beverage Office, including information related to banquet event orders (BEOs) and binders containing standard operating procedures.  The same member of Modern management accessed a computer in the F&B Office that also contained confidential and proprietary information.

c.  Since the raid, Modern representatives have rummaged through files in the Human Resources Office.  That Office contains confidential and proprietary information, including information related to employee benefits and salaries that would provide a competitor of Marriott an unfair advantage if accessed.  Modern representatives have also accessed and/or moved group sales files, including group contracts containing rate information, group proposals, documents demonstrating how Marriott tracks its sales managers and their success, and revenue strategy information; files containing information related to business travel accounts, including corporate rates; expense reports showing the types of activities Marriott performs to generate business; and training manuals and standards of procedure.

32. On August 31, 2011, my security employees stationed at the Hotel exits observed Aqua employees walking out of the Hotel with bags and boxes of paper.  As far as I know, they did not enter the Hotel during the raid with boxes and bags of paper.

I declare under penalty of perjury that the foregoing is true and correct.

Michael Rock

Dated: 9/1/11