NELIGAN FOLEY, LLP
PATRICK J. NELIGAN, JR.
   Texas State Bar No. 14866000
  *Pro Hac Vice Application Pending*
JAMES P. MUENKER
   Texas State Bar No. 24002659
  *Pro Hac Vice Application Pending*
325 N. St. Paul, Suite 3600
Dallas, Texas 75201
Telephone (214) 840-5300
Facsimile: (214) 840-5301

KLEVANSKY PIPER, LLP
A Limited Liability Law Partnership
SIMON KLEVANSKY    3217-0
ALIKA L. PIPER    6949-0
NICOLE D. STUCKI    9151-0
841 Bishop Street, Suite 1707
Honolulu, Hawaii 96813
Telephone: (808) 536-0200
Facsimile: (808) 237-5758
E-Mail: sklevansky@kplawhawaii.com;
apiper@kplawhawaii.com; nstucki@kplawhawaii.com

Attorneys for Debtor

# UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| In re<br><br>M WAIKIKI LLC.<br><br>        Debtor. | Case No. 11-02371<br>(Chapter 11)<br><br>DECLARATION OF DAMIAN MCKINNEY IN SUPPORT OF FIRST DAY MOTIONS |

# DECLARATION OF DAMIAN MCKINNEY IN SUPPORT OF FIRST DAY MOTIONS

DAMIAN MCKINNEY declares, under penalty of perjury, that:

1. I am fully competent and qualified in all respects to make this declaration.

2. All statements within this declaration are true and correct, and, unless otherwise qualified, are within my personal knowledge and are true and correct.

3. I am the Manager of eRealty Fund LLC, which is the Manager of debtor M Waikiki LLC ("Debtor" or "M Waikiki"). I am familiar with essentially all aspects of the debtor's business and events that led to bankruptcy.

## A. Structure of M Waikiki

4. Debtor is a Hawaii limited liability company with its principal place of business located in San Diego, California. It is a special purpose entity that has approximately seventy-five indirect investors. M Waikiki was formed to acquire a hotel property in Honolulu, The Modern Honolulu, f/k/a the Waikiki Edition ("Hotel"), which it currently owns.

5. The Hotel was acquired in July 2006 for a purchase price of approximately $112 million. Debtor thereafter expended another approximately $138 million to renovate the property.

6.  In order to finance the acquisition of the Hotel, on July 12, 2006, Debtor issued a promissory note to Nomura Credit & Capital, Inc. ("Nomura Credit") in consideration of $114,900,000 with an original maturity date of August 9, 2008 ("Senior Loan"), secured by a mortgage on the Hotel. Thereafter, Nomura Credit assigned the Senior Loan to the Nomura CRE CDO Grantor Trust, Series 2007-2 ("Nomura Trust"). The Loan is presently held by Wells Fargo Bank, National Association, in its capacity as the Trustee for the Nomura Trust ("Wells Fargo"). C-III Asset Management LLC is the servicer of the Senior Loan. The maturity date of the Senior Loan was August 9, 2011. On August 10, 2011, Wells Fargo declared an Event of Default on the Senior Loan.

7.  On March 13, 2009, Debtor also issued a promissory note to Centerline Real Estate Special Situations Mortgage Fund LLC ("Centerline") in consideration of $15,000,000, also secured by a mortgage on the Hotel. This loan was never funded by Centerline, but a replacement loan was subsequently documented and funded by the Davidson Family Trust in November 2010 (the "Junior Loan"). The maturity date of the Junior Loan was August 9, 2011. On August 25, 2011, the Davidson Family Trust declared the loan in default.

B. **Factual Background.**

8.  Following the acquisition of the Hotel, Debtor sought experienced, competent, and recognized experts to provide critical pre-opening

assistance in the form of design, technical, and marketing services, as well as long-term post-opening branding and services in the form of day-to-day operational management and revenue-generating reservations, sales, and advertising programs.

9.　　In 2007, I learned that Marriott Hotel Services, Inc. ("Marriott") was creating a new brand of boutique hotels to be operated under the "Edition" brand. I understand that the Edition brand was the brain-child of Ian Schrager, a well known hotelier. In January 2008, I understand that Marriott represented that it had agreements in place with developers for the first nine Edition hotels which were to be located in Paris, Madrid, Costa Rica, Miami, Chicago, Washington D.C., Los Angeles (2), and Scottsdale.

10.　　Debtor contacted Marriott to inquire if Marriott would have an interest in managing Debtor's Hotel as a Marriott Edition hotel. Marriott responded with interest in branding the Hotel as an Edition and managing it, and convinced Debtor that it would put its full wherewithal behind the development of the Edition brand and the Hotel. Marriott provided us with projections for the first year of Hotel operations (the "March 2008 Projections"), in which it predicted a profitable first year of operation as a member of the Edition chain. For example, Marriott forecast that Debtor's net operating profit for the first year of operation would be in excess of $14 million on $53.5 million in total revenue. Marriott also estimated that the Hotel, as an Edition, would achieve an occupancy rate of 68%,

an average daily rate ("ADR") of $400, and revenue per available room ("RevPAR") of $272 during its first year. Importantly, Marriott assured Debtor that it had assembled an elite team of talented and experienced senior executives dedicated to the development and promotion of the new brand and the oversight of Hotel operations, and that several Edition hotels would open prior to the Hotel.

        11. Accordingly, on July 9, 2008, Debtor entered into two agreements: (a) a Design and Technical Services and Pre-Opening Agreement among I.S. International, LLC ("I.S. International") Ian Schrager and Marriott ("TSA"); and (b) a Management Agreement between Debtor and Marriott.

        12. Pursuant to the TSA, Marriott and I.S. International undertook to perform a number of design-related duties, and were granted a number of related powers. For example, Marriott and I.S. International controlled and had "veto-power" over the design process and costs associated therewith. In addition, Marriott and I.S. International controlled the selection and pricing of materials, furniture, fixtures, and equipment, and also controlled the pre-opening reservations, booking, and Pre-Opening Account. In exchange for design and pre-opening services, I.S. International and Ian Schrager were to receive a multi-million dollar Concept Design Fee, and I.S. International and Marriott were to receive and share a monthly Technical Services Fee. The Concept Design Fee

escalated nearly twenty percent, and due to delays, the Technical Services Fee paid was approximately $1.5 million.

13.　Pursuant to the Management Agreement, Debtor engaged Marriott to supervise and direct the management and operation of the Hotel under Marriott's exclusive supervision and control.  The Management Agreement imposed upon Marriott responsibility for the "proper and efficient operation of the Hotel" and the duty to "act as a reasonable and prudent operator."  The Management Agreement also required Marriott to operate the Hotel "with the goal of achieving long-term profitability."  In addition, Marriott was obligated to "diligently pursue feasible measures to operate the Hotel in accordance with the Business Plan" prepared by Marriott and approved by Debtor.

14.　Marriott also expressly undertook duties to Debtor in connection with its receipt, handling, expenditure, and accounting for Debtor's funds.  In addition, Marriott acted on behalf of Debtor and was authorized and empowered to enter into various contracts on its behalf; to procure necessary goods, supplies, and equipment utilizing Debtor's funds; and otherwise bind Debtor in commercial transactions.

15.　In consideration of Marriott's promised full and faithful performance of the foregoing contractual obligations and fiduciary duties, among others, Debtor agreed to provide Marriott specified compensation.  Specifically,

Debtor agreed to pay Marriott a base management fee expressed as a percentage of the Hotel's gross revenues and, if applicable, an incentive fee expressed as a function of the Hotel's operating profit. Those fees are essentially "pure profit" to Marriott, because the Management Agreement also requires Debtor to pay for all operating expenses of the Hotel, fund all capital costs, cover the Hotel's payroll (notwithstanding the fact that all Hotel workers are deemed to be employees of Marriott), and pay Marriott various fees and charges for so-called "chain services," including central reservations, national sales office, and national advertising and promotion services.

      16. In anticipation of an opening date of September 28, 2010, Marriott submitted a partial Business Plan for the fourth quarter of 2010 (the "2010 Q4 Business Plan"). Marriott's 2010 Q4 Business Plan did not include a net operating profit line item, but projected total revenue for those three months in the amount of $6.9 million, average occupancy of 39%, ADR of $231, and RevPAR of $90. Remarkably, despite the colossal slide in its projected revenue and profits since the March 2008 Projection, Marriott's actual performance as Hotel manager for the fourth quarter of 2010 was dramatically worse than predicted in its 2010 Q4 Business Plan. Not only did Marriott lose nearly $3.9 million of Debtor's money in a mere three months of operation, it under-performed the Hotel's "competitive set" – the six hotels against which the Hotel's performance is compared for

benchmarking purposes pursuant to the Management Agreement – by a remarkable margin. In addition to Marriott's total inability to attract customers at a respectable rate, Marriott failed to control its variable expenses throughout its management of the Hotel.

17. Marriott failed to properly and efficiently operate the Hotel. In Marriott's own words, "the Waikiki Edition is an unknown hotel." In connection with its projections and budgets, and its responsibility to manage to the budget, Marriott has failed miserably in its duty to act as a reasonable and prudent operator of the Hotel. Moreover, Marriott has failed to operate the Hotel with a goal towards achieving long-term profitability. Indeed, Marriott has demonstrated a wholesale inability to understand (or a profound disregard of) the fundamentals of the budgeting, planning, revenue-management, and cost control processes as they relate to the Hotel. Further, the Hotel's financial performance has been abysmal. Since opening, Debtor has sustained operating losses at the Hotel in excess of $8.4 million. In addition, Edition's key executives have abandoned Edition. Specifically, in March 2011, the two principal Marriott-employed Edition executives – Dan Flannery, the Managing Director since Edition's inception, and Yoav Gery, Head of Development and Owner Relations – left Edition to work for a competing hotel management company. Subsequently, in August 2011, Kate Harth, V.P. of Sales, also left Edition to join Gery and Flannery.

## C. Notice Of Default, Failure To Cure, And The Commencement Of Litigation

18.  Based upon Marriott's failure to comply with the terms of the Management Agreement, on May 26, 2011, Debtor: (1) provided Marriott with a notice of default; and (2) filed suit in the Supreme Court of the State of New York, County of New York. Marriott did not cure or initiate any cure of its material breaches of the Management Agreement.

## D. Debtor's Business Could Not Survive Under Marriott's Management

19.  The Hotel's performance continued to deteriorate subsequent to filing the Action. In addition, the Hotel is still under-performing its competitive set by a considerable margin. The most recent Star Report shows the Hotel running at a 47% year-to-date RevPAR index to its competitive set. In addition, in late-August 2011, Marriott updated its 2011 Hotel forecast to increase the projected loss, before debt service, for the remainder of 2011 from $1.2 million to over $1.9 million, including $500,000 of additional costs. In fact, since opening, the Hotel has lost an average of approximately $840,000 per month. These losses were simply not sustainable by Debtor.

20.  Debtor met with Marriott repeatedly and candidly informed Marriott that Debtor could not sustain such losses and continue funding the negatives, especially in a market where the Hotel's competition was outpacing the Hotel by a wide margin. In fact, following our last meeting with Marriott in

August, Debtor, at Marriott's request, submitted a proposed amendment to the Management Agreement to Marriott that offered a plan to resolve the parties' dispute. Despite Marriott's promised response to our proposal, Marriott ignored our proposal and, to date, had offered no response. Moreover, Marriott rejected our proposals that its continued operation of the Hotel be conditioned upon its payment of any losses sustained by the Hotel under Marriott's management.

E.      **Termination**

21.     Because of Marriott's utter failure to prudently run the Hotel, Debtor's business was on the brink of total failure. After repeated efforts to resolve these issues, which went unanswered by Marriott, Debtor concluded that to preserve its equity in the Hotel, a change in manager had to be made. Accordingly, Debtor terminated Marriott as its agent and manager of the Hotel on August 28, 2011. Simultaneously, Debtor installed Modern Management Services, LLC ("Modern Management"), an affiliate of Aqua Hotels & Resorts, as the interim Hotel manager.

22.     Our decision to terminate Marriott was not made lightly, but it was, however, absolutely necessary for Debtor to have any chance to save the Hotel and its investment therein. In short, without taking this decisive step, the failure of our $250 million investment was certain.

23. The transition of management from Marriott to Aqua Modern Management occurred at August 28, 2011 at approximately 2:30 a.m. in order to avoid disruption of Hotel services. I represented M Waikiki at the Hotel in connection with the transition.

24. Thereafter, Debtor assumed full control of the physical premises and, in conjunction with Modern Management, full control of all operations of the Hotel.

25. The Hotel is now called The Modern Honolulu. It no longer has any affiliation with Edition or Marriott. In furtherance of the transition and in order to effectively conduct its business, Debtor announced through a press release, various media outlets, and the internet that the Hotel is open for business and taking reservations under new management. A new website for the Hotel has been created and launched at www.themodernhonolulu.com. The Hotel is now taking reservations via its new website and early indications are that e-traffic-flow is strong. According to Marriott's recent press release, Marriott is no longer taking reservations for the Hotel. Indeed, Marriott now has no relationship whatsoever with the Hotel.

26. Further, the Hotel's many vendors have been contacted by Debtor's representatives in arrangements have been made to continue the provision of services under the management of Modern Management.

## F. EVENTS FOLLOWING TERMINATION.

27. Even after the Management Agreement and Marriott's agency were terminated, Marriott's disregard for Debtor, employees, and guests continued. For instance, according to many reports, Mike Rock, the former general manager of the Hotel under Marriott, attempted to persuade Hotel employees not to show up to work for Modern Management. Rock apparently deliberately led many Hotel employees to believe that they would not be offered employment at the Hotel by Modern Management. In addition, Marriott employees attempted to interfere with the Hotel's vendor relationships by instructing the vendors not to sell to or work with the new management of the Hotel. Fortunately, Debtor and Modern Management were able to resolve each of these issues promptly; however, Marriott's actions were designed to increase the time and expense in connection with the transition.

28. In a final attempt to re-assert control over the Hotel, Marriott filed a Motion for a Temporary Restraining Order and Preliminary Injunction in the Supreme Court for the State of New York. Debtor vigorously opposed the Motion. Nevertheless, the Court granted the motion, and ordered Debtor to return control of the Hotel to Marriott on August 31, 2011, by 2:30 p.m. local time.

29. Realizing that a return of operations to Marriott would most certainly destroy Debtor's equity in the Hotel, and given that the members will not

Declaration of Damian McKinney.DOC

- 12 -

continue to accept losses if Marriott returns as manager, I concluded that we had no choice other than to file bankruptcy.

I, DAMIAN MCKINNEY, DO DECLARE THAT THE FOREGOING IS TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE, INFORMATION AND BELIEF.

_____
DAMIAN MCKINNEY