NELIGAN FOLEY, LLP
PATRICK J. NELIGAN, JR.
    Texas State Bar No. 14866000
    *Admitted Pro Hac Vice*
JAMES P. MUENKER
    Texas State Bar No. 24002659
    *Admitted Pro Hac Vice*
325 N. St. Paul, Suite 3600
Dallas, Texas  75201
Telephone  (214) 840-5300
Facsimile:  (214) 840-5301

KLEVANSKY PIPER, LLP
A Limited Liability Law Partnership
SIMON KLEVANSKY      3217-0
ALIKA L. PIPER        6949-0
NICOLE D. STUCKI      9151-0
841 Bishop Street, Suite 1707
Honolulu, Hawaii 96813
Telephone:  (808) 536-0200
Facsimile:   (808) 237-5758
E-Mail:  sklevansky@kplawhawaii.com;
apiper@kplawhawaii.com; nstucki@kplawhawaii.com

Attorneys for Debtor

# UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| **In re**<br><br>**M WAIKIKI LLC,**<br><br>        **Debtor.** | **Case No. 11-02371**<br>**(Chapter 11)**<br><br>**MOTION FOR ORDER GRANTING AUTHORITY TO (I) OPERATE UNDER EXISTING MANAGEMENT AGREEMENT PENDING DECISION TO ASSUME OR REJECT AGREEMENT AND (II) HONOR INDEMNIFICATION OBLIGATIONS FOR** |

## MOTION FOR ORDER GRANTING AUTHORITY TO OPERATE UNDER MANAGEMENT AGREEMENT AND RELATED RELIEF

M Waikiki LLC ("M Waikiki" or the "Debtor"), as debtor and debtor-in-possession, files this motion (the "Motion") pursuant to Sections 105(a), 363(b), and 503(b) of the Bankruptcy Code[1] to request authority to continue to operate its Hotel (as defined below) under a pre-petition Hotel Management Agreement with Modern Management Services, LLC ("Modern Management"), pending a determination of whether such agreement should be assumed and/or whether a prior management agreement with Marriott (as defined below) should be rejected and, in connection therewith, to honor certain indemnification obligations thereunder to allow reimbursement of post-petition expenses incurred by Modern Management. In support, M Waikiki submits the Declaration of Robert Watson, attached hereto as **Exhibit B**, and shows as follows:

### I. SUMMARY OF RELIEF REQUESTED

1.      As a result of the unique circumstances and events immediately preceding the commencement of M Waikiki's chapter 11 case, the Committee (as

---

[1]    11 U.S.C. § 101, *et seq.* Unless otherwise noted, all statutory references are to the Bankruptcy Code.

defined below) and others have requested that M Waikiki postpone the hearing on its motion to reject a pre-petition management agreement with Marriott. As an accommodation to the Committee and others, M Waikiki has adjourned the hearing on multiple occasions and is currently in discussions with the Committee and Marriott regarding a stipulation that provides for an even longer continuance. However, absent the relief sought herein, the delay in resolving the issues with respect to Marriott's management agreement will have a negative impact on Modern Management, the Hotel's current property manager, as M Waikiki cannot move forward with its decision to assume or reject Modern Management's agreement until the issues surrounding the termination of Marriott's agreement are resolved.

2.      Consequently, M Waikiki has filed this motion for an order (i) confirming its ability under the Bankruptcy Code to honor its post-petition obligations and indemnification obligations to Modern Management, and (ii) confirming Modern Management's authority to operate the Hotel pending further order of the Court. By this Motion, M Waikiki does <u>not</u> currently seek to assume its pre-petition agreement with Modern Management (although, as discussed in more detail below, it does seek authority to honor its indemnification obligations to Modern Management to the extent Modern Management incurs post-petition fees and expenses under the agreement and seeks reimbursement thereof, or otherwise

U.S. Bankruptcy Court - Hawaii  #11-02371  Dkt # 374  Filed  11/28/11  Page 3 of 61

incurs an indemnified claim related to the post-petition operation of the Hotel). Rather, the relief sought herein will provide (a) comfort to M Waikiki's customers, vendors and other parties in interest that do business with the Hotel that, pending further order of the Court, Modern Management is authorized to manage the Hotel post-petition in accordance with the terms of its agreement, and (b) comfort to Modern Management that it will be indemnified by M Waikiki on a current basis to the extent Modern Management incurs attorneys' fees and expenses in connection with being caught in the middle of the disputes between M Waikiki and Marriott.

## II. JURISDICTION AND VENUE

3.      This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157 and 1334.  Consideration of this Motion is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue of this proceeding is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

## III. INTRODUCTION

4.      On August 31, 2011 (the "Petition Date"), M Waikiki filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

5.      Pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code, M Waikiki continues to operate its business and manage its properties, affairs and assets as a debtor-in-possession.

6.     On September 9, 2011, the United States Trustee appointed an official committee of unsecured creditors (the "Committee").

## IV. BACKGROUND

7.     M Waikiki is the owner of an 18-story, 353-room luxury hotel property in Honolulu known as the MODERN Honolulu (f/k/a the Waikiki Edition Hotel) (the "Hotel"). The Hotel is currently operated and managed by Modern Management under the terms of a Hotel Management Agreement, dated August 28, 2011 (the "Agreement").

8.     Prior to the Petition Date, M Waikiki terminated its management agreement with Marriott Hotel Services, Inc. ("Marriott")[2] and entered into the Agreement with Modern Management. A copy of the Agreement is attached hereto as **Exhibit A**.

9.     Under the Agreement, Modern Management has the sole and exclusive right to manage and operate the Hotel for the benefit of M Waikiki, and is generally responsible, for the daily operation, direction, management and supervision of the Hotel. Subject to M Waikiki's oversight, Modern Management is also responsible for generating the Business Plan and the Annual Budget (as

---

[2]     A more detailed history of M Waikiki, its disputes with Marriott, and the events preceding the commencement of this case is set forth in the Declaration of Damian McKinney In Support Of First Day Motions [Docket No. 17] (the "McKinney Declaration"), which is incorporated by reference herein. Marriott disputes that its management agreement was validly terminated pre-petition.

those terms are defined in the Agreement).[3]  *See* Agreement at Art. 4.  However, M

Waikiki remains responsible for funding the Hotel's operating expenses.  *Id*. at 4.7.

10.    In  exchange  for  managing  and  operating  the  Hotel,  Modern
Management is entitled to Operating Fees of 2.0% of the Hotel's Gross Operating
Revenues  through  January  2012,  and  either  2.0%  or  2.5%  thereafter  depending
upon whether the Hotel meets certain revenue and occupancy goals set forth in the
Agreement.  *Id*. at Art. 5.1.  The Operating Fees are paid to Modern Management
monthly from the Hotel Operating Account.  *Id*.  At the end of each year, Modern
Management is also entitled to an Incentive Fee equal to:   (i) 5% of the amount the
Hotel's  Gross  Operating  Profit  exceeds  the  amount  projected  in  the  Annual
Budget; and (ii) 10% of the amount the Hotel's Gross Operating Profit exceeds
110% of the amount projected in the Annual Budget.  *Id*. at Art. 5.2.  The Incentive
Fee is payable to Modern Management at the end of each year.  *Id*. at 5.2.

11.    As  is  standard  and  customary  in  the  hotel  management  industry,
Modern Management required that an indemnification clause be included in the
Agreement.    In  this  situation,  Modern  Management  was  also  particularly
concerned because M Waikiki was already in litigation with Marriott at the time

---

[3]    Unless otherwise defined, capitalized terms in this section shall have the
meaning ascribed to them in the Agreement.

U.S. Bankruptcy Court - Hawaii   #11-02371   Dkt # 374   Filed  11/28/11   Page 6 of 61

the Agreement was executed.[4]  The indemnification provision required by Modern Management as a condition to entering into the Agreement requires M Waikiki to, among other things, indemnify, defend and hold Modern Management harmless from any claims brought by Marriott related to the termination of Marriott's hotel management agreement with M Waikiki.  *Id.* at Art. 6.2.

12.   When M Waikiki interviewed various management companies before retaining Modern Management, all such companies indicated that full and effective indemnification would be a condition to accepting the role as new manager of the Hotel.  Without effective and prompt indemnification, M Waikiki may be unable to retain Modern Management or obtain any other professional hotel management services that it needs during this Chapter 11 proceeding.

13.   The scope and immediate effectiveness of the indemnity agreement is a real and active concern for Modern Management:  for example, depositions of various Modern Management executives and personnel have already occurred and may occur in the future, in connection with which Modern Management has been, and may in the future be, required to produce various documents.  To comply with these and related demands, Modern Management is currently incurring attorneys' fees and expenses, and expects to incur more in the future.  Modern Management

_____

4    On or about May 26, 2011, M Waikiki:  (1) provided Marriott with a notice of default; and (2) filed suit in the Supreme Court of the State of New York, County of New York.  McKinney Declaration, ¶ 18.

seeks assurances that it will be reimbursed on a current, dollar-for-dollar basis for such post-petition fees and expenses, and that M Waikiki will honor all of its post-petition obligations under the Agreement with respect to Modern Management's post-petition operation of the Hotel.

## V. RELIEF REQUESTED

14.    By this Motion, M Waikiki requests authority, pursuant to Sections 105(a), 363(b), and 503(b) of the Bankruptcy Code, confirming M Waikiki's ability to honor its post-petition obligations under the Agreement and Modern Management's ability to continue managing and operating the Hotel in accordance with the terms of the Agreement, pending further order of the Court. M Waikiki also requests authority to honor the indemnity provisions of the Agreement for fees and expenses incurred post-petition, and for any indemnified obligations that arise from the post-petition operation of the Hotel. By this Motion, M Waikiki does not seek authorization to assume the Agreement at this time. M Waikiki reserves the right to seek authorization to assume the Agreement at a later date should M Waikiki decide, in the exercise of its business judgment, that assumption of the Agreement would be in the best interests of M Waikiki, its creditors and estate.

## VI. BASIS FOR RELIEF

15.    Section 363(c)(1) of the Bankruptcy Code permits a debtor to engage in ordinary course transactions without the necessity of notice or a hearing. What

constitutes "ordinary course" is not defined in the Bankruptcy Code, but courts have developed a two-part test for determining whether a transaction is "ordinary" for purposes of Section 363. *See, e.g., In re Lavigne*, 114 F.3d 379, 384 (2d Cir. 1997). The first is the "creditor's expectation test" also known as the "vertical test." *Id.* The second is the "industry-wide test" or "horizontal test." *Id.* The vertical test looks at the transaction from the vantage point of a hypothetical creditor, and asks whether the transaction imposes economic risks consistent with what such creditor would expect. *Id.* at 385. The horizontal test inquires as to whether other businesses in the debtor's industry would engage in the proposed transaction as ordinary business. *Id.*

16. M Waikiki believes that post-petition performance under the Agreement is within the ordinary course of its business because it is "ordinary" for both M Waikiki specifically, and the hotel industry generally, to contract for professional property management services on terms similar to those provided under the Agreement. Furthermore, a hypothetical creditor would reasonably expect the Hotel to continue its normal operations and to be professionally managed during M Waikiki's Chapter 11 proceeding. Although both the Agreement and its general indemnification provisions are standard in the industry, M Waikiki has filed this Motion to disclose the terms of the Agreement with Modern Management and to obtain an order authorizing M Waikiki to honor its

post-petition obligations (including post-petition indemnification obligations) under the Agreement in the ordinary course, and to pay post-petition costs and expenses to Modern Management on a current basis, according to the terms of the Agreement, including, without limitation, any claims for reimbursement of attorneys' fees and other expenses incurred post-petition that Modern Management may assert under the indemnification provision of the Agreement.

17.     M Waikiki therefore requests the entry of an order authorizing M Waikiki to honor its post-petition obligations under the Agreement as an ordinary course transaction pursuant to Section 363(c)(1).  Granting the relief requested herein will also provide assurances to vendors, guests and customers of the Hotel that may have been confused by the pre-petition management change and the impact of the bankruptcy filing, that they can continue to do business with the Hotel and Modern Management pending the Debtor's decision whether the Agreement should be assumed and/or whether the prior management agreement with Marriott should be rejected (to the extent it was not validly terminated pre-petition).[5]

18.     Alternatively, the Court may grant the relief requested herein pursuant to section 363(b)(1) of the Bankruptcy Code, which provides that "[t]he trustee,

_____

    5   Section 105(a) of the Bankruptcy Code also empowers the Court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."

after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." To approve an application concerning a transaction outside the ordinary course of business, the Court must "find from the evidence presented before him at the hearing a good business reason to grant such an application." *Committee of Equity Security Holders v. Lionel Corp. (In re Lionel Corp.),* 722 F.2d 1063, 1071 (2d Cir. 1983).

19.     In this case, sound business reasons exist justifying M Waikiki's performance under the Agreement.   The Hotel needs professional property management services and M Waikiki and its estate will benefit from the property management services that Modern Management will provide under the Agreement. The Agreement is on market terms, and M Waikiki determined prior to the Petition Date, in the exercise of its business judgment, to contract with Modern Management to provide these services.

20.     Further, pursuant to Section 503(b) of the Bankruptcy Code, most obligations that arise in connection with the post-petition delivery of services are administrative expense priority claims.  Specifically, Section 503(b)(1)(A) allows for the payment of the "actual, necessary costs and expenses of preserving the estate, including wages, salaries, or commissions for services rendered after the commencement of the case."  Thus, the granting of the relief sought herein with respect to post-petition services provided under the Agreement will not provide

Modern Management with any greater priority than they otherwise would have if the relief herein were not granted, and will not prejudice any other party in interest. As noted above, M Waikiki does not seek to assume the Agreement at this time.

21.     With respect to obligations arising under the indemnification provision of the Agreement, such obligations arising out of pre-petition agreements do not generally constitute administrative expenses. *See Abercrombie v. Hayden Corp.*, 139 F.3d 755 (9th Cir. 1998). However, the Abercrombie court recognized an exception to that rule where "the damage to the [claimant] was caused by the postpetition operation of the estate's business." *Id*. at 758.

22.     In this case, M Waikiki submits that any claims of Modern Management arising under the indemnification provision of the Agreement (which was entered into just 3 days before the Petition Date) for attorneys' fees and other reimbursable expenses incurred *after* the Petition Date fall within the exception noted in *Abercrombie* and should be treated as administrative expenses. Modern Management continues to operate the Hotel at M Waikiki's request and for M Waikiki's benefit and that of its estate. Modern Management has been required to hire counsel to respond to post-petition discovery requests in connection with the post-petition operation of the Debtor's Hotel and Modern Management's post-petition performance under the Agreement. Accordingly, M Waikiki submits that it should be permitted to honor its indemnification obligation to Modern

U.S. Bankruptcy Court - Hawaii   #11-02371   Dkt # 374   Filed  11/28/11   Page 12 of 61

Management to the extent that Modern Management has incurred or continues to incur fees and expenses post-petition that are indemnifiable under the terms of the indemnification provision of the Agreement (or any other indemnifiable obligation related to the post-petition operation of the Hotel), and that any reasonable expenses incurred in connection therewith constitute administrative expenses of M Waikiki's estate. Alternatively, M Waikiki should be authorized, pursuant to Section 363(b) of the Bankruptcy Code, to enter into a new post-petition indemnification agreement with Modern Management, *nunc pro tunc* to the Petition Date, on the same terms as set forth in Article 6.2 of the Agreement.

23.     Failure to authorize the Debtor to either honor its indemnification obligation to Modern Management as described herein, or provide a new post-petition indemnification to Modern Management, would likely require M Waikiki to have to seek to assume the Agreement in its entirety or risk having Modern Management seek relief from the Court, which could include a request to terminate the Agreement and cease managing the Hotel. M Waikiki believes that any management company would require a similar indemnification provision to manage the Hotel under the circumstances. Consequently, the relief requested herein is in the best interests of M Waikiki, its estate and creditors and should be approved.

U.S. Bankruptcy Court - Hawaii   #11-02371   Dkt # 374   Filed 11/28/11   Page 13 of 61

## VII. NOTICE

24.     No trustee or examiner has been appointed in this case. A copy of this Motion has been served on (i) the United States Trustee, (ii) counsel for the Committee; (iii) all secured creditors and their counsel, (iv) the Debtor's twenty (20) largest known unsecured creditors, and (v) any party that has made an appearance and requested service of pleadings in this case. M Waikiki submits that no other or further notice need be provided.

## VIII. PRAYER

Accordingly, M Waikiki requests that the Court enter an order (i) granting the relief requested in this Motion and (ii) awarding M Waikiki any further relief the Court deems appropriate.

DATED: Honolulu, Hawaii, November 28, 2011.

NELIGAN FOLEY LLP

/s/Patrick J. Neligan, Jr.
PATRICK J. NELIGAN, JR.
        Texas State Bar No. 14866000
JAMES P. MUENKER
        Texas State Bar No. 24002659

KLEVANSKY PIPER, LLP
A Limited Liability Law Partnership

/s/ Simon Klevansky
SIMON KLEVANSKY
ALIKA L. PIPER
NICOLE D. STUCKI
Attorneys for Debtor

66422v.5

# EXHIBIT "A"

HOTEL MANAGEMENT AGREEMENT

BETWEEN

MODERN MANAGEMENT SERVICES, LLC

AND

M WAIKIKI LLC


August 28, 2011

**EXHIBIT "A"**

U.S. Bankruptcy Court - Hawaii   #11-02371   Dkt # 374   Filed  11/28/11   Page 16 of 61

## TABLE OF CONTENTS

Page

ARTICLE 1 ENGAGEMENT .................................................................................................. 1
    1.1    Manager ........................................................................................................... 1
    1.2    Purpose ........................................................................................................... 1

ARTICLE 2 DEFINITIONS .................................................................................................... 1
    2.1    Annual Budget .............................................................................................. 1
    2.2    Asset Manager .............................................................................................. 1
    2.3    Business Plan ................................................................................................ 2
    2.4    Competitive Set ............................................................................................ 2
    2.5    Direct Employment Cost ............................................................................. 2
    2.6    Extraordinary Receipts ................................................................................ 2
    2.7    First-Class Hotel(s) ...................................................................................... 2
    2.8    Fixed Charges .............................................................................................. 2
    2.9    Force Majeure .............................................................................................. 2
    2.10    Furniture, Fixtures and Equipment ............................................................. 3
    2.11    Gross Operating Profit ................................................................................. 3
    2.12    Gross Operating Revenue ............................................................................ 3
    2.13    Hotel ............................................................................................................ 3
    2.14    Hotel Operating Account ............................................................................. 4
    2.15    Hotel Capital Improvement Reserve Account ............................................ 4
    2.16    Manager ....................................................................................................... 4
    2.17    Manager's General and Administrative Expenses....................................... 4
    2.18    Marketing Fee .............................................................................................. 4
    2.19    Marketing Fee Services ............................................................................... 4
    2.20    Morimoto's .................................................................................................. 4
    2.21    Mortgage:  Mortgage Financing .................................................................. 5
    2.22    Operating Expenses ..................................................................................... 5
    2.23    Operating Fee ............................................................................................... 6
    2.24    Operating Loss ............................................................................................. 6
    2.25    Operating Supplies and Expendables .......................................................... 6
    2.26    Operating Term ............................................................................................ 7
    2.27    Operating Year ............................................................................................ 7
    2.28    Owner .......................................................................................................... 7
    2.29    Performance Standards ................................................................................ 7
    2.30    Reimbursable Costs ..................................................................................... 7
    2.31    REVPAR ..................................................................................................... 7
    2.32    Substantially Similar Revenues .................................................................. 7
    2.33    Working Capital .......................................................................................... 8
    2.34    Uniform System of Accounts for Hotels .................................................... 8

ARTICLE 3 STARTUP SERVICES........................................................................................ 8
    3.1    Term of Startup Services ............................................................................. 8
    3.2    Startup Services ........................................................................................... 8

U.S. Bankruptcy Court - Hawaii  #11-02371  Dkt # 374  Filed  11/28/11  Page 17 of 61

| | | |
|---|---|---|
| 3.3 | Fee for Startup Services | 9 |
| 3.4 | Startup Reimbursement Expenses | 9 |

ARTICLE 4 OPERATION OF THE HOTEL .................................................................. 9
| | | |
|---|---|---|
| 4.1 | Manager | 9 |
| 4.2 | Negation of Partnership or Joint Venture | 9 |
| 4.3 | Use and Standard of Operation | 9 |
| 4.4 | Leases and Concessions | 12 |
| 4.5 | Licenses and Permits | 12 |
| 4.6 | Personnel | 12 |
| 4.7 | Owner to Bear all Operational Expenses | 13 |
| 4.8 | Owner to Bear All Risk of Loss in Operation of Hotel | 14 |
| 4.9 | Annual Budget, Business Plan and Financial Reports | 14 |
| 4.10 | Cash Flow Reports | 15 |
| 4.11 | Monthly Reports | 15 |
| 4.12 | Annual Financial Report | 15 |
| 4.13 | Additional Financial Reports | 16 |
| 4.14 | Books and Records | 16 |
| 4.15 | Tax Assessments | 17 |
| 4.16 | Maintenance and Repair | 17 |
| 4.17 | Owner's Covenants | 17 |
| 4.18 | Dispute Resolution | 17 |
| 4.19 | Performance Standards | 18 |

ARTICLE 5 OPERATING FEES .................................................................................. 18
| | | |
|---|---|---|
| 5.1 | Base Fee | 18 |
| 5.2 | Incentive Fee | 18 |
| 5.3 | Reimbursable Costs | 19 |

ARTICLE 6 INDEMNIFICATION ................................................................................ 19
| | | |
|---|---|---|
| 6.1 | Manager's Indemnification | 19 |
| 6.2 | Owner's Indemnification | 19 |

ARTICLE 7 INSURANCE ............................................................................................ 20
| | | |
|---|---|---|
| 7.1 | Owner's Insurance | 20 |
| 7.2 | Manager's Insurance | 20 |
| 7.3 | Named Insureds | 21 |
| 7.4 | Cancellation Notice | 21 |
| 7.5 | Report | 21 |
| 7.6 | Waiver of Subrogation | 21 |
| 7.7 | Blanket Insurance | 21 |
| 7.8 | Operating Expense | 21 |

ARTICLE 8 BANK ACCOUNTS .................................................................................. 21
| | | |
|---|---|---|
| 8.1 | Hotel Operating Account | 21 |
| 8.2 | Distributions to Owner | 22 |
| 8.3 | Hotel Capital Improvement Reserve Account | 22 |

U.S. Bankruptcy Court - Hawaii   #11-02371   Dkt # 374   Filed   11/28/11   Page 18 of 61

ARTICLE 9 TRANSFER OF OWNERSHIP ............................................................23
    9.1    Manager ............................................................................................23
    9.2    Owner ...............................................................................................23

ARTICLE 10 OPERATING TERM ...................................................................23

ARTICLE 11 TERMINATION ..........................................................................24
    11.1   For Cause .........................................................................................24
    11.2   Notice ...............................................................................................25
    11.3   Without Cause .................................................................................25
    11.4   Rights Not Limited .........................................................................25
    11.5   Termination for Any Reason ...........................................................26

ARTICLE 12 TITLE, MORTGAGES, ETC. .....................................................26
    12.1   Title ..................................................................................................26
    12.2   Mortgages ........................................................................................27
    12.3   Estoppel Certificates .......................................................................27

ARTICLE 13 MISCELLANEOUS .....................................................................28
    13.1   Name and Identification ..................................................................28
    13.2   Severability ......................................................................................28
    13.3   Notices and Payments .....................................................................28
    13.4   Successors and Assigns ...................................................................29
    13.5   No Waiver ........................................................................................29
    13.6   Estoppel Certificates .......................................................................29
    13.7   Amendments ....................................................................................29
    13.8   Choice of Law; Venue .....................................................................29
    13.9   Arbitration .......................................................................................29
    13.10  Ground Lease ...................................................................................31
    13.11  Confidentiality .................................................................................31
    13.12  Counterparts ....................................................................................31

U.S. Bankruptcy Court - Hawaii   #11-02371   Dkt # 374   Filed   11/28/11   Page 19 of 61

# HOTEL MANAGEMENT AGREEMENT

THIS HOTEL OPERATING AGREEMENT ("Agreement") is entered into as of August 28, 2011, by and between M WAIKIKI LLC, a Hawaii limited liability company ("Owner") and MODERN MANAGEMENT SERVICES, LLC, a Hawaii limited liability company ("Manager").

## RECITALS

A.    Owner is the owner in fee simple of the real property upon which the hotel to be known as The Modern Waikiki ("Hotel") is located at 1775 Ala Moana Blvd, Honolulu, Hawaii, and more particularly described on Exhibit "A" attached hereto (the "Premises").

B.    Manager and its affiliates are experienced in the business of operating and managing hotels.

C.    Owner desires to engage Manager to manage and operate the Hotel on the Premises for Owner following termination of present management, and Manager, upon Owner's termination of present management and for certain fees herein provided, wishes to assume the management and operation of the Hotel.

**NOW, THEREFORE**, in consideration of the mutual promises, covenants and agreements herein contained, and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the parties hereto agree as follows:

## ARTICLE 1
## ENGAGEMENT

1.1    <u>Manager</u>.  Owner hereby engages Manager to operate and manage the Hotel in accordance with and pursuant to the terms of this Agreement, and Manager hereby agrees to operate and manage the Hotel for and on behalf of Owner and in accordance with the terms of this Agreement.

1.2    <u>Purpose</u>.  The primary purpose for which this Agreement is being entered into is to engage and retain Manager to provide management services in connection with the exclusive operation and management of the Hotel as a First-Class Hotel so far as is economically and legally possible, in accordance with the Annual Budget.

## ARTICLE 2
## DEFINITIONS

The following terms and phrases shall have the following meanings for the purposes of the Agreement:

2.1    <u>Annual Budget</u>.  "Annual Budget" shall have the meaning given to such term in Paragraph 4.9.

2.2    <u>Asset Manager</u>.  Asset Manager" means Bond HD, LLC, a Delaware limited liability company.

U.S. Bankruptcy Court - Hawaii  #11-02371  Dkt # 374  Filed 11/28/11  Page 20 of 61

2.3    Business Plan.  "Business Plan" shall have the meaning given to such term in Paragraph 4.9

2.4    Competitive Set.  "Competitive Set" shall be a group of projects/hotels/resorts, each of which is within the market study prepared for the Hotel which is attached hereto as Exhibit "B" and which are commercially reasonable to include in the Competitive Set.  The initial group of projects/hotels/resorts for the Competitive Set that are agreed to are as follows: (i) Waikiki Parc (STR-_____), (ii) the Halekulani (STR-16876), (iii) the Moana Surf rider, A Westin Resort (STR-1632), (iv) the Royal Hawaiian (STR -1634 ), (v ) the Kahala Hotel & Resort (STR -16887) and (vi) J.W. Marriott Ihilani (STR-_____).  Owner and Manager may change the Competitive Set upon the mutual consent of Owner and Manager.  The Competitive Set shall be reviewed and revised, as approved by Manager and Owner, each Operating Year as part of the Annual Operating Budget to reflect changes in supply and conditions of hotels and similar facilities, brands, products and levels. If there is a dispute regarding the Competitive Set, that dispute may be submitted to Dispute Resolution pursuant to Section 4.18.

2.5    Direct Employment Cost.  "Direct Employment Cost" shall mean the salaries and mandatory and customary employee benefits such as statutory employee benefits, insurance, pensions, customary payroll taxes and similar benefits to the extent actually paid or accrued of those employees of Manager engaged in providing direct on-site/local services to the Hotel (as compared to corporate mainland employee costs), prorated where applicable for the portion of their time allocated in providing such services to the Hotel, including Specialized Services (as hereinafter defined), but excluding, however, employees who are executives or chain wide employees of Manager except to the extent provided herein.

2.6    Extraordinary Receipts.  "Extraordinary Receipts" shall mean and refer to the proceeds from such items as (a) sales or other dispositions of any of the assets of Owner used in connection with or forming a part of the Hotel other than in the ordinary course of business of the Hotel, (b) damage recoveries and casualty insurance proceeds, (c) revenue derived from the sale or other disposition of capital assets used in connection with or forming a part of the Hotel, (d) condemnation awards, or sales in lieu of and under the threat of condemnation, (e) net proceeds from any financing or refinancing and (f) all distributions of any nature to Owner and all receipts of Owner not arising out of Owner's interest in the Hotel.

2.7    First-Class Hotel(s).  "First-Class Hotel" shall mean a luxury resort with 4-star standards.

2.8    Fixed Charges.  "Fixed Charges" shall mean and refer to the following:  (a) all debt service including payment of interest and principal reduction; (b) all rent payable under ground leases; (c) all premiums payable under insurance policies; (d) all expenditures for capital improvements, and (e) all real estate taxes and assessments imposed against the Hotel and/or Furniture, Fixtures and Equipment.

2.9    Force Majeure.  Events of "Force Majeure" shall mean and refer to any delay occasioned by war, insurrection, acts of terrorism, strikes, lockouts, riots, floods, earthquakes, fires, casualties, acts of God, embargoes, governmental restrictions on priority, hurricanes, acts or failure

U.S. Bankruptcy Court - Hawaii  #11-02371  Dkt # 374  Filed  11/28/11  Page 21 of 61

to act of any public or governmental agency or entity, or default by any lender furnishing financing to Owner for the Hotel.

2.10 <u>Furniture, Fixtures and Equipment</u>. "Furniture, Fixtures, and Equipment" of the Hotel shall include, by way of example but not limitation, carpeting, rugs and other similar soft floor coverings, draperies, shades, Venetian blinds, curtains, mattresses, bedspreads, pillows, chairs, tables, sofas, chests, radios and television sets whether located within guests rooms, offices or the lobby or other public areas of the Hotel, and Hotel equipment (excluding major mechanical and electrical equipment) used in the operation of kitchens, dining rooms, bars and laundry and dry-cleaning facilities, cleaning equipment, telephone equipment, office and accounting equipment and machines, special lighting and other equipment of a like nature. If a third-party operator is not leased the premises for a spa, then Owner and Manager shall mutually agree on the Furniture, Fixtures and Equipment for the spa.

2.11 <u>Gross Operating Profit</u>. "Gross Operating Profit" shall mean the positive difference, if any, between the Gross Operating Revenue and the Operating Expenses for any particular period.

2.12 <u>Gross Operating Revenue</u>. "Gross Operating Revenue" which is used herein solely between Owner and Manager for purposes of certain calculations specified in this Agreement, shall mean all revenue and income of any kind derived directly from the Hotel's operations, including such sources as rental of rooms, food and beverage sales, sales from gift and other shops operated by Manager for the Hotel, rentals or agreements for other guest services, vending machines, banquet and convention operations, marina operations, parking, and rentals or other payments from lessees, licensees or concessionaires, from retail or other space users, determined in accordance with generally accepted accounting principles (Uniform System of Accounts for Hotels) applied on a consistent basis, excluding all refunds, rebates, discounts (but not credit card discounts paid to a credit card system) and credits of a similar nature given, reasonably paid or returned by Owner or Manager in the ordinary course of obtaining such revenue and income and all tax refunds and/or rebates; provided, however, that any amounts received, recognized or realized in the nature of the following shall not be included in the calculations of Gross Operating Revenue:

(a) Applicable excise, sales and use taxes or similar government charges collected directly from patrons or guests, or as a part of the sales price of any goods, services or displays, such as gross receipts, admission, cabaret or similar or equivalent taxes, except to the extent the same are paid to non-government third parties and are treated as an Operating Expense;

(b) Extraordinary Receipts; and

(c) Morimoto's revenues.

2.13 <u>Hotel</u>. The "Hotel" consists of 353 guest rooms, together with appurtenant public and support facilities, restaurants, bars, clubs and cocktail lounges, exterior landscaping, meeting rooms, banquet facilities and swimming pools. The Hotel shall include, but not be limited to, the following:

(a) The "Public Areas" of the Hotel including, but not limited to: the lobby, exhibition and related areas, meeting and banquet rooms (excluding any kitchen and service areas associated therewith), pre-function areas, public restrooms, Hotel management offices, corridors,

U.S. Bankruptcy Court - Hawaii  #11-02371  Dkt # 374  Filed 11/28/11  Page 22 of 61

vehicle parking areas, together with those areas which are hereinafter designated restaurants, other than Morimoto's, and bars and lounges;

        (b)      The "Guest Rooms" including all guest rooms, all guest room buildings, and suites and baths associated therewith;

        (c)      The "Kitchens and Related Non-Public Food and Beverage Service Areas" including, but not limited to, food and beverage storage, preparation, and service areas associated with meeting and banquet rooms, restaurants and bars and lounges;

        (d)      The "Laundry and Valet" areas for providing such services to the Hotel and guests therein; and

        (e)      The "Back of the House" areas including Hotel employees' locker rooms, dressing areas, restrooms, and cafeteria, uniform and linen storage, housekeeping and room service areas, miscellaneous storerooms, maintenance and repair shops, and any other similar service or storage areas and appropriate employee offices related to the operation of the Hotel.

    2.14   <u>Hotel Operating Account</u>.  "Hotel Operating Account" shall mean and refer to the operating account established pursuant to Paragraph 8.1.

    2.15   <u>Hotel Capital Improvement Reserve Account</u>.  The term "Hotel Capital Improvement Reserve Account" ("Reserve Account") shall mean and refer to the reserve account established by Owner pursuant to Paragraph 8.3.

    2.16   <u>Manager</u>.  "Manager" shall mean Modern Management Services, LLC.

    2.17   <u>Manager's General and Administrative Expenses</u>.  "Manager's General and Administrative Expenses" shall mean all of the general and administrative expenses incurred by Manager and its affiliates in connection with the operation of its general office, such as payroll costs and other compensation paid to officers, executives and other personnel who do not work full time on business directly related to the Hotel and expend a significant portion of their time working on matters unrelated to the Hotel.

    2.18   <u>Marketing Fee</u>.  "Marketing Fee" shall mean a fee, included in the Annual Budget, payable by the Hotel to Manager or one of its Affiliates, the proceeds of which shall be used by Manager to pay for Marketing Fee Services. Manager may use the funds collected from the Marketing Fee to pay for expenditures on such Marketing Fee Services described in the Business Plan.

    2.19   <u>Marketing Fee Services</u>.  "Marketing Fee Services" shall mean the marketing services specific to the Hotel included in the Business Plan.

    2.20   <u>Morimoto's</u>.  "Morimoto's" shall mean the Morimoto Waikiki restaurant located on the premises on the effective date hereof, or such other restaurant, that may occupy the same location on the premises.

U.S. Bankruptcy Court - Hawaii  #11-02371  Dkt # 374  Filed  11/28/11  Page 23 of 61

2.21   Mortgage: Mortgage Financing.  "Mortgage Financing" shall mean and refer to, collectively, all financing wherein the security is the Hotel or any property used in connection therewith and/or the Furniture, Fixtures and Equipment pursuant to any and all mortgages, deeds to secure debt, deeds of trust, security agreements or other security arrangements, regardless of the lien position thereof.

2.22   Operating Expenses.  "Operating Expenses" shall mean expenses incurred in the operation of the Hotel, which expense categories are set forth in the Annual Budget, commercially reasonable or competitively bid by Manager where in similar circumstances such bids would occur in comparable hotels of the same size and character ("Comparable Operations"), of any kind directly or indirectly paid or incurred in connection with the operation of the Hotel and which would be deemed an operating expense under the Uniform System of Accounts for Hotels, including, but not by way of limitation, the following:

(a)   The cost of all food and beverages and of all Operating Supplies and Expendables other than those forming a part of the initial inventory for the operation of the Hotel;

(b)   All Direct Employment Costs;

(c)   All credit card discounts paid to a credit card system;

(d)   The cost of all other goods and services obtained by Manager in connection with Manager's operation of the Hotel, including without limitation, utilities, laundry and dry cleaning, office and other supplies, travel agents' commissions, reservation service, music and entertainment, fuel and ice, licenses and permits, refuse removal and all other services performed by third parties;

(e)   The cost of repairs, landscaping and maintenance of the Hotel;

(f)   Insurance premiums for business interruption insurance, public liability and products liability insurance, worker's compensation insurance or insurance required by similar employee benefit acts and such use and occupancy insurance and such other insurance as Manager and Owner may provide for protection against claims, liabilities and losses arising from the operation of the Hotel.  Premiums on policies for more than one year will be prorated over the period of insurance coverage and premiums under blanket policies will be allocated among properties covered property.  Insurance deductibles for building and contents against damage or destruction by fire, weather, sprinkler leakage, boiler explosion, plate glass breakage or any other cause shall not be Operating Expenses, unless the payment of such deductibles is required as a result of the negligence of Manager;

(g)   All taxes and public dues, performing rights and copyright royalties (other than income, franchise, ad valorem and like taxes), and all water, sewer and other utility charges payable by or assessed against Owner with respect to the operation of the Hotel;

(h)   Legal fees and fees of any accountants for services related to the operation of the Hotel, but excluding such fees for the benefit of Manager;

(i)     The costs and expenses of technical, legal and accounting consultants and specialized operations experts for specialized services in connection with non-recurring work on non-capitalized operation, functional, decorating, design or construction problems and activities, permitted or provided for herein;

(j)     All expenses for advertising and promoting the Hotel, including the Marketing Services Fee to be paid by Owner to Manager pursuant to Article 5;

(k)     Reimbursable Costs as defined in Paragraph 2.30;

(l)     An allowance for bad debts and doubtful accounts determined annually by Owner and Manager based on historical experience;

(m)     All Operating Fees;

(n)     Such other Hotel costs and expenses as are described elsewhere herein;

(o)     Such other Hotel costs and expenses identified in the Annual Budget as operating expenses; and

(p)     Such other Hotel costs and expenses as may otherwise be determined in accordance with generally accepted accounting principles applied on a consistent basis or the Uniform System of Accounts for Hotels.

Notwithstanding the foregoing, any amounts deposited or paid into a reserve for future payment of real estate taxes or insurance premiums or into the Hotel Capital Improvement Reserve Account or into any other reserve established under the terms of the Agreement shall be an Operating Expense at the time so deposited or paid into a reserve or into the Hotel Capital Improvement Account if and to the extent the same would be an Operating Expense under this Paragraph 2.22 when expended from such reserve or the Hotel Capital Improvement Account but shall not be an Operating Expense when so expended from such reserve or Hotel Capital Improvement Account.

2.23    Operating Fee. "Operating Fee" shall mean and refer to the fee to be paid by Owner to Manager for operating the Hotel pursuant to the provisions of Article 5.

2.24    Operating Loss. "Operating Loss" shall mean the negative difference, if any, between (a) the Gross Operating Revenue less (b) the sum of Operating Expenses for the applicable period.

2.25    Operating Supplies and Expendables. The "Operating Supplies and Expendables" for the Hotel shall include, by way of example, but not be limited to, the following items, to the extent obtained for use in the Hotel and to the extent the costs for which are expended in accordance with the Uniform System of Accounts for Hotels, provided, however, notwithstanding anything to the contrary contained in this Agreement, Owner may, for income tax purposes or otherwise, elect to capitalize rather than expense such costs; laundry supplies, food service preparation utensils, food service china ware, food and beverage service glassware, food and beverage service silverware and hollowware, food and beverage service equipment and supplies, linens (food and beverage service and guestroom), housekeeping supplies, accounting supplies, miscellaneous general supply items,

U.S. Bankruptcy Court - Hawaii   #11-02371   Dkt # 374   Filed 11/28/11   Page 25 of 61

uniforms and inventories of foods and beverages, paper supplies and other such items that when used once are disposed of and all other similar items necessary or appropriate for the operation of the Hotel as contemplated by this Agreement.

2.26    Operating Term. The "Operating Term" of this Agreement, as further set forth at Article 10, shall mean the period beginning on the Commencement Date and ending upon the date of expiration of this Agreement, unless earlier terminated in accordance with the terms and provision of this Agreement.

2.27    Operating Year. An "Operating Year" shall mean a calendar year during the Operating Term; provided, however, in the event the Commencement Date is on a date other than the first day of a calendar year, then the first Operating Year shall commence on the Commencement Date and end upon December 31 of the year in which the Commencement Date occurs.

2.28    Owner. "Owner" shall mean M Waikiki LLC, a Hawaii Limited Liability Company.

2.29    Performance Standards. "Performance Standards" is defined in Paragraph 4.19.

2.30    Reimbursable Costs. Certain employees, contractors and consultants of Manager may perform and manage for the direct and immediate benefit of Hotel, certain specialized services in the areas of food and beverage control, MIS services, retail purchase and procurement, corporate legal and accounting, labor relations, and other professional consultants ("Specialized Services") for the Hotel as well as other hotels owned and/or operated by Manager. Such Specialized Services will result in "Reimbursable Costs" due to Manager from Owner as the result of a reasonable allocation of costs incurred and expenditures made to third parties in performance of their specialized services under this Agreement. Such allocation shall be commercially reasonable and consistent with the allocation by Manager of these costs to other hotels owned and/or operated by Manager not to exceed one percent (1%) of the Gross Operating Revenues of the Hotel plus costs attributable to sales and marketing, financial services and reservation costs not to exceed the amounts approved in the Annual Budget for each Operating Year. "Reimbursable Costs" shall include but not be limited to reasonable travel expenses of Manager's corporate office employees while engaged directly in the performance of this Agreement, payments made and expenses incurred for the cost, fees, compensation and other expenses of persons engaged in Specialized Services, and other costs and expenses to be reimbursed to Manager by Owner under the terms of this Agreement. Except as expressly provided to the contrary above, Reimbursable Costs shall not include Manager's General and Administrative Expenses. In addition, Owner shall be afforded at least as favorable treatment in terms of pricing and terms in connection with the provision of any commodity or service as any other owner of any other property managed by Manager.

2.31    REVPAR. "REVPAR" shall mean room revenue per available room, calculated by multiplying the Hotel's average daily room rate by the Hotel's occupancy rate consistent with the Uniform System of Accounts for Hotels.

2.32    Substantially Similar Revenues. "Substantially Similar Revenues" shall be deemed to exist so long as the Hotel has at least 300 guest rooms available for occupancy as transient units under management by Manager.

U.S. Bankruptcy Court - Hawaii  #11-02371  Dkt # 374  Filed 11/28/11  Page 26 of 61

2.33    Working Capital. "Working Capital" shall mean, but shall not be limited to, that money necessary for the Hotel to carry sufficient inventories, to meet current debts and obligations, to make those repairs where Owner's approval is not required and to take advantage of discounts for cash payments for a period of at least one month.

2.34    Uniform System of Accounts for Hotels. "Uniform System of Accounts for Hotels" means the most current Uniform System of Accounts for Hotels (as may be hereafter revised), pursuant to which all accounts of the Hotel shall be determined unless specifically otherwise provided herein.

## ARTICLE 3
## STARTUP SERVICES

3.1    Term of Startup Services. Startup ("Startup Services") provided by Manager to Owner shall begin on the date that Owner advises Manager that Owner's current operator has been terminated and will continue until completed as determined at the discretion of the Owner or its designated representative, but under all circumstances within two (2) weeks from the transition of the Hotel to Manager from the current management group.

3.2    Startup Services. The Startup Services shall be comprised of:

(a)    Reviewing and achieving all Hotel operating requirements of Owner during the transition, including meeting critical path timeline objectives.

(b)    Preparing a strategic positioning, operations and sales and marketing plan (the "Transition Services Plan"), in accordance with the "Initial Year Budget" attached hereto as Exhibit C, to include: staffing, advertising, marketing and Hotel collateral needs, public relations and training, and operational supplies and equipment for the Hotel including the food and beverage Outlets. The Transition Services Plan shall include:

(i)    A forecast of Hotel occupancy and average daily rate ("ADR") by market segment by month;

(ii)    An identification of target accounts;

(iii)    A revenue management plan for maximizing the Hotel's REVPAR;

(iv)    An analysis of the Hotel's food and beverage outlets, nightclub and spa, and banquet facilities;

(v)    A listing of the key initiatives marketing packages, trade shows, programs or other major action items to be utilized by the sales and marketing staff of the Hotel, for the Hotel, and the food and beverage outlets including airline and other travel company relationships; and

(vi)    An identification of any reservation systems providers or rating agencies to which the Hotel shall seek participation or membership.

U.S. Bankruptcy Court - Hawaii  #11-02371  Dkt # 374  Filed 11/28/11  Page 27 of 61

(c)     Preparing a proposed budget (the "Proposed Operating Budget") look at definitions for the initial Operating Year of the Hotel after the transition.

(d)     Overseeing a pre-sales effort for booking corporate accounts, group, SERF, and leisure transient business at the Hotel.

(e)     Developing a human resources plan for the Hotel, including an employee manual (the "Employee Manual").

(f)     Developing and perfecting all job descriptions and roles in the hotel and analyzing needed job roles in coordination with the Proposed Operating Budget.

(g)     Assisting the Owner in applying for and securing all licenses and permits, including for the serving of alcoholic beverages at the Hotel.

(h)     Providing such other reasonable Transition Services as are customarily performed by managers of comparable premier first-class hotels.

The approval of the Transition Services Plan, is subject to the sole and absolute discretion of Owner or its designated representative.

3.3     <u>Fee for Startup Services</u>. The fee to Manager for the Startup Services is set forth in the Initial Year Budget attached hereto as Exhibit "C."

3.4     <u>Startup Reimbursement Expenses</u>. The Manager shall be entitled to reimbursement of reasonable travel expenses for two trips by one person to and from the Hotel as directed by Owner and other reasonable pre-approved expenses incurred in connection with Manager's Startup Services.

## ARTICLE 4
## OPERATION OF THE HOTEL

4.1     <u>Manager</u>. Owner and Manager agree that, with respect to the performance by Manager of all of its duties as Manager of the Hotel, Manager shall act in accordance with the terms of this Agreement.

4.2     <u>Negation of Partnership or Joint Venture</u>. Nothing in this Agreement shall constitute, or be construed to be or to create a partnership, joint venture, agency coupled with an interest, or lease between Owner and Manager with respect to the Hotel.

4.3     <u>Use and Standard of Operation</u>.  Subject to the terms and provisions of this Agreement, Owner hereby grants to Manager the sole and exclusive right to manage and operate the Hotel for and on behalf of Owner and pursuant to the terms of this Agreement, including, without limitation, the right of the Manager to operate all restaurants (other than Morimoto's), bars and lounges, amenities and to operate all concessions, businesses, and entertainment ("Concessions") in the Hotel subject to (i) the Business Plan approved in writing by Owner, (ii) the Annual Budget and (iii) the Concession agreements (as hereinafter defined).  Manager shall consult on a regular basis with representatives of Owner, including, without limitation, the Asset Manager.  One or more of

U.S. Bankruptcy Court - Hawaii  #11-02371  Dkt # 374  Filed  11/28/11  Page 28 of 61

Manager's Senior Corporate Executive(s) shall be directly involved in: the oversight of the critical and strategic matters set forth in the initial and annual Business Plan for the Hotel, and the Annual Budget; the training, hiring, and firing of the key Hotel personnel and other personnel including restaurant employees; the development, modification and execution of key operating standards of the Hotel; the attendance at quarterly meetings with the Owner; and the review of all monthly financial reports provided to Owner.

(a)     Subject to subsection (c) of this Paragraph, Manager, shall have control and discretion in the operation, direction, management and supervision of the Hotel (except as otherwise specifically limited under this Agreement and subject to compliance with all conditions and provisions contained in this Agreement), including without limitation, the right and power to negotiate and enter into such reasonable contracts at the expense of and in the name of Owner as may be reasonably necessary or advisable in connection with the operation of the Hotel so long as such contracts are consistent with the applicable Annual Budget and the right to determine (i) prices and rate schedules for guest rooms, meeting rooms, commercial space, food, beverage, and other salable or rentable items making up the Hotel or its business; (ii) labor policies for employees of Manager performing services for the Hotel (including wage rates, the hiring and discharging of employees) provided the installation of employee retirement or other benefits hereunder do not exceed those normally given employees in the Hotel industry and are consistent with the applicable Annual Budget; and (iii) all phases of promotion and publicity relating to the Hotel except that Owner and Manager shall have the mutual right to approve of the promotional and publicity concepts, themes and media concepts including, without limitation, the website unique to the Hotel, provided that all promotion and publicity must be consistent with the concepts and media previously approved by Owner unless Owner gives its written consent otherwise. Notwithstanding anything to the contrary, any contract having a term of more than one year, a total cost of more than $50,000, or a contract which is with a collective bargaining group (*i.e.*, a union) shall not be entered into without the approval of Owner in Owner's sole discretion.

(b)     Owner and Manager shall have the mutual right to approve of all concepts for operating the Hotel.

(c)     Manager will operate and maintain the Hotel in conformity with a First-Class Hotel, except to the extent excused as provided in Paragraph 4.3 (e), and shall use the Hotel solely for the operation of a Hotel business conforming to that of a First-Class Hotel, and for other activities which are customary and usual in connection with such an operation. Manager shall operate the Hotel as a full service hotel and shall provide management services comparable with first-class independent hotel management companies in the area in which the Hotel is located.

(d)     Notwithstanding anything in Paragraph 4.3 (d) or elsewhere in this Agreement, Manager shall be excused from its obligation to operate the Hotel in conformity to that of a First-Class Hotel (i) to the extent and whenever Manager shall be prevented from compliance with such standard by reason of Force Majeure; (ii) to the extent of any breach by Owner of any material provision hereof directly preventing the operation of the Hotel in conformity to that of a First-Class Hotel, including, without limitation, a breach of Owner's obligations under Paragraph 8.1 (b) to deposit amounts in the Hotel Operating Account required under the Annual Budget; and/or (iii) to the extent and whenever there is herein provided a limitation upon Manager's ability to expend funds in respect of the Hotel which have been provided for in the Annual Budget, provided

U.S. Bankruptcy Court - Hawaii  #11-02371  Dkt # 374  Filed 11/28/11  Page 29 of 61

that the failure to expend funds by reason of the operation of such limitation shall reasonably prevent Manager from meeting such standard.

     (e)    Manager will keep Owner advised regarding all policy matters affecting the Hotel and will not make any major policy change, not reflected in the Annual Budget previously approved in writing by Owner, without prior written approval of Owner.

     (f)    Manager agrees to operate the Hotel for Owner in compliance with all applicable governmental laws, regulations, ordinances, orders and requirements and agrees to operate the Hotel in accordance with the terms and conditions of any Mortgage and in accordance with the requirements of any carrier having insurance on the Hotel or any part thereof.

     (g)    Manager agrees to establish, implement and supervise for Owner the accounting, inventory and cost control systems necessary for the efficient operation and maintenance of the Hotel including the acquisition and disposition of all Furniture, Fixtures and Equipment and all Operating Supplies and Expendables used in the operation of the Hotel. Also, Manager shall maintain adequate control over any records of Owner and Manager, which records shall be comparable in scope, accuracy and timeliness to those maintained by other major chain hotel operators of similar size and operating hotels.

     (h)    Manager shall in the name, for the account and at the expense of Owner arrange for water, electricity, gas, fuel, oil, telephone, vermin extermination, trash removal and other services necessary for the operation of the Hotel; (ii) make purchases of all Operating Supplies and Expendables, Furniture, Fixtures and Equipment and such other services and merchandise as are necessary for the proper operation and servicing of the Hotel; and (iii) receive all such items and employ and consume them in the maintenance and operation of the Hotel. To the extent Manager and/or the Hotel receives any discount, rebate, credit or similar amount in connection with the foregoing, the same shall be for the sole benefit of Owner unless otherwise agreed to by Owner. Manager shall not arrange for, purchase or receive any items or services for the Hotel from any affiliate of Manager unless the terms thereof are fair and reasonable and consistent with market conditions.

     (i)    Manager shall, on behalf of Owner, collect, account for and remit promptly to the proper governmental authority all applicable excise, sales and use taxes or similar governmental charges collected by the Hotel directly from patrons or guests, or as a part of the sales price of any goods, services, or displays, such as gross receipts, admission, cabaret or similar or equivalent taxes, as well as all licenses, certificates, permits, authorizations and examination fees, and all other charges, that are lawfully levied on Owner in connection with the operation of the Hotel.

     (j)    Manager shall use its reasonable commercial efforts and due diligence in the renting of all of the Hotel rooms and facilities in a commercially reasonable manner.

     (k)    Manager shall accord such rooms and privileges to investors, officers and employees of Owner as are consistent with Owner's written policy (so long as according such rooms and privileges does not prevent the renting of rooms to the public).

U.S. Bankruptcy Court - Hawaii  #11-02371  Dkt # 374  Filed 11/28/11  Page 30 of 61

(l)     Manager shall take all actions reasonably necessary to assist Owner and the Hotel in procuring, and maintaining during the term hereof, all licenses, permits or authorizations necessary for the operation of the Hotel.

(m)     Manager shall pay to Owner any rebates it receives from any vendor or service provider in connection with the Hotel.

4.4     <u>Leases and Concessions</u>.

(a)     Manager shall not, without the prior written approval of Owner, arrange leases or concessions for any Hotel operations, any restaurant or food service operations or for any other commercial operation in or about the Hotel or enter into contract unless same are (i) for a term less than one (1) year, (ii) upon terms and provisions included in the approved Business Plan and Annual Budget, and (iii) are otherwise consistent within the terms and provisions of this Agreement, including without limitation, the terms and provisions of Paragraph 4.3 (b).  Notwithstanding the foregoing, Manager shall not enter into a lease or Concession Agreement (as hereinafter defined) (x) with a related party or affiliate of Manager unless same is made upon "arm's length" terms and with the prior written approval of Owner, (y) with any person with respect to any restaurant, dance club, bar, spa, , it being understood that Manager shall obtain Owner's prior written approval of all agreements to operate all restaurants, dance clubs, bars, spas, and lounges within the Hotel.  Any such lease or concession so approved shall be entered into in Owner's name and shall be executed by Owner ("Concession Agreements").

(b)     Manager shall use reasonable efforts to perform, on Owner's behalf, all of the obligations required of Owner as landlord or concessionaire under all present or future leases and concessions made or granted with respect to the Hotel.

(c)     Manager shall collect all rents and other sums falling due during the Operating Term under any present or future lease or concession, and shall deposit the same in the Hotel Operating Account.

4.5     <u>Licenses and Permits</u>.  All licenses, permits and/or authorizations necessary for the operation of the Hotel and as required in order for Owner to comply with any financing or lease agreements to which Owner is a party shall be obtained in Owner's name at Owner's expense. Manager shall assist Owner in securing such license, permits and authorizations.  If any permit, license or authorization necessary for the operation of the Hotel is required to be obtained, in Manager 's name, Owner shall cooperate with Manager in obtaining such license, permit or authorization, and shall execute all documents, and take all other actions, that are reasonably necessary to secure such licenses, permits or authorizations in Manager 's name. Manager shall hold all such licenses, permits and authorizations for the benefit of Owner, and shall cooperate in their transfer or replacement in connection with any termination of this Agreement.

4.6     <u>Personnel</u>.

(a)     Manager shall hire, promote, discharge, and supervise the work of the executive staff (general manager, assistant managers and department heads) of the Hotel and supervise through the executive staff the hiring, promotion, discharge and work of all other operating and service employees performing services in or about the Hotel, all in the name of the Manager, and

U.S. Bankruptcy Court - Hawaii  #11-02371  Dkt # 374  Filed 11/28/11  Page 31 of 61

not in the name of the Owner; provided, however, Owner shall have the right to approve the hiring or transferring of any person by Manager who is part of "key Hotel personnel" which includes the General Manager, Director of Sales and Marketing, Director of Finance, Director of Food and Beverage and Director of Banquet/Catering of the Hotel, which approval shall not be unreasonably withheld or delayed. Asset Manager shall have reasonable authority to communicate with the key Hotel personnel, however key Hotel personnel will report to Manager. Manager agrees that it will not transfer any key Hotel personnel from the Hotel to another asset operated by Manager or any affiliate of Manager without first receiving Owner's approval of the transfer. Manager warrants the exercise of good faith and fair dealing in any proposed transfer in order to protect the interests of the Hotel and Owner.

      (b)    Each and every Hotel employee shall be the employee of Manager and not of Owner. All benefit employee programs will be consistent with the programs offered by Manager at similar hotels, and annual compensation levels will be consistent with the compensation for comparable positions at Competitive Hotels, as approved by Owner as part of the Annual Budget.

      (c)    Since the General Manager may need to reside at the Hotel and be available full-time to perform properly the duties of his employment, he may receive, free of charge and in addition to his salary, room and board and reimbursement for any reasonable expenses, which he may reasonably incur in performance of his duties.

      (d)    Other than through the Asset Manager as described in Paragraph 4.6(a) above, Owner shall not interfere with or give orders or instructions to personnel employed at the Hotel.

      (e)    Manager and all employees of Manager who handle or are responsible for the handling of Owner's monies hereunder shall be under a blanket fidelity bond in factor of Owner and Manager in such amounts and with a company reasonably acceptable to Owner and the premiums for such bond shall be an Operating Expense.

      (f)    Manager shall prepare and file punctually when due all forms, reports and returns required by law relating to the employment of Manager.

    4.7    <u>Owner to Bear all Operational Expenses</u>. In performing its duties hereunder during the Term, Manager shall act solely for the account of Owner. All Operating Expenses incurred by Manager in performing its duties shall be borne exclusively by Owner. To the extent that the funds necessary therefore are not generated by the operation of the Hotel, they shall be promptly supplied by Owner consistent with the Annual Budget and Monthly Cash Flow Forecast. Manager shall in no event be required to advance any of its funds for the operation of the Hotel, nor to incur any liability in connection therewith unless Owner shall have furnished operator with funds necessary for the discharge thereof. However, if Manager shall, at any time advance funds in payment of Operating Expenses, which Manager shall have the right but not the obligation to do in the case of any emergency or with the prior consent of Owner, Owner shall repay Manager all funds so advanced. Moreover, Owner shall be responsible for and pay from its own account (except to the extent cash in the Operating Account is sufficient and Owner and Manager mutually approve in writing) all Fixed Charges and Manager shall have no responsibility or liability with respect thereto.

U.S. Bankruptcy Court - Hawaii  #11-02371  Dkt # 374  Filed 11/28/11  Page 32 of 61

4.8    Owner to Bear All Risk of Loss in Operation of Hotel. All risk of any Operating Loss for any Operating Year resulting from the operation of the Hotel shall be borne exclusively by Owner except for losses caused by (i) the fraud, gross negligence or willful misconduct on the part of Manager, its agents and/or employees, (ii) Manager's material breach of any of the representations or covenants contained in this Agreement (including, but not limited to, any material failure by Manager to perform its duties hereunder), and/or (iii) Manager's violation of any applicable laws or government regulations. Should the operation of the Hotel result in an Operating Loss and should there be insufficient funds in the Hotel Operating Account to pay all amounts due and owing, sufficient funds shall be supplied by Owner to Manager as provided in Paragraph 8.1(b).

4.9    Annual Budget, Business Plan and Financial Reports.

(a)    At least sixty (60) days prior to the beginning of each Operating Year (or such time as Owner and Manager shall mutually agree), Manager shall prepare and deliver to Owner for Owner's approval a proposed budget and operating plan in preliminary draft form (including staffing projections) acceptable to Owner in Owner's sole discretion, together with such other information as is necessary in determining the financial needs of the Hotel and in forecasting the financial results from the operation of the Hotel. The information shall include an analysis of the Performance Standards under Paragraph 4.19. Such information shall include a statement of projected earnings, a statement of projected cash receipts and disbursements on a month-by-month basis for the ensuing Operating Year, together with pertinent supporting statistical information, including, without limitation, a schedule of Hotel room rentals and budget estimates in detail for salaries, advertisements and promotional expenses, taxes, utilities, repairs, maintenance, replacements and capital expenditures for such ensuing Operating Year or Years ("Annual Budget"). Such other information required as part of the "Business Plan", in addition to that included in the Annual Budget, shall include a marketing and advertising plan for the Hotel and a 3-year forecast for capital expenditures.

(b)    Each such Annual Budget and Business Plan, following approval by Owner in writing, as originally submitted or as subsequently modified in writing, shall constitute a standard to which Manager shall use its best efforts to adhere. With respect to any Operating Year for which there is not an Annual Budget or Business Plan approved by the Owner, the Annual Budget for the prior Operating Year shall govern until the Owner approves an Annual Budget for such Operating Year.

(c)    If any new year shall commence before Owner shall have approved the proposed Annual Budget for such year, Manager shall use its reasonable judgment in incurring costs and expenses relating to the operation and maintenance of the Hotel until an Annual Budget for such year is in effect and, in doing so, shall be guided by the Annual Budget for the previous year. In such case, Manager shall be subject to the same financial limitations established by such prior Annual Budget as if the applicable portions of such budget or plan, as applicable, were in effect for the then current year, until Owner approves the new Annual Budget.

(d)    Notwithstanding the foregoing, if Manager reasonably determines that the funds provided in the Annual Budget are or will be at any time during the year insufficient for purposes of operating the Hotel, Manager shall notify Owner as soon as reasonably possible after

U.S. Bankruptcy Court - Hawaii  #11-02371  Dkt # 374  Filed  11/28/11  Page 33 of 61

making such determination and shall propose such modifications to the Annual Budget as Manager shall deem necessary, together with detailed explanations of the reasons therefore.

4.10   Cash Flow Reports.  Manager shall prepare and submit to Owner, at least five (5) business days before the beginning of each month, the proposed monthly cash flow forecast for the Hotel for such month, broken down by weeks in each month, which shall be consistent with the historical cash flow requirements for the Hotel and the Annual Budget, or otherwise be approved by Owner.  To the extent that the proposed monthly cash flow forecast, if, implemented, does not violate the requirements of the preceding sentence; each such forecast shall be deemed to be the "Monthly Cash Flow Forecast" for such month.

4.11   Monthly Reports.  Within ten (10) days after the end of each calendar month, Manager shall have prepared for Owner and delivered to Owner reasonably detailed financial statements ("Monthly Report"), which statements shall reflect the financial position, and results of operations by department, all in accordance with generally accepted accounting principles applied on a consistent basis and so certified as true and correct in all material respects by an executive officer of Manager.  The information on such Monthly Report shall be for the period of the preceding calendar month and the Operating Year to date.  Such Monthly Report shall include a supplemental statement of the computation of Gross Operating Revenue of the Hotel for such month and the Operating Year to date together with such other supplementary data as Owner may reasonably request and believe necessary to an understanding of the operation of the Hotel, including, but not limited to, comparison with previous periods, comparison with the Annual Budget and the projections, necessary information to demonstrate compliance with Mortgages and other agreements, and any proposed deviation from previously approved Annual Budgets.

(a)   The Monthly Reports submitted pursuant to this Paragraph 4.9 shall be accompanied by (a) any notices received from the holder of any Mortgage on the Hotel, or any insurance carrier or any governmental agency received during the previous month (notwithstanding this requirement, all such notices are required to be forwarded immediately by Manager to Owner), together with an appropriate explanation of such notice and (b) any recommendations of Manager relating to the Annual Budget, operations or capital improvements for the current Operating Year of the Hotel.  Without limiting the generality of the foregoing, any notices of specific obligations (monetary or otherwise) to which the Hotel, Owner or Manager must comply and notices of noncompliance with any such obligations shall be immediately forwarded by Manager to Owner; provided, however, that "notices" received from a governmental agency shall exclude information bulletins, questionnaires and similar materials related to employment practices, and other similar materials of general distribution unless compliance therewith is expected to have a material adverse effect upon the Hotel, Owner or Manager.

4.12   Annual Financial Report.  Within ninety (90) days after the end of each Operating Year, Manager shall deliver to Owner an annual financial report ("Annual Financial Report") for the Hotel, including reasonably detailed financial statements reflecting the financial position, results of operations by department, and changes in financial position, all prepared in accordance with generally accepted accounting principles applied on a consistent basis.  Such statements shall include a supplemental statement of the calculation of operating profit, and such other supplementary data as Owner shall reasonably request and believe necessary to an understanding of the operation of the Hotel, including, but not limited to, the comparisons with previous periods, comparison with the

U.S. Bankruptcy Court - Hawaii  #11-02371  Dkt # 374  Filed  11/28/11  Page 34 of 61

Annual Budget and the projections, and necessary information to demonstrate compliance with Mortgages and other agreements. The Annual Financial Report shall be examined by, and an opinion expressed thereon by, any firm or firms of independent certified public accountants to be selected by Owner which is reasonably acceptable to Manager. The cost of such audit shall be an Operating Expense. Additional Financial Reports. Manager shall, upon the request of Owner, prepare for Owner or assist Owner in the preparation of such additional financial reports with respect to the Hotel as may be required in the preparation of the audited Annual Financial Report to be prepared pursuant to Paragraph 4.10. Further, upon the request of Owner, Manager shall prepare a three (3) year business plan for the Hotel which business plan shall forecast, inter alia, the capital needs of the Hotel, the financial results from the operation of the Hotel, etc. for the ensuing three (3) years as well as set forth such other information as Owner reasonably requests respecting the Hotel for such three (3) year period. The cost of the preparation of all of the financial reports described herein shall be an Operating Expense. The cost of the audit of the Annual Financial Report may also be funded as an Operating Expense, but such cost shall not be included in the calculation of fees due to Manager pursuant to Article 5 hereof.

4.13    Additional Financial Reports. Manager shall, upon the request of Owner, prepare for Owner or assist Owner in the preparation of such additional financial reports with respect to the Hotel as may be required in the preparation of the audited Annual Financial Report to be prepared pursuant to Paragraph 4.10. Further, upon the request of Owner, Manager shall prepare a three (3) year business plan for the Hotel which business plan shall forecast, inter alia, the capital needs of the Hotel, the financial results from the operation of the Hotel, etc. for the ensuing three (3) years as well as set forth such other information as Owner reasonably requests respecting the Hotel for such three (3) year period. The cost of the preparation of all of the financial reports described herein, and the cost of the audit of the Annual Financial Report, shall be an Operating Expense.

4.14    Books and Records. Manager's services to Owner shall include keeping complete and adequate books and records for Owner of Owner's accounts and other records reflecting the results of the operation of the Hotel on an accrual basis, all in accordance with generally accepted accounting principles. All books of account and all other records relating to or reflecting the operations of the Hotel shall be maintained at the Hotel and shall be available to Manager and Owner, and their representatives, all at reasonable times for examination, audit, inspection and copying. Owner, or persons appointed by Owner, may, during ordinary business hours and upon at least twenty-four (24) hours' prior notice, examine all books, records and files maintained for Owner by Manager. Owner may perform any audit or investigation relating to Manager's activities either at the Hotel or at any office of Manager if such audit or investigation relates to Manager's activities for Owner. Should Owner or Owner's employees or representatives discover any errors in recordkeeping, Manager shall correct such discrepancies promptly upon discovery or within a reasonable period of time thereafter. Manager shall inform Owner in writing of the action taken to correct any audit discrepancies. If any audit reveals that Gross Operating Revenues have been understated or overstated by more than five percent (5%), the costs of such audit shall be borne by Manager; otherwise the costs shall be borne by Owner. Except as otherwise provided herein, none of such books and records, including without limitation books of account, guest records and front office records, shall be removed from the Hotel without Owner's prior written approval. Upon any termination of this Agreement, all of such books and records shall remain the property of Owner.

U.S. Bankruptcy Court - Hawaii  #11-02371  Dkt # 374  Filed  11/28/11  Page 35 of 61

4.15   Tax Assessments.  When requested by Owner, Manager shall from time to time render advice and assistance to Owner in the negotiation and prosecution of all claims for the reduction of real estate and other taxes or assessments affecting the Hotel.  Any out-of-pocket costs and expenses reasonably incurred in connection therewith shall be an Operating Expense.

4.16   Maintenance and Repair.  Subject to expenditures approved in the Annual Budget, Manager shall on behalf of Owner and at Owner's expense and for Owner's account cause the Hotel and its related improvements and landscaping and the Furniture, Fixtures and Equipment and appliances therefor to be maintained in good operating condition and repair as same would be for a First-Class Hotel and shall replace such items of the Furniture, Fixtures and Equipment as from time to time may be appropriate pursuant to Annual Budgets approved by Owner.  Manager, either with the prior written approval of Owner, or after reasonable but unsuccessful efforts to contact Owner, without Owner's consent, shall take reasonable steps to effect emergency repairs in situations which involve immediate risk of loss or damage or injury to the Hotel, its Furniture, Fixtures, Equipment or to person.  As soon as possible after the commencement of such repairs, Manager shall inform Owner of the problem and the steps taken to remedy the problem.  All such Furniture, Fixtures and Equipment, upon acquisition and installation, shall be and become, without further act, the property of Owner, and Owner shall furnish to Manager copies of any guarantees and warranties relating to any portions of the Hotel, and Manager agrees to enforce the terms thereof.  However, Manager shall not make any expenditures for the repair and replacement of the Furniture, Fixtures and Equipment or for maintenance and repair of the Hotel and its related improvements without Owner's prior written approval if such expenditures would be for items or services which would result in or cause a variation or change in the general interior design concepts previously approved by Owner for the Hotel.

4.17   Owner's Covenants.  Owner covenants that Manager may, until the termination of this Agreement, operate and manage and peaceably and quietly possess, occupy and use the Hotel, free from interference, eviction or disturbance by Owner, or by any person through whom Owner shall derive its title to or right to occupy and use the Hotel (in no event, however, shall such contract right be deemed to constitute an interest in real property), or by any other person or persons claiming any interest by, through or under Owner, except as otherwise provided herein.  Subject to the rights of Owner in this Agreement, Owner warrants operation, direction, management and supervision of the Hotel until termination of this Agreement in accordance with its terms.  Owner agrees to execute and deliver any and all applications, certificates and other documents as may be necessary or appropriate to obtain and maintain all licenses and permits required in connection with the operation of the Hotel and to cooperate with Manager to the fullest extent possible to obtain and maintain such licenses and permits.  Notwithstanding the foregoing or anything else herein to the contrary, Owner shall have the right to close the Hotel from time to time on a temporary basis to perform such renovations or other work in the Hotel as Owner may determine in its sole discretion, but not to exceed sixty (60) days during any consecutive three year period.

4.18   Dispute Resolution.  In the event the Owner and Manager do not resolve disputes over the Annual Operating Budget, or over the composition of the Hotel's Competitive Set, the parties mutually agree to engage a hotel industry company with Hotel expertise in such matters (the "Hotel Expert").  The conclusions of such Hotel Expert shall be binding on the parties to the Management Agreement, if such dispute involves a dollar amount below five percent (5%) of the Hotel's prior year Gross Operating Revenue results, (the "Budget Dispute Threshold").  Other

disputes, including budget disputes involving amounts greater than the Budget Dispute Threshold, shall be resolved in accordance with the terms of the Management Agreement.

4.19    Performance Standards.  The Manager shall be responsible for achieving certain performance thresholds (the "Performance Standards") for each Operating Year commencing in calendar year 2012, which is the first full year of operations of the Hotel after the Hotel's Opening Date.  The Performance Standards are based upon the Hotel meeting or exceeding both of the following thresholds: (i) the Gross Operating Profit threshold and (ii) the Competitive Hotels REVPAR threshold.  The Performance Standards, commencing for calendar year 2012, shall be as follows:

(a)    To achieve the threshold for Gross Operating Profit in each Operating Year, the Hotel's Gross Operating Profit for that Operating Year must be ninety percent (90%) or greater of the Annual Budget for that Operating year.

(b)    To achieve the Competitive Hotels REVPAR threshold in each Operating Year, the Hotel's REVPAR Index, as defined and tracked in a Smith Travel Research Report (or similar successor reporting company), shall meet or exceed the percentage set forth below of the average REVPAR Index of the Competitive Set of hotels:

| Operating Year | Competitive Set Hotels Average |
|---|---|
| 1st Operating Year | 85% |
| 2nd Operating Year | 90% |
| 3rd Operating Year and thereafter | 95% |

(c)    Manager shall have the right, up to a maximum of three (3) Operating Years during the entire Operating Term to cure the Gross Operating Profit Test in any given Operating Year by making payment to Owner in the amount needed to meet the Gross Operating Profit threshold in the Annual Budget for such Operating Year.

## ARTICLE 5
## OPERATING FEES

During the Operating Term, Manager shall be entitled to receive Operating Fees as follows:

5.1    Base Fee.  Manager shall receive a base fee equal to two percent (2%) of Gross Operating Revenues ("Base Fee") until January 1, 2012.  Thereafter, the Base Fee shall be equal to two and one-half percent (2.5%) of the Gross Operating Revenues if Manager meets or exceeds the Competitive Hotels REVPAR test set forth in Paragraph 4.20 (c) or shall remain equal to two percent (2%) if Manager does not meet such test.  The Base Fee shall be paid by Manager to itself monthly from the Hotel Operating Account upon presentation to Owner of the Monthly Report.

5.2    Incentive Fee.  In addition to the Base Fee, Manager shall be entitled to receive an annual incentive equal to (i) five percent (5%) of the amount of Gross Operating Profit that exceeds the projected Gross Operating Profit set forth in applicable year's Annual Budget and (ii) ten percent (10%) of the amount of the Gross Operating Profit that exceeds one hundred ten percent (110%) of the amount of the projected Gross Operating Profit set forth in applicable year's Annual Budget ("Incentive Fee").  In the event Manager is entitled to receive a greater or lesser Incentive Fee for the

U.S. Bankruptcy Court - Hawaii  #11-02371  Dkt # 374  Filed 11/28/11  Page 37 of 61

year than the monthly installments of Incentive Fee actually received during the year, the parties shall, within thirty (30) days thereafter make such payment or reimbursement between them as may be required to provide Manager with the Incentive Fee due to Manager for the year based on the Gross Operating Profit reflected in the Annual Financial Report.

     5.3    <u>Reimbursable Costs</u>.  In addition to management fees and Marketing Services Fees payable to Manager, Manager shall also receive payment for Reimbursable Costs incurred by Manager as set forth in the Monthly Report.  Manager shall reimburse itself for Reimbursable Costs monthly from the Hotel Operating Account.  Manager shall also be entitled to reimbursement of reasonable pre-approved travel expenses for Manager's employees to and from the Hotel as directed by Owner. Reasonable travel shall be deemed to be not more than one trip for one person in any three (3) month period using normal commercial travel.  Reimbursable Costs are subject to cap of one percent (1%) of the Gross Operating Revenues plus costs attributable to sales and marketing, financial services and reservation costs not to exceed the amounts approved in the Annual Budget for each Operating Year as set forth in Section 2.30.

## ARTICLE 6
## INDEMNIFICATION

     6.1    <u>Manager's Indemnification</u>.  Manager agrees to indemnify, defend and hold Owner harmless from and against any and all claims, damages, liabilities, actions, suits (whether civil or criminal), costs and expenses (including attorneys' fees), or injuries to persons or damage to property, resulting from or arising out of (i) the fraud, negligence or willful misconduct on the part of Manager, its agents and/or employees, (ii) Manager's breach of any of the representations or covenants contained in this Agreement (including, but not limited to, any failure by Manager to perform its duties hereunder), and/or (iii) Manager's violation of any applicable laws or government regulations, provided, however, that Manager shall not be responsible for any fines or assessments arising from violation of applicable liquor law,  rules or regulations of which Manager was not previously aware.  It is expressly understood between the parties that the provisions of this paragraph shall survive the termination of this Agreement.

     6.2    <u>Owner's Indemnification</u>.  Owner agrees to indemnify, defend and hold Manager, as well as Manager's members and affiliates, and officers, directors, agents and employees and others acting on their behalf, harmless from and against any and all claims, damages, liabilities, actions, suits (whether civil or criminal), costs and expenses (including interest, fines, taxes and reasonable attorneys' fees), or injuries to persons or damage to property, resulting from or arising out of (i) all costs and expenses incurred in the operation of the Hotel pursuant to the terms hereof, (ii) the fraud, negligence or willful misconduct on the part of Owner, its agents and/or employees, (iii) Owner's breach of any of the representations or covenants contained in this Agreement (including, but not limited to, any failure by Owner to perform its duties hereunder), (iv) any claims brought by Marriott Hotel Services, Inc. ("Marriott") related to the termination of the management agreement between Owner and Marriott for the management of the Hotel; (v) any amounts determined to be due and owing to any labor organization or Hotel employees under any applicable collective bargaining agreements relating to the Hotel, and/or (vi) Owner's violation of any applicable laws or government regulations.  It is expressly understood between the parties that the provisions of this paragraph shall survive the termination of this Agreement.

U.S. Bankruptcy Court - Hawaii  #11-02371  Dkt # 374  Filed  11/28/11  Page 38 of 61

## ARTICLE 7
## INSURANCE

7.1     Owner's Insurance.  During the term of this Agreement, Owner shall take out, renew and maintain the following insurance:

(a)     Such business interruption insurance as determined by Owner and in amounts reasonably approved by Manager, which coverage includes Manager as an insured and covers Manager's lost income;

(b)     Fire and extended coverage insurance (including pressure vessel coverage) for the Hotel in a minimum amount in Owner's reasonable discretion;

(c)     Property insurance coverage on the Hotel's building and contents against loss or damage.  Such coverage, to the extent available on commercially reasonable rates, terms and conditions, shall be for not less than one hundred (100%) of the replacement costs thereof, less a reasonable deductible and subject to commercially reasonable sub-limits.  Flood insurance, to the extent such coverage is excluded or sub-limited, from the Property Insurance shall be obtained having minimum limits in Owner's reasonable discretion;

(d)     Premises Generally Liability with minimum amounts in Owner's reasonable discretion; and

(e)     Such insurance as the holder of any Mortgage reasonably requests or Owner otherwise reasonably requests, including terrorism insurance.

7.2     Manager's Insurance.  During the term of this Agreement, Manager shall take out, renew and maintain the following insurance:

(a)     Commercial general liability insurance against claims for bodily injury, death and property damage occurring in conjunction with the Operations of the hotel, and automobile liability insurance on vehicles operated in conjunction with the Hotel, with a combined single limit for each occurrence of not less than fifty million dollars ($50,000,000);

(b)     Workers' compensation coverage as may be required under applicable laws covering all of the personnel employed by the Manager at the hotel, and employer's liability insurance of not less than One Million Dollars ($1,000,000) per accident/disease;

(c)     Fidelity bond coverage in an amount not less than One Million Dollars ($1,000,000) covering Manager's employees at the Hotel;

(d)     Employment practices liability insurance covering Manager's employees at the Hotel, to the extent available at commercially reasonable rates and terms, in an amount not less than One Million Dollars ($1,000,000); and

(e)     Such other insurance in amounts as determined by Manager, and approved by Owner in its reasonable discretion, deemed advisable for protection against claims, liabilities and losses arising out of or connected with the operation of the Hotel.

7.3     Named Insureds.  Owner, and the holder of any Mortgage (and their designees) shall be party-insureds as their interest may appear and as may be permissible under applicable law, under all policies provided in Section 7.2 hereunder.  Manager shall be named as an additional named insured under Owner's premises generally liability policy provided in Section 7.1(d) hereunder.  Upon request, Manager or Owner shall promptly provide each other with certificates of insurance, an/or certified copies of the policies procured.

7.4     Cancellation Notice.  Copies of the policies of all such insurance shall be furnished to Owner.  Such insurance shall provide that these policies may not be canceled, materially altered or the coverage terminated without thirty (30) days prior written notice to both parties.  All insurance coverage shall be placed with such companies, in such amounts and with such beneficial interests appearing therein, as shall be acceptable to Owner and otherwise in conformity with the requirements of any Mortgage.

7.5     Report.  Manager shall, on behalf of Owner, promptly investigate all accidents made known to Manager and make a full written report to Owner as to all material claims for damages relating to the ownership, operation and maintenance of the Hotel as soon as such claims shall become known to Manager.  Manager shall also make a full written report with respect to any damage or destruction to the Hotel and the estimated cost of repair thereof as soon as such information shall become known to Manager.  Thereafter, Manager shall prepare for approval by Owner any and all reports required by any insurance company in connection therewith.  All such reports shall be filed with Owner promptly.  Manager shall not settle any material claims for personal injury or property damage nor hire any attorney to defend any such claim against owner or Hotel without Owner's written consent.

7.6     Waiver of Subrogation.  Manager agrees to have all such policies of insurance provided that the insurance company will have no right of subrogation against Owner or Manager, or the agents or employees thereof and that Owner and/or Manager may waive their right of subrogation as against third parties.

7.7     Blanket Insurance.  Manager and Owner shall have the right to include any such insurance policies in any blanket insurance policies or program available to Manager or Owner so long as such insurance otherwise satisfies the insurance requirements of this Article.

7.8     Operating Expense.  In accordance with Section 2.22(f) the cost of all such policies shall be an Operating Expense.

## ARTICLE 8
## BANK ACCOUNTS

8.1     Hotel Operating Account.  All funds received from the operation of the Hotel shall be promptly deposited by Manager into the Hotel Operating Account.

(a)     Only Owner and Manager's primary financial officer, or persons expressly designated by Owner and Manager, shall have the right to withdraw funds from the Hotel Operating Account.

U.S. Bankruptcy Court - Hawaii  #11-02371  Dkt # 374  Filed  11/28/11  Page 40 of 61

(b)     On or before the last day of each calendar month, Owner shall deposit in the Hotel Operating Account an amount sufficient for the payment of the projected Operating Expenses of the Hotel for the next calendar month and to allow retention of the adequate cash reserve as reasonably determined by Owner and in accordance with the Annual Budget and the Monthly Cash Flow Forecast. Out of said account there shall be paid, on behalf of Owner, all Operating Expenses, subject to all of the terms and provisions of this Agreement. Owner hereby agrees to grant the authority to sign checks on or other documents of withdrawal from the Hotel Operating Account for such payments to the Hotel's General Manager or his designees (not to exceed the five (5) persons), provided all such persons shall be identified to Owner and, upon request of owner, covered by a surety bond or otherwise adequately insured.

8.2     <u>Distributions to Owner</u>.  On the last day of each calendar month during each Operating Year, a distribution from the Hotel Operating Account shall be made to Owner equal to the amount of cash in the Hotel Operating Account on such date, less an amount equal to a reasonable reserve for anticipated Working Capital that will be required by the Manager pursuant to the terms of this Agreement before additional Gross Operating Revenue will provide funds therefore. The amount of such reserve shall be determined by reference to the applicable Annual Budget and Monthly Cash Flow Forecast approved by Owner.

8.3     <u>Hotel Capital Improvement Reserve Account</u>.  Owner agrees to initially equip and furnish such Hotel in accordance with such Operating Standards, and to make annual deposits to a segregated account ("Reserve Account"), and to undertake other capital expenditures expressly approved by Owner in the Annual Budget; or as otherwise required due to legal or emergency requirements.

(a)     Deposits from Gross Operating Revenues shall be deposited by the Manager on an annual basis (or at Owner's option more frequently) into the Reserve Account as follows:

(i)     One percent (1%) of Gross Operating Revenues in for the period ending on the first full Operating Year after the Opening Date;

(ii)     Two percent (2%) of Gross Operating Revenues in the second Operating Year after the Opening Date;

(iii)     Three percent (3%) of Gross Operating Revenues in the third Operating Year after the Opening Date; and

(iv)     Four percent (4%) of Gross Operating Revenues in the fourth Operating Year after the Opening Date and thereafter.

(b)     Such above stated amounts shall be subject to any applicable requirements of Hotel's lender; provided that if the required amounts of lender are less than the above-stated annual percentages, such above-stated amounts shall govern.

(c)     If such above stated amounts not be sufficient to keep the Hotel in first class operating condition, Owner may increase the contribution or Manager may request a new list of Competitive Set of hotels.

(d)     The Reserve Account shall be designated for capital improvements and for the purpose of making replacements, substitutions and revisions to Furniture, Fixtures and Equipment. Except as otherwise specified, the Reserve Account shall be used solely for the purposes in this Paragraph. All funds in the Reserve Account are to be expended according to the Annual Budget and any funds in excess of the Annual Budget shall be carried over for the next Operating Year Reserve Account. Any expenditure for replacement or substitution of or addition to Furniture, Fixtures and Equipment during each Operating Year may be made by Manager from the Reserve Account without Owner's consent up to the amount included in an approved Annual Budget. All proceeds from the sale of Furniture, Fixtures and Equipment no longer needed for the operation of the Hotel shall be used to reduce the amount to thereafter budgeted and reserved for the Reserve Account. Any expenditure in excess of the approved Annual Budget shall be subject to the Owner's prior written approval.

## ARTICLE 9
## TRANSFER OF OWNERSHIP

9.1     <u>Manager</u>. This Agreement is for the personal services of Manager, and Manager shall not assign this Agreement or any of its rights hereunder; nor shall this Agreement or any of Manager's rights or obligations hereunder be transferable on Manager's part (i) by reason of the sale of all of substantially all of the assets or stock of Manager or of a controlling interest in Manager; (ii) by reorganization, merger or consolidation, or (iii) by operation of law or otherwise.

9.2     <u>Owner</u>. Subject to Paragraph 11.3, Owner shall have the right to sell, pledge, transfer or convey the Hotel, without the consent of Manager and Manager agrees to cooperate with Owner and its proposed transferee in connection with any such sale, pledge, transfer or conveyance. Owner shall have the right to assign its interest in this Agreement in connection with a sale or conveyance of the Hotel. After the effective date of any such sale or conveyance, and assignment and assumption of this Agreement, Owner shall be relieved and released of any obligations, responsibilities or liabilities arising out of or in connection with the Hotel or this Agreement.

## ARTICLE 10
## OPERATING TERM

The Operating Term shall commence on the date Manager commences to operate and manage the Hotel ("Commencement Date") and shall expire on the fifth (5th) anniversary of the Commencement Date ("Initial Term"); provided, however, there shall be an automatic extension of the Operating Term for two (2) additional five (5) Operating Year terms unless Manager or Owner gives written notice to terminate ninety (90) days prior to the expiration of the Operating Term, as may have been extended; provided further, however, that upon a sale or refinance during the initial four (4) Operating Years of the Initial Term, Owner may extend the Initial Term in order that, effective upon completion of the sale of refinance, the total remaining years of the Initial Term is five (5) years.

101602665.3 / 23771-14
Hotel Management Agreement
M Waikiki LLC

U.S. Bankruptcy Court - Hawaii  #11-02371  Dkt # 374  Filed  11/28/11  Page 42 of 61

# ARTICLE 11
## TERMINATION

11.1 <u>For Cause</u>. This Agreement may be terminated by Owner or Manager, without the payment of any termination fee, upon the occurrence of any of the following events:

(a) By Owner, following written notice to Manager specifying the default and the expiration of thirty (30) days thereafter without a cure of the default, or, if such default cannot be cured within thirty (30) days but is susceptible to cure, then such additional period as shall be reasonable not in any event to exceed sixty (60) days, provided Manager has commenced to cure such default during such thirty (30) day period and continuously, diligently and in good faith pursues such cure to completion, or, in the event of a failure of Manager to pay any amount to Owner provided for herein for a period of thirty (30) days after notice that such payment is due and payable.

(b) By Manager, following written notice to Owner specifying the default and the expiration of thirty (30) days thereafter without a cure of the default, or, if such default cannot be cured within thirty (30) days but is susceptible to cure, then such additional period as shall be reasonable not in any event to exceed sixty (60) days, provided Owner has commenced to cure such default during such thirty (30) day period and continuously, diligently and in good faith pursues such cure to completion, or, in the event of a failure of Owner to pay any amount to Manager provided for herein for a period of thirty (30) days after notice that such payment is due and payable.

(c) By Owner or Manager, as the case may be, in the event the other files a voluntary petition in bankruptcy or insolvency or a petition for reorganization under any bankruptcy law.

(d) By Owner or Manager, as the case may be, in the event the other consents to an involuntary petition in bankruptcy or fails to vacate within sixty (60) days from the date of entry thereof of any order approving an involuntary petition.

(e) By Owner or Manager, as the case may be, in the event the other has entered against it an order, judgment or decree by any court of competent jurisdiction, on the application of a creditor, adjudicating the other a bankrupt or insolvent or approving a petition seeking reorganization or appointing a receiver, trustee or liquidator of all or a substantial part of such party's assets, and such order, judgment or decree shall continue unstayed and in effect for a period of one hundred twenty (120) consecutive days.

(f) By Owner in the event of the taking of the entire or a substantial portion of the Hotel through lawful condemnation proceedings by any governmental authority.

(g) By Owner in the event title or possession of the Hotel is transferred to a mortgagee (or its designee) or to a purchaser at foreclosure or to a subsequent purchaser from the mortgagee, as described in Paragraph 12.2(b).

(h) By Owner or Manager, as the case may be, following written notice to defaulting party specifying the default and the expiration of thirty (30) days thereafter without a cure of the default, in the event of a material failure of the other to perform, keep or fulfill any of the other material covenants, undertakings, obligations or conditions set forth in this Agreement.

101602665.3 / 23771-14
Hotel Management Agreement
M Waikiki LLC

8/28/11

U.S. Bankruptcy Court - Hawaii #11-02371 Dkt # 374 Filed 11/28/11 Page 43 of 61

(i)     By Owner upon sixty (60) days prior written notice to Manager if, absent a Force Majeure Event, Manager fails to meet or cure, in accordance with Paragraph 4.19, the Performance Standards in any Operating Year commencing with the second full Operating Year after the Opening Date; provided Owner notifies Manager of such termination within ninety (90) days from Owner's receipt of the Annual Budget and Financial Reports pursuant to Paragraph 4.9.

(j)     By Manager, upon sixty (60) days prior written notice to Owner in the event Manager, its member or any of its affiliates or their respective officers, directors or employees are named as parties in any litigation involving the former manager of the Hotel and are not dismissed from such litigation within one hundred and twenty (120) days thereafter.

(k)     By Manager, upon thirty (30) days prior written notice to Owner if Manager reasonably believes that Manager, as a result of actions taken at Owner's directions, is or will become obligated to pay for union benefits or is or will be subject of collective bargaining efforts at properties other than the Hotel.

11.2     Notice.  Upon the occurrence of any such event, the terminating party may give the other party notice of its intention to terminate the Operating Term after the expiration of a period of thirty (30) days from the date of such notice and, upon the expiration of such period, the Operating Term shall expire.

11.3     Without Cause.  Notwithstanding Paragraph 11.1 and 11.2, Owner may terminate this Agreement without cause for any reason or for no reason or upon (a) giving Manager sixty (60) days written notice of its intention to terminate this Agreement or to sell the Hotel and (b) paying to Manager the following termination fee concurrently with the termination date:

(a)     In the event of termination of the Manager, without cause, as a result of the sale of the Hotel, the Manager shall be entitled to an amount equal to the Base Fee for the three (3) month period immediately preceding the termination plus all outstanding fees due and owing at the time of the sale.

(b)     In the event of the termination of the Manager, without cause, and not in conjunction with a sale of the Hotel, the Manager will be entitled to the following termination fee:

(i)     If the termination takes place in Operating Years 1-5, an amount equal to the Base Fee payable to Manager for the six (6) month period immediately preceding the termination plus all outstanding fees due and owing at the time of the sale; and

(ii)     If the termination takes place in Operating Years 6 and beyond, an amount equal to the Base Fee payable to Manager for the three (3) month period immediately preceding the termination.

11.4     Rights Not Limited.  The rights granted hereunder shall not be in substitution for, but shall be, except as otherwise provided in this Agreement, in addition to any and all rights and remedies at law or in equity.  Notwithstanding anything herein seemingly to the contrary, the outstanding balance of all accrued but unpaid fees then due Manager shall be immediately due and payable upon any termination of this Agreement without cause.

U.S. Bankruptcy Court - Hawaii  #11-02371  Dkt # 374  Filed  11/28/11  Page 44 of 61

11.5    Termination for Any Reason.  Upon termination of this Agreement for any reason:

(a)    Neither Manager nor Owner shall contest or dispute the effectiveness of the termination.

(b)    Manager shall have seven (7) days after termination in which Manager shall remove its own property from the Hotel.

(c)    Manager shall leave the Hotel in a clean and orderly condition.

(d)    Manager shall, in connection with the termination of this Agreement, surrender and assign to Owner and Owner shall assume any and all licenses, permits and/or other authorizations or property required for the operation of the Hotel in accordance with directions of Owner and with applicable governmental laws, regulations, orders or other provisions.

(e)    Manager shall deliver to Owner any and all equipment, supplies, keys, lock and safe combinations, reservations lists, ledgers, bank statements for operating accounts, budgets, accounting books and records, insurance policies, binders and other documents, memoranda, schedules, lists, contracts, agreements, correspondence, records and other properties required for the operation of the Hotel, including cash, and/or required to be developed, maintained or kept by Manager pursuant to the terms and provisions of this Agreement.  Without limiting the foregoing, Manager shall deliver to Owner and Owner shall assume all utility contracts, service contracts, leases, licenses, and other contracts entered into in connection with the operation of the Hotel and all warranty contracts, warranty cards, operating instructions and other information and guarantees concerning all equipment installed in or used in connection with the operation of the Hotel.  Any and all contracts, leases, licenses, warranties, guarantees, bank accounts and other Hotel assets which are held in Manager's name shall be assigned by Manager to Owner, and Manager and Owner agree to execute and deliver such instruments of assignment and assumption in connection therewith in such form and in such descriptions as may be from time to time requested by Owner or Manager after termination of this Agreement.

(f)    Manager shall account to Owner as of the date of termination for all amounts expended by Manager from the Hotel Operating Account or otherwise.  Such accounting shall be done in a manner consistent with the terms and provisions of this Agreement.

## ARTICLE 12
## TITLE, MORTGAGES, ETC.

12.1    Title.  Notwithstanding any other agreements in effect between Owner and Manager or Manager's affiliates, this Agreement shall not be deemed at any time to be an interest in real estate or a lien or security interest of any nature against the Hotel, any land used in connection with the Hotel, including, without limitation any equipment, fixtures, inventory, motor vehicles, contracts, documents, accounts, notes, drafts, acceptances, instruments, chattel paper, general intangibles or other personal property existing or that may hereafter be acquired or entered into with respect to the Hotel or operation thereof.  Without the consent of the Owner, neither this Agreement nor any memorandum thereof shall be recorded in Official Records.  Except as described herein, the right of Manager shall at all times be subject and subordinate to all Mortgages, security agreements and other

U.S. Bankruptcy Court - Hawaii   #11-02371   Dkt # 374   Filed   11/28/11   Page 45 of 61

security instruments which are now or may hereafter be outstanding and to all renewals, modifications, rearrangements, consolidations, replacements and extensions thereof.

12.2 <u>Mortgages</u>. Owner shall have the right, at any time and from time to time, to borrow funds for any purpose whatsoever using the Hotel and related assets as security for the repayment of such borrowing by subjecting all or any part thereof to a Mortgage or other security instrument or agreement and shall have the right to increase the amount of any such borrowing by obtaining additional borrowing and/or by refinancing apart of all or any then existing borrowing. This Agreement, including any and all extensions, renewals, replacements or modifications thereof or thereto, and all right and interest of Manager in and to the Hotel, shall be subject and subordinate to the interests of any current or future mortgagee. Manager agrees (i) to provide to any mortgagee of which it has received notice a copy of all notices of default or other material notices delivered under this Agreement at the time of delivery of such notices to Owner and (ii) that any mortgagee shall have the right to cure any default by Owner on behalf of Owner.

(a) Manager agrees to timely execute any documents reasonably requested by a mortgagee, including estoppel certificates, acknowledgements of the mortgagee's rights, subordinations of Manager's right to payment hereunder to the obligations of Owner under any such financing documents, and such other documents as a mortgagee may reasonably require for the protection of its interests in connection with such financing (the "Financing Documents"). Such Financing Documents may provide, without limitation, that upon a foreclosure of the mortgage(s) held by the mortgagee, the transfer of the Hotel to the mortgagee by deed in lieu of foreclosure or other exercise by the mortgagee of its remedies in respect of a default under the financing, in connection with which title or possession of the Hotel is transferred to the mortgagee (or its designee) or to a purchaser at foreclosure or to a subsequent purchaser from the mortgagee (or from its designee) (all of the foregoing shall collectively be referred to as "Subsequent Owners"), the Subsequent Owners would have the right to terminate this Agreement upon such shorter, or no, notice as may be provided therein.

(b) If compliance by Manager, in good faith, with any Financing Document would otherwise cause a breach by Manager of any provision of this Agreement, Manager shall comply with the Financing Document, and shall not be deemed to have breached this Agreement.

12.3 <u>Estoppel Certificates</u>. Within ten (10) days after request therefore, Owner or Manager, as the case may be, shall deliver to the other or any prospective lender, prospective purchaser or other person designated by Owner or Manager, as the case may be, an estoppel certificate stating the following (or to the extent not true, stating any exceptions):

(a) That this Agreement is in full force and effect and has not been amended;

(b) To the best knowledge of the person providing such estoppel certificate, that the other party to this Agreement is not in default under this Agreement;

(c) The date through which the Base Fee and the Incentive Fee have been paid to Manager and

(d) Such other matters respecting this Agreement as may be reasonably requested.

U.S. Bankruptcy Court - Hawaii   #11-02371   Dkt # 374   Filed   11/28/11   Page 46 of 61

## ARTICLE 13
## MISCELLANEOUS

13.1 <u>Name and Identification</u>. The Hotel shall be operated under the name chosen by Owner. Notwithstanding the foregoing, Owner may change the name and identification of the Hotel. All names, logos and designs used at the Hotel, together with pertinent good will, shall be the exclusive property of Owner ("Owner-Owned Names"). Accordingly, Manager agrees that no right or remedy of Manager for any default on the part of Owner under this Agreement shall, nor shall any provision of this Agreement, confer upon Manager or its successors or assigns the right to use Owner-Owned Names except in the operation of the Hotel. In the event of any breach of this covenant by Manager, Owner, in addition to any remedies available to it under this Agreement or at law or in equity, shall have the right to injunctive relief. Owner recognizes that the marks AQUA and AQUA HOTELS & RESORTS are marks owned by Manager's affiliate and agrees that nothing in this Agreement, or otherwise, confers upon Owner or its successors or assigns any right to use these marks, or others that are likely to be confused therewith, except as the parties may agree to use such marks in the operation of the Hotel.

13.2 <u>Severability</u>. If any term or provision of any Article or paragraph of this Agreement or the application thereof to any persons or circumstances shall be to any extent or for any reason be invalid or unenforceable, the remainder of this Agreement and the application of such term or provision to persons or circumstances other than those as to which it is held invalid or unenforceable shall not be affected thereby, and each term and provision of any Article and paragraph of this Agreement shall be valid and enforced to the fullest extent permitted by law.

13.3 <u>Notices and Payments</u>. All notices, demands and other communications required or permitted under the provisions of any Article or paragraph of this Agreement shall be in writing, unless otherwise specified, sent by telegram or by registered or certified first-class air mail, postage prepaid, return receipt requested, to the party or parties herein specified to receive such notices, demands or other communications at the following addresses.

      (a)    As to Manager:

            c/o Aqua Hotels & Resorts
            1860 Ala Moana Blvd. Suite 411
            Honolulu, HI 96815
            Attn: Ben Rafter

      (b)    As to Owner:

            c/o eRealty Fund LLC
            12250 El Camino Real Ste 220
            San Diego, CA 92130
            Attn: Damian McKinney

and to such other address as the party to whom the notice is sent shall have designated in writing in accordance with the provisions of this paragraph.

U.S. Bankruptcy Court - Hawaii  #11-02371  Dkt # 374  Filed  11/28/11  Page 47 of 61

13.4 <u>Successors and Assigns</u>. This Agreement shall be binding upon the heirs, personal representatives, successors and assigns of the parties hereto; provided, however, this provision shall not be deemed to authorize the assignment or other transfer of this Agreement which may only be accomplished as expressly provided herein.

13.5 <u>No Waiver</u>. No failure by Manager or Owner to insist upon strict performance of any covenant, agreement, term or condition of this Agreement or to exercise any right or remedy consequent upon a breach thereof, shall constitute a waiver any such breach or any subsequent breach of such covenant, agreement, term or condition. No covenant, agreement, term or condition of this Agreement and no breach thereof shall be waived, altered or modified except by written instrument. No waiver of any breach shall affect or alter this Agreement, but each and every covenant, agreement, term or condition of this Agreement shall continue in full force and effect with respect to any other than existing or subsequent breach thereof.

13.6 <u>Estoppel Certificates</u>. Upon request of either party, the other party shall execute a certificate stating whether or not this Agreement is in full force and effect, whether or not there are any uncured defaults hereunder, and whether or not all sums due and owing hereunder have been paid.

13.7 <u>Amendments</u>. This Agreement constitutes the entire agreement between the parties hereto regarding the subject matter covered hereby and no modifications or amendments hereto shall be effective unless in writing and signed by both of the parties hereto.

13.8 <u>Choice of Law; Venue</u>. This Agreement shall be interpreted in all respects in accordance with the internal laws of the State of California without regard to conflict of law provisions. Venue of all actions arising hereunder shall be in San Diego County, California.

13.9 <u>Arbitration</u>.

(a) Except as set forth in Paragraph 4.18, in each case in which a dispute arises under this Agreement, if any claim, dispute or difference of any kind whatsoever (a "Dispute") shall arise out of or in connection with or in relation to this Agreement whether in contract, tort, statutory, or otherwise, and including any questions regarding the existence, scope, validity, breach or termination of this Agreement, the parties shall first attempt to settle such Dispute by participating in at least five (5) hours of mediation, which mediation shall take place at the principal place of business of the Owner and shall be administered by JAMS (or if JAMS no longer exists, another mutually acceptable alternative dispute resolution provider) (the "ADR Provider"). The complaining party must notify the other party that a Dispute exists and then contact the ADR Provider to schedule the mediation conference, which conference shall take place no later than fourteen (14) days after the complaining party notifies the other party that a Dispute exists. A designated individual mediator who is a member in good standing of the ADR Provider will then be mutually selected by the parties to conduct the mediation; provided that such mediator must have at least 10 year experience as a mediator and must not have any conflict of interest (the "Mediator"). If the parties are unable to agree upon the identity of the Mediator within five (5) days after the complaining party has notified the other party that a Dispute exists, then, subject to the requirements of this Section, the ADR Provider shall select a qualified mediator of its choosing who shall act as the Mediator of the Dispute. The mediation will be a nonbinding conference between the parties conducted in

U.S. Bankruptcy Court - Hawaii  #11-02371  Dkt # 374  Filed  11/28/11  Page 48 of 61

accordance with the applicable rules and procedures of the ADR Provider. Neither Party may initiate litigation or arbitration proceedings with respect to any dispute until the mediation of such dispute is complete. Any mediation will be considered complete: (i) if the parties enter into an agreement to resolve the dispute; or (ii) if the dispute is not resolved after completion of five (5) hours of such mediation. The parties shall share equally in the cost of the mediation.

(b)     If any dispute remains between the parties after the mediation is complete, then the dispute shall be submitted to final and binding arbitration pursuant to the procedures set forth in this Section 13.9. The parties agree that the Arbitrator (as defined herein) shall have the power to order equitable remedies, including specific performance and injunctive relief.

(c)     An arbitral tribunal of one arbitrator (the "Arbitrator") shall be established in conformity with the Comprehensive Arbitration Rules and Procedures of JAMS or such other rules of a successor ADR provider mutually agreed by the parties (the "Rules") in effect at the time such arbitration is commenced. Each party shall appoint a person to appoint the Arbitrator within fifteen (15) days of the date of a request to initiate arbitration, and the two appointed person will then jointly appoint the Arbitrator (provided that the Arbitrator shall not be the same person as the Mediator) within fifteen (15) days of the date of the appointment of the second person, to act as the Arbitrator. Appointed person or the Arbitrator not appointed within the time limits set forth in the preceding sentence shall be appointed by the ADR Provider. In rendering a decision hereunder, the Arbitrator shall take into account the Operating Standards of the Hotel and other applicable provisions of this Agreement.

(d)     The final hearing relating to any dispute in arbitration must be commended within sixty (60) days after the completion of the mediation. The arbitration, regardless of the amount in dispute, shall be conducted in accordance with the Rules. The parties agree that Rule 31 of the Rules shall apply to each Dispute subject to arbitration. Any arbitration shall take place in San Diego, California. The arbitrators shall apply the substantive law of California (exclusive of choice of law principles) in resolving the Dispute. Issues relating to the conduct of the arbitration and enforcement of any award shall be governed by the Federal Arbitration Act, 9 U.S.C. §§1-16. No party to any Dispute shall be required to join any other Person as a party to the Dispute pursuant to the arbitration provisions set forth in this Section 13.9.

(e)     Except as expressly required by applicable law, the Arbitrator's monetary awards shall include a requirement that the losing party bear attorneys' fees and costs of the arbitration proceeding. Any monetary award shall be in dollars of the United States of America. The award rendered in any arbitration commended hereunder shall be final and binding upon the parties, and each party herby waives any claim or appeal whatsoever against it or any defense against its enforcement.

(f)     The obligation to arbitrate under this Section 13.9 is binding on the parties, successors and assigns. For purposes of appointing persons to appoint the arbitrator, any party, successors and assigns shall jointly appoint such party's appointer.

(g)     Until such time as a final determination of any Dispute is obtained pursuant to this Section 13.9 and, notwithstanding any termination of or default under, or alleged termination of or default under, this Agreement, all parties to this Agreement involved in such Dispute shall remain

U.S. Bankruptcy Court - Hawaii  #11-02371  Dkt # 374  Filed  11/28/11  Page 49 of 61

labile for, and shall be required to continue to satisfy, their respective obligations under this Agreement. For purposes of resolving any dispute relating to the Annual Plan or the Operating budget, the Arbitrator shall be obligated or render a final decision within one hundred twenty (120) days following the date that the Arbitrator has been appointed.

13.10   Ground Lease. Notwithstanding any other terms to the contrary, so long as Manager continues to receive Substantially Similar Revenues, Owner may separate the fee ownership of the land from the building improvements in accordance with a ground lease.

13.11   Confidentiality. To the extent allowed by law, the parties agree to keep confidential the terms and conditions set forth in this Agreement, and all discussions and negotiations pursuant to this Agreement. Any public announcement indicating the association of Manager with the Hotel or vice versa, and the timing of such announcements must be mutually approved by Owner and Manager in advance.

13.12   Counterparts. This Agreement may be executed in counterparts, each of which shall be deemed to be an original, but all of which taken together shall constitute one and the same Agreement. The facsimile signatures of the parties shall be of the same force and effect as an original signature.

IN WITNESS WHEREOF, the parties hereto have hereunto executed and sealed this Agreement as of the day and year first above written.

**MANAGER**:

MODERN MANAGEMENT SERVICES, LLC, a Hawaii limited liability company

By: _____

Name: BENJAMIN RAFTER

Title: DIRECTOR

**OWNER**:

M WAIKIKI LLC, a Hawaii limited liability company

By:      eRealty Fund, LLC, a California limited liability company, its Manager

By: _Damian M'Kinney_

Name: _Damian M'Kinney_

Title: _Manager_

U.S. Bankruptcy Court - Hawaii  #11-02371  Dkt # 374  Filed  11/28/11  Page 50 of 61

EXHIBIT "A"

Premises

[To Be Attached]

EXHIBIT "A"

U.S. Bankruptcy Court - Hawaii   #11-02371   Dkt # 374   Filed  11/28/11   Page 51 of 61

## PROPERTY DESCRIPTION

All of that certain parcel of land situate at Kalia, Waikiki, Honolulu, City and County of Honolulu, State of Hawaii, described as follows:

LOT 1-B, area 71,516 square feet, as shown on Map 2. filed in the Office of the Assistant Registrar of the Land court of the State of Hawaii with Land Court Consolidation No. 64 of Ala Moana properties, Limited;

Together with a perpetual easement appurtenant to said Lot I-B for the construction, use and maintenance for storm drain purposes only over, across or under Lot 25, as shown on Map 4 of Land Court Consolidation
No. 32 of Bishop Trust Company, Limited, Trustee for Hobron Land Trust;

Together also with a perpetual non-exclusive easement appurtenant to Lot I-B for pedestrian and vehicular traffic over and across Lot 23, as shown on said Map 4;

Together with a perpetual overhead easement over and across Lot l-C and a perpetual easement under, over and across said Lot 1-C for utility, communications, sewer and other like purposes; said easements shall be utilized by the owner of the above described premises in a manner which will not interfere with the free flowage of vehicular and pedestrian .traffic on said lot;

Together also with the right to construct, repair, replace, maintain and improve for and on behalf of the state of Hawaii, the following:

(a) An elevated pedestrian right-of-way over Lot 25, as shown on Map 4 of Land court Consolidation No. 32,
(b) One elevated public pedestrian overpass extending from said elevated public pedestrian right-of-way in (a} hereinabove, provided however, the said overpass may be relocated with the approval of the State of Hawaii;

Together with the foundations and columns to support the structures in subparagraphs (a) and (b) hereinabove, and1 also, together with the installation, repair, replacement, and maintenance of utilities and other similar appurtenances in conjunction with the structures mentioned in said sub-paragraphs (a) and (b),

As granted and reserved by Land Court Document No. 324984, and subject to the conditions contained in said Document.

Being land(s} described in Transfer certificate of Title No. 813,270 issued to M WAIKIKI LLC, a Hawaii limited liability companly

EXHIBIT "B"

Competitive Set

[To Be Attached]

l01602665.3
U.S. Bankruptcy Court - Hawaii   #11-02371   Dkt # 374   Filed  11/28/11   Page 53 of 61

Exhibit B
Competitive Set

- Moana Surfrider
- Royal Hawaiian
- Halekulani
- Kahala
- JW Marriott Ihilani
- Waikiki Parc

EXHIBIT "C"

Initial Year Budget

[To Be Attached]

EXHIBIT "C"

U.S. Bankruptcy Court - Hawaii   #11-02371   Dkt # 374   Filed  11/28/11   Page 55 of 61

Exhibit C

**The Modern Honolulu**

Statement of Income
Actual/Projection Year - 2011

| | Projection A Sep 2011 | Projection A Oct 2011 | Projection A Nov 2011 | Projection A Dec 2011 | Total | |
|---|---|---|---|---|---|---|
| Rooms Available | 10,590 | 10,943 | 10,590 | 10,943 | 43,066 | |
| Rooms Sold | 5,000 | 5,500 | 6,300 | 6,500 | 23,300 | |
| ADR | $ 199.00 | $ 210.00 | $ 275.00 | $ 235.00 | $ 232.19 | |
| Occupancy% | 47.2% | 50.3% | 59.5% | 59.4% | 54.1% | |
| RevPAR | $ 93.96 | $ 105.55 | $ 163.60 | $ 139.59 | $ 125.62 | |
| | | | | | | |
| Rooms | 995,000 | 1,155,000 | 1,732,500 | 1,527,500 | 5,410,000 | 65.4% |
| F&B | 400,000 | 400,000 | 850,000 | 650,000 | 2,300,000 | 27.8% |
| Other Operated Departments | 100,000 | 120,000 | 175,000 | 125,000 | 520,000 | 6.3% |
| Rentals & Other Income | 8,500 | 10,000 | 10,000 | 12,000 | 40,500 | 0.5% |
| Total Revenue | 1,503,500 | 1,685,000 | 2,767,500 | 2,314,500 | 8,270,500 | 100% |
| | | | | | | |
| Rooms Expense | 398,000 | 404,250 | 606,375 | 611,000 | 2,019,625 | 37.3% |
| F&B Expense | 320,000 | 320,000 | 637,500 | 520,000 | 1,797,500 | 78.2% |
| Other Operated Departments Expense | 90,000 | 108,000 | 157,500 | 112,500 | 468,000 | 90.0% |
| Rentals & Other Income Expense | 0 | 0 | 0 | 0 | 0 | 0.0% |
| Departmental Expense | 808,000 | 832,250 | 1,401,375 | 1,243,500 | 4,285,125 | 51.8% |
| | | | | | | |
| A&G | 255,070 | 258,700 | 280,350 | 271,290 | 1,065,410 | 12.9% |
| Marketing | 222,553 | 275,275 | 341,513 | 284,718 | 1,124,058 | 13.6% |
| R&M | 100,000 | 100,000 | 100,000 | 100,000 | 400,000 | 4.8% |
| Energy | 170,000 | 160,000 | 165,000 | 170,000 | 665,000 | 8.0% |
| Undistributed Expense | 747,623 | 793,975 | 886,863 | 826,008 | 3,254,468 | 39.4% |
| | | | | | | |
| Gross Operating Profit | (52,123) | 58,775 | 479,263 | 244,993 | 730,908 | 8.8% |
| | -3.47% | 3.49% | 17.32% | 10.59% | | |
| Management Fees | 30,070 | 33,700 | 55,350 | 46,290 | 165,410 | 2.0% |
| | | | | | | |
| Income before Fixed Expense | (82,193) | 25,075 | 423,913 | 198,703 | 565,498 | 6.8% |
| | | | | | | |
| Rent/Lease | 231 | 231 | 231 | 231 | 924 | 0.0% |
| Property Taxes | 72,333 | 72,333 | 72,333 | 72,333 | 289,332 | 3.5% |
| Insurance | 62,715 | 63,654 | 66,094 | 64,414 | 256,877 | 3.1% |
| Other | 14,085 | 17,668 | 16,682 | 15,872 | 64,307 | 0.8% |
| FF&E Reserve | 15,035 | 33,700 | 55,350 | 46,290 | 150,375 | 1.8% |
| Total Fixed Charges | 164,399 | 187,586 | 210,690 | 199,140 | 761,815 | 9.2% |
| | | | | | | |
| NOI | (246,592) | (162,511) | 213,223 | (438) | (196,318) | -2.4% |

# EXHIBIT "B"

NELIGAN FOLEY, LLP
PATRICK J. NELIGAN, JR.
    Texas State Bar No. 14866000
    *Admitted Pro Hac Vice*
JAMES P. MUENKER
    Texas State Bar No. 24002659
    *Admitted Pro Hac Vice*
325 N. St. Paul, Suite 3600
Dallas, Texas  75201
Telephone  (214) 840-5300
Facsimile:  (214) 840-5301

KLEVANSKY PIPER, LLP
A Limited Liability Law Partnership
SIMON KLEVANSKY            3217-0
ALIKA L. PIPER             6949-0
NICOLE D. STUCKI           9151-0
841 Bishop Street, Suite 1707
Honolulu, Hawaii 96813
Telephone:  (808) 536-0200
Facsimile:   (808) 237-5758
E-Mail: sklevansky@kplawhawaii.com;
apiper@kplawhawaii.com; nstucki@kplawhawaii.com

Attorneys for the Debtor

## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| In re<br><br>M WAIKIKI LLC,<br><br>Debtor. | Case No. 11-02371<br>(Chapter 11)<br>**DECLARATION OF ROBERT WATSON IN SUPPORT OF DEBTOR'S MOTION FOR ORDER GRANTING AUTHORITY TO (I) OPERATE UNDER EXISTING MANAGEMENT AGREEMENT PENDING DECISION TO ASSUME OR REJECT AGREEMENT AND (II) HONOR INDEMNIFICATION** |

1

**EXHIBIT "B"**

## DECLARATION OF ROBERT WATSON

I, ROBERT WATSON, declare under penalty of perjury pursuant to 28 U.S.C. § 1746, as follows:

1.     I am fully competent and qualified in all respects to make this Declaration.  The facts stated herein are true and correct and, unless otherwise qualified, are within my personal knowledge.

2.     I am the founder and Chief Executive Officer of Bond HD ("Bond"), the asset manager of The MODERN Honolulu f/k/a the Waikiki Edition (the "Hotel").  I have more than twenty years experience in the hospitality industry, and have been involved with more than a dozen lifestyle hotel and restaurant openings in the United States and abroad.  Prior to creating Bond, I served in various positions for W Hotels over a period more than five years, including most recently as Regional Director of Brand Operations for W Hotels Western U.S. properties. Prior to working for W Hotels, I worked with Kimpton Hotel and Restaurant Group for five years, during which time I opened the first Hotel Monaco and was part of that brand's development and expansion.

3.     In my experience, it is common in the industry for an independent owner of a hotel property (i.e., a hotel owned by an investor or group of investors

as opposed to a property owned by a hotel brand) to contract with a third party for management services for the hotel. In most cases, the primary reason for contracting with a third party management company is because the owner(s) of a hotel property usually do not have the expertise and/or resources necessary to operate the hotel in a manner that will enable the owner(s) to maximize the value of the hotel.

4. In this case, the Hotel is owned by M Waikiki LLC (the "Debtor"), a special purpose entity created for the purpose of owning the Hotel that has no employees. Consequently, the Debtor needs professional hotel management services for the Hotel.

5. The Hotel was previously managed by Marriott Hotel Services, Inc. ("Marriott") until August 28, 2011, during which time the Hotel consistently lost substantial amounts of money on operations. On August 28, 2011, the Debtor replaced Marriott with Modern Management LLC ("Modern Management"), an affiliate of Aqua Hotels & Resorts ("Aqua").

6. I participated in the process undertaken by the Debtor to select a replacement property manager, and, along with other Debtor representatives, assisted in the Debtor's negotiation of the management agreement with Modern Management (the "Agreement"). In connection therewith, I and others acting on behalf of the Debtor interviewed multiple management companies. All such

companies indicated that full and effective indemnification of any liabilities arising out of the operation of the Hotel would be a condition to accepting the role as the new manager of the Hotel. At the time of these negotiations, the Debtor was already involved in a lawsuit with Marriott in New York regarding the management of the Hotel, which made the indemnification provision even more important to prospective hotel managers.

7.    Based on my experience, it is my opinion that the Agreement is on market terms, particularly given the circumstances, and that the Agreement is within the ordinary course of the Debtor's business because it is "ordinary" for both the Debtor specifically, and the hotel industry generally, to contract for professional hotel management services on terms similar to those provided under the Agreement.

8.    Except as otherwise indicated, all statements contained herein are within my personal knowledge.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 25th day of November, 2011.

_____/s/ Robert Watson_____
ROBERT WATSON

4