NELIGAN FOLEY, LLP
PATRICK J. NELIGAN, JR.
  Texas State Bar No. 14866000
  Admitted *Pro Hac Vice*
JAMES P. MUENKER
  Texas State Bar No. 24002659
  Admitted *Pro Hac Vice*
325 N. St. Paul, Suite 3600
Dallas, Texas 75201
Telephone:  (214) 840-5300
Facsimile:   (214) 840-5301

KLEVANSKY PIPER, LLP
A Limited Liability Law Partnership
SIMON KLEVANSKY   3217-0
ALIKA L. PIPER        6949-0
NICOLE D. STUCKI     9151-0
841 Bishop Street, Suite 1707
Honolulu, Hawaii 96813
Telephone: (808) 536-0200
Facsimile: (808) 237-5758
E-Mail: sklevansky@kplawhawaii.com
apiper@kplawhawaii.com; nstucki@kplawhawaii.com

ATTORNEYS FOR DEBTOR

BICKEL & BREWER
WILLIAM A. BREWER III
  Texas State Bar No. 02967035
  Admitted *Pro Hac Vice*
MICHAEL S. GARDNER
  Texas State Bar No. 24002122
  Admitted *Pro Hac Vice*
1717 Main Street, Suite 4800
Dallas, Texas 75201
Telephone:  (214) 653-4000
Facsimile:   (214) 653-1014
E-Mail: wab@bickelbrewer.com; mgardner@bickelbrewer.com

SPECIAL LITIGATION COUNSEL FOR DEBTOR

# UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF HAWAII

In re

M WAIKIKI LLC,

      Debtor.

Case No. 11-02371
(Chapter 11)

**DEBTOR'S OBJECTION TO PROOF OF CLAIM NO. 79 FILED BY MARRIOTT HOTEL SERVICES, INC. AND MARRIOTT INTERNATIONAL, INC.; DECLARATION OF DAMIAN MCKINNEY IN SUPPORT THEREOF; EXHIBITS "1" through "11"**

HEARING:
Date:
Time:
Judge: Hon. Robert J. Faris

---

## DEBTOR'S OBJECTION TO PROOF OF CLAIM NO. 79 FILED BY MARRIOTT HOTEL SERVICES, INC. AND MARRIOTT INTERNATIONAL, INC.

M WAIKIKI LLC (the "Debtor"), as debtor and debtor-in-possession, submits the following Objection to Proof of Claim No. 79 (the "Claim") filed by Marriott Hotel Services, Inc. and Marriott International, Inc. (collectively referred to herein as "Marriott"), and respectfully states as follows:

# I.

## SUMMARY OF OBJECTION

1.     The Debtor is the owner of an 18-story, 353-room luxury hotel property near Waikiki Beach in Honolulu (the "Hotel").  The Hotel is currently operated and managed by Modern Management Services, LLC ("Modern Management").  The Debtor acquired the Hotel in July 2006 for a purchase price of approximately $112 million.  The Debtor thereafter expended another approximately $138 million to renovate the Hotel.

2.     In July 2008, the Debtor entered into two separate agreements with Marriott Hotel Services, Inc.:  (a) the Design and Technical Services and Pre-Opening Agreement among the Debtor, Marriott, and Schrager LLC (the "TSA"), and (b) the Management Agreement between Debtor and Marriott (the "Management Agreement").[1]  The TSA conferred upon Marriott full control over and responsibility for the redesign and renovation of the Hotel.  The Management Agreement appointed Marriott to "supervise, direct, and control the management and operation of the Hotel" as "Manager" and provided that the "operation of the Hotel shall be under the exclusive supervision and control of Manager."  In that capacity, Marriott had control over all funds derived from the operations of the

_____

        [1]    True and correct copies of the Management Agreement and TSA are attached as Exhibits "1" and "2" to the McKinney Declaration (defined below).

U.S. Bankruptcy Court - Hawaii   #11-02371   Dkt # 505   Filed  01/19/12   Page 3 of 36

Hotel as the Debtor's fiduciary, out of which it was to pay for all expenses of the operations of the Hotel. Further, pursuant to section 1.02 of the Management Agreement, Marriott had the duty to "act as a reasonable and prudent operator of the Hotel."

3.    As described in detail below and in the supporting declaration of Damian McKinney (the "McKinney Declaration"),[2] Marriott breached its obligations under the TSA and the Management Agreement and failed to meet the performance standards required under the two agreements by, among many other things, failing to open other Edition-brand hotels to establish the brand, contributing to the failure to open the Hotel until more than a year *after* its scheduled opening date, failing to provide appropriate senior management for the Hotel, failing to exercise proper oversight of personnel and expenses, failing to institute appropriate financial controls and oversight, and failing to achieve anything remotely resembling Marriott's projected operating results once the Hotel finally opened.

4.    So abusive and damaging was Marriott's operation of the Hotel that the Debtor properly notified Marriott of its default under the Management

_____

[2]    The Debtor also incorporates by reference herein the Declaration of Damian McKinney in Support of First Day Motions [Docket No. 17] (the "First McKinney Declaration"), and the Declaration of Dennis Simon in Support of Motion to Extend Exclusivity filed on December 2, 2011 [Docket No. 397] (the "Simon Declaration").

U.S. Bankruptcy Court - Hawaii  #11-02371  Dkt # 505  Filed 01/19/12  Page 4 of 36

Agreement on May 26, 2011, and lawfully exercised its right to terminate the Management Agreement and Marriott's authority thereunder on August 28, 2011 (the "Termination"), in order to save the Debtor's $250 million investment in the Hotel. The Debtor replaced Marriott as Manager by hiring Modern Management. The Hotel's operating results since the Termination have steadily improved and the Hotel is on a path to profitability, which is persuasive evidence of Marriott's breach of contract and failure to operate the Hotel according to industry standards.

5. Marriott's Claim includes four separate claims, none of which should be allowed. Each is materially defective for the reasons set forth in this Objection and the supporting declaration.

| Claim | Amount Claimed | Objection | Disposition |
|-------|----------------|-----------|-------------|
| Breach of contract | $65,471,668 | No liability: Because Marriott had breached the Management Agreement, the Termination was justified and not a breach of contract on Debtor's part;<br><br>Lack of basis for amount: (a) Declaration submitted with Claim fails to set forth any basis for the calculation of the amount, which is grossly overstated and contrary to the terms and formulas provided in the Management Agreement; and (b) Amount is also grossly in excess of amounts permitted under applicable state law, | Disallow in its entirety. |

U.S. Bankruptcy Court - Hawaii  #11-02371  Dkt # 505  Filed  01/19/12  Page 5 of 36

| Claim | Amount Claimed | Objection | Disposition |
|---|---|---|---|
| | | which limits future profits claims to those that can be established with reasonable certainty and based upon known reliable factors without undue speculation. | |
| Loan | $5,599,082 | No liability: Cost overruns and excessive expenditures caused by Marriott led to the cash shortfalls;<br><br>Lack of documentation for amount;<br><br>No right to setoff against deposits and taxes collected, among other things; and<br><br>Amount is more than offset by Debtor's claims. | Disallow in its entirety. |
| Misappropriation | Unstated | No liability: data and property at issue either (a) belonged to Debtor or (b) to the extent it belonged to Marriott, was properly handled, preserved, and has been or will be returned to Marriott;<br><br>Lack of any documentation of amount; and<br><br>Amount is more than offset by Debtor's claims. | Disallow in its entirety. |
| Chargeback | $28,271 | No liability: Claim is contingent, with contingencies | Disallow in its entirety. |

U.S. Bankruptcy Court - Hawaii  #11-02371  Dkt # 505  Filed  01/19/12  Page 6 of 36

| Claim | Amount Claimed | Objection | Disposition |
|-------|----------------|-----------|-------------|
| | | highly unlikely to occur due to passage of time;<br><br>Lack of documentation for amount and chargebacks were likely to have been caused by Marriott's efforts to persuade customers to cancel and transfer reservations; and<br><br>Amount is more than offset by Debtor's claims. | |

For all these reasons, Marriott's Claim should be disallowed in its entirety.

**II.**

## JURISDICTION AND PROCEDURAL HISTORY

6.    On August 31, 2011 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").  Pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code, the Debtor continues to operate its business and manage its properties, affairs and assets as a debtor-in-possession.

7.    On January 3, 2012, Marriott filed the Claim.

8.    This Court has jurisdiction to consider this Objection pursuant to 28 U.S.C. §§ 157 and 1334.  As an objection to a claim, this is a core proceeding

U.S. Bankruptcy Court - Hawaii   #11-02371   Dkt # 505   Filed  01/19/12   Page 7 of 36

pursuant to 28 U.S.C. § 157(b)(2)(B). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## III.

## FACTUAL BACKGROUND

**A.    Marriott Attempts to Make A Late Entry Into The Emerging Boutique Hotel Market With Its "Edition" Brand.**

9.    Marriott is well-known for its traditional approach to hotel design and concepts. That philosophy has served it well in the run-of-the-mill business class of hotels. Its conservatism, however, has contributed to its inability to penetrate the lucrative and growing "lifestyle" – or "boutique" – hotel market.

10.    Conversely, Marriott's competitors have grabbed significant market shares in that growing segment over the past decade. Since 1998, the lifestyle brand of Starwood Hotels & Resorts Worldwide, Inc. – "W Hotels" – has flourished. W Hotels now has 38 hotels totaling over 11,000 rooms. In addition, InterContinental Hotels Group opened its lifestyle brand, "Hotel Indigo," which has over 45 locations worldwide. Even Hyatt Hotels, which entered the lifestyle hotels segment at the same time as Marriott, now has five "Andaz" hotels.

11.    With the hope of breaking into this new market, in June 2007, Marriott announced that it had entered into an agreement with Ian Schrager[3] and

_____

[3]    Ian Schrager is a well known, high profile hotelier widely regarded as the developer of the "lifestyle hotel" concept.

I.S. International, LLC ("Schrager LLC") to develop a new boutique hotel brand – "Edition." The Edition brand was an entirely new business venture for Marriott, serving a market in which Marriott had no prior experience or expertise. Marriott and Schrager identified twenty-two "gateway cities" worldwide which, they announced, would be the first locations of Edition hotels (Honolulu was not among the cities listed as inaugural members of the Edition hotel chain). Marriott also announced that it expected to have five Edition hotel deals by the end of that year, and 100 Edition hotels in operation globally within ten years (*i.e.,* by 2017). The venture was designed to make Marriott competitive with W Hotels and other popular emerging boutique chains.

**B.    In Reliance On Marriott's Representations, the Debtor Agrees To Affiliate Its Hotel With The "Edition" Brand.**

12.    Upon being contacted to inquire if it would have an interest in managing the Hotel, Marriott immediately set about to convince the Debtor to affiliate the Hotel with the Edition brand. In March 2008, Marriott provided projections to the Debtor that forecast a profitable first year of operations for the Hotel as a member of the Edition chain (the "March 2008 Projections"). *See* McKinney Declaration, Exh. "3". For example, Marriott forecasted that Debtor's net operating profit in the first year of the Hotel's operation would be in excess of $14 million on $53.5 million in total revenue. *Id.* It also estimated that the Hotel, as an Edition property, would achieve an occupancy rate of 68% and an average

U.S. Bankruptcy Court - Hawaii   #11-02371   Dkt # 505   Filed  01/19/12   Page 9 of 36

daily rate ("ADR") of $400 in its first year, which would result in revenue per available room ("RevPAR") of $272 in that first year. *Id.* Marriott assured the Debtor that it had assembled an elite team of talented and experienced senior executives dedicated to the development and promotion of the new brand and the oversight of Debtor's Hotel operations. *See* First McKinney Declaration, ¶ 10. Importantly, Marriott also represented to the Debtor that several Edition hotels would open prior to the Hotel (thereby giving birth to the Edition "chain" of hotels), and that the momentum created from those openings and the accompanying media blitz would make the Hotel a great success. *Id.* at ¶¶ 9-10.

13. Marriott also promised the Debtor that Mr. Schrager would be personally involved in the physical design and operational development of the Hotel.[4] That involvement, including Schrager's attendance at key design meetings, would ensure that the Hotel had all the elements of style for which Schrager had become known, and which were necessary for the success of the Hotel. The Debtor would not have agreed to brand the Hotel as an Edition without Marriott's assurances regarding the personal involvement of Schrager in the development of the Hotel.

---

[4] Specifically, Section 4.2 of the TSA provides: "Ian Schrager shall be personally involved in the design, concepting and direction of the Hotel and shall be available for key design meetings in connection therewith."

14.     In reliance on the foregoing representations, as well as other promises and undertakings by Marriott, Debtor entered into the TSA and the Management Agreement.

## C.     **The Technical Services and Pre-Opening Agreement**

15.     Pursuant to the TSA, and in anticipation of the Hotel being opened and operated in the Edition chain, Marriott undertook to perform a number of design-related duties, for which it was granted a number of related powers.  For instance, Marriott, through its partner, Schrager LLC, was given power of final approval, in its discretion, over the interior design and the overall "theme and feel" of the Hotel.  Marriott and its partner, therefore, had "veto power" over the design process for the Hotel.

16.     Marriott also had the power of final approval over all matters concerning Edition Technical Standards, Hotel Systems, and fire and life safety matters at the Hotel.  It had exclusive power to not only determine, but also control, the Debtor's costs of renovating, furnishing, and equipping the Hotel to comply with their design standards and demands.  The TSA also gave Marriott control over the Debtor's funds, even permitting it to distribute such funds to itself under certain circumstances.

17.     In addition, the TSA provided that Marriott "was responsible for obtaining all permits and licenses required for the operation of the Hotel, such as

the hotel operating license, liquor licenses and other miscellaneous licenses." Marriott also undertook, during the pre-opening period, to "begin hiring and training staff and booking reservations for the Hotel," and agreed to "undertake pre-opening promotion and advertising" and "design and implement a marketing, public-relations and sales strategy for the Hotel." To that end, the Debtor funded a "Pre-Opening Account," which was under the exclusive control of Marriott, to be used solely for paying various pre-opening expenses, including reimbursements for Marriott's own out-of-pocket costs and fees. In turn, Marriott was obligated to provide Debtor an accounting of all funds disbursed from the account.

18. As a result of the extraordinary powers provided to Marriott under the TSA – including, but not limited to, its design decision-making authority; its control over the selection and pricing of materials, furniture, fixtures, and equipment; its control over the Hotel's pre-opening reservations and booking activities; and its control over the Pre-Opening Account (comprised of the Debtor's funds) – Marriott became the Debtor's fiduciary. Under the TSA, Marriott had the power to bind the Debtor in dealings with third-parties as well as the obligation to act in the best interests of the Debtor. Marriott, therefore, owed the Debtor the highest duties recognized in law, including obligations of loyalty, full disclosure, due care, and good faith and fair dealing – notwithstanding any contrary provision in the TSA purporting to disclaim such duties or relationship.

## D.    The Management Agreement

19.    Pursuant to the Management Agreement, the Debtor entrusted Marriott with the responsibility for the operational performance and financial success of its Hotel. Specifically, pursuant to Section 1.01 of the Management Agreement, the Debtor engaged Marriott to "supervise, direct, and control the management and operation of the Hotel." Based on Marriott's representations, the Debtor delegated substantial power to Marriott under the Management Agreement, which provided that the "operation of the Hotel shall be under the exclusive supervision and control of Manager," and that "Manager shall have discretion and control in all matters relating to management and operation of the Hotel." *See* Management Agreement, Section 1.02. Further, pursuant to Section 1.02, Marriott had the duty to "act as a reasonable and prudent operator of the Hotel."

20.    The Management Agreement authorized and empowered Marriott to enter into various contracts on behalf of the Debtor and the Debtor's Hotel; to procure necessary goods, supplies, and equipment utilizing the Debtor's funds; and otherwise bind the Debtor in commercial transactions. It also required Marriott to perform agency-related, revenue-generating services by soliciting and booking business for the Hotel on behalf of the Debtor through the provision of sales and reservations services.

21.     For example, the Management Agreement obligated, empowered, and authorized Marriott to:   (1) "[e]stablish prices, rates and charges for services provided in the Hotel, including Guest Room rates and rates for commercial space and other space in the Hotel;" (2) "[r]eceive, hold and disburse funds, maintain bank accounts and make payments on accounts payable and handle collections of accounts receivable;" (3) "enter into leases, licenses, and concessions for the Hotel (including rooftops and all other spaces related to the Hotel), which Manager may execute on behalf of the Hotel or Owner;" (4) "undertake publicity and promotion, arrange for and supervise public relations and advertising;" (5) "prepare and deliver interim accountings, annual accountings, Annual Operating Statements, Building Estimates, FF&E Estimates, and such other information as is required by this Agreement and be available at reasonable times to discuss generally with Owner the above-listed items as well as the operations at the Hotel;" (6) "[p]lan, execute and supervise repairs, maintenance, and FF&E purchases at the Hotel;" (7) "[p]rovide, or cause to be provided, risk management services relating to the types of insurance required to be obtained or provided by Manager under this Agreement;" and (8) "[u]se reasonable efforts to maintain and keep in full force and effect, either in Manager's name or in Owner's name, as may be approved by Manager or as required by applicable law, any and all operating licenses and permits."  Management Agreement, Section 1.04.

22.    Under the Management Agreement, all funds derived from operation of the Hotel were to be deposited by Marriott in accounts held in Marriott's name; and it was Marriott's duty to make disbursements from such accounts. Marriott, however, was not liable for any debt incurred in exercising those duties. Specifically, the Management Agreement provided that "[d]ebts and liabilities incurred by Manager as a result of its operation and management of the Hotel . . . will be paid by Owner." Indeed, Section 11.03 of the Management Agreement expressly acknowledged that Marriott was the Debtor's fiduciary with respect to the funds it held in the Operating Accounts, the FF&E Reserve, and any other funds entrusted to it under the agreement.

23.    In exercising the foregoing powers, Marriott was responsible for ensuring the "proper and efficient operation of the Hotel," and had a duty to "act as a reasonable and prudent operator." See Management Agreement, Section 1.02. Applying the industry-recognized definitions of those terms, Marriott was obligated to competently manage the Debtor's Hotel in accordance with the standards of care generally applicable to hotel operators, and with a minimum of waste and expense. The Management Agreement also required Marriott to operate the Hotel "with the goal of achieving long-term profitability," and to "diligently pursue feasible measures to operate the Hotel in accordance with the Business Plan" prepared by Marriott and approved by the Debtor. *Id.*

24.     As a result of its explicit undertaking of the above-described duties to the Debtor, and its acceptance and exercise of a variety of inherent agency powers, Marriott entered into an agency relationship with the Debtor, as its principal, with respect to such matters.  By virtue of that principal-agent relationship, Marriott owed fiduciary duties to the Debtor of loyalty, full disclosure, the utmost good faith and fair dealing, and due care as a matter of law – notwithstanding any contrary provision of the Management Agreement purporting to disclaim any such duty or relationship.[5]

## E.     Failure To Launch:  The Edition Chain Never Gets Off The Ground.

25.     A fundamental element underlying the entirety of Marriott's duties and responsibilities under the Management Agreement was, from the inception of the parties' contractual relationship, the existence of a "chain" of Edition Hotels. Indeed, Section 1.02 of the Management Agreement specifically required Marriott to operate the Hotel "as part of the Edition Hotel System" – defined as the "chain

---

[5]     *See, e.g., Deep Blue Ventures, Inc. v. Manfra, Tordella & Brookes, Inc.*, 791 N.Y.S.2d 298 (N.Y. Sup. 2004) ("Although agency is a consensual relationship, how the parties to any given relationship label it is not dispositive. The existence of any agency relationship does not depend on the intent of the parties to create it, nor their belief that they have done so … [I]f the agreement results in the factual relationship between them to which are attached the legal consequences of an agency, an agency may exist although the parties did not call it agency and did not intend the legal consequences")(internal citations omitted); 2A N.Y. Jur.2d, *Agency & Independent Contractor*, § 23 ("[A] disclaimer of agency between the parties is not binding in determining their true relationship").

U.S. Bankruptcy Court - Hawaii   #11-02371   Dkt # 505   Filed 01/19/12   Page 16 of 36

of full-service boutique hotels operated and managed by Marriott" or its affiliates under the "Edition Hotels" name.

26. Contrary to the promises and requirements set forth in the TSA and Management Agreement, there is no Edition chain of hotels. The Hotel, which opened in September 2010, was the first Edition hotel. Since that time, only one other Edition property has opened, a small hotel located in Istanbul, Turkey, which commenced operation in April 2011. To date, Marriott has failed to open any of the Edition hotels which were to be located in Paris, Madrid, Coasta Rica, Miami, Chicago, Washington D.C., Los Angeles and Scottsdale, all of which were announced over four years ago. *See* First McKinney Declaration, ¶ 9.

27. Making matters worse, Edition's key executives – essentially acknowledging the brand's failure – abandoned the company. In March 2011, Dan Flannery, the Managing Director of Edition Hotels from the brand's inception, left to work at a competing management company. Leaving with Flannery was Yoav Gery, formerly head of Development and Owner Relations for Edition, who began heading that same competitor's development group. Kate Harth, Edition's Vice President of Sales, and Josh Fluhr, Edition's Senior Vice President of Operations, also left to join Messrs. Flannery and Gery. Furthermore, Ian Schrager realized that his venture with Marriott was a failure and, thus, abandoned Edition and the Debtor to create his own lifestyle hotel brands. Sadly, rather than intensifying its

efforts to make the Hotel's opening a success in the face of the Edition chain's challenges, Marriott did nothing to rectify the deteriorating situation.

28.     For example, Marriott failed to comply with its obligation to undertake pre-opening promotion and advertising, and to formulate effective marketing, public relations, and sales strategies for the Hotel. Because of those failings, the Hotel opened with precious few bookings – a "standing start" that has plagued the Hotel's operations and financial performance from the outset.

**F.     Facing Unsustainable Losses Resulting From Marriott's Breaches Of Contractual And Fiduciary Duties, Debtor Is Forced To Declare Marriott In Default And Terminate The Management Agreement In Order To Save The Hotel And Its Investment.**

29.     Under the Management Agreement, Marriott was required to, among other things, prepare a Business Plan setting forth estimated Gross Revenues, departmental profits and Operating Profit for each forthcoming Fiscal Year. It was also required to "diligently pursue feasible measures to operate the Hotel in accordance with the Business Plan."

30.     In August 2009, Marriott submitted a new set of first-year financial projections for the Hotel (the "August 2009 Projections"). *See* McKinney Declaration, Exh. "4". Those projections, which Marriott issued only after the Debtor had signed on to affiliate the Hotel with the Edition brand, foretold a less-optimistic, but still quite profitable, first-year for the Hotel as compared to the March 2008 Projections. Specifically, the August 2009 Projections forecasted that

the Debtor's net operating profit would be $6.5 million on projected total revenue of $37.5 million – with an estimated average occupancy of 62%, ADR of $319, and RevPAR of $198. *Id.*

31.    In anticipation of an opening date of September 21, 2010, Marriott submitted a partial Business Plan to Debtor in July 2010 for the fourth quarter of 2010 (the "2010 Q4 Business Plan"). *See* McKinney Declaration, Exh. "5". That plan did not include a net operating profit line item, but it projected total revenue for those three months in the amount of $6.9 million, average occupancy of 39%, ADR of $231, and RevPAR of $90. *Id.* Remarkably, despite the colossal slide in its projected revenue and profits since its March 2008 Projections, Marriott's actual performance as Hotel manager for the fourth quarter of 2010 was far worse than what was set forth in the 2010 Q4 Business Plan.

32.    Specifically, Marriott lost nearly $3.9 million of the Debtor's money in its first three months of operation. *See* Simon Declaration, ¶ 4. The actual revenue generated by Marriott in Q4 2010 was $3.7 million – a mere 54% of budgeted revenue – while  the Hotel's average occupancy was 29.5%, its ADR was $220, and its RevPAR a mere $65. *Id.* at Exh. "1". Such dismal results were due

to Marriott's material failure to manage and operate the Hotel in a "reasonable and prudent" manner.[6]

33.     On January 27, 2011, Marriott issued its 2011 Business Plan for the Hotel. *See* McKinney Declaration, Exh. "6". That plan forecast a net operating profit for the Debtor in 2011 of only $1.1 million. *Id*. Yet, once again, Marriott overestimated its ability to perform. In actuality, the Hotel suffered $2.2 million in losses in Q1 2011 alone. *See* McKinney Declaration, Exh. "7".

34.     Faced with the deteriorating effects of Marriott's multiple breaches of duty, on May 26, 2011, the Debtor served Marriott with a notice of default pursuant to the Management Agreement and filed suit against Marriott in New York seeking appropriate damages (the "Pre-Petition Lawsuit"). *See* McKinney Declaration, Exh. "8" and "9". The Debtor's notice of default stated, in pertinent part:

> Pursuant to Section 9.01(G) of the [Management Agreement], Owner provides this written notice of default and hereby notifies Manager that it has failed to comply with its contractual and common law duties relating to the management and operation of Owner's Hotel.

_____

[6]     Marriott's poor performance is exemplified by the fact that that the Debtor incurred over $8.7 million in Pre-Opening Expenses, which more than doubled the initial budget of $3.8 million (and represented a 50% increase over the Debtor-approved budget of $5.1 million). As just one example, Marriott and Schrager LLC spent a staggering $472,000 for the Hotel's opening party, despite initially budgeting only $150,000 for that event.

Pursuant to Section 1.02 of the [Management Agreement], Manager is responsible for the proper and efficient operation of the Hotel. It is also required to act as a reasonable and prudent operator of the Hotel. In addition, pursuant to Section 4.08(b) of the [Management Agreement], Manager is required to diligently pursue feasible measures to operate the Hotel in accordance with the Business Plan. Manager has defaulted with respect to each of those obligations. Manager's failures to comply with the above obligations include, but are not limited to, its failure to: (1) pursue feasible measures to operate the Hotel according to the Business Plan, it has failed to control the variable expenses at the Hotel; and (2) reasonably and prudently operate the Hotel, including, but not limited to, failing to: adequately staff the Hotel; manage the sales and marketing of the Hotel; and conduct proper public relations activities.

Further, Manager breached its obligations to develop the Edition brand and the Edition Hotel System, meaning a chain of full-service boutique hotels, operated and managed by Marriott (or one or more of its Affiliates) as of the Effective Date.

In addition, as Owner's agent, Manager has breached its common law duties to Owner, including the duties of care, loyalty, candor, and full disclosure by, among other things: (1) failing to manage the Hotel with due care; (2) failing to disclose to Owner the true condition of Edition Hotels, including failing to disclose that Edition Hotels did not have the new hotel deals in place that it purported to have both publicly and to Owner.

35.    Despite its receipt of the foregoing, Marriott failed to cure its material breaches of the Management Agreement and violations of its fiduciary duties to the Debtor. Instead, on August 2011, Marriott updated its 2011 financial projections for the Hotel with the July 2011 Projections (e.g., apparently prepared the month before), this time estimating that it would lose an additional $1.2-1.9 million over the remainder of the year. *See* McKinney Declaration, Exh. "7". Those estimates reflected the Hotel's abysmal performance in comparison to the

U.S. Bankruptcy Court - Hawaii   #11-02371   Dkt # 505   Filed 01/19/12   Page 21 of 36

properties in its "Competitive Set" (*i.e.*, the Hotel's RevPAR was only 47% of its competitors). *See* McKinney Declaration, Exh. "11". By this time, the Debtor's cumulative losses under Marriot's management had increased to $8.4 million. *See* First McKinney Declaration, ¶ 17.

36. Between September 2010 and August 2011, the Debtor repeatedly informed Marriott that it could not continue to sustain the losses it was suffering as a result of Marriott's mismanagement, especially in a market where the competition was outpacing the Hotel by a wide margin. At a meeting held in August 2011, after it received the latest negative earnings and revenue forecast, the Debtor – at Marriott's request – submitted a proposed amendment to the Management Agreement that offered a realistic plan to address the issue. Marriott never responded to that proposal. It also rejected the Debtor's proposal that its continued management of the Hotel be conditioned upon its payment of any losses sustained by the Hotel under Marriott's management. Even worse, Marriott refused to reduce variable costs to reflect the reality of the low occupancy and average daily rates.

37. Confronted with economic disaster stemming from Marriott's continued mismanagement, the Debtor had no choice but to terminate Marriott on August 28, 2011, and install Modern Management as the new Hotel manager. That decision was not made lightly, and only came about after repeated efforts to

resolve the Debtor's disputes with Marriott were rebuffed out of hand. Without taking this step, the Debtor would have lost its $250 million investment in the property.

### G. The Debtor Completes The Hotel's Transition To New Management.

38.     The transition from Marriott to Modern Management on August 28, 2011 was professional and peaceable. On that date, a representative of the Debtor, Damian McKinney, entered the Hotel at approximately 2:30 a.m. – a time chosen to minimize disruption of Hotel services and guest stays – and handed the Marriott Manager on Duty two letters, one informing him that Marriott had been terminated as manager, and the other a copy of a letter from the Debtor to Marriott's President and Chief Operating Officer, Arne Sorenson, informing Marriott of the termination. *See* McKinney Declaration, ¶ 12. Thereafter, the Debtor assumed full control of the Hotel through its new agent-operator, Modern Management.

39.     No use of force or threats of any kind were used in connection with the transition. Given the hour, minimal staff was on the property. Tellingly, the vast majority of Hotel employees – numbering more than 200 – subsequently accepted employment with Modern Management.

40.     Upon the transition, the Debtor and Modern Management also promptly took actions to ensure that any of Marriott's confidential and proprietary information, systems, and property were secured and returned (or in some cases,

secured and retained pending court determination as to whether the information and property in question belonged to Marriott or the Debtor).  For example, all signage, literature, linens, and other effects on or within the Hotel that contained Marriott's trade names or trademarks were promptly removed from use or, in some cases, the trade names or trademarks were removed from such items or the items were relabeled so they could be reused without infringing on any of Marriott's trade names or trademarks.

## H.  Marriott Improperly Interferes With The Hotel's Operations Following Its Termination.

41.    Immediately after the transition, Marriott began taking improper actions deliberately aimed at interfering with the Debtor's and Modern Management's ability to operate the Hotel.  For example, the Debtor has learned that former Edition managers interfered with numerous employees who continued to work at the Hotel for Modern Management, including sending harassing e-mails, making unwanted phone calls, and applying in-person pressure tactics.  Other misconduct by Marriott was targeted more directly at the Hotel's and the Debtor's bottom line.  In another instance, Marriott employees contacted planners for events scheduled at the Hotel after the transition and convinced them to cancel at the last minute and move those events to the Marriott Waikiki Hotel.

42.    All of those acts appear to have been part of a coordinated effort by Marriott to disrupt the operations of the Hotel post-termination and post-petition.

Marriott has only just begun to produce documents responsive to the Debtor's initial requests for production that were served in late October and early November with respect to Marriott's post-termination efforts to interfere with the Hotel's customers and vendors. Therefore, the Debtor reserves the right to supplement this Objection when discovery is complete.

## I. Notwithstanding Marriott's Concerted Efforts To Destroy the Debtor's Business Operations, The Hotel Has Been Successful Under New Management.

43. The Hotel no longer has any affiliation with Marriott, and now operates successfully under the name "The Modern Honolulu." Even in the brief period since the transition, the financial performance of the Hotel has improved markedly. Modern Management has acted aggressively to bring variable costs under control (steps that Marriott adamantly refused to implement) and improve the operating efficiency of the Hotel. Throughout the Hotel, Modern Management has reduced the number of full time equivalent positions at the managerial level, and also lowered the salaries of those positions to bring them in line with market rates. In addition, it has taken steps to ensure that staffing levels for all departments are flexible enough to change appropriately with the Hotel's occupancy levels.

44. As a result, the Hotel's average monthly operating losses of over $840,000 under Marriott's management have been effectively eliminated and the

Hotel under Modern Management's control is projected to be profitable on an operational basis in 2012.  In sum, now that Marriott's gross mismanagement is a thing of the past, the Hotel is on the road to a full recovery and long-awaited profitability.

**IV.**

**OBJECTIONS TO MARRIOTT'S PROOF OF CLAIM**

45.    The Debtor realleges and incorporates by reference all of the allegations set forth in the preceding paragraphs.

**A.    Legal Standard**

46.    Section 502(a) of the Bankruptcy Code provides that a proof of claim is "deemed allowed, unless a party in interest … objects."  Pursuant to Bankruptcy Rule 3001(f), a proof of claim executed and filed in accordance with the Bankruptcy Rules is prima facie evidence of the validity and the amount of such claim.  However, upon objection to the claim, if the objector provides sufficient evidence to demonstrate that an actual dispute as to the validity of the claim exists, the burden of production (i.e., the burden of going forward) shifts back to the claimant.  *In re Garvida*, 347 B.R. 697, 706 (9th Cir. B.A.P. 2006).  Moreover, the ultimate burden of proof as to the claim's validity and amount remains at all times with the claimant.  *Id*. at 707.

## B. The Claim Fails to Identify or Distinguish the Holder of the Claims

47.     The Debtor objects to the Claim because it improperly refers to the two Marriott entities collectively as Marriott and fails to distinguish what claims are being asserted by each Marriott entity.  The only party to the Management Agreement at issue, which is the basis for all of the claims asserted by Marriott, is Marriott Hotel Services, Inc.  Any purported claim of Marriott International should therefore be disallowed in its entirety.

## C. Insufficient Proof

48.     The Debtor objects to Marriott's Claim and asserts that such claim should be disallowed in its entirety because it is not supported by the facts or by the limited affidavit testimony and documents submitted by Marriott.  For example, Marriott fails to submit any supporting documents or evidence with respect to the following claims asserted against the Debtor, among others:  (i) Marriott's alleged working capital loan to the Debtor in the amount of $5,599,082; (ii) Marriott's alleged injury to its reputation, brand identity, loss of goodwill and loss of customers allegedly sustained by Marriott as a result of the Debtor's alleged breach of the Management Agreement; (iii) alleged past and future damages and expenses incurred by Marriott as a result of the Termination, including all alleged

severance claims, WARN Claims[7] and other payments allegedly made to Marriott employees; (iv) the alleged damages resulting from the Debtor's alleged conversion, misappropriation or unlawful use of Marriott's allegedly proprietary information; (v) the facts and circumstances surrounding the alleged customer chargebacks; and (vi) its calculation of its alleged "lost profits" under the Management Agreement.

49.     Consequently, the Debtor disputes that Marriott has made a prima facie showing with respect to its Claim and objects to the Claim in its entirety.

## D.     <u>The Claim is Precluded By Marriott's Material Breach of Contract</u>

50.     The Debtor objects to Marriott's Claim and submits that the Claim should be disallowed in its entirety – and the Debtor should not be held liable for any of the fees, costs, expenses or other alleged legal damages on which the claim is based and calculated – because of Marriott's prior material breaches of the TSA and Management Agreement, Marriott's breaches of its fiduciary duties to the Debtor, and Marriott's misconduct following its termination as manager of the Hotel.

---

[7]     The Debtor further disputes that either it or Marriott is liable for any alleged WARN claims as virtually all Hotel employees were offered employment by the new manager as required by the Management Agreement and to prevent the incurrence of any such claims.

U.S. Bankruptcy Court - Hawaii   #11-02371   Dkt # 505   Filed  01/19/12   Page 28 of 36

51.     The Debtor further objects to Marriott's Claim because the Management Agreement was properly terminated by the Debtor prior to the Debtor's bankruptcy filing.  Therefore, Marriott has <u>no</u> valid claim against the Debtor under the Management Agreement and is not entitled to <u>any</u> damages.

**E.     Marriott's Claim for "Lost Profits" is Unenforceable Under New York Law or, at a Minimum, Vastly Overstated.**

52.     The Debtor objects to the portion of Marriott's Claim for management fees allegedly due Marriott under the Management Agreement, and submits that Marriott's claim for lost profits should be disallowed in its entirety, or at a minimum reduced, because it: (i) incorrectly assumes, without support, that the Management Agreement would have remained in place for the full 50 years (comprised of the initial term and the renewal terms); (ii) is based on speculative calculations that is belied by the Hotel's actual performance under Marriott's management; and (iii) is improperly based on an alleged loss of gross revenue rather than net profit, among other things.

53.     In order to recover damages for loss of future profits under New York law,[8] a claimant must demonstrate with certainty that such damages have been caused by the defendant's breach and, second, the alleged loss must be capable of proof with reasonable certainty.  *Ashland Mgmt. Inc. v. Janien*, 82 N.Y.2d 395, 403

_____

[8]     Section 11.04 of the Management Agreement provides for the application of New York law.

U.S. Bankruptcy Court - Hawaii   #11-02371   Dkt # 505   Filed 01/19/12   Page 29 of 36

(N.Y. 1993); *Kenford Co., Inc. v. Erie County*, 67 N.Y.2d 257, 261 (N.Y. 1986). In other words, the damages may not be merely speculative, possible or imaginary, but must be reasonably certain and directly traceable to the breach, not remote or the result of other intervening causes. *Ashland*, 82 N.Y.2d at 404; *Kenford*, 67 N.Y.2d at 261. In addition, there must be a showing that the particular damages were fairly within the contemplation of the parties to the contract at the time it was made. *Ashland*, 82 N.Y.2d at 403; *Kenford*, 67 N.Y.2d at 261. If it is a new business seeking to recover for loss of future profits, a stricter standard is imposed for the obvious reason that there does not exist a reasonable basis of experience upon which to estimate lost profits with the requisite degree of reasonable certainty. *Ashland*, 82 N.Y.2d at 404; *Kenford*, 67 N.Y.2d at 261.

54. *Kenford* involved a dispute arising out of the construction and operation of a domed stadium in Buffalo, New York. *Id.* at 260. The plaintiff contracted with Erie County to manage and operate the stadium for a period of 20 years after its construction. *Id.* When the county failed to complete the stadium, the plaintiff sued for breach of contract and sought damages for loss of its prospective profits during the 20 year term of the management contract. *Id.* at 261. Despite the fact that the plaintiff submitted a "massive" quantity of proof that "unquestionably represent[ed] business and industry's most advance and

sophisticated method of predicting the probable results," the court refused to award damages for two reasons. *Id*. at 262.

55.    First, the court concluded that the parties to the management agreement did not contemplate that the non-breaching party would be liable for lost profits over a 20 year period because the remedy provisions in the contract did not "suggest or provide for such a heavy responsibility." *Id*. Further, the court held that "despite the massive quantity of expert proof submitted" by the claimant, "the multitude of assumptions required to establish projections of profitability over the [20 year] life of the contract require speculation and conjecture, making it beyond the capability of even the most sophisticated procedures to satisfy the legal requirements of proof with reasonable certainty." *Id.*

56.    In *24/7 Records, Inc. v. Sony Music Entertainment, Inc.*, 566 F. Supp. 2d 305, 316 (S.D.N.Y. 2008), the court refused to award lost profits to a business that had operated at a loss in the 17 months since it opened. The court concluded that "there [was] no evidence that 24/7 . . . ever made a profit, and there is no reliable, non-speculative means of ascertaining whether the business could have become profitable during the one and one-half years remaining under the exclusive distribution period of the agreement." *Id.*; *see also Nineteen New York Properties Ltd. Partnership v. 535 5th Operating Inc.*, 621 N.Y.S.2d 42, 43 (N.Y. App. Div. - 1st Dept. 1995) (start-up venture's lost profits too speculative); *R.S.D., Inc. v.*

U.S. Bankruptcy Court - Hawaii   #11-02371   Dkt # 505   Filed 01/19/12   Page 31 of 36

*Scandia Realty*, 600 N.Y.S.2d 678 (N.Y. App. Div. - 1st Dept. 1993) (first three months of new business's operation did not provide proof to a reasonable certainty to establish subsequently lost profits).

57.     Here, the Debtor objects to Marriott's lost profits calculation on the ground that even if the Management Agreement was not terminated prior to the Debtor's bankruptcy, it is pure speculation, unsupported by any facts relating to the actual operating performance of the Hotel while under Marriott's management and control, to assume that Marriot could have or would have continued to manage the Hotel for an additional 47 years or would have sustained damages anywhere close to the amount Marriott claims.

58.     First, it is highly likely that, given Marriott's actual performance managing the Hotel, the Debtor would have exercised its option to terminate the Management Agreement following the seventh (7th) year of operations – and that Marriott would have allowed the termination to occur rather than pay the Debtor the substantial "shortfall payments" that would likely have been due under the Management Agreement as the price for Marriott to continue to manage the Hotel.

59.     Specifically, pursuant to Section 2.02 of the Management Agreement, the Debtor has the option to terminate the agreement if, with respect to any two (2) consecutive fiscal years following the fifth full year after the opening of the Hotel, the Hotel failed to meet (i) the Performance Termination Threshold of at least

U.S. Bankruptcy Court - Hawaii   #11-02371   Dkt # 505   Filed 01/19/12   Page 32 of 36

$17,500,000 in Operating Profit and (ii) the Revenue Index Threshold of ninety percent (90%) of the average RevPAR of hotels in the Competitive Set. *See* Section 1.02A(1) and (2). Upon failing to meet these performance thresholds, the Management Agreement would have been terminated unless Marriott made a payment to the Debtor equal to the amount by which the Operating Profit for both of the two fiscal years was less than the Performance Threshold Amount for such fiscal year.

60. By way of example, if the Performance Threshold Amount in each of years 6 and 7 was $17,500,000, and the Operating Profit for each such year was $7,500,000 (which assumes an improvement in Operating Profit of over $16 million per year over Marriott's actual performance), Marriott would owe the Debtor a shortfall payment of $20,000,000 ($17,500,000 - $7,500,000 = $10,000,000 multiplied by two years = $20,000,000). Furthermore, the Hotel's year-to-date RevPAR was only 47% of its competitors as of the last full month that Marriott managed the Hotel, well below the 90% required under Section 1.02 of the Management Agreement. *See* McKinney Declaration, Exh. "11".

61. Given Marriott's history of substantial losses managing the Hotel, Marriott cannot demonstrate with any reasonable certainty required by applicable New York law that Marriott could have achieved the results necessary to prevent termination of the Management Agreement at the end of the 7th year. Thus, if

U.S. Bankruptcy Court - Hawaii  #11-02371  Dkt # 505  Filed 01/19/12  Page 33 of 36

Marriott has any claim for lost profits, which the Debtor denies, any such claim must be limited to 7 years.

62.     The Debtor further objects to Marriott's speculative lost profits calculation on the ground that it is improperly based upon calculation of the discounted present value of lost **revenues**, instead of lost **profits**.  See Affidavit of Catherine L. Young, attached to the Claim, at ¶ 4 ("I have conducted an analysis of the amount of **revenue** that Marriott would earn during that period, and I have discounted that revenue to present value") (emphasis added).  Under applicable law, the most Marriott would be entitled to is lost **profits**.  The Claim fails to account for the costs of Marriott providing the services required under the Management Agreement, and therefore uses an improper measure of damages for a breach of contract claim.

63.     Finally, the Debtor objects to Marriott's speculative lost profits calculation on the ground that it using an impermissibly low discount rate.

**F.     Marriott's Claim for Working Capital Loans Should be Disallowed**

64.     The Debtor further objects to Marriott's Claim as it relates to the alleged "working capital loans" on the ground that Marriott's damages, if any, were caused entirely by Marriott's own mismanagement and breach of duties to run the Hotel as a reasonable and prudent operator, and not by any act or omission of the Debtor.

35610_3

- 34 -

65.     In the event the Court determines that some or all of Marriot's claims should not be disallowed, or should be allowed at a revised amount, the Debtor reserves all rights to object on grounds other than those set forth above and to assert one or more additional defenses, counterclaims or offsets against such claims at a later date.

## V.

## <u>RESERVATION OF RIGHTS</u>

66.     Nothing in this Objection should be construed as a waiver of the Debtor's claims for affirmative relief and damages asserted against Marriott which are pending in the Pre-Petition Lawsuit (McKinney Declaration, Exh. 8), which has been removed to the United States District Court for the Southern District of New York, and which the Debtor is seeking to transfer to the United States District Court of Hawaii.  To the extent necessary, the Debtor incorporates by reference its claims asserted in the Pre-Petition Lawsuit as affirmative defenses to the Claim.

## VI.

## <u>REQUEST FOR RELIEF</u>

In light of the foregoing, the Debtor respectfully requests that the Court disallow and deny Marriott's Proof of Claim in its entirety.

Dated: Honolulu, Hawaii, January 19, 2012.

Respectfully submitted,

**NELIGAN FOLEY, LLP**

/s/ Patrick J. Neligan, Jr.
**PATRICK J. NELIGAN, JR.**
    Texas State Bar No. 14866000
**JAMES P. MUENKER**
    Texas State Bar No. 24002659

**KLEVANSKY PIPER, LLP**
A Limited Liability Law Partnership

/s/ Simon Klevansky
**SIMON KLEVANSKY**
**ALIKA L. PIPER**
**NICOLE D. STUCKI**

**ATTORNEYS FOR DEBTOR**

**BICKEL & BREWER**

/s/ William A. Brewer III
**WILLIAM A. BREWER III**
    Texas State Bar No. 02967035
**MICHAEL S. GARDNER**
    Texas State Bar No. 24002122
**SPECIAL COUNSEL FOR DEBTOR**

---

In re M Waikiki LLC, Debtor, Case No. 11-02371, United States Bankruptcy Court, District of Hawaii; DEBTOR'S OBJECTION TO PROOF OF CLAIM NO. 79 FILED BY MARRIOTT HOTEL SERVICES, INC. AND MARRIOTT INTERNATIONAL, INC.; DECLARATION OF DAMIAN MCKINNEY IN SUPPORT THEREOF