RUSH MOORE LLP
A Limited Liability Law Partnership
SUSAN TIUS 2873-0
737 Bishop Street, Suite 2400
Honolulu, Hawaii 96813-3862
Tel. No. 521-0406
Fax No. 521-0497
E-mail: Stius@rmhawaii.com

SHEPPARD MULLIN RICHTER & HAMPTON LLP
CARREN B. SHULMAN
ALAN M. FELD
30 Rockefeller Plaza
New York, NY 10112-0015
Tel. No. (212) 653-8700
Fax No. (212) 653-8701
E-mail: CShulman@sheppardmullin.com
E-mail: AFeld@sheppardmullin.com

JENNER & BLOCK LLP
LINDSAY C. HARRISON
1099 New York Avenue, NW
Washington, DC 20001
Tel. No. (202) 639-6865
Fax No. (202) 661-4956
E-mail: LHarrison@jenner.com

Attorneys for MARRIOTT INTERNATIONAL, INC.
and MARRIOTT HOTEL SERVICES, INC.

## UNITED STATES BANKRUPTCY COURT

### DISTRICT OF HAWAII

| | |
|---|---|
| In Re<br><br>M WAIKIKI LLC,<br><br>        Debtor. | Case No. 11-02371 (Chapter 11)<br><br>**MARRIOTT HOTEL SERVICES, INC. AND MARRIOTT INTERNATIONAL, INC.'S PRE-HEARING BRIEF REGARDING THE ESTIMATION OF** |

**MARRIOTT HOTEL SERVICES, INC. AND MARRIOTT
INTERNATIONAL, INC.'S PRE-HEARING BRIEF REGARDING THE
<u>ESTIMATION OF MARRIOTT'S PROOF OF CLAIM NO. 79</u>**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................iv

INTRODUCTION ......................................................................1

FACTUAL BACKGROUND ..........................................................5

    A.    The Hotel. ...................................................................5

    B.    The Management Agreement. .....................................6

        1.    Marriott's Management Fees .............................8

        2.    Termination Provisions. ....................................8

        3.    Key Money. ...................................................10

    C.    The Construction and Delayed Opening of the Hotel. ........11

    D.    The Hotel's Opening ...................................................11

    E.    The Hotel's Ramp Up. ................................................12

    F.    The Takeover. ............................................................14

    G.    The Aftermath. ..........................................................15

    H.    Proceedings in Bankruptcy Court ..................................16

MARRIOTT'S WITNESSES .........................................................16

ARGUMENT ..........................................................................17

I.    THE DEBTOR BREACHED THE MANAGEMENT AGREEMENT. ......17

II.    MARRIOTT IS ENTITLED TO RECOVER DAMAGES FOR THE BREACH. ...............................................................................19

i

A.  Marriott Is Entitled to the Recovery of the Management Fees
    That It Would Have Earned Under the Management
    Agreement. ...............................................................................20

    1.  Expert Analysis Establishes that the Present Value of
        Marriott's Lost Management Fees Is Equal To
        $35,041,800................................................................21

        a.  Methodology ...............................................................21

        b.  The Hotel's Historic Performance ...............................22

        c.  The Hotel's Anticipated Future Performance.................25

        d.  Marriott's Base Management Fees ...............................27

        e.  Marriott's Incentive Management Fees...........................28

        f.  Discount Rates .............................................................28

        g.  Marriott's Avoided Costs .............................................29

        h.  Total Management Fee-Related Damages.....................32

        i.  Debtor's January 2011 Projections...............................33

        j.  Debtor's Estimate of Marriott's Damages.....................34

    2.  Marriott's Calculation of Management Fees Is Not Unduly
        Speculative. ..............................................................35

        a.  With Respect to General Damages, New York Law
            Places the Burden of Uncertainty on the Breaching
            Party. ............................................................................35

        b.  The Cases Cited by the Debtor Are Inapposite to
            this Case. ....................................................................38

ii

3. The Debtor's Objection That Marriott Would Have Failed the Performance Test Is Flawed Legally and Factually.......................................................43

   a. Under New York Law, the Debtor May Not Seek To Limit Marriott's Damages By Claiming That Marriott Would Have Been Unable to Perform in the Future .......................................44

   b. Marriott Would Have Passed the Performance Test ......46

B. Marriott Is Entitled to Recover $4,424,306.95 In Loans Made to Working Capital and Other Expenses Incurred on Behalf of the Hotel. ..............................................47

C. Marriott Is Entitled to Recover $ 961,139.29 In Severance and Relocation Expenses..................................49

D. Marriott Is Entitled to Recover $57,466 In Customer Chargebacks and Refunds. ..............................50

CONCLUSION ..............................................51

U.S. Bankruptcy Court - Hawaii   #11-02371   Dkt # 840   Filed  03/29/12   Page 5 of 59

# TABLE OF AUTHORITIES

**CASES**

*150 Broadway N.Y. Assoc. L.P. v. Bodner*, 14 A.D.3d 1 (N.Y. App. Div. 2004) ............................................................................................19

*24/7 Records, Inc. v. Sony Music Entertainment, Inc.*, 566 F. Supp. 2d 305 (S.D.N.Y. 2008) ............................................................................38

*Adams v. Lindblad Travel, Inc.*, 730 F.2d 89 (2d Cir. 1984).............................30

*American List Corp. v. U.S. News & World Report, Inc.*, 75 N.Y.2d 38 (1989) ........................................................................................19, 44

*Ashland Management Inc. v. Janien*, 82 N.Y.2d 395 (1993) ..........37, 40, 41, 42, 43

*Autowest, Inc. v. Peugeot, Inc.*, 434 F.2d 556 (2d Cir. 1970)............................37

*Bloor v. Falstaff Brewing Corp.*, 601 F.2d 609 (2d Cir. 1979) ...........................38

*Borne Chemical Co. v. Dictrow*, 85 A.D.2d 646 (N.Y. App. Div. 1981) ..............36

*Brushton–Moira Central School District v. Fred H. Thomas Associates, P.C.*, 91 N.Y.2d 256 (1998) .............................................................19

*Contemporary Mission, Inc. v. Famous Music Corp.*, 557 F.2d 918 (2d Cir. 1977) ........................................................................................36, 38

*In re Food Management. Group, LLC*, 372 B.R. 171 (Bankr. S.D.N.Y. 2007) .....................................................................................44, 45, 46

*Goodstein Construction Corp. v. City of New York*, 80 N.Y.2d 366 (1992)...........19

*Hirschfeld v. IC Securities, Inc.*, 132 A.D.2d 332 (N.Y. App. Div. 1987) .............36

*J. Petrocelli Construction, Inc. v. Realm Electrical Contractors, Inc.*, 15 A.D.3d 444 (N.Y. App. Div. 2005) ........................................................... 18-19

*Katz Communications, Inc. v. Evening News Ass'n*, 705 F.2d 20 (2d Cir. 1983) ........................................................................................30

*Kenford Co. v. County of Erie*, 67 N.Y.2d 257 (1986)....................................38, 39

*R&I Electronics, Inc. v. Neuman*, 66 A.D.2d 836 (N.Y. App. Div. 1978)..............30

iv

*Two Guys from Harrison-N.Y., Inc. v. S.F.R. Realty Assocs.*, 63 N.Y.2d 396 (1984)..................................................................................................................19

*Tractebel Energy Marketing, Inc. v. AEP Power Marketing, Inc.*, 487 F.3d 89 (2d Cir. 2007).......................................................................................36, 39

*Vermont Teddy Bear Co. v. 538 Madison Realty Co.*, 1 N.Y.3d 470 (2004)..........18

v

Marriott Hotel Services, Inc. and Marriott International, Inc. (collectively "Marriott") submit this pre-hearing brief in connection with the hearing to estimate its Proof Of Claim No. 79. In support of this pre-hearing brief, Marriott respectfully states as follows.

## INTRODUCTION

This case concerns a luxury-lifestyle hotel formerly known as The Waikiki EDITION ("the Hotel"). The building was purchased by Debtor, M Waikiki LLC, in 2006. In 2008, Debtor signed a long-term management agreement with Marriott to operate the property as The Waikiki EDITION. Debtor agreed that Marriott would manage the Hotel for an initial term of 30 years, followed by two 10-year extension terms, and that this agreement would survive the sale of the Hotel.

The parties' agreement contemplated an original Opening Date of July 1, 2009. After eight failed opening dates, the Hotel opened on September 28, 2010. The repeated delays deprived the Hotel of critical group business in its early months, as meeting and event planners were reluctant to book business in a hotel with an uncertain opening date. That exacerbated the difficulties of opening a new luxury hotel during a severe economic downturn.

As Marriott worked to overcome these challenges, Debtor praised Marriott's sales and marketing strategies as sound. But the Japanese tsunami struck in March

1

2011, reducing travel to Honolulu and placing downward pressure on rates and occupancy.

Discovery has revealed that Debtor intended to hold the property for only three to five years following its 2006 purchase, and then sell it.[1] As that deadline drew near, Debtor grew impatient – even though the Hotel had only been open a matter of months, and even though the contract does not call for an assessment of the Hotel's performance until at least five years after opening. Debtor filed a lawsuit in New York accusing Marriott of mismanagement even though it had warranted to the contrary in an Estoppel Certificate just a few months earlier. Rather than helping the Hotel, the instability and uncertainty generated by the lawsuit drove business away.

Notwithstanding these obstacles – many of them Debtor-created – Marriott continued to build the Hotel's base of business. It continually implemented adjustments and refinements to its sales and marketing strategies, and they were yielding significant results. Nevertheless, in the pre-dawn hours of August 28, 2011 – only eleven months after the Hotel's opening – Debtor raided the Hotel with roughly fifty security personnel and the aid of Marriott's Head of Security, whose defection Debtor had secretly induced. This was a flagrant violation of the parties' contract. Debtor was expressly forbidden from terminating the long-term

---

[1] Deposition of Damian McKinney at 13:25-14:21 & Ex. 2.

agreement on the basis of an alleged default by Marriott without first securing a final court order declaring Marriott to be in default. Instead, Debtor bypassed the contractually required judicial process and arrogated to itself the role of judge and jury.

Under New York law, which governs the agreement of the parties, Marriott is entitled to the income it would have earned from the Management Agreement as damages for Debtor's flagrant breach of contract. Those damages consist of two streams of income that Debtor promised to pay Marriott. The first, base management fees, are simply a percentage of the Hotel's total revenue and do not depend on profitability. Because the Hotel was certain to earn revenue, Marriott's entitlement to base fees is a certainty, and the only question is in what amount. The second stream of revenue, incentive management fees, are a percentage of the Hotel's net operating income above a certain threshold. The incentive management fees thus depend in part on the Hotel's profitability.

As described below and set forth in the Declaration of Bruce Baltin, a leading expert in the hospitality industry with decades of experience working for owners and managers alike, the total present value of Marriott's management fees under the contract, accounting for costs that Marriott will avoid incurring, is $33,053,307.

U.S. Bankruptcy Court - Hawaii  #11-02371  Dkt # 840  Filed  03/29/12  Page 10 of 59

Debtor's response to these damages is unavailing. Debtor's main argument is that Marriott would have failed the Management Agreement's "performance test" – a test that would not have kicked in until 2017. Marriott would have passed this test had it been allowed to continue performing, but in any event it is blackletter law that, having repudiated the contract and prevented Marriott from continuing to perform, Debtor is legally barred from arguing that Marriott would not have been able to meet this test. Debtor's other argument is that Marriott should have to deduct a portion of its overall corporate fixed costs from its lost fees. New York law does not support that assertion either, because Marriott will incur those costs regardless whether it manages this particular Hotel.

Marriott is entitled to additional damages beyond the lost management fees. Marriott has loaned millions of dollars to the Hotel's working capital account to fund operating expenses – expenses Debtor is contractually obligated to pay. Marriott also incurred out-of-pocket costs in the aftermath of Debtor's takeover of the Hotel, including severance payments made to employees who were terminated following the takeover and the refund of deposits to customers who had booked with Marriott and did not trust Debtor's new manager.[2]

---

[2] Marriott is also entitled to interest on a large portion of these costs, as described in greater detail in the McCann Declaration. Additionally, these costs continue to grow as additional pre-petition operating expenses and out-of-pocket costs are invoiced.

4

Accordingly, Marriott respectfully requests that the Court estimate the total value of Marriott's claim at $38,496,219.24, plus prejudgment interest.[3]

## FACTUAL BACKGROUND

### A.     The Hotel.

Conceived by Marriott in partnership with Ian Schrager, the EDITION brand is Marriott's newest full-service luxury brand. The brand is a "lifestyle" brand, which combines the intimate, individualized lodging experience created by Schrager, with the global reach, expertise and scale of Marriott. It offers unique design and true innovation with personal, friendly service as well as one-of-a-kind food, beverage and entertainment offerings, all under one roof. Each highly stylized hotel functions as a "home away from home." Declaration of Kenneth Rehmann ("Rehmann Decl.") ¶11.

The Hotel was the brand's first property. Located in Waikiki, the property includes 353 guestrooms and suites, nearly all affording full or partial ocean views; 12,627 square feet of meeting space; a restaurant run by celebrity chef Morimoto; a

---

[3] These damages understate the harm that Debtor has caused to Marriott by its ouster of Marriott after only ten months of operation. As explained in the Declaration of Kenneth Rehmann, Debtor's lawless conduct also caused significant harm to Marriott's reputation. For purposes of this Claim, Marriott has not attempted to quantify these reputational damages, but they are also substantial. Furthermore, Marriott has yet to receive discovery from Aqua, the competitor to whom Debtor provided Marriott's proprietary information. Marriott reserves the right to supplement the record when it receives outstanding discovery, including the right to seek estimation of additional amounts stemming from Debtor's theft of Marriott's proprietary information.

5

spa; the Crazybox nightclub; two separate pool areas; a lobby bar; and a fitness center. The interior design is striking, and its combination of modern aesthetics and luxury service set The Waikiki EDITION apart from other properties in the market. Expert Declaration of Bruce Baltin ("Baltin Decl.") ¶29.

**B.      The Management Agreement.**

The Management Agreement that governs the relationship between Marriott and Debtor was executed on July 9, 2008.[4] The term totals 50 years: an initial term of 30 years began on September 28, 2010, and Marriott is entitled in its discretion to renew for two successive periods of ten years each. MA § 2.01; Declaration of Catherine Young ("Young Decl.") ¶4.

Debtor agreed to vest Marriott with operational and managerial authority over the Hotel, including in the areas of employment, pricing, publicity and advertising, licenses, and permits. MA §§1.02, 1.04. Debtor held veto rights over the hiring of the general manager and director of sales. M.A. §1.06(E).

Debtor agreed to bear virtually the entire cost associated with managing the Hotel. In particular, Marriott may pay from the Hotel's Gross Revenues all operational expenses for the Hotel, including wages and benefits of Hotel employees, and marketing and advertising costs. MA §§1.04, 4.05, 12.01 at 60-62

---

[4] That same day the parties executed a Design and Technical Services and Pre-Opening Agreement ("TSA").

6

(definition of "Deductions") & Ex. D. If the Hotel's Gross Revenues are not sufficient to cover Marriott's operating expenses, Debtor must cover the shortfall. MA §4.03(D); *see also id.* §4.02(C).

Furthermore, Debtor was obligated to fund a working capital account upon request by Marriott to pay for the Hotel's operating expenses. *See id.* §4.09. In the event Owner fails to fund such working capital, Marriott may "lend to Owner such amount from [Marriott's] own funds" with interest. *Id.*[5]

In addition, the Management Agreement required Debtor to pay Marketing Fee Services – services provided for the general marketing of the EDITION brand – equal to 1.5% of the Hotel's revenue. MA §12.01 at 67; Young Decl. ¶¶9, 14.

Debtor was also required to pay for Chain Services, including reservation services and Information Technology services. Young Decl. ¶¶9, 15; MA §1.11 & Ex. C. Each hotel that utilizes Chain Services is charged for its fair share of services used. When one hotel exits the system, the fair share paid by the other hotels simply increases to account for the fact that there is one fewer hotel using the services. Young Decl. ¶15.

---

[5] Debtor was similarly obligated to fund Marriott's pre-opening costs under the TSA. *See* TSA §§5.3-5.5. Debtor alone bore the cost of Marriott's pre-opening expenses. *Id.* §5.4. If Debtor failed to pay, Marriott had "the option to reimburse itself such amounts together with interest . . . from distributions otherwise payable to Owner pursuant to the Management Agreement." *Id.* §5.5.

7

The only costs borne by Marriott under the Management Agreement were Central Office Services, which include, for example, executive supervision of hotel operations, corporate finance work, and legal services. MA §1.10 & Ex. B. With the exception of the cost of travel to the Hotel site, Central Office Services are **fixed costs that Marriott would incur regardless of whether it managed this Hotel** or not. Young Decl. ¶18; Declaration of Tim Miller ("Miller Decl.") ¶¶14-15.

### 1. Marriott's Management Fees.

The Management Agreement entitles Marriott to earn a Base Management Fee, which ranges from 3-4 percent of the Hotel's gross revenues. MA §§1.03(B), 3.01(A) (as amended by First Amendment to MA §4). Gross revenues are defined to include the rental of the Hotel's restaurant if leased to a third party. MA §12.01, at 65.

In addition, Marriott was entitled to receive an Incentive Management Fee, equal to 25 percent of operating profits above an owner's "priority" return of $19,425,000. MA §§1.03(B), 3.01(B), 12.01 at 66. However, if the Hotel's restaurant is leased (as it was), the owner's priority was to be equitably reduced. *See* M.A. §11.27.

### 2. Termination Provisions.

The Management Agreement only permits termination under specific conditions.

8

*First*, under the heading "Performance Termination" in Section 2.02(A), Debtor has a termination right that does not even begin to vest until the Hotel has been open for five years. Even then, Debtor only has the right to terminate if, for two consecutive years, (a) the Hotel's operating profits are less than a certain threshold (the "Performance Termination Threshold"), (b) the Hotel's revenue per available room ("RevPAR") is less than 90% of its "competitive set," (c) the Hotel's performance is not attributable to certain conditions beyond Marriott's fault, and (d) Marriott chooses not to prevent termination by making a "shortfall payment" equal to the difference between the operating profits and the Performance Termination Threshold for the two consecutive fiscal years.

The Management Agreement allowed Marriot to make two such shortfall payments in any fifteen-year period. MA §2.02(B). Thus, if Marriott failed the performance test and decided to make shortfall payments, Debtor could not have terminated for performance until eleven years after the Hotel's opening.

The reason a performance termination right does not arise for several years is to give the Hotel the opportunity to "ramp up" its performance. As admitted by Debtor's asset manager, new hotels typically have a "ramp up" period of three to seven years before their room rates and occupancy stabilize. *See* 3/22/2012 Deposition of Paul Guccini ("Guccini Dep.") at 135:11-15.

9

*Second*, either party **is entitled to terminate the contract** in the Event of Default by the other party, but "a non-defaulting party may *not* terminate this Agreement on the basis of an Event of Default *unless and until* "a court of competent jurisdiction has issued a final, binding and non-appealable order finding that the Event of Default has occurred and that it has such a material adverse effect." MA §9.02(A)(iii).

*Third*, **the Management Agreement** expressly limits Debtor's ability to terminate at any time for any reason, "including, without limitation, any Event of Default," if Marriott is then-providing loans to Debtor with respect to the Hotel or **so long as any amounts** funded by Marriott pursuant to any loan remain outstanding and payable to Marriott. MA §2.03.

### 3.   Key Money.

Immediately after the Hotel opened, Marriott paid $4.98 million in Key Money to Debtor in consideration for the **Management Agreement.** Young Decl. ¶21; *see also* MA §11.26.A; First Amendment at ¶3. Section 11.26.B of the Management Agreement provides a clear formula for determining the amount of Key Money Debtor is required to return to Marriott if the Agreement is terminated prematurely.[6]

---

[6] As an alternative to damages flowing from the its lost management fees, Marriott is entitled to the return of its key money pursuant to formula in Section 11.26 of the Management Agreement.

U.S. Bankruptcy Court - Hawaii   #11-02371   Dkt # 840   Filed 03/29/12   Page 17 of 59

## C.    The Construction and Delayed Opening of the Hotel.

Debtor was responsible for managing the construction process for the Hotel and overseeing the project to completion. TSA §§4.1, 6.1, 6.3, 8.2.1; MA §1.03. Although the TSA set the Hotel's projected opening date at July 1, 2009,[7] the Hotel did not actually open until September 28, 2010. By the time the Hotel opened its doors to the public, Debtor had projected, and failed to meet, eight separate opening dates for the property. *See* Miller Decl. ¶¶8-9.

Debtor's eight opening delays thwarted Marriott's best efforts to market the Hotel during the pre-opening period. Because Marriott relied on Debtor's projected opening dates to market the Hotel to travel agents and potential guests, the Hotel's extended and uncertain construction period undermined confidence that the Hotel would open when promised. Marriott's competitors seized upon this uncertainty to lure business away. *See* Miller Decl. ¶10.

These difficulties in pre-opening marketing were compounded by the recession, which profoundly impacted tourism in Honolulu and placed downward pressure on the rates that established competitors could charge. Miller Decl. ¶11.

## D.    The Hotel's Opening.

Despite these difficulties, the Hotel opened to rave reviews from critics and received an extraordinary amount of positive press coverage with a value of

---

[7] TSA §5.1.

11

millions of dollars.  Rehmann Decl. ¶18.  In the months following the opening, the

Hotel received numerous accolades from prestigious publications such as Travel +

Leisure and Conde Nast Traveler.  *Id.*  Soon after the Hotel's opening, the rating

authority AAA inspected the Hotel and rated it as a Four Diamond property,

earned by fewer than four percent of AAA-inspected hotels.  Baltin Decl. ¶63.

### E.    The Hotel's Ramp Up.

Notwithstanding the positive publicity achieved around the Hotel's opening,

the Hotel was slower to "ramp up" than Marriott had anticipated.  "Ramp up" is

the period after opening during which a new hotel builds its rate and occupancy,

and that period of transition can last between three and seven years.  *See* Guccini

Dep. 11:22-24, 12:3-9; 49:16-22; 135:11-25.  The Hotel's ramp up was hampered

by the construction delays, the economic recession, and the tsunami, which

decreased Japanese tourism to Hawaii and led competitor hotels to reduce their

rates.  Miller Decl. ¶¶10-11.

Marriott adjusted its sales and marketing efforts, as well as its operations,

accordingly.  In order to boost occupancy, the Hotel lowered rates and used e-

commerce outlets like Expedia.  The strategy was to increase the number of guests

coming to the Hotel, offer an outstanding experience, and build a base of positive

reviews and loyal customers, which would allow the Hotel to increase its rates in

the future.  Miller Decl. ¶11.  The strategy was working, as reflected in the Hotel's

top ratings and its acceptance into Virtuoso, a top luxury travel agency which reflected the market's understanding that the Hotel was properly positioned as a luxury lifestyle product. *Id.* Marriott also facilitated bookings by marketing the Hotel through existing Marriott and Ritz-Carlton sales organizations and by featuring the Hotel in Marriott's communications to travel agents.[8] Marriott also put into place cost-cutting measures. A Profit Improvement Plan itemized areas in which the Hotel could save money.[9] The savings were projected to exceed $1 million by the end of 2011.[10]

At the same time, Debtor began to refuse to fund the Hotel's working capital, in violation of the Management Agreement. Despite repeated requests, Debtor's last contribution of working capital was made in April 2011. *See also* Young Decl. ¶¶22-24. In the interest of ensuring that Hotel employees and local vendors did not go unpaid, Marriott funded shortfalls pursuant to Section 4.09 of the Management Agreement, as itemized on the Hotel's Owner Franchise Billing ("OFB") statements. Young Decl. ¶26.

---

[8] *See* MHS00617370.

[9] *See* MHS00603911.

[10] *Id.*

13

### F.    The Takeover.

On May 26, 2011, Debtor filed suit in New York state court ("State Court"), alleging breach of contract.  The litigation adversely affected the Hotel's marketing efforts, as  prospective guests did not wish to book reservations and events at a hotel in legal flux, and competitors marketed against the Hotel on that basis. Miller Decl. ¶12.

Despite Owner's resort to legal process, including its request that a New York State court issue a declaration of its right to terminate the Management Agreement without consequence, Debtor had no intention of acting within the bounds of the law.  Discovery has revealed that less than two weeks after filing its lawsuit in New York State court, Debtor was already engaged in discussions regarding the removal of Marriott as Hotel manager. *See* Guccini Dep., Ex. 4.

At approximately 2:30 a.m. on August 28, 2011, eleven months after the Hotel first opened, Debtor entered the Hotel with approximately fifty hired security personnel and advised a Marriott employee on duty that it was purporting to terminate the parties' Management Agreement based on its "common law" right to do so.  Declaration of Roula McCann ("McCann Decl.") ¶4.  Debtor provided no prior notice of any of these actions. *Id.* ¶5.

Confronted with this flagrant disregard for the law, Marriott sought a temporary restraining order ("TRO") in State Court on August 30, 2011.  The

14

following day, after hearing from Debtor, the State Court issued the requested TRO, ordering that "Marriott shall be allowed to return to its management role by 2:30 p.m. on Wednesday, August 31, 2011 (Hawaii time; 8:30 p.m. EST)." *Order to Show Cause, Temporary Restraining Order, and Preliminary Injunction, Index No. 651457/2011 IAS Part 3* (N.Y. Sup. Ct. Aug. 31, 2011) (Bransten, J.). At 2:40 p.m., ten minutes after Debtor was obligated to comply with the terms of the TRO, Debtor filed for bankruptcy.

### G. The Aftermath.

Debtor's decision to conduct a hostile takeover has caused untold harm to Marriott, which has spent decades building its reputation as a company that provides superb, first-class service to its guests. Rehmann Decl. ¶¶38-40.

The takeover caused Marriott's group and leisure customers anxiety about events and stays they had booked at the Hotel. Many cancelled and brought their business elsewhere, demanding that Marriott refund their deposits. Others remained at the Hotel under its new manager and had disappointing experiences. They blamed Marriott for their distress. Rehmann Decl. ¶¶38-40; McCann Decl. ¶¶16-19; Young Decl. ¶33.

Marriott employees were also displaced. Given the pending TRO, Marriott paid salaried employees as usual during the days surrounding the takeover and hourly employees were paid in such a manner as to ensure they were kept whole.

15

Once Marriott determined that it would no longer be managing the Hotel, employees were notified that they would be severed. All employees were paid severance in accordance with Marriott policy. McCann Decl. ¶¶20-23; Young Decl. ¶¶29-30.

### H.    Proceedings in Bankruptcy Court.

Marriott filed its Proof of Claim in this Court on January 3, 2012. Debtor filed its Objection on January 19, 2012. An estimation hearing to estimate the value of Marriott's Claim is scheduled to begin on April 3, 2012.

## MARRIOTT'S WITNESSES

Marriott will present five witnesses at the Estimation Hearing who will provide testimony as follows:

- **Catherine Young** will provide testimony on the Management Agreement, losses Marriott incurred as a result of Debtor's unlawful breach of the Management Agreement, costs Marriott incurred as a result of Debtor's unlawful breach, operating expenses Marriott incurred in managing the Hotel, and Marriott's other unliquidated damages.

- **Kenneth Rehmann** will provide testimony on Marriott's business, the EDITION Brand concept, Marriott's contract with Debtor, the Hotel's opening and performance, Marriott's support for the EDITION brand, and Debtor's takeover of the Hotel.

16

- **Tim Miller** will provide testimony on factors that affected the Hotel's first-year performance and the limited incremental costs Marriott incurred in operating the Hotel.

- **Roula McCann** will provide testimony on loans Marriott has made to fund the Hotel's working capital account, and costs Marriott incurred as a result of Debtor's takeover.

- **Bruce Baltin** will provide expert testimony on the projected fees Marriott would have earned in performing the Management Agreement for the full term of the contract; the Hotel's expected performance relative to its competitive set; and factors affecting the Hotel's performance in the months after it opened.

### ARGUMENT

## I. DEBTOR BREACHED THE MANAGEMENT AGREEMENT.

In its Objection, Debtor does not claim that it terminated the Management Agreement consistent with its terms. Indeed, Debtor could not make any such claim. Debtor was not entitled to terminate on performance grounds, because the that termination right did not vest for another four years; it required two consecutive years of poor performance when the Hotel had been open only ten months; and it also could be cured by Marriott through a shortfall payment. MA §2.02. Nor was Debtor entitled to terminate for an Event of Default, because Marriott contested the existence of a Default, and there had been no final decision

17

by any court finding the existence of a Default, as is required for termination in
Event of Default.  MA §9.02(A).

Moreover, Marriott **had loaned money** to the Hotel to fund needed working
capital – capital that Debtor was obligated to fund under the Management
Agreement's terms.  And the Management Agreement makes clear that Debtor
may not terminate the contract while loans advanced to it by Marriott remain
outstanding.  MA §2.03.

In a letter delivered to **Marriott at the time of the takeover,** Debtor claimed to
be exercising a "common law" right of termination extrinsic to the terms set out in
the Management Agreement.  That notion finds no support in New York law.  The
Management Agreement is an integrated agreement that was carefully negotiated
by sophisticated parties.  New York law is clear **that when such parties craft the**
terms and conditions under which unilateral termination may be exercised, the
parties enjoy no extra-contractual rights of termination, whether derived from
common law or elsewhere, to unilaterally void the contract.  *See Vermont Teddy
Bear Co., Inc. v. Madison Realty Co.*, 1 N.Y.3d 470, 475 (N.Y. 2004) ("when
parties set down their agreement in a clear, complete document, their writing
should . . . be enforced according to its terms" (citations and quotation marks
omitted, alteration in original)); *J. Petrocelli Constr., Inc. v. Realm Elec.*

18

*Contractors, Inc.*, 15 A.D.3d 444, 446 (N.Y. App. Div. 2005) ("where parties agree on a termination procedure, the clause must be enforced as written").

That rule makes good sense. If a party retained a supposed common law right to terminate a contract, it would be futile for parties to bother to negotiate provisions defining and limiting the circumstances under which termination is permitted. However, New York law holds that courts may not interpret agreements to render a clause meaningless. *See Two Guys from Harrison-N.Y., Inc. v. S.F.R. Realty Assocs.*, 63 N.Y.2d 396, 403 (1984); *150 Broadway N.Y. Assoc. L.P. v. Bodner*, 14 A.D.3d 1, 6 (N.Y. App. Div. 2004) (contracts must be construed to "avoid an interpretation that would leave contractual clauses meaningless").

## II.     MARRIOTT IS ENTITLED TO RECOVER DAMAGES FOR THE BREACH.

Under New York law, a breaching party is liable for general damages that are "the natural and probable consequence of the breach." *Am. List Corp. v. U.S. News & World Report, Inc.*, 75 N.Y.2d 38, 42-43 (1989). Such damages are intended to give the non-breaching party the benefit of its bargain by placing that party in the same position that it would have been in, but for the breach. *See Brushton–Moira Cent. School Dist. v. Thomas Assoc.*, 91 N.Y.2d 256, 261 (1998); *Goodstein Constr. Corp. v. City of New York*, 80 N.Y.2d 366, 373 (1992) (same).

19

U.S. Bankruptcy Court - Hawaii   #11-02371   Dkt # 840   Filed  03/29/12   Page 26 of 59

Here, Marriott's damages fall into four categories: first, the management fees that Debtor agreed to pay Marriott under the Management Agreement; second, the money that Marriott has loaned to the Hotel's working capital account that Debtor is obligated to repay under the terms of the Management Agreement as well as other pre-petition operating expenses that have since been billed to the Hotel; third, the severance and relocation expenses that Marriott has incurred as the direct and natural result of Debtor's breach; and fourth, the costs Marriott has incurred in refunding the deposits of customers who made reservations at the Hotel on the expectation that the Hotel would be managed by Marriott.

### A. Marriott Is Entitled to the Recovery of the Management Fees That It Would Have Earned Under the Management Agreement.

The Management Agreement entitles Marriott to two streams of revenue: base management fees, equal to a percentage of the Hotel's *total* revenue; and incentive management fees, equal to a percentage of the Hotel's *net* operating income above a certain threshold. These fees constitute the main consideration promised to Marriott in exchange for entering into the Management Agreement. They are the principal benefit of Marriott's bargain, and Marriott is entitled to recover the present value of those fees.

U.S. Bankruptcy Court - Hawaii   #11-02371   Dkt # 840   Filed  03/29/12   Page 27 of 59

1. **Expert Analysis Establishes that the Present Value of Marriott's Lost Management Fees Is Equal To $33,053,307.**

Bruce Baltin, a Senior Vice President of PKF USA, one of the top global hospitality industry consulting firms, *see* Baltin Decl. ¶15, has analyzed the present value of the management fees owed to Marriott. Mr. Baltin has over 40 years of experience conducting market demand and valuation studies for hotel owners as well as hotel managers, including extensive experience in the Hawaii market. *Id.* ¶¶11-14. Further, PKF is familiar with the Hotel itself, having appraised the property three times in the past ten years, including in 2008 for Debtor's lender, Centerline Capital Group. *Id.* ¶21.

a. Methodology

Mr. Baltin's methodology for calculating Marriott's lost management fees was to identify the hotels that will provide primary competition for the Hotel based on the Hotel's luxury lifestyle positioning; to identify the advantages and disadvantages of the Hotel that will affect its market penetration relative to its competitors; and, based on the historic and anticipated performance of the competitors, to project the likely future financial performance of the Hotel. *See* Baltin Decl. ¶¶35-38. This type of analysis is well-established in the industry as the accepted method for estimating future returns for business planning and investment purposes. *Id.* ¶37; Guccini Dep. 56:3-11. Indeed, Debtor's asset manager prepared projections for the Hotel using the same methodology, see

21

Guccini Dep. 50:20-24, 52:17-25;[11] as has one of Debtor's experts, James

Hallstrom. *See* Declaration of James Hallstrom ("Hallstrom Decl.") ¶5.

### b. The Hotel's Historic Performance

Looking to the historic and anticipated performance of competitors offers a

more stable foundation for projecting the Hotel's future performance than using the

Hotel's very limited historic data. *See* Baltin Decl. ¶58. Debtor ousted Marriott

from the Hotel eleven months after opening, and as a result, there are only ten

complete months of historic performance data. For several reasons, that limited

data is not a reliable predictor of the Hotel's future performance.

*First*, in the initial months following opening, it is normal for a hotel to

experience a period of "shakeout" during which the operation of the hotel – such as

its staffing and marketing strategy – is adjusted to respond to the marketplace.

Baltin Decl. ¶57. Thus, it is not rational to project a hotel's expected future

performance based on its first months of operation. *Id.* ¶58.

*Second*, all hotels undergo a period of "ramp up," typically lasting three to

five years. Baltin Decl. ¶56; *see also* Guccini Dep. 135:11-16 (noting ramp-up

period of three to seven years). For the first several years of operation, hotels

typically experience occupancy rates and ADR that are lower than their

---

[11] *See also* DFT0011688.

22

competitors, but build large year-to-year increases in those figures as they broaden their base of business and ramp up to competitive levels.  Baltin Decl. ¶¶56-58.

*Third*, in this case, the Hotel suffered from a number of extraordinary or one-time challenges that made its first ten months more challenging than usual but will not have a long-term adverse effect on the Hotel's performance.  Baltin Decl. ¶60-63.  The challenges include:

- Repeated construction delays that interfered with the Hotel's pre-opening marketing.  The Hotel was originally slated to open in July 2009.  That date was pushed back eight separate times, and the Hotel ultimately opened on September 28, 2010.  Miller Decl. ¶8-9.  These delays had a devastating effect on the Hotel's ability to book wholesale and group business in anticipation of its opening.  Meeting and event planners want to ensure that a hotel will be open when their event takes place, and repeated opening delays undermine a hotel's credibility.  Miller Decl. ¶10; Rehmann Decl. ¶20; Guccini Dep. 134:13-16; Baltin Decl. ¶60.  Indeed, competing hotels used the Hotel's delayed opening dates to capture group business at the expense of the Hotel.  Rehmann Decl. ¶20.

- The most severe economic recession in decades, which resulted in a significant reduction in tourist traffic to Hawaii in 2009 and a

23

corresponding drop in the rates charged by the Hotel's competitors. Baltin Decl. ¶¶46, 60. The hotels in the competitive set are only now returning to pre-recession levels of performance. The recession exacerbated the Hotel's difficulties in booking business prior to opening, and it depressed the Hotel's rate and occupancy upon opening. Baltin Decl. ¶60; Rehmann Decl. ¶20.

- The Japanese tsunami in March 2011, which negatively impacted Japanese tourism to Hawaii, which is a major market for Hawaiian hotels. Although the Hotel did not yet rely significantly on Japanese business, its competitors depend heavily on such business, and downward pressure on the rates of those hotels impacted the Hotel's ability to increase its rates. Baltin Decl. ¶60; Miller Decl. ¶11.

- The onset of litigation in May 2011, which was highly publicized and created uncertainty concerning the future management of the Hotel. Potential guests are wary of booking reservations and events at a hotel in legal flux, and the Hotel's competitors capitalized on these concerns to market against the Hotel. Miller Decl. ¶12.

Notwithstanding these significant challenges, the Hotel's financial performance had begun to improve markedly over the first seven months of 2011.[12]

---

[12] MHS00033597.

24

By August 2011, the Hotel was on pace to turn a profit for the first time, and it had landed significant group bookings for Fall 2011.[13]

Moreover, the Hotel had received excellent reviews from guests on websites such as TripAdvisor, Expedia, and Yelp. Baltin Decl. ¶63. It also had received strongly favorable reviews from critics and numerous accolades from industry press. *Id.* Additionally, the Hotel was invited to participate in Virtuoso, one of the industry's leading luxury travel companies, showing that the market recognized the Hotel's capacity to attract a luxury clientele and charge luxury rates. *Id.*; Rehmann Decl. ¶18.

However, Debtor's takeover of the Hotel on August 28, 2011– only eleven months after the Hotel's opening – prevented Marriott from continuing this ramp-up, which, after a difficult opening, had begun to accelerate. It would be irrational to conclude that the Hotel's performance during its first ten months of operation is indicative of the Hotel's expected future performance. Accordingly, using competitors' historic performance and expected future performance as a baseline provides a more stable foundation for projecting the Hotel's own future performance. Baltin Decl. ¶¶61-62.

c. The Hotel's Anticipated Future Performance

---

[13] *See* MHS00275241, MHS00632024.

U.S. Bankruptcy Court - Hawaii   #11-02371   Dkt # 840   Filed  03/29/12   Page 32 of 59

Based on his familiarity with the hotel market in Oahu, and Waikiki Beach in particular, Mr. Baltin identified six properties that would be the primary competitors to the Hotel. These six hotels match the "competitive set" chosen by the parties to benchmark the Hotel's performance as well as the competitive set employed by Debtor's expert in his analysis. *See* MA §12.01 at 59 & Second Amend. ¶3; Hallstrom Decl., Ex. A at 3.

The hotels in the competitive set fall into three different tiers. *See* Baltin Decl. ¶¶42-44. Based on his knowledge of the market, and after analyzing the Hotel's location, facilities, amenities, and level of service in comparison to the hotels in the competitive set, Mr. Baltin projects that the Hotel – once it completes its ramp up – will achieve lower rates than the top tier hotels (the Halekulani and Kahala) but higher rates than the middle and lower tier hotels. *Id.* ¶¶67-68, 71. Significantly, this positioning of the Hotel is identical to that forecasted by Debtor's asset manager, Paul Guccini, in January 2011 when preparing a pro forma for distribution to potential buyers of the Hotel. *See* Guccini Dep. 52:21-25.

In particular, Mr. Baltin notes that the Hotel enjoys several unique strengths that set it apart from its competitors: its attractive and cutting-edge design resulting from a new and extensive renovation; a higher level of luxury service than provided by several of the competing hotels; a location closer than any of the competitors to the Ala Moana Center, the Hawaii Convention Center, and

26

Downtown Honolulu and away from "touristy" areas of Waikiki; the Morimoto restaurant, which opened to rave reviews; the Crazybox nightclub, which became the "in" spot for Honolulu nightlife following the Hotel's opening; two pool venues; a partial or full ocean view from virtually every guest-room; and one of the largest ballrooms in Oahu. Baltin Decl. ¶67. Once the Hotel's ramp-up is complete, Mr. Baltin projects that the Hotel achieve a RevPAR that is 97% of the competitive set's average RevPAR. Baltin Decl. ¶¶72-74.

### d. Marriott's Base Management Fees

Using these projections, Mr. Baltin calculated the Hotel's projected Room Revenues for each year: it is equal to the Hotel's expected RevPAR for that year multiplied by the number of rooms in the Hotel (353). To calculate the projected revenues for other Hotel Departments, such as Food & Beverage, Spa, and Valet Parking, Mr. Baltin employed a proprietary database owned by PKF containing revenue data from comparable properties. Baltin Decl. ¶¶77-117.

The total base management fees that would have been earned over the life of the contract – which are simply a percentage of gross revenues – equal $204,292,870. Baltin Decl. ¶¶122-23. As discussed below, Mr. Baltin then applied industry-standard techniques to discount the value of that amount to $34,461,429 in today's dollars. *Id.* ¶142.

U.S. Bankruptcy Court - Hawaii   #11-02371   Dkt # 840   Filed  03/29/12   Page 34 of 59

### e. Marriott's Incentive Management Fees

Mr. Baltin next projected the incentive management fees that Marriott would have earned over the life of the contract. These are equal to 25% of operating profits above an owner's "priority" return of $19,425,000. MA §12.01. Using PKF's proprietary database of comparable properties, Mr. Baltin identified the expenses the Hotel would incur and then calculated its profits. Baltin Decl. ¶¶77-117. Mr. Baltin determined that Marriott would not begin earning incentive management fees until the third decade of the contract, and the total incentive management fees over the life of the contract would equal $72,618,917. Mr. Baltin determined that the present value of the incentive management fees equals $580,371. *Id.* ¶142.

### f. Discount Rates

In order to calculate the present value of Marriott's base and incentive management fees, Mr. Baltin employed a discount rate for each type of management fee. A discount rate accounts for inflation as well as the risk associated with an investment; the higher the discount rate, the more risky the investment. Baltin Decl. ¶130. Because the base management fees (which depend solely on Hotel gross revenues) are much less risky than the incentive management fees (which depend on Hotel profitability above a certain threshold), *see* Baltin

28

Decl. ¶131; Guccini Dep. 17:15-18, Mr. Baltin employed a different discount rate for each type of management fee.

To determine the appropriate discount rates to use, Mr. Baltin, among other things, looked to investor surveys and Marriott's internal investment parameters, specifically the "hurdle rates" Marriott uses when evaluating whether to enter into new management contracts. *Id.* ¶¶132-33. Mr. Baltin also gathered publicly available information concerning Marriott's capitalization rate. *Id.* Based on these figures, he employed a conservative 7.5% discount rate for Marriott's base management fees – while also concluding that a 6.5% discount rate would be reasonable – and a 13.5% discount rate for its incentive management fees. *Id.* ¶136. Applying these discount rates, Mr. Baltin determined that Marriott would have collected, in total, $35,041,800 in today's dollars.

### g. Marriott's Avoided Costs

To put Marriott in the same position that it would have been absent the breach, Marriott has deducted from its lost management fees the costs that it will avoid incurring due to Debtor's breach. As New York law makes clear, such costs are the variable costs associated with performing a contract -- that is, the costs that are incurred solely in connection with performance of the contract and that would not otherwise be incurred.

29

New York law does not require Marriott to deduct its fixed costs, that is, the costs that it will incur regardless of whether it performs the contract. *See, e.g., R&I Electronics, Inc. v. Neuman*, 66 A.D.2d 836, 838 (N.Y. App. Div. 1978) (rejecting deduction of fixed expenses in computing lost profits and noting that "[t]he wrongdoer is entitled to a deduction of only such business costs as can reasonably be saved by reason of his breach… If the defendant's breach causes a reduction in the plaintiff's business but does not require the layoff or discharge of employees because they are needed to fulfill the plaintiff's other contracts, a proportional share of their salaries should <u>not</u> be deducted from plaintiff's expenses."); *Katz Communications, Inc. v. Evening News Ass'n*, 705 F.2d 20, 27 (2d Cir. 1983) (same); *Adams v. Linblad Travel, Inc.*, 730 F.2d 89, 93 (2d Cir. 1984) (no offset for fixed costs).

Here, Marriott will avoid only *de minimis* costs due to Debtor's breach. As explained above, under the terms of the Management Agreement, the costs of operating the property on a day-to-day basis are all reimbursed by Debtor. *See supra* at Facts §B.1. Marriott bears only the cost of Central Office Services associated with the Hotel's management – for example, the salaries of Marriott's executives who supervise hotel operations, conduct corporate planning and policy making, corporate finance and accounting, legal services, trademark protection, and product research and development. MA §1.10 and Ex. B; Young Decl. ¶17.

U.S. Bankruptcy Court - Hawaii   #11-02371   Dkt # 840   Filed  03/29/12   Page 37 of 59

These Central Office Services costs are fixed, meaning that Marriott will incur

them regardless of whether or not it performs the Management Agreement.

Marriott continues to carry these costs regardless whether it manages this particular

Hotel. Young Decl. ¶¶17-18. Accordingly, under New York law, such costs do

not need to be deducted from Marriott's lost management fees.

Debtor itself has acknowledged that the costs associated with Marriott's

performance of the Management Agreement are essentially zero. As Debtor's

manager represented to the Court in connection with Debtor's First Day Motions:

> Debtor agreed to pay Marriott a base management fee . . .
> [and] an incentive fee. . . . Those fees are essentially
> "pure profit" to Marriott, because the Management
> Agreement also requires Debtor to pay for all operating
> expenses of the Hotel, fund all capital costs, cover the
> Hotel's payroll (notwithstanding the fact that all Hotel
> workers are deemed to be employees of Marriott), and
> pay Marriott various fees and charges for so-called 'chain
> services,' including central reservations, national sales
> office, and national advertising and promotion services.

*See* Docket No. 17, 9/1/11 McKinney Aff. ¶15 (emphasis added).

The only variable costs incurred by Marriott in managing the Hotel are the

costs of travel to the property by Marriott staff members supervising the

management of the Hotel. Miller Decl. ¶¶14-15. Marriott has estimated these

costs to be between $41,688 and $74,112 per year. *Id.* Mr. Baltin conservatively

31

estimated that such trips would cost $100,000 per year. Baltin Decl. ¶141. Thus, in today's dollars, Marriott's total avoided costs equal $1,988,493. *Id.*[14]

### h. Total Management Fee-Related Damages

Adding the present value of the base management fees and incentive management fees that Marriott would have earned over the course of the Management Agreement, and subtracting the present value of its avoided cost, Mr. Baltin determined that the total damages owed to Marriott stemming from its lost management fees is equal to **$33,053,307**.

This calculation reflects a conservative analysis in several respects:

- The calculation makes no assumption about the success of the EDITION brand. If the EDITION brand is successful – and Marriott has every incentive to make it so, *see* Rehmann Decl. ¶¶27-28 – the Hotel will likely perform better than Mr. Baltin's projections suggest. Baltin Decl. ¶128.

- The calculation does not account for the marketing fee that Debtor was obligated to pay Marriott, equal to 1.5% of total revenues, to market the brand. MA §12.01. Some of that fee would no doubt be

---

[14] Debtor suggests that Marriott's management fees should be reduced by 25% to reflect amounts Marriott will owe to Ian Schrager under a contract between Marriott and Ian Schrager. Schrager has not submitted any Claim in this proceeding. The fact that Marriott may owe Schrager a portion of the management fees it collects is not a reason to reduce *Debtor*'s liability to Marriott.

32

used to offset costs Marriott would otherwise incur (such as the
EDITION website). Baltin Decl. ¶9.

- Mr. Baltin applied a conservative discount rate of 7.5 percent to the
base management fees, even though he stated that a 6.5 percent
discount rate would be reasonable. Baltin Decl. ¶¶133, 136.

- Mr. Baltin conservatively estimated Marriott's avoided costs. Baltin
Decl. ¶141.

- With respect to the incentive management fee, Mr. Baltin does not
perform the equitable adjustment lowering the Owner's "priority,"
even though such an adjustment is required when the Hotel restaurant
is leased to a third party. Baltin Dec. ¶121; MA ¶11.27.

- Mr. Baltin has not considered reputational damages suffered by
Marriott. As explained in the Rehmann Declaration, those damages
were substantial. The sudden takeover of the Hotel created negative
publicity for Marriott, resulted in a negative experience for Marriott's
guests, and undermined the confidence and trust that travel agents and
group managers place in Marriott. Rehmann Decl. ¶¶38-40.

i. Debtor's January 2011 Projections

Significantly, Debtor's own projections of the Hotel's future revenues –
prepared in January 2011 in anticipation of a possible sale of the Hotel – were even

33

*more* optimistic than Mr. Baltin's, even accounting for the fact that Debtor's revenue projections included revenues for Morimoto restaurant in addition to the Hotel.[15] Debtor's asset manager who prepared these projections admitted that they were reasonable projections based on the quality and characteristics of the Hotel and could reasonably achieved as an EDITION hotel. Guccini Dep. 42:6-12. Debtor's asset manager further agreed that the Hotel was reasonably capable of achieving 100% market penetration – that is, achieving the average RevPAR of the competitive set. Guccini Dep. 58:14-20.

### j. Debtor's Estimate of Marriott's Damages

Additionally, in the course of making a decision about whether to eject Marriott from the Hotel, Debtor's asset manager calculated the potential damages that Marriott might be owed based on the value of the Management Agreement, and calculated that sum to be ███████████[16] That estimation assumed that Marriott would collect ████████ in management fees for each year of the contract – which implies total revenues of approximately ████████ per year. *Id.* Debtor's asset manager acknowledged that that projection was conservative (indeed, much more conservative than his projections for potential investors

---

[15] *See* DFT0011688.

[16] *See* MWAIKIKI00083538.

34

merely a few months earlier[17]) and that the Hotel's revenues – and thus Marriott's base management fees, which are merely a percentage of total revenues – could be higher.  Guccini Dep. 95:25-96:7, 98:24-99:25.

**2.    Marriott's Calculation of Management Fees Is Not Unduly Speculative.**

Debtor's Objection asserts that Marriott is not entitled to recover *any* management fees because their calculation is too speculative.  Objection to Claim ¶48.  That ignores Debtor's own estimate of the value of the Management Agreement, as just discussed; it is contrary to New York law; and it exaggerates the degree of certainty that is required when a party seeks to recover general damages for breach of contract.

a.    <u>With Respect to General Damages, New York Law Places the Burden of Uncertainty on the Breaching Party.</u>

Cases applying New York law make clear that, while general damages "must be reasonably certain . . . '[C]ertainty,' as it pertains to general damages, refers to the *fact* of damages, not the amount.  For 'when it is certain that damages have been caused by a breach of contract, and the only uncertainty is as to their amount, there can rarely be good reason for refusing, on account of such uncertainty, any damages whatever for the breach.  A person violating his contract should not be permitted entirely to escape liability because the amount of the

_____

[17] *Compare* MWAIKIKI00083538 with DFT0011688.

35

damage which he has caused is uncertain.'" *Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc.*, 487 F.3d 89, 110 (2d Cir. 2007) (quoting *Wakeman v. Wheeler & Wilson Mfg. Co.*, 101 N.Y. 205 (1886)) (emphasis in original); *Borne Chem. Co. v. Dictrow*, 85 A.D.2d 646, 651 (N.Y. App. Div. 1981).

Accordingly, a plaintiff alleging breach of contract "need only show a 'stable foundation for a reasonable estimate' of the damage incurred as a result of the breach." *Contemporary Mission, Inc. v. Famous Music Corp.*, 557 F.2d 918, 926 (2d Cir. 1977) (quoting *Freund v. Washington Square Press, Inc.*, 34 N.Y.2d 379, 383 (1974)). "Such an estimate necessarily requires some improvisation, and the party who has caused the loss may not insist on theoretical perfection." *Tractebel*, 487 F.3d at 111 (internal quotation marks omitted); *see also Hirschfeld v. IC Securities, Inc.*, 132 A.D.2d 332, 336-37 (N.Y. App. Div. 1987). Further, "the burden of uncertainty as to the amount of damage is upon the wrongdoer." *Contemporary Mission*, 557 F.2d at 926; *Tractebel*, 487 F.3d at 110 (same); *Hirschfeld*, 132 A.D.2d at 337 ("[T]he benefit of the doubt must be given to the innocent party, not the contract violator.").

Here, there is certainty that Marriott would have earned substantial management fees under the contract. It is indisputable that the Hotel would have earned significant revenues (regardless of its profitability), of which Marriott was entitled to a percentage as base management fees. Thus, there is certainty that

36

damages have been caused by Debtor's breach of contract, and the only question is their amount.

Mr. Baltin has performed a carefully reasoned and well-supported analysis, using a methodology that is a common and widely accepted method used in the industry for valuing hotel investments. Baltin Decl. ¶37; Guccini Dep. 56:3-11 (admitting that this method of valuing a hotel deal is "commonly" used). This method was used by PKF to appraise the property for Debtor's lender in 2008;[18] it was used by Debtor to set a potential sales price for the Hotel in January 2011, see Guccini Dep. 50:20-24, 52:17-25;[19] and it was used by Debtor's own expert in this litigation, see Hallstrom Decl. ¶5. Where the parties themselves, in the ordinary course of business, have used such "carefully studied professional judgments of what they believed were realistic estimates of" future financial performance, damages are not unduly speculative. *Ashland Management Inc. v. Janien*, 82 N.Y.2d 395, 406 (1993); *Autowest, Inc. v. Peugeot, Inc.*, 434 F.2d 556, 566 (2d Cir. 1970) (not speculative to rely on projections that "were the product of deliberation by experienced businessmen charting their future course").

Moreover, Mr. Baltin's methodology is one that courts applying New York law have approved in measuring general damages in other industries. *See, e.g.*,

---

[18] *See* MWAIKIKI00066093.

[19] *See also* DFT0011688.

37

*Bloor v. Falstaff Brewing Corp.*, 601 F.2d 609, 615 (2d Cir. 1979) (Friendly, J.);

*Contemporary Mission*, 557 F.2d at 927-28. To be sure, projecting Marriott's

anticipated management fees over a **fifty year period involves some uncertai**nty;

but as the Second Circuit recently put it, "long-term contracts are entered into

regularly, and a degree of speculation is acceptable in the business community."

*Tractebel*, 487 F.3d at 112 n.25.

        b.    <u>The Cases Cited by Debtor Are Inapposite to this Case.</u>

      Debtor cites some cases in which damages have been rejected as too

speculative, *see* Objections at ¶¶53-56 (citing *Kenford Co. v. County of Erie*, 67

N.Y.2d 257 (1986); *24/7 Records, Inc. v. Sony Music Entertainment, Inc.*, 566 F.

Supp. 2d 305, 316 (S.D.N.Y. 2008)). It also cites cases denying recovery of lost

profits to new businesses. *See* Objections at ¶56.

      Significantly, however, those cases involved a claim by the plaintiff for

*consequential* rather than *general* damages, and New York law applies a more

stringent standard of proof to the former than the latter. This case, however, does

not involve consequential damages.[20] As the Second Circuit has explained, "Lost

profits are consequential **damages** when, as a result of the breach, the non-

breaching **party suffers loss of profits** on collateral business arrangements."

---

[20] Indeed, under the Management Agreement, the parties are not entitled to recover consequential damages. MA §11.21.

U.S. Bankruptcy Court - Hawaii   #11-02371   Dkt # 840   Filed  03/29/12   Page 45 of 59

*Tractebel*, 487 F.3d at 109-10. Such damages are claimed, for example, when a breach of contract "affect[s] the ability of the non-breaching party to operate his business, and thereby generate profits on collateral transactions [which are] contingent on the performance of the primary contract." *Id.* at 109 (emphasis added).

In New York, the extent of such consequential (collateral) damages must be proved with reasonable certainty, and the plaintiff must also establish that such potential liability was fairly within the contemplation of the parties when they entered the contract. *Id.* In *Kenford*, for example, the plaintiff sued for breach of a contract for the construction of a domed stadium, and sought to recover the profits it would have earned as manager of the stadium (had it been built). The Court of Appeals held that when the parties entered into the construction contract, they did not contemplate liability for lost profits stemming from the management of the stadium and resulting transactions with third parties. Additionally, the Court held, applying the standard for consequential damages, that the lost profits could not be proved with reasonable certainty. 67 N.Y.2d at 132-33.

In contrast to consequential damages, "when the non-breaching party seeks only to recover money that the breaching party agreed to pay under the contract, the damages sought are general damages." *Tractebel*, 487 F.3d at 109. As the Second Circuit has explained,

39

> The damages may still be characterized as lost profits
> since, had the contract been performed, the non-
> breaching party would have profited to the extent that his
> cost of performance was less than the total value of the
> breaching party's promised payments. But, in this case,
> the lost profits are the direct and probable consequence of
> the breach. *The profits are precisely what the non-*
> *breaching party bargained for*, and only an award of
> damages equal to lost profits will put the non-breaching
> party in the same position he would have occupied had
> the contract been performed.

*Id*. at 109-10 (emphasis added). As discussed above, with respect to general

damages, "'[c]ertainty' . . . refers to the *fact* of damage, not the amount." *Id*. at

110. A reasonable estimation of general damages is permitted, and the burden of

any uncertainty is placed upon the wrongdoer. *Id*.

Here, the management fees Marriott seeks to recover are plainly general

damages directly arising from the breach and are specifically described in the

Management Agreement, not consequential damages arising from potential

collateral transactions that have been lost as a result of the breach. The essence of

the Management Agreement involves revenues from hotel guests and hotel

operations, from which fees are paid to Marriott; indeed, the management fees are

"precisely what [Marriott] bargained for." *Id*.

The fact that The Waikiki EDITION was a new business does not change

matters. A case cited by Debtor, *Ashland Management Inc. v. Janien*, 82 N.Y.2d

395 (1993), is instructive. In that case, the contract provided that Ashland

40

Management, an investment management company, would provide the plaintiff with a share of revenues earned from marketing a new mathematical model for selecting stocks. *Id.* at 405. In order to project the value of the contract, the plaintiff estimated the future revenues Ashland would earn by managing assets with the mathematical model. The Court of Appeals held that such a projection was not unduly speculative. It emphasized several factors in reaching that conclusion, each of which is present here.

First, the Court noted that the parties themselves had made "carefully studied professional judgments of what they believed were realistic estimates of future assets to be managed by the use of" the mathematical model. *Id.* at 406. As discussed above, that is true of the parties here as well.

Second, "while the parties were launching a new investment strategy, they were not entering a new or unfamiliar business. Ashland had been a substantial presence in the financial management field for several years. The introduction of [the new mathematical model] was seen as an addition to and an enhancement to Ashland's existing [product] strategy, which had been highly successful, and Ashland intended to rely on its experience in marketing [its existing product] to market [the new model]." *Id.*

Precisely as in *Ashland Management*, the Hotel here was seen as an "addition to and an enhancement to" Marriott's existing business strategy, and

U.S. Bankruptcy Court - Hawaii  #11-02371  Dkt # 840  Filed  03/29/12  Page 48 of 59

Marriott intended to rely on its vast experience in managing hotels to manage the EDITION Waikiki. Although EDITION was a new brand and the EDITION Waikiki a new hotel, Marriott was hardly a newcomer to the business of managing luxury hotels or launching new brands. To the contrary, Marriott manages over 3,700 lodging properties in 73 countries and territories, and operates and franchises hotels under 13 distinct brands. In fiscal year 2011, Marriott International reported revenues of over $12 billion and collected management fees in the amount of approximately $741 million. As Debtor's expert acknowledges, Marriott typically dramatically over-performs the market, achieving RevPARs of up to 140% of the competitive set. *See* Declaration of Fred Kleisner ("Kleisner Decl.") ¶15. As *Ashland* shows, the cases cited by Debtor concerning new business are inapposite to this situation, involving a manager with vast experience managing thousands of properties over a period of decades to enormous success.

Third, like Ashland, Marriott had a "ready reservoir of customers . . . because it intended to appeal not only to the market in general but also to its existing . . . customers." *Id.* The Hotel, for example, utilized Marriott's reservations platform for both voice and Marriott.com. *See* Rehmann ¶29. Marriott developed a website for the Waikiki EDITION on Marriott.com that was used as both a sales vehicle and as a landing page for booking-related marketing activities. *Id.* ¶31. The Hotel was a member of Marriott Rewards, a loyalty

U.S. Bankruptcy Court - Hawaii  #11-02371  Dkt # 840  Filed  03/29/12  Page 49 of 59

program for existing Marriott customers that would introduce them to the Hotel. *Id.* ¶30. And the Hotel utilized numerous other Marriott sales and marketing channels to reach loyal Marriott customers around the world. *Id.* ¶33.

Finally, as in *Ashland*, it is significant that Marriott's base management fee – which constitutes the bulk of its management fees – depends upon revenue alone. It does not in any way depend upon the Hotel's costs or profitability, and therefore is much less speculative than the typical lost profits claim. Indeed, *it is undisputed that the Hotel has received and will continue to receive revenue.* Thus, there is nothing at all speculative about Marriott's continued collection of a base management fee in the future.

### 3. Debtor's Objection That Marriott Would Have Failed the Performance Test Is Flawed Legally and Factually.

Debtor's expert reports adopt the theory that Marriott is not entitled to significant damages because it would not have passed the performance test after the fifth year of operation, and so should not be permitted to claim management fees for the entire term of the Management Agreement. *See* Hallstrom Decl., Ex. A at 10-11; Kleisner Decl. ¶32; Declaration of Francis Nardozza ("Nardozza Decl.") at 6-19. That contention is flawed.

43

a.   Under New York Law, Debtor May Not Seek To Limit
Marriott's Damages By Claiming That Marriott Would Have
Been Unable to Perform in the Future

It is blackletter law that Debtor may not seek to limit Marriott's damages by

arguing that Marriott would have failed a condition of performance *in the future*.

New York law is clear that, having breached the contract and deprived Marriott of

the opportunity to perform, Debtor is not entitled to claim that Marriott's

performance would have been deficient in the future and therefore that Debtor, *in

the future*, would have been entitled to terminate the contract lawfully.

Where one party breaches or repudiates a contract, that party cannot limit its

liability by claiming that the counterparty would have failed to satisfy a condition

for performance in the future. *See, e.g., American List Corp. v. U.S. News &

World Report*, 75 N.Y. 2d 38, 44-45 (1989); *In re Food Mgmt. Group, LLC*, 372

B.R. 171, 190-94 (Bankr. S.D.N.Y. 2007) (applying New York law).  In *Food

Management*, the court observed that "[b]y foreclosing the future, the breaching

party deprives the counter-party of the opportunity to take the necessary actions to

tender its performance under the contract." *Id.* at 191.  Therefore, the court

explained, "the breaching party is estopped to claim that its own breach does not

matter because the counter-party could not have performed anyway." *Id.; see id.* at

192 (noting the "fundamental principle" that "a contracting party may not claim

44

that the counter-party's non-performance excused its own obligation when performance was wrongfully precluded by the contracting party's own breach").

Importantly, this rule applies even if there is some doubt (which there is not in this case) whether the plaintiff would have been able to perform. *See Food Mgmt.*, 372 B.R. at 192 ("In cases where it may not be possible to know whether the counter-party would have been able to perform, anticipatory repudiation by the **breaching party** *relieves the counter-party of the need to prove its ability to perform.*" (emphasis added) (citing *G.G.F. Properties, LLC v. Yu Mi Hong*, 284 A.D.2d 427, 455 (N.Y. App. Div. 2001)). As the court in *Food Management* put it, because the breaching party's "repudiation [had] foreclosed the future and made it impossible to know whether the [counterparty] could have [performed], . . . [t]he law would pervert justice if it imposed upon the [counterparty] the consequence of this uncertainty." *Id.*

The foregoing principles apply with equal force in the damages context. *American List*, decided by New York's highest court, is directly on point. In *American List*, the defendant purported to cancel a ten-year contract midway through the second year, and the plaintiff sued for breach. The plaintiff prevailed at trial, but the trial court – relying on testimony from the defendant's expert – reduced the award of lost profits to reflect "the risk that plaintiff would be unable to perform the contract in the future." *Id.* at 45. The Court reversed, observing

45

that "the doctrine [of anticipatory breach] relieves the nonrepudiating party of its obligation of future performance and entitles that party to recover the present value of its damages from the repudiating party's breach of the total contract." *Id.* at 44. The trial court's decision to "factor in the risk that the [plaintiff would] be unable to perform the contract in the future," the court reasoned, would improperly "require the nonrepudiating party to prove its ability to perform in the future, despite the fact the doctrine is intended to operate to relieve the nonrepudiating party from that very performance." *Id.* at 44-45; *see id.* at 44 ("The nonrepudiating party need not . . . prove its ability to perform the contract in the future.").

This case is indistinguishable from *American List*. Just as the *American List* defendant's second-year cancellation of a ten-year contract made it impossible for the plaintiff to perform in the contract's "out years," here Debtor's breach of the Management Agreement obviously makes it impossible for Marriott to perform in the future. Any reduction of damages to reflect that "the risk that [Marriott] would be unable to perform the contract in the future," *id.* at 44 – even if purportedly supported by testimony from Debtor's expert – would constitute legal error.

        b.   <u>Marriott Would Have Passed the Performance Test</u>

In any event, Marriott would readily have passed the performance test, as shown by Mr. Baltin's analysis. *See* Baltin Decl. ¶¶118-21. The pro forma prepared by Debtor's asset manager in anticipation of an offering to potential

46

investors in the Hotel reflects a similar expected performance. As the asset manager stated in his deposition, he projected that the Hotel would achieve close to 100% market penetration – that is, in terms of rate and occupancy, it would perform as well as the competitive set. Guccini Dep. 58:14-20.[21]

Accordingly, Marriott is entitled to recover **$33,053,307** in damages reflecting the present value of the management fees that it would have earned, but for Debtor's breach.[22]

**B.    Marriott Is Entitled to Recover $4,424,306.95 In Loans Made to Working Capital and Other Expenses Incurred on Behalf of the Hotel.**

In addition to the lost management fees that Marriott would have earned but for Debtor's breach, Marriott is also entitled to recover approximately $4,314,496.45 in working capital that it loaned to Debtor by foregoing payment of expenses incurred on behalf of the property, in addition to other operating expenses and guest accident claims, for a total of $4,424,306.95. MA §4.09.

---

[21] Marriott received the opposing experts' reports late in the day on March 24, 2012, and have not yet had the opportunity to depose those experts. Marriott will specifically rebut the assumptions and conclusions of these experts at trial.

[22] In the alternative, Marriott is entitled at the very least to recover the key money that is owed to it upon termination of the contract. Marriott paid Debtor key money equal to $4,980,000, and under Section 11.26(B) of the Management Agreement, Marriott is entitled to the return of that sum multiplied by the fraction of the years remaining in the initial 30-year term of the Agreement. Thus, Marriott is entitled to the return of key money equal to 29/30 of $4,980,000: that is, $4,814,000. Marriott claims its key money only in the alternative, because that money would not have been returned to it if the contract had not been terminated and Marriott had continued managing the property for the entire contract term.

U.S. Bankruptcy Court - Hawaii   #11-02371   Dkt # 840   Filed  03/29/12   Page 54 of 59

Between mid-April and August 2011, the Hotel made numerous requests for additional working capital.[23] These requests went unheeded. Although these funds were needed to pay the salaries of the Hotel's employees and the local vendors servicing the Hotel, Debtor refused to do so.[24] In order to compensate for the deficiencies in working capital caused by Debtor's failure to satisfy its obligations under Section 4.09 of the Management Agreement, Marriott forewent reimbursement for operational expenses incurred on behalf of the Hotel and itemized on Owner Franchise Billing ("OFB") statements. As noted in its July 19, 2011 letter regarding Owner's working capital default, Marriott deemed the amounts "paid from [Marriott's] own fund . . . a loan from [Marriott] in accordance with Section 4.09(ii) of the Management Agreement."

Having incurred the expenses itemized in unpaid OFB statements and other amounts payable for pre-takeover activity, Marriott is entitled to recover the total amount paid from its own funds, together with interest at the rate of prime plus three percent. These amounts come to $4,314,496.45. McCann Decl. ¶14.[25]

---

[23] *See* MHS00614130; MHS00614132.

[24] *See* MHS00614128.

[25] To the extent the $4,314,496.45 owed by Debtor for working capital loans includes amounts owed for pre-opening expenses or working capital deficits created by Debtor's non-payment of certain pre-opening expenses, these amounts are also recoverable. *See* TSA §§5.4 ("Pre-Opening Expenses shall be borne solely by Owner."), 5.5 (if owner fails to pay, Marriott entitled to interest on amounts advanced by Marriott).

48

In addition, pre-petition expenses continue to be billed to the Hotel, including moneys paid for guest accident claims and other expenses. Together with the working capital loans, these amounts total $4,424,306.95. *See* McCann Decl. ¶26 (Section B(i) total plus Section B(iv) guest accident claims). Marriott is also entitled to interest on that amount, but for purposes of this Estimation Hearing it has not calculated the interest that has accrued.

### C.   Marriott Is Entitled to Recover $ 961,139.29 In Severance and Wage Expenses.

Under the terms of the parties' contract and under New York law, Marriott is entitled to recover all severance pay and other wage payments it made to Hotel employees following Debtor's breach. M.A. §11.11(G).

For several days after Debtor's takeover, Marriott continued to pay salaried Hotel employees as usual and paid hourly employees in a manner that kept them whole. Marriott incurred these significant wage expenses while the fate of the Hotel remained unknown and the livelihood of large numbers of Hotel employees remained in doubt. *See* Young Decl. ¶29. Under the terms of the Management Agreement, these costs would have been paid out of the Hotel's gross revenues.

After Debtor declared bankruptcy and Marriott understood that it would no longer manage the Hotel, Marriott paid eligible employees severance pay, severance-related benefits, and 2011 pro-rated bonus payouts in accordance with the Marriott severance and bonus policy. *See id.* ¶30.

49

To date, Marriott has paid displaced Hotel employees approximately $400,151.51 in other wage and benefit expenses, and $560,987.78 in severance pay (including any underlying benefits) and pro-rated 2011 bonus payments, for a total of $961,139.29.[26] *See* McCann Decl. at ¶¶21-22. Debtor is not only obligated to pay these costs under the Management Agreement, but also under New York law, as these expenses are a natural and probable consequence of the breach.

### D. Marriott Is Entitled to Recover $57,466 In Customer Chargebacks and Refunds.

As noted above, as a result of Debtor's takeover of the Hotel and replacement of Marriott with another manager, certain guests cancelled their Hotel reservations completely or requested to be relocated to another Marriott hotel. Young Decl. ¶31. Many of the guests who cancelled or relocated had previously paid advanced deposits to Marriott at the time they made their reservations. Guests typically paid these advanced deposits by credit card or check. *Id.* ¶32. In accordance with the Management Agreement, Marriott deposited all of these funds into the Hotel's Operating Accounts and used them in the ordinary course of business. *See* MA §4.03.

When these guests cancelled or relocated because of the takeover, they demanded a refund of the advanced deposits previously paid to Marriott. Some

---

[26] Marriott continues to make severance payments to former Hotel employees. *See* McCann Decl. ¶23. Marriott therefore reserves the right to recover at a later date those severance expenses that have not yet accrued or been recorded.

U.S. Bankruptcy Court - Hawaii   #11-02371   Dkt # 840   Filed  03/29/12   Page 57 of 59

groups transferred their events to a different Marriott hotel but refused to place a new deposit. Thus Marriott International was forced to pay the deposit for the customer to make the hotel whole.

Other customers disputed the charge for the original deposit with their credit card providers, which then billed Marriott in the form of a "chargeback." In the normal course of business, guests who demanded refunds directly from Marriott or in the form of credit card chargebacks would have been reimbursed out of the Hotel's Operating Accounts. *See* MA §§4.03.C-D. While Debtor sought and obtained the authority to pay such reimbursements pursuant to the Order Authorizing Debtor to Honor Pre-Petition Customer Obligations Nunc Pro Tunc (Docket No. 403), Debtor has consistently refused to reimburse guests directly or via their credit card carriers. As a result, Marriott has incurred $57,466 in damages due to guests' refund demands and credit card chargebacks.

## CONCLUSION

For the foregoing reasons, this Court should estimate the value of Marriott's Claim at **38,496,219.24** plus pre-judgment interest.

U.S. Bankruptcy Court - Hawaii   #11-02371   Dkt # 840   Filed  03/29/12   Page 58 of 59

DATED:  Honolulu, Hawaii, March 28, 2012.

/s/ Susan Tius
SUSAN TIUS
Attorney for MARRIOTT
INTERNATIONAL, INC. and
MARRIOTT HOTEL SERVICES,
INC.

DATED:  Los Angeles, California, March 28, 2012.

/s/ Alan M. Feld
ALAN M. FELD
Attorney for MARRIOTT
INTERNATIONAL, INC. and
MARRIOTT HOTEL SERVICES,
INC.

DATED:  Washington, DC, March 28, 2012.

/s/ Lindsay C. Harrison
LINDSAY C. HARRISON
Attorney for MARRIOTT
INTERNATIONAL, INC. and
MARRIOTT HOTEL SERVICES,
INC.

U.S. Bankruptcy Court - Hawaii   #11-02371   Dkt # 840   Filed  03/29/12   Page 59 of 59