# UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF HAWAII

In re

**M WAIKIKI LLC,**

         **Debtor.**

Case No. 11-02371
(Chapter 11)

**DECLARATION OF
FRANCIS J. NARDOZZA**

---

## PRIVILEGED AND CONFIDENTIAL

## DECLARATION OF FRANCIS J. NARDOZZA

I, FRANCIS J. NARDOZZA declare under penalty of perjury, that:

I am the principal of REH Capital Partners, LLC ("REH"). I have personal knowledge of each of the facts stated in this Declaration, except for those facts stated on information and belief and, as to those facts, I am informed and believe them to be true.

I submit this Declaration on behalf of debtor M Waikiki LLC ("Debtor") in connection with the estimation of Proof of Claim No. 79 (the "Claim"), filed by Marriott Hotel Services, Inc. and Marriott International, Inc. (together, "Marriott").

I.

## ASSIGNMENT AND SCOPE OF WORK

**A. I have been retained by the law firm of Bickel & Brewer, on behalf of Debtor, to review and provide expert analysis with respect to, among other things, Marriott's contention that it has an unsecured claim of $65,471,668, representing the "lost profits" component of the damages alleged by Marriott in its Proof of Claim, and that Marriott is owed $5,599,082 by the Debtor comprising the balance of its total unsecured claim of $71,070,750.**

1. In addition to relying upon my 34 years of extensive experience in the hospitality industry, I have reviewed a number of documents in this case, including but not limited to: (1) the Management Agreement between Debtor and Marriott, dated July 9, 2008 as amended on March 13, 2009 and November 8, 2010, (the "Management Agreement"); (2) the Proof of Claim; (3) the Amended and Restated Consulting and Development Agreement by and between I.S. International, LLC and Marriott International, Inc., dated July 28, 2009, as amended January 25, 2009 and January 15, 2010 ("Schrager Agreement"); (4) the Affidavit of Catherine Young, Sr. V.P. Global Asset Management for Marriott, sworn to on August 29, 2011, that accompanied and was made part of the Proof of Claim; (5) Ms. Young's Management Fee Estimation and Damages Calculation[1] (6) the memorandum and pro forma prepared by Dana Jacobsohn, a Vice President in Marriott's Development, Planning & Feasibility Group, dated June 24, 2011[2]; (7) Ms. Jacobson's revised pro forma dated June 28, 2011[3]; (8) Transcript of Deposition of Catherine Young dated March 1, 2012; (9) Transcript of Deposition of Dana Jacobsohn dated March 2, 2012; (10) Transcript of Deposition of Tim Miller, Mg. Dir. and Sr. V.P. Edition Brand dated March 14, 2012; (11) various other documents, reports, pro forma's and Profit and Loss Statements prepared for the Hotel by Marriott including various invoices presented by Marriott to Debtor in connection with its claim for reimbursement of payroll and other costs of the Hotel; and (12) Smith

---

[1] MHS00000212-00000217

[2] MHS00000023-00000034

[3] MHS00585959-000585960

2

Travel Research ("STR") reports showing market and financial performance of the defined "Competitive Set" of the Hotel.

2.  I also visited the Hotel on several occasions, toured the Hotel from "top to bottom" and interviewed a number of the senior managers of the Hotel's current operator, Modern Hotel Management, Inc., and researched various matters pertinent to my review.

II.

## PROFESSIONAL EXPERIENCE AND EXPERTISE

B.  **I have over 34 years of experience in the areas of investment, finance, operations, project planning, and market and business strategy within the real estate and hospitality industries.**

1.  I am currently the Chairman and CEO of REH Capital Partners, LLC, a national investment and advisory services firm whose primary focus is on investment, transactional services and advisory services to the real estate and hospitality industries. The firm offers a depth of focus and capabilities to assist clients in addressing stressed real estate and hospitality assets and situations through a full range of restructuring, insolvency, recovery, and turn-around advisory services.

2.  Prior to launching REH, I was the National and Global Real Estate and Hospitality Consulting Practice Leader for KPMG, LLP and KPMG Consulting, Inc. I am recognized nationally and internationally for my work in the areas of strategic planning, mergers and acquisitions, deal structuring, transactional services and business performance improvement in the hospitality industry.

3.  I obtained a B.S. Accounting from Florida State University, and am a Certified Public Accountant. I also completed the Executive Partner Program on International Business at The Wharton School, University of Pennsylvania and have completed thousands of hours of continuing professional education throughout my professional career.

III.

<u>**SUMMARY OF OPINIONS**</u>

**A.    As discussed in greater detail below, I have formulated the following expert opinions pertaining to Marriott's contention that it has an unsecured claim of $65,471,668, representing the "lost profits" component of the damages ("Lost Profits Damages Claim") alleged by Marriott and an unsecured claim of $5,599,082 representing Hotel expenses paid by Marriott ("Expense Claim") comprising the balance of its total unsecured claim of $71,070,750 alleged in its Proof of Claim:**

1.  Marriott's alleged Lost Profits Damages Claim, representing the "lost profits" component of the damages in the amount of $65,471,668, is vastly overstated in amount and highly speculative in nature, and is based on flawed methodologies and unrealistic and unreasonable pro forma's and assumptions.

2.  Based on Marriott's own pro forma's produced in support of its Lost Profits Damages Claim[4], Debtor would have had the right to terminate the Management Agreement in mid-2018 because, during fiscal years 2016 and 2017, Marriott would have failed the Performance Termination Tests contained in the Management Agreement.  Assuming the Debtor would have exercised its termination right and terminated Marriott in mid-2018, the discounted present value of net profits Marriott would have earned under the Management Agreement (after subtracting reasonable controllable corporate costs incurred in connection with earning fee revenues and REDACTED) would not have exceeded $2.6 million as of September 1, 2012 (the determination date used by Marriott to discount Lost Profits Damages to their present value).

3.  Even if Marriott were to have exercised its rights under the Management Agreement to avoid termination in 2018 by making a "Shortfall Payment" to Debtor to cover profit shortfalls for fiscal years 2016 and 2017 as allowed under the Management Agreement, based on Marriott's own Pro Forma's produced in support of its Lost Profits Damages Claim[5], Marriott

---

[4] Edition Waikiki Revised Pro Forma's dated 6/28/11 MHS00585959-00585960 and 6/24/11 MHS00000033-00000034

[5] Edition Waikiki Revised Pro Forma's dated 6/28/11 MHS00585959-00585960 and 6/24/11 MHS00000033-00000034

would have failed to meet the Performance Termination Tests for the following two, consecutive, two fiscal-year periods (2018-2019 and 2020-2021) and Debtor would have had the right to terminate the Management Agreement again in mid-2020, and for a final time in mid-2022 (assuming Marriott would have exercised its rights to avoid termination in 2020 for the final time by making another "Shortfall Payment" to Debtor to cover shortfalls for fiscal years 2018 and 2019). Taking into account the requisite Shortfall Payments, Marriott, would have incurred a <u>net loss</u> and therefore would have <u>no lost profits</u> through the date of final termination in mid-2022.

4.  Even if the Management Agreement would have remained in effect for 49 additional years without Marriott having failed the Performance Termination Test, (which is unlikely based on Marriott's own Damages Pro Forma), assumptions underlying Marriott's calculation of Lost Profits and Damages are flawed in many material respects including but not limited to the following:

    a.  REDACTED

    b.  Marriott made an unreasonable and unrealistic assumption that the Management Agreement would continue in effect for 49 more years, including two, successive ten-year renewal terms beyond the expiration of the initial 30 year term, and unreasonably assumed that Hotel RevPAR and Operating Profit would grow uninterrupted for virtually every year throughout the 49 year projection period.

    c.  Marriott failed to take into account various controllable corporate costs it incurs in earning its Management Fees as well as REDACTED REDACTED in its calculation of Lost Profits Damages that had the effect of materially overstating Lost Profits Damages;

    d.  Marriott's Lost Profits Damages calculations are based on an REDACTED doesn't reflect economic reality and Marriott's own weighted average cost of capital.

---

[6] RevPAR is a key performance metric in the hotel industry, which is calculated by multiplying a hotel's average daily room rate by its occupancy rate.

5. Even if the Management Agreement would have remained in effect for 29 additional years through the end of the Initial Term, or 49 additional years assuming renewal under two, successive ten-year renewal terms without Marriott having failed the Performance Termination Test under the Management Agreement (which is unlikely based on Marriott's own pro forma's), after subtracting reasonable controllable corporate costs expected to be incurred by Marriott to earn its fees and REDACTED REDACTED xercising a , and using a discount rate no less than Marriott's weighted average cost of capital (currently estimated to be between 7 and 8%), the discounted present value of Lost Profits as of September 1, 2012 based on Marriott's own Damages Pro Forma would not have exceeded $10.3 million over an additional 29 years through the end of the Initial Term and $13.4 million over 49 remaining years (including two, successive ten-year renewal terms). However, I respectfully dismiss Marriott's estimation of Lost Profits Damages in this regard as unfounded, based on unreasonable assumptions and unreliable.

6. Marriott's Expense Claim of $5,599,082 for Hotel expenses that Marriott alleges it paid on Debtor's behalf is not supported by reasonable back up documentation, particularly as related to a major portion of the Expense Claim totaling $3,621,342.

B. **My additional findings, observations and conclusions underpinning my Expert Opinions are more fully addressed below.**

IV.

## FINDINGS AND CONCLUSIONS IN SUPPORT OF MY OPINIONS

A. **Debtor Would Have Had the Right to Terminate the Management Agreement in Mid-2018 Because Marriott Would Have Failed to Meet the Performance Termination Tests Contained In the Management Agreement.**

1. On July 9, 2008, Debtor and Marriott entered into the Management Agreement pursuant to which Debtor engaged Marriott to manage and operate the Hotel under the "Edition" brand. Pursuant to Section 2.02 of the Management Agreement, Debtor had the right to terminate the Management Agreement if, with respect to any two (2) consecutive fiscal

6

years following the fifth full year after the opening of the Hotel (therefore starting with 2016): (1) the Operating Profit for each such fiscal year is less than the Performance Termination Threshold for such fiscal year; and (2) the Revenue Index of the Hotel during each such fiscal year is less than the Revenue Index Threshold for such fiscal year.

2. Operating Profit is defined in the Management Agreement as "the excess of Gross Revenues over Deductions (each calculated in accordance with this Agreements and the Uniform System of Accounts)." Performance Termination Threshold is defined in the Management Agreement as "an amount equal to ninety percent (90%) of the Owner's Priority." Owner's Priority is defined to be equal to $19,425,000. Accordingly, the Performance Termination Threshold is approximately $17,483,000. Both the Owner's Priority and the Performance Termination Threshold are subject an equitable reduction if any food or beverage outlet at the Hotel is leased to, licensed to or otherwise operated by a third party.[7] REDACTED REDACTED It is my understanding that no agreement has been reached between Marriott and the Debtor to make any reduction in the Owner's Priority or Performance Termination Threshold in connection with the restaurant lease and no such reduction was taken into account by Marriott in their Lost Profits Damages Claim. My considerations on this matter in formulating my professional opinion are addressed later in this Declaration.

3. The Hotel's Revenue Index is defined in the Management Agreement as the number that is equal to (a) the Revenue per Available Room ("RevPAR") for the Hotel divided by (b) the average RevPAR of the Hotel's "Competitive Set." The Revenue Index Threshold is defined in the Management Agreement as the fraction equal to ninety (90) divided by one hundred (100), or .90 as a decimal.

4. The Hotel opened on September 28, 2010. Accordingly, if the Hotel failed to meet the performance tests set forth in Section 2.02 of the

---

[7] Section 11.27 of the Management Agreement provides that if any food or beverage outlet at the Hotel will be leased to, licensed to or otherwise operated by a third party, the Owner's Priority amount and the Performance Termination Threshold will be equitably reduced to account for the fact that Gross Revenues, Operating Profit and Available Cash Flow will not include some or all of the revenues generated by such food or beverage outlet.

[8] Restaurant lease dated December 12, 2007 M Waikiki LLC and MM Restaurant Hawaii LLC (MWAIKIKI00061862- 00061891).

Management Agreement in fiscal years 2016 and 2017, then Debtor could terminate the Management Agreement in 2018.

a. **Based on Marriott's Own <u>June 24, 2011 Pro Forma</u>, the Hotel Could Not Meet The Operating Profit Performance Termination Threshold Test for Fiscal Years 2016 and 2017.**

(1) Debtor commenced a lawsuit against Marriott and others in New York state court in May 2011, arising out of Marriott's alleged mismanagement of the Hotel. Shortly thereafter, on June 24, 2011, Marriott's Vice President of Development Planning & Feasibility Group, Dana Jacobsohn, prepared a memorandum and pro forma in connection with the New York lawsuit. This June 24, 2011 pro forma and memorandum (June 24, 2011 Pro Forma), on its face, shows that the Hotel REDACTED REDACTED in 2016 and 2017, respectively, the first two consecutive fiscal years during which the Performance Termination Test becomes applicable.

(2) Consequently, based on the June 24, 2011 Pro Forma, Operating Profit would have fallen well below the $17.5 million Performance Termination Threshold amount for 2016 and 2017 and Marriott would have failed the Operating Profit Performance Termination Test under the Management Agreement.

b. **Based on Marriott's <u>June 24, 2011 Pro Forma</u>, Neither Could the Hotel Meet The Revenue Index Test For Fiscal Years 2016 and 2017, The Second Of The Two-Part Performance Termination Test, and Would Have Overall Failed the Performance Termination Test for Fiscal Years 2016 and 2017.**

(1) Under Marriott's June 24, 2011 Pro Forma, the RevPAR of the Hotel for fiscal years 2016 and 2017 was projected to be REDACTED and REDACTE respectively. Conservatively, using the actual RevPAR achieved by the Competitive Set of $245.65 in 2011 and assuming no increases in RevPAR for the Hotel's Competitive Set over the next 6 years from 2012 to 2017, the Hotel's Revenue Index would be 81.6% ($200.46/$245.65) and 84.0% ($206.27/$245.65) respectively, in 2016 and 2017, and thus Marriott would also have failed the Revenue Index Performance Test for 2016 and 2017.

8

(2) Consequently, Marriott would have failed both the Operating Profit Performance Termination Test and the Revenue Index Performance Termination Test for the first two consecutive years during which the Performance Termination tests become applicable, and accordingly, Debtor would have had the right to terminate the Management Agreement in Mid-2018.

c. **Marriott Put Aside The June 24, 2011 Pro Forma and Based Its Lost Profits Damages On a Revised Pro Forma Dated June 28, 2011 (Dated Just 4 Days Later) That Paints a Radically Rosier Picture of Hotel Revenue.**

(1) In connection with its Proof of Claim, Marriott submitted an affidavit from Catherine Young, Senior Vice President for Global Asset Management at Marriott International, Inc., dated August 29, 2011. Ms. Young therein concluded that the present value of the revenue stream generated by the Management Agreement over its full term is $65,471.668.

(2) Marriott later produced a damages pro forma prepared by Ms. Young titled "Management Fee Estimation" ("Damages Pro Forma" or "Young Damages Pro Forma") in support of her damages calculations. Ms. Young testified in her March 1, 2012 deposition that the Damages Pro Forma was based on a revised pro forma prepared by Ms. Jacobsohn dated June 28, 2011 ("June 28, 2011 Revised Pro Forma"), which was a revised version of Ms. Jacobsohn's June 24, 2011 Pro Forma prepared just four days later.

(3) The June 28, 2011 Revised Pro Forma shows a REDACTED REDACTED REDACTED from one pro forma to the next.

(4) RevPAR projections under the Young Damages Pro Forma for years subsequent to 2015 are based on the higher RevPAR for 2015. This dramatic increase, in my opinion, is unsubstantiated and appears to be done in an attempt to address Marriott's apparent failure of the Revenue Index Performance Test in 2016 and 2017 under the June 24, 2011 Pro Forma.

(5) Provided below is a summary of projected occupancy, Average Daily Room Rate ("ADR") and RevPAR extracted from the Young Damages Pro Forma.

9

REDACTED

(6) The revenue growth assumptions underlying the Young Damages Pro Forma are aggressive. The Hotel's ADR is projected to

REDACTED

in 2015, the year just before performance testing begins.

(7) Provided below is a summary of projected occupancy, ADR and RevPAR from Ms. Jacobsohn's June 24, 2011 Pro Forma and comparative differences to the Young Damages Pro Forma that was based principally on the June 28, 2011 Revised Pro Forma.

REDACTED

REDACTED

(8) As can be seen in the table above, within the June 24, 2011 Pro Forma, ADR was assumed to REDACTED

REDACTED

However for the Damages Pro Forma prepared just four days later, ADR's and RevPAR

10

were inexplicably REDACTED the amounts projected in the June 24, 2011 Pro Forma.

(9) There is no conceivable basis to assume that Marriott could have engineered a plan for such a remarkable turnaround in the Hotel's top line performance within 4 days from the date of one pro forma to the next, especially considering Marriott's dismal historical performance and the Hotel's competitive position in the market.

**(a) The Hotel's Market Performance Under Marriott's Management Was Dismal.**

i) Provided below is a summary of the Hotel's market performance in terms of RevPAR and Revenue Index since opening under Marriott management, compared to the Competitive Set.

| Edition RevPAR & Revenue Index - 2010-2011 | | | |
|---|---|---|---|
| RevPAR | Edition | Comp Set | Index |
| **2010** | | | |
| Oct | $ 51.65 | $ 211.05 | 24.5 |
| Nov | $ 63.88 | $ 204.70 | 31.2 |
| Dec | $ 90.81 | $ 246.83 | 36.8 |
| **2010 Oct-Dec** | **$ 69.58** | **$ 221.04** | **31.5** |
| **2011** | | | |
| Jan | $ 80.17 | $ 243.89 | 32.9 |
| Feb | $ 126.05 | $ 245.44 | 51.4 |
| Mar | $ 82.96 | $ 200.06 | 41.5 |
| Apr | $ 116.67 | $ 217.07 | 53.7 |
| May | $ 111.30 | $ 208.94 | 53.3 |
| Jun | $ 106.96 | $ 238.60 | 44.8 |
| Jul | $ 148.15 | $ 273.49 | 54.2 |
| **2011 Jan-Jul** | **$ 110.09** | **$ 232.36** | **47.4** |
| Source: STR Monthly Star Reports Oct.2010 to July 2011 | | | |

ii) As can be seen in the table above, the Hotel performed poorly and was woefully behind the Competitive Set ("Comp Set") since opening and averaged a Revenue Index of less than 50% for the first seven months of 2011. During this seven month period, the Comp Set achieved a 75% occupancy, $310 ADR, and $232 RevPAR, compared to the Edition at 49.8% Occupancy, $221 ADR and $110 RevPAR[9].

---

[9] Edition Waikiki, Monthly STAR Report, STR, July, 2011.

U.S. Bankruptcy Court - Hawaii   #11-02371   Dkt # 841-27   Filed  03/29/12   Page 11 of 35

iii) Worst yet, as presented in the table below, for nearly every month since it opened, the Hotel performed dead last at 7th out of the 7 hotels in the Competitive Set in both Occupancy and RevPAR, and 6th or 7th out of the 7 hotels in ADR. In essence, not only did the Hotel perform way below the composite average of the 7 hotels in its Competitive Set, but it was hovering at or near dead last amongst all the hotels in the Competitive Set.

| Occupancy (%) | 2010 | | | 2011 | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Oct | Nov | Dec | Jan | Feb | Mar | Apr | May | Jun | Jul |
| My Property | 30.3 | 27.7 | 36.6 | 35.3 | 54.8 | 41.7 | 48.0 | 50.2 | 52.0 | 67.0 |
| Competitive Set | 73.8 | 69.2 | 71.7 | 72.7 | 80.1 | 66.9 | 71.1 | 70.9 | 77.5 | 85.3 |
| Index (MPI) | 41.0 | 40.1 | 51.0 | 48.5 | 68.4 | 62.3 | 67.5 | 70.8 | 67.1 | 78.6 |
| Rank | 7 of 7 | 7 of 7 | 7 of 7 | 7 of 7 | 7 of 7 | 7 of 7 | 7 of 7 | 6 of 7 | 7 of 7 | 7 of 7 |

| ADR | 2010 | | | 2011 | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Oct | Nov | Dec | Jan | Feb | Mar | Apr | May | Jun | Jul |
| My Property | 170.74 | 230.59 | 248.13 | 227.04 | 230.07 | 199.05 | 243.26 | 221.72 | 205.54 | 220.96 |
| Competitive Set | 286.11 | 295.97 | 344.25 | 335.27 | 306.31 | 299.20 | 305.37 | 294.74 | 307.69 | 320.80 |
| Index (ARI) | 59.7 | 77.9 | 72.1 | 67.7 | 75.1 | 66.5 | 79.7 | 75.2 | 66.8 | 68.9 |
| Rank | 6 of 7 | 5 of 7 | 5 of 7 | 6 of 7 | 6 of 7 | 6 of 7 | 6 of 7 | 6 of 7 | 6 of 7 | 5 of 7 |

| RevPAR | 2010 | | | 2011 | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Oct | Nov | Dec | Jan | Feb | Mar | Apr | May | Jun | Jul |
| My Property | 51.65 | 63.88 | 90.81 | 80.17 | 126.05 | 82.96 | 116.67 | 111.30 | 106.96 | 148.15 |
| Competitive Set | 211.05 | 204.70 | 246.83 | 243.89 | 245.44 | 200.06 | 217.07 | 208.94 | 238.60 | 273.49 |
| Index (RGI) | 24.5 | 31.2 | 36.8 | 32.9 | 51.4 | 41.5 | 53.7 | 53.3 | 44.8 | 54.2 |
| Rank | 7 of 7 | 7 of 7 | 7 of 7 | 7 of 7 | 7 of 7 | 7 of 7 | 6 of 7 | 7 of 7 | 7 of 7 | 6 of 7 |

SMITH TRAVEL RESEARCH, Inc

**(b) Marriott's Flawed Operational Strategies and Product Limitations Are Partly to Blame for the Hotel's Poor Performance**

i) While it's true that new hotels sometimes require a period of ramp-up to achieve stabilized operations, the Edition's market performance against the Competitive Set can only be characterized as "atypically poor", especially considering that market demand for the Competitive Set was strong, as evidenced by the high occupancy of 75% and ADR of $310.38 for the first

12

seven months of 2011[10], compared to an occupancy of 49.8% and an ADR of $221.10 for the Edition. This tells me that the Hotel was suffering from poor marketing and business generation, and that this poor performance cannot be reasonably attributed to a "normal business ramp up".

ii) In my opinion there are several factors that contributed to the poor market performance of the Edition since opening in comparison to the Competitive Set, including but not limited to the following:

a) **Unknown Brand and Concept** - The Edition name and product concept were unknown to the Hawaiian hotel market including wholesale booking agents, travel agencies, Japanese tour and travel intermediaries, local corporate businesses and individual travelers. The product concept of a "hip, high style hotel" was also new to the Waikiki beach resort market. Marriott failed to deploy the resources, strategies and tactics necessary to establish the brand and concept in the Hawaiian hotel market.

b) **Non-Beachfront Location** – The Hotel is not a beachfront hotel, but five of the six hotels in the Competitive Set are beachfront hotels. Within the Competitive Set, only the Waikiki Parc Hotel has a non-beachfront location across the street from the Halekulani, a beachfront hotel that is its sister property, operated under common ownership and management. Not being a beachfront hotel is a major competitive disadvantage for the Hotel as was pointed out in various Marriott internal marketing plans and reports. It's questionable whether the Hotel as conceived and marketed by Marriott would have ever been able to achieve an ADR close to the ADR of the Competitive Set. But Marriott's strategy was to price the rooms in the Hotel at the high end of the Competitive Set's room rates, resulting in its

---

[10] Edition Waikiki, Monthly STAR Report, July 2011

13

failure to achieve acceptable occupancy rates and profitability.

c) **Failure to Appropriately Target and Penetrate the Luxury Market** – The Hotel relied heavily on discounted Government and Military business, Marriott Rewards Redemptions and other discounted segments for approximately 60% of its total rooms business in 2011. Marriott's reliance on these market segments is inconsistent with the high-end product investment in the Hotel and its unique luxury, lifestyle brand positioning. The Hotel captured only a small portion of the high-end Asian-Japanese market that is a major market segment for the Competitive Set. Business from the "lifestyle" clientele targeted by Marriott and the premium rates envisioned largely never materialized.

d) **Limited Meeting Facilities** – The Hotel is limited in the amount of meeting space and "breakout" rooms in comparison to other hotels in the Competitive Set. The Hotel's main function space is a large 9,200 square foot ballroom, but it is supported by only five conference studio suites (including the Sun Suite) limiting the Hotel's ability to capture group meetings business that is lucrative for certain other hotels in the Competitive Set. However, Marriott also did not take advantage of the large ballroom space by failing to aggressively pursue local banquet business. The catering sales staff was not even allowed to show pictures of the property to prospective clients until close to the Grand Opening date of the Hotel, ignoring the lead time required by most meeting planners.

U.S. Bankruptcy Court - Hawaii   #11-02371   Dkt # 841-27   Filed  03/29/12   Page 14 of 35

PRIVILEGED AND CONFIDENTIAL

    d.   **Even Using Marriott's More Aggressive Damages Pro Forma, The Hotel Could Not Pass The Operating Profit Performance Termination Threshold Test and The Revenue Index Performance Test For Fiscal Years 2016 and 2017.**

    (1)  **Based on Marriott's More Aggressive Damages Pro Forma the Hotel Could Not Pass The Operating Profit Performance Termination Threshold Test for Fiscal Years 2016 and 2017.**

    **(a)**  As shown in Marriott's Damages Pro Forma, Operating Profit was projected at REDACTED for both Fiscal Years 2016 and 2017, an amount that is well below the Performance Termination Threshold level of approximately $17.48 million.

    **(b)**  Accordingly, the Hotel would fail the Performance Termination Threshold Test under Marriott Damages Pro Forma.

    (2)  **Based on Marriott's More Aggressive Damages Pro Forma The Hotel Also Could Not Pass Revenue Index Test.**

    **(a)**  Under Marriott's Damages Pro Forma, the RevPAR of the Hotel for fiscal years 2016 and 2017 was projected to be REDACTED respectively.

    **(b)**  Factoring in reasonable increases in RevPAR for the Competitive Set (the comparative benchmark used for the Revenue Index Test), Marriott would also fail the 90% Revenue Index Test for fiscal years 2016 and 2017.

    **(c)**  Provided below is a summary of the Competitive Set's market performance since 2003, when the Waikiki hotel market began its recovery from the 2001 to 2003 economic downturn.

U.S. Bankruptcy Court - Hawaii   #11-02371   Dkt # 841-27   Filed  03/29/12   Page 15 of 35

| STR Competitive Set - Historical Performance Metrics | | | | | | |
|---|---|---|---|---|---|---|
| STR for Competitive Set | Occ% | % Change | ADR ($) | % Change | RevPAR ($) | % Change |
| 2003 | 68.1 | - | $ 245.93 | - | $ 167.40 | - |
| 2004 | 76.3 | 12.0% | $ 258.34 | 5.0% | $ 196.99 | 17.7% |
| 2005 | 80.8 | 6.0% | $ 282.99 | 9.5% | $ 228.75 | 16.1% |
| 2006 | 78.1 | -3.3% | $ 301.98 | 6.7% | $ 235.94 | 3.1% |
| 2007 | 72.5 | -7.2% | $ 320.97 | 6.3% | $ 232.80 | -1.3% |
| 2008 | 74.3 | 2.5% | $ 325.30 | 1.3% | $ 241.79 | 3.9% |
| 2009 | 63.1 | -15.0% | $ 301.77 | -7.2% | $ 190.54 | -21.2% |
| 2010 | 72.3 | 14.5% | $ 294.68 | -2.3% | $ 213.01 | 11.8% |
| 2011 | 77.3 | 7.0% | $ 317.71 | 7.8% | $ 245.65 | 15.3% |
| CGR in REVPAR 2004-2008 | | -0.6% | | 5.9% | | 5.3% |
| CGR in REVPAR 2009-2011 | | 10.7% | | 2.6% | | 13.5% |
| CGR in REVPAR 2003-2011 | | 1.6% | | 3.3% | | 4.9% |
| Source: STR Custom Trends Report - March 13, 2012 | | | | | | |

(d) As can be seen in the table above, RevPAR for the Competitive Set (excluding the Edition) grew at a CAGR of 4.9% per year from 2003 to 2011 (8 years), and at a strong CAGR of 13.5% per year since the huge market downturn in 2009 during the Great Recession.

(e) Included in the Competitive Set (as prescribed in the Management Agreement) are the following hotels:

| STR Code | Name of Establishment | City & State | Aff Date | Open Date | Rooms |
|---|---|---|---|---|---|
| 19965 | JW Marriott Ihilani Ko Olina Resort & Spa | Kapolei - Oahu, HI | Nov 1999 | Jun 1993 | 387 |
| 26509 | Waikiki Parc Hotel | Honolulu - Oahu, HI | Nov 1988 | Nov 1988 | 297 |
| 16876 | Halekulani | Honolulu - Oahu, HI | Mar 1984 | Mar 1984 | 453 |
| 1632 | Moana Surfrider, A Westin Resort | Honolulu - Oahu, HI | May 2007 | Mar 1989 | 793 |
| 1634 | Luxury Collection The Royal Hawaiian | Honolulu - Oahu, HI | Jan 2009 | Jun 1959 | 528 |
| 16887 | The Kahala Hotel & Resort | Honolulu - Oahu, HI | Mar 2006 | Jun 1964 | 338 |
| | | | | 6 | 2796 |

(f) It is a reasonable assumption that RevPAR for the Competitive Set will continue to grow over the next six years through 2017, based on its historical performance, though not at the growth levels projected by Marriott for the Edition Hotel in its Damages Pro Forma.

(g) According to various Marriott marketing plans and reports for the Hotel, most of the hotels included in the Competitive Set have either recently undergone a major renovation or have concrete plans to undergo a major renovation in the near term.

(h) **Competitive Set Growth Analysis** - Presented below is an estimate of RevPar growth for the Competitive Set that I

16

believe is a reasonable and conservative estimate predicated on historical trends.

| STR Comp Set Analysis | Actual | Actual | Projected | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
| Occupancy | 72.3% | 77.3% | 78.5% | 79.3% | 79.3% | 79.3% | 79.3% | 79.3% | 79.3% | 79.3% | 79.3% |
| Occ pct change vs LY | 14.5% | 7.0% | 1.5% | 1.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| ADR | $294.68 | $317.71 | $343.13 | $363.72 | $381.91 | $397.18 | $408.70 | $420.55 | $432.75 | $445.30 | $458.21 |
| ADR pct change vs LY | -2.3% | 7.8% | 8.0% | 6.0% | 5.0% | 4.0% | 2.9% | 2.9% | 2.9% | 2.9% | 2.9% |
| RevPAR | $ 213.01 | $ 245.65 | $ 269.28 | $ 288.29 | $ 302.70 | $ 314.81 | $323.94 | $333.33 | $343.00 | $352.95 | $363.18 |
| RevPAR pct change vs LY | 11.8% | 15.3% | 9.6% | 7.1% | 5.0% | 4.0% | 2.9% | 2.9% | 2.9% | 2.9% | 2.9% |
| REVPAR CAGR 2011-2015 | 6.4% | | | | | | | | | | |
| REVPAR CAGR 2011-2017 | 5.2% | | | | | | | | | | |
| REVPAR CAGR 2011-2020 | 4.4% | | | | | | | | | | |

| Revenue Index | Actual | Projected | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| STR Comp Set Growth Assumption | 3 Mos. 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
| Revenue Index: | | | | | | | | | | | |
| Marriott 62411 Proforma | NA | 48.7% | 53.0% | 56.4% | 62.5% | 61.9% | 61.9% | 61.9% | 61.9% | 61.9% | 61.9% |
| Marriott Damages Proforma | | 49.7% | 54.9% | 63.3% | 75.4% | 80.8% | 80.8% | 80.8% | 80.8% | 80.8% | 80.8% |

i) The analysis above assumes that RevPAR for the Competitive Set will grow at a CAGR of 5.2% through 2015, considerably below the 13.5% CAGR experienced by the Competitive Set from 2009 to 2011, but on par with the historical CAGR experienced by the Competitive Set from 2004 through 2008 when the Competitive Set was in a similar growth cycle position as exists today and at a similar occupancy level (76.3% in 2004 versus 77.3% in 2011).

ii) As shown in the earlier table of historical trends for the Competitive Set, 2011 was the first year following the Great Recession when the Competitive Set was able to grow ADR. The Competitive Set achieved a strong recovery in occupancy in 2010, and ADR growth began in 2011. Though it's reasonable to expect ADR growth for the Competitive Set in 2012 and 2013 to be at higher rates than for 2011, given the 77.3% occupancy just achieved, to be conservative, the ADR growth rate for 2012 was estimated approximately on par with 2011 at 8%, and a slower growth rate was assumed for 2013 at 6% and at 5% for 2014.

iii) The second table above presents the calculation of the Revenue Index for the Hotel using Marriott's RevPAR

U.S. Bankruptcy Court - Hawaii   #11-02371   Dkt # 841-27   Filed  03/29/12   Page 17 of 35

PRIVILEGED AND CONFIDENTIAL

estimates from both Marriott's June 24, 2011 Pro Forma and Marriott's Damages Pro Forma based on the Competitive Set RevPAR growth analysis. The result is that the Hotel would fail the 90% Revenue Index Performance Test under both Marriott's June 24, 2011 Pro Forma and Marriott's more aggressive Damages Pro Forma.

(3) Thus, under the more aggressive Damages Pro Forma, Marriott would have still failed both the Operating Profit Performance Termination Threshold Test and the Revenue Index Test for the Fiscal Years 2016 and 2017, the first two consecutive years during which the Performance Termination Test first becomes applicable, and accordingly, Debtor would have had the right to terminate the Management Agreement in Mid-2018.

e. **Marriott Would Have Had To Make Shortfall Payments to Debtor of Approximately $31.1 Million under the June 24, 2011 Pro Forma And Approximately $20.7 Million Under Marriott's More Aggressive Damages Pro Forma In Order To Continue Managing The Hotel After Fiscal Year 2017.**

(1) Section 2.02(b) of the Management Agreement gives Marriott the option of avoiding a performance termination by making a "Shortfall Payment" to Debtor "of the amount by which Operating Profit for both of the two (2) Fiscal Years . . . was less than the Performance Termination Threshold for such Fiscal Years."

(2) Using the numbers in Marriott's June 24, 2011 Pro Forma, Marriott would have had to pay Debtor a Shortfall Payment of approximately $31.2 million in order to continue managing the Hotel after 2017. Even using the numbers in the more aggressive June 28, 2011 Revised Pro Forma, Marriott would have had to pay Debtor a Shortfall Payment of approximately $20.7 million in order to continue managing the Hotel after 2017.

(3) Provided below is a calculation of Shortfall Payments under both Marriott's June 24, 2011 Pro Forma and Marriott's June 28, 2011 Damages Pro Forma:

18

**Waikiki Edition - Marriott 6-24-11 Proforma**

*SCHEDULE B - PERFORMANCE TERMINATION TEST*

| | 2,016 | 2,017 | 2,018 | 2,019 | 2,020 | 2,021 | 2,022 |
|---|---|---|---|---|---|---|---|
| REDACTED | | | | | | | |

**Waikiki Edition - Marriott 6-28-11 Damages Proforma**

*SCHEDULE B - PERFORMANCE TERMINATION TEST*

| | 2,016 | 2,017 | 2,018 | 2,019 | 2,020 | 2,021 | 2,022 |
|---|---|---|---|---|---|---|---|
| REDACTED | | | | | | | |

19

PRIVILEGED AND CONFIDENTIAL

**B. Based on Marriott's Pro Forma's, Marriott Would Have Failed the Performance Termination Test Again for 2018-2019 and Assuming Marriott Would Have Made the Last Allowed Shortfall Payment To Debtor To Manage The Hotel Beyond 2019, Marriott Would Have Failed The Performance Termination Test Again For The Two Year Period 2020-2021, And The Debtor Would Have The Right To Finally Terminate The Management Agreement In 2022.**

1. As shown in the Performance Termination schedules above, based on Marriott's own Pro Forma's, Marriott would have failed the Performance Termination Test for the next two, consecutive, two Fiscal Year periods 2018-2019 and 2020-2021, and Debtor would have had the right to terminate the Management Agreement again in mid-2020.

2. Assuming Marriott made the second and final allowed Shortfall Payment in 2020, the Debtor would have the right to terminate the Management Agreement a final time in mid-2022 since the Management Agreement provides that Manager shall not be entitled to avoid termination by making Shortfall Payments more than two (2) times in any fifteen (15) year period during the Term.

**C. Marriott Would Have Also Failed The Performance Termination Tests for 2016 Through 2021 If A Reasonable Reduction Were Made To The Owner's Priority and Performance Termination Threshold Amounts Pursuant to Section 11.27 Of The Management Agreement In Connection With Leasing The Restaurant Facility.**

1. As stated earlier, Marriott and the Debtor did not enter into any agreement on a reduction in the Owner's Priority and Performance Termination Threshold amounts pursuant to Section 11.27 of the Management Agreement with respect to Debtor leasing out the Morimoto restaurant facility, and no such reduction was taken into account by Marriott in connection with their calculation of Lost Profits Damages Claim.

2. I took into consideration the provisions of Section 11.27 with respect to the restaurant lease in formulating my opinions regarding Marriott's failure of the Performance Tests and concluded that with a reasonable reduction in the Owner's Priority and Performance Termination Threshold associated with leasing out the Morimoto restaurant facility, Marriott would still fail the Performance Termination Tests for Fiscal Years 2016 Through 2021 under both Marriott's June 24, 2011 Pro Forma and Marriott's more aggressive Damages Pro Forma.

20

**3.** My conclusion is based in part on the following findings:

    a. According to an earlier Marriott pro forma prepared in 2007[11] that I reviewed in connection with this case, I noted that operations of the Hotel's restaurant facility were included in the pro forma as if Marriott were managing the restaurant facility. For Fiscal Year 2011, Net House Profit for the Hotel was projected in the 2007 pro forma to be REDACTED

       REDACTED

    b. Within the 2007 pro forma, restaurant revenue for 2011 was projected at REDACTED

       REDACTED

    c. REDACTED

    d. Even if the Owner's Priority in the Management Agreement of $19,425,000 was reduced by the full REDACTED of projected profit for 2011, to REDACTED and the 90% Performance Termination Threshold were reduced accordingly from $17,383,000 to REDACTED, Marriott would still fail the Performance Tests for 2016 and 2017, as well as for 2018 through 2021 using Marriott's June 24, 2011 Pro Forma or Marriott's more aggressive Damages Pro Forma.

**D. The Fair And Reasonable Estimate of the Present Value of Lost Profits Damages Under Marriott's Damages Pro Forma Assuming Marriott's Failure of the Performance Tests And Termination In Mid- 2018 Is An Amount Not in Excess of $2.6 million Calculated As of September 1, 2012 (Marriott's Date of Determination of Present Value).**

---

[11] Memo from Marriott's Dana Jacobsohn to Yoav Gery dated March 26, 2008, and attached Hotel Developer's pro forma dated 3/26/07 MHS00080303.

PRIVILEGED AND CONFIDENTIAL

1. With the failure of the performance tests set forth in Section 2.02 of the Management Agreement as discussed above, Marriott would have been terminated and would have transitioned off the Hotel property by July 2018. From September 1, 2011 through June 30, 2018, under Marriott's own Damages Pro Forma, management fees would have been approximately REDACTED. However, to earn these management fees, Marriott would have incurred corporate costs of approximately 35%-45% of management fees and paid 25% of management fees earned to I.S. International under a fee sharing arrangement[12][13], though Marriott failed to take these costs into account in estimating its lost profits claim.

2. Accordingly, Marriott's lost profit claim for the period from September 1, 2011 to June 30, 2018 should be estimated for confirmation and feasibility purposes not in excess of $2.6 million calculated as follows:

|  | **Millions** |
|---|---|
| **Management Fees (9/1/11 to 6/30/18)** | **$9.8** |
| **Less cost incurred to earn fees:** | |
| Corporate costs (45%) | (4.4) |
| REDACTED | |
| **Total Costs** | **(6.8)** |
| **Net Lost Profits** | **$3.0** |
| **PV of Lost Profits at Sept. 1, 2012:** | |
| REDACTED **(Rate used by Marriott)** | REDACTED |
| **@7.6% Discount Rate (Est. WACC)** | **$2.3** |
| **@9.6% Discount Rate (WACC plus Risk Premium)** | **$2.1** |

---

[12] MHS00582004, Waikiki Edition Valuation Summary, January 9, 2009

[13] Paragraph 4(A)(ii) of Schrager Agreement.

22

**E. Even If The Management Agreement Would Have Remained In Effect For 49 Additional Years (A Premise That I Dismiss As Unfounded), Marriott's Projection Of Lost Profits Damages Is Flawed.**

1. Even if Marriott would not have been terminated in Mid-2018 for failing to satisfy the Management Agreement's Performance Termination Tests, Marriott's calculation of Lost Profits over the remaining 49 years (or 29 years through end of Initial Term) of the Management Agreement contains several flaws, resulting in a gross overstatement of alleged Lost Profits Damages.

   a. First, as stated earlier, Marriott's Lost Profits analysis assumes an aggressive ramp up of RevPAR from 2011 through 2015 that may not materialize.

   b. Second, it is not reasonable to assume that a hotel management agreement would remain in effect for 50 years including two renewal terms and that hotel operating performance and profits over the remaining 49 years could be projected with any degree of certainty and reliability.

   c. Third, as also stated above, Marriott's analysis fails to net out the costs it will incur to earn its management fees. In my estimation these costs are between 35%-45% of the fees earned, plus an additional REDACTED split of fees earned payable to REDACTED REDACTED

   d. Fourth, the discount rate of RDC used by Marriott to calculate the present value of the 49-year stream of management fees is exceedingly low and inappropriate for calculating lost profits damages in this case. The appropriate discount rate should be at least equal Marriott's weighted average cost of capital ("WACC"), which is likely between 7% and 8%, plus a risk premium of 400 to 500 Basis Points, taking into account various risks specific to the Management Agreement.

   e. Each of these points is more fully discussed below.

2. Accordingly, if Marriott would not have been terminated at the end of fiscal year 2017 for failure of the Performance Termination Tests (which is unlikely), using Marriott's more aggressive Damages Pro Forma, Marriott's maximum Lost Profits Damages Claim under the alleged wrongful termination of the Management Agreement should be estimated for confirmation and feasibility purposes at no more than $10.3 million for an additional 29 remaining years under the Management Agreement and

$13.4 million for an additional 49 years as calculated below. These calculations are based on Marriott's more aggressive Damages Pro Forma and the results are considerably less using Marriott's June 24, 2011 Pro Forma.

|  | **29 Years**<br>*(Millions)* | **49 Years**<br>*(Millions)* |
|---|---|---|
| **Management Fees (Per Damages Pro Forma)**<br>**(Sept. 1, 2011 to Sept. 30, 2040/2060)** | REDACTED | |
| **Less est. costs incurred to earn fees:** | | |
| Corporate costs (35% to 45%) | (27.2) | (57.8) |
| REDACTED | | |
| **Total Costs** | **(44.9)** | **(95.9)** |
| **Net Lost Profits** | **$25.7** | **$56.6** |
| **PV of Lost Profits at Sept. 1, 2012:** | | |
| **@7.6% Discount Rate (Est. WACC)** | **$8.9** | **$10.8** |
| **@12.6% Discount Rate (WACC plus Risk Premium)** | **$5.4** | **$5.7** |
| **PV of Lost Profits at Sept. 1, 2012**<br>REDACTED | | |
| **@7.6% Discount Rate (Est. WACC)** | **$10.3** | **$13.4** |
| **@12.6% Discount Rate (WACC plus Risk Premium)** | **$5.5** | **$6.1** |

3. A summary of other major flaws in Marriott's Projection of Lost Profits Damages is provided below:

REDACTED

24

a. **Marriott's Calculation of Lost Profits Damages for a Length of Term of 49 Additional Years is Not Reasonable or Reliable.**

(1) Though Section 2.01 of the Management Agreement provides for an Initial Term of 30 years and two (2) successive renewal periods of ten (10) years, it is not common in the hotel industry for a third party Management Agreement (where the hotel manager does not own the hotel) to remain in effect for 50 years, or for that matter 30 years, particularly in connection with a new and untested brand such as Edition.

(2) Based on Marriott's own disclosures in a 2010 analyst presentation, the average remaining life of its North America hotel management contracts is 18 years[15].

(3) Furthermore, even if the Management Agreement were to remain in place for an additional 29 or 49 years, there is no reasonable and reliable basis for projecting the Hotel's revenues, profits (or losses) and management fees over this long period of time with any degree of accuracy.

(4) As stated above, Marriott assumed in its Lost Profits Damages Pro Forma that Hotel Revenues and Profits would increase uninterrupted for every consecutive year in its 49 year damages period (with no future downturns). That is an unreasonable assumption.

b. **Marriott Failed to Subtract Its Controllable Costs in Connection with Earning Management Fees in Calculating Lost Profits Damages.**

(1) Marriott included only the gross management fee income in its Lost Profits Damages calculations and failed to subtract corporate costs and the costs of a fee sharing arrangement with REDACTED REDACTED

(2) From my 34 years of experience in negotiating and reviewing hundreds of hotel management agreements with major international hotel brands, including Marriott, as well as reviewing hotel company corporate costs and expenses, I know that major brands like Marriott typically incur non-reimbursable controllable corporate costs associated with earning Management

---

[15] Marriott International Security Analyst Meeting, Octorber 27, 2010.

Fees in the range of 35% to 45% of fee income, and for start-up brands within the major multi-brand companies, incremental start up costs push the percentages materially higher.

(3) It is my understanding that specific information was requested of Marriott through discovery in this case before the Court regarding Marriott's corporate costs associated with its hotel management business, and it is my further understanding that the information has not yet been fully produced by Marriott. In my opinion, based on information I have reviewed in this matter and from my professional experience on this subject, a Marriott controllable corporate cost factor of from 35% to 45% of management fees is a reasonable and conservative estimate of controllable corporate costs to be incurred by Marriott in connection with earning management fees under the Management Agreement, especially in consideration that Edition is a start-up brand for Marriott.

(4) In addition, Marriott would incur costs of REDACTED REDACTED

   (a) The second set of calculations of Present Value of Lost Profits presented in the earlier table assumes that the REDACTED REDACTED would through the end of 2019, and in 2020 Marriott would REDACTED REDACTED

(5) I reviewed and considered the following information pertinent to assessing Marriott's corporate costs for the subject Management Agreement in formulating this opinion:

---

[16] July 28, 2008 Amended and Restated Consulting and Development Agreement by and between I.S. International, LLC, a Delaware limited liability company ("Schrager") and Marriott International, Inc., as amended January 25, 2009 and January 15, 2010.

[17] Paragraph 5 of the Schrager Agreement.

26

(a) Marriott's most recent Form 10K filing, wherein I analyzed ratios of corporate costs to fee revenues (excluding reimbursable revenues and costs);

(b) Ms. Jacobsohn's deposition, where she indicated that Marriott normally calculates corporate costs at 0.9% of gross hotel revenues in connection with hotel management contract valuations which equates to 30% of a 3% Base Management Fee (.9% ÷ 3%=30%) and 23% of a 4% (.9% ÷ 4%=23%) Base Management Fee;

(c) Edition Brand departmental cost summaries for various periods, wherein substantial, non-reimbursable payroll and other controllable costs were recorded (and for the periods reviewed, those costs were substantially larger in amount than management fees earned by Marriott under the Management Agreement).

i) As shown in the financial statements for the Edition Brand Management Division provided by Marriott, for the years ended December 31, 2010 and 2011[18], Edition incurred Direct Wages and Controllable Costs totaling approximately REDACTED respectively, in 2010 and 2011. For each of these years professional fees included in the totals amounted to approximately REDACTED respectively, for 2010 and 2011. Though not labeled as such, presumably the professional fees were payable to REDACTED

ii) The 353 room Waikiki Edition was the first and only Edition hotel in operation until Marriott's opening of the second 78-room Istanbul Edition in 2011. Today, to the best of my knowledge, the Istanbul Edition is the only hotel opened and in operation under the Edition Brand.

iii) For a number of years going forward, it is questionable whether Marriott will earn any net profits on management fee income from Edition branded hotels during the startup phase of the brand, which given the

---

[18] MHS00579218-00579221 and MHS00579284-00579292

U.S. Bankruptcy Court - Hawaii  #11-02371   Dkt # 841-27   Filed  03/29/12   Page 27 of 35

slow start of this brand, is likely to continue at least through 2015 and beyond.

iv) In consideration that there is only one other small 78-room Edition Hotel in operation, it's reasonable to assume that a large portion of Edition Brand Management Division expenditures were and would have been incurred in the future attributable to managing the Waikiki Edition Hotel. Furthermore, with the advent of termination of the Management Agreement by the Debtor in August of 2011, it is also reasonable to assume that Marriott, if they opted to do so, could drastically reduce the Edition Division's Direct and Controllable costs now and into the future for substantial cost savings.

**(d)** Though arguably the combination of Edition Direct and Controllable Costs together with other Marriott corporate controllable costs pushes the percentage of controllable costs incurred by Marriott in connection with earning management fees for the Waikiki Edition now and into the near term future well above 100% of fees earned, to be conservative I kept my estimate of controllable corporate costs to within the range of 35% to 45% of management fees for purpose of calculating the maximum possible Lost Profits Damages in connection with this case.

c. **The Discount Rate Of 3.2% Used By Marriott To Calculate The Present Value Of The 49-year Stream Of Management Fees Is Exceedingly Low And Inappropriate For Calculating Lost Profits Damages In This Case.**

(1) A discount rate is the interest rate used to calculate the present value of future receipts or payments. (For example, $1 put in the bank today at 5% interest will be worth $1.63 in 10 years. Therefore, the present value of $1.63 to be received in 10 years is $1 today at a 5% discount rate).

(2) The discount rate of REDACTED by Marriott to calculate the present value of the 49-year stream of management fees is exceedingly low and inappropriate for calculating lost profits damages in this case. The appropriate discount rate should be at least equal Marriott's weighted average cost of capital ("WACC

Rate"), which is likely to be in the range of 7% to 8% plus a risk premium of from 400 to 500 Basis Points, taking into account various risks specific to the Management Agreement and Marriott's projections including the unreasonably long damages period. (Assuming Marriott would have failed the Performance Test and been terminated in mid-2018, this would entail a shorter projection period, and a 200 Basis Points risk premium above the WACC Rate would apply).

(3) It is my understanding that specific information was requested of Marriott through discovery regarding Marriott's WACC Rate and it is my further understanding that the information has not yet been disclosed by Marriott.

(4) Alternatively, using information disclosed in Marriott's most recent Form 10K filing along with publicly available research reports on Marriott from Reuters and others, I concluded that 7-8% is a reasonable estimate of Marriott's WACC Rate determined as of February 27, 2012.

(5) The WACC Rate reflects Marriott's enterprise-wide composite annual cost of debt and equity capital. In Lost Profits calculations, the WACC Rate is usually the starting point for deciding upon an appropriate discount rate to discount lost profits to their present value. To discount Lost Profits Damages in this case, in my opinion the WACC Rate should be adjusted upward to reflect risks specific to Marriott's hotel management business and the subject Management Agreement. Some of these risks factors are discussed below.

(6) In Marriott's annual and quarterly SEC filings, management discusses several risk factors that are relevant for consideration in this case for deciding on an appropriate discount rate. The items below are direct quotes from Marriott's 2011 SEC Filings:

(a) "As a result of current economic conditions, we continue to experience weakened demand for our hotel rooms and timeshare products. Recent improvements in demand trends globally may not continue, and our future financial results and growth could be further harmed or constrained if the recovery stalls or conditions worsen."

(b) "In recent years, our business has been hurt by decreases in travel resulting from weak economic conditions and the heightened travel security measures that have resulted from

29

the threat of further terrorism. Our future economic performance could be similarly affected by the economic environment in each of the regions in which we operate."

(c) "A failure to keep pace with developments in technology could impair our operations or competitive position. The lodging and timeshare industries continue to demand the use of sophisticated technology and systems, including those used for our reservation, revenue management and property management systems. These technologies and systems must be refined, updated, and/or replaced with more advanced systems on a regular basis. If we are unable to do so as quickly as our competitors or within budgeted costs and time frames, our business could suffer".

(d) "Our business and profitability could be harmed if online intermediaries succeed in significantly shifting loyalties from our lodging brands to their travel services, diverting bookings away from www.Marriott.com, or through their fees increasing the overall cost of Internet bookings for our hotels".

(e) "Failure to maintain the integrity of internal or customer data could result in faulty business decisions, operational inefficiencies, damage of reputation and/or subject us to costs, fines, or lawsuits".

(f) "If we cannot recruit, train, develop, and retain sufficient numbers of talented associates, we could experience increased associate turnover, decreased guest satisfaction, low morale, inefficiency, or internal control failures".

(g) **"Our hotel management and franchise agreements may also be subject to premature termination in certain circumstances**, such as the bankruptcy of a hotel owner or franchisee, or a failure under some agreements to meet specified financial or performance criteria."

(h) "Weak property-level revenue or profitability could decrease our fee revenue".

(i) **"Disagreements with the owners of the hotels that we manage or franchise may result in litigation or may delay implementation of product or service initiatives**. If any such litigation results in a significant adverse judgment, settlement or court order, we could suffer significant losses,

our profits could be reduced, or our future ability to operate our business could be constrained."

(7) Other public disclosures relevant to the Edition Brand by Marriott on its website, in press releases and in SEC Filings that I agree with include:

(a) From the Marriott Web Site, Brands section: "EDITION is intended to push the boundaries, break new ground and take the hospitality industry into bold, <u>uncharted</u>, areas."

(b) From Marriott press release January 19, 2012: Announcing Five New EDITION Hotels in Gateway Cities. The statements about the number and opening dates for the new Edition hotels "are subject to a number of risks and uncertainties, including supply and demand changes for hotel rooms; competitive conditions in the lodging industry; relationships with clients and property owners; the availability of capital to finance hotel growth; and other risk factors".

(c) 10Q Filing September 30, 2011 - "Our new programs and new branded products may not be successful".

(d) 10Q Filing September 30, 2011 – "Some of our new brands involve or may involve cooperation and/or consultation with one or more third parties, including some shared control over product design and development, sales and marketing, and brand standards. Disagreements with these third parties could slow the development of these new brands and/or impair our ability to take actions we believe to be advisable for the success and profitability of such brands".

(e) 10Q Filing September 30, 2011 - "Events that may be beyond our control that could affect the reputation of one or more of our properties or more generally impact the reputation of our brands".

(8) I have summarized other risks specific to the performance of the Waikiki Edition and therefore to the reliability of the Lost Profits Damages claim submitted by Marriott as follows:

(a) **Poor performance of the Hotel since opening** - Under Marriott's management from October 2010 to August, 2012,

31

performance was so poor that there was a high risk that the property would never reach the revenues and profit levels projected by Marriot. Marriott's inability or unwillingness to market the hotel through its regional or international marketing teams make the projected growth in occupancy and room rates unlikely. The high employee cost structure imposed on the Hotel by Marriott made profitability unlikely. Marriott did not have a turnaround strategy as to how they planned to improve performance.

(b) **Existence of Performance Termination Test** – The Performance Termination Test under Article II of the Management Agreement made the early termination of the Management Agreement a distinct possibility and a particularly significant risk to Marriott.

(c) **No Brand Track Record** – Marriott had no track record of success in operating and managing Edition Hotels, since the Waikiki Edition was the first ever hotel to be developed under the Edition brand and managed by Marriott. Its marketing, operation, and targeted clientele were vastly different than for Marriott or Ritz Carlton branded and managed hotels in Hawaii or elsewhere.

(d) **Unusually High Projection Risk** – Projections, even for a short term (10 years or less) are highly speculative in the hotel industry and highly sensitive to assumptions concerning ADR, Occupancy and RevPAR. There will usually be differences between projected and actual results because events and circumstances do not occur as expected and the differences could be material. To project results and management fees out for 49 years is unreasonable, inappropriate and unreliable.

(9) Marriott's discount rate of 3.2% to discount Lost Profits is inexplicable and inappropriate.

(a) In Ms. Young's deposition, she indicated that this rate was arrived at by using Marriott's mortgage borrowing rate of 300 Basis Points over Libor.

(b) When Ms. Young was asked in her deposition what the lowest and highest discount rates she had ever before seen

U.S. Bankruptcy Court - Hawaii  #11-02371  Dkt # 841-27  Filed  03/29/12  Page 32 of 35

applied to analyze the net present value for a management contract, she indicated a low of 6% and a high of 25%.

(c) The discount rate for calculating the present value of speculative projections of Lost Profits Damages has little if anything to do with the interest rate on secured real estate loans. The WACC Rate plus a risk premium measures the lost opportunity costs to Marriott from having foregone the receipt of profits that could have otherwise been reinvested in other opportunities by Marriott or returned to shareholders in the form of dividends.

(d) Furthermore, the secured borrowing rate referred to by Ms. Young is for borrowings where real estate collateral exists as security for the loan, the term is for 5 or 7 years, and the borrowing amount is far less than the fair market value of the collateral.

(e) Thus the borrowing rate used by Ms. Young has no applicability to the calculation of the present value of projected lost profits from a management agreement over a 49 year period.

(f) I respectively submit to the Court that the 3.2% discount rate chosen by Marriott to calculate its Lost Profits Damages Claim should be dismissed as irrelevant and unreliable.

d. Taking all of these factors into consideration, in my opinion a reasonable and appropriate discount rate for calculating the present value of lost profits damages in this case for the first ten years should be at a minimum of 9.6% (200 Basis Points above Marriott's WACC Rate), and for projections of lost profits beyond 10 years, at a minimum of 12.6% (at least 500 Basis Points above Marriott's WACC Rate).

**F. Marriott's Expense Claim of $5,599,082 For Hotel Expenses That Marriott Alleges It Paid On Debtor's Behalf In Large Part Is Not Supported By Reasonable Back Up Documentation, Particularly As Relates To A Major Portion Of The Expense Claim Totaling $3,621,342.**

1. Ms. Young's Affidavit that accompanied and was made part of the Proof of Claim stated the total amount of the Expense Claim was $5,599,082 but she did not provide any detail regarding the composition of the amount claimed.

33

2. REDACTED

3. REDACTED

---

[19] MHS00137835

[20] MHS00585957

[21] MHS00578595-00578597; MHS00578728-00578730; MHS00578856;MHS00578974-00578976;    MHS00579032-00579033;    MHS00579067-00579069;    MHS00578972; MHS00578858-00578860; MHS00579117-00579118; MHS00579125

34

I respectfully reserve the right to provide a supplemental Declaration or supplement this Declaration with additional information or opinions not fully covered by this Declaration after reviewing additional discovery materials and any expert reports prepared on behalf of Marriott.

I declare under penalty of perjury that the foregoing is true and correct.

Dated:          March 23, 2012

_____
FRANCIS J. NARDOZZA

35

5263173.4
2147-03