RUSH MOORE LLP
A Limited Liability Law Partnership
SUSAN TIUS 2873-0
737 Bishop Street, Suite 2400
Honolulu, Hawaii 96813-3862
Tel. No. 521-0406
Fax No. 521-0497
E-mail: Stius@rmhawaii.com

SHEPPARD MULLIN RICHTER & HAMPTON LLP
CARREN B. SHULMAN
ALAN M. FELD
30 Rockefeller Plaza
New York, NY 10112-0015
Tel. No. (212) 653-8700
Fax No. (212) 653-8701
E-mail: CShulman@sheppardmullin.com
E-mail: AFeld@sheppardmullin.com

JENNER & BLOCK LLP
DAVID A. HANDZO
LINDSAY C. HARRISON
1099 New York Avenue, NW
Washington, DC 20001
Tel. No. (202) 639-6865
Fax No. (202) 661-4956
E-mail: DHandzo@jenner.com
E-mail: LHarrison@jenner.com

Attorneys for MARRIOTT INTERNATIONAL, INC.
and MARRIOTT HOTEL SERVICES, INC.

# UNITED STATES BANKRUPTCY COURT

# DISTRICT OF HAWAII

In Re

M WAIKIKI LLC,

      Debtor.

Case No. 11-02371 (Chapter 11)

**MARRIOTT HOTEL SERVICES, INC. AND MARRIOTT INTERNATIONAL, INC.'S POST-HEARING BRIEF REGARDING THE ESTIMATION OF MARRIOTT'S PROOF OF CLAIM NO. 79**

**MARRIOTT HOTEL SERVICES, INC. AND MARRIOTT INTERNATIONAL, INC.'S POST-HEARING BRIEF REGARDING THE <u>ESTIMATION OF MARRIOTT'S PROOF OF CLAIM NO. 79</u>**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................. iii

INTRODUCTION ............................................................................................... 1

ARGUMENT ........................................................................................................ 5

I.     BURDEN OF PROOF ............................................................................ 5

II.    DEBTOR BREACHED THE MANAGEMENT AGREEMENT, AND MARRIOTT IS ENTITLED TO DAMAGES AS A RESULT ................................................................................................ 9

III.   THE VALUE OF MARRIOTT'S LOST MANAGEMENT FEES IS EQUAL TO $33,053,307.00 ............................................................ 10

     A.    There Is Substantial Agreement Concerning the Management Fees Marriott Would Have Earned Had It Continued to Manage the Hotel ...................................................... 10

     B.    Marriott Is Entitled to Damages for the Full Length of the Contract Term ............................................................................ 18

     C.    The Court Should Deduct Only Those Costs That Marriott Would Shed As a Result of the Breach ....................................... 22

     D.    A Discount Rate of 7.5% for a Relatively Safe Stream of Management Fee Income Is Conservative and Reasonable .......... 27

IV.   DEBTOR MAY NOT RELY ON THE PERFORMANCE TEST TO LIMIT MARRIOTT'S DAMAGES ................................................... 34

     A.    New York Law Bars Debtor's Reliance on the Performance Test ................................................................................................ 34

     B.    Marriott Would Have Passed the Performance Test ..................... 36

          1.    Mr. Hallstrom Errs in Concluding That the Hotel Could Not Compete With Its Contractual Competitive Set ........................................................................................ 36

i

      2.      Mr. Nardozza's Performance Test Analysis Is Methodologically Flawed ......................................................43

      3.      Mr. Kleisner's Analysis Regarding Marriott's Likely Future Performance Is Without Factual Basis.....................45

V.     MARRIOTT IS ENTITLED TO $4,314,496.45 IN PRE-PETITION COSTS ARISING FROM WORKING CAPITAL-RELATED AND OTHER OPERATIONAL EXPENSES OF THE HOTEL ......................................................................................48

    A.     Debtor Is Contractually Obligated To Fund Working Capital and Other Operational Expenses ....................................48

    B.     Debtor Previously Conceded Its Contractual Obligation to Fund Working Capital and Other Operational Expenses...............50

VI.    DEBTOR IS ALSO OBLIGATED TO PAY AT LEAST $1,433,333.89 IN COSTS OUTLINED ON POST-PETITION OFB BILLS .............................................................................52

VII.   THE COURT SHOULD NOT DEDUCT PRE-OPENING EXPENSES OR AMOUNTS OWED BY THIRD PARTIES FROM THE TOTAL OWED TO MARRIOTT ......................................57

    A.     Debtor Was Properly Held Responsible for Pre-Opening Expenses.......................................................................57

    B.     Debtor Must Pursue Collection of the Hotel's Accounts Receivable with the Responsible Entities, Not Marriott...............59

CONCLUSION ........................................................................60

U.S. Bankruptcy Court - Hawaii   #11-02371   Dkt # 990   Filed  05/01/12   Page 4 of 90

# TABLE OF AUTHORITIES

**CASES**

*Adams v. Linblad Travel, Inc.*, 730 F.2d 89 (2d Cir. 1984).....................................26

*American List Corp. v. U.S. News & World Report, Inc.*, 75 N.Y.2d 38
    (1989) .........................................................................9, 32, 34, 35, 36

*Aqua Dredge, Inc. v. Stony Point Marina & Yacht Club, Inc.*, 183 A.D.2d
    1055 (N.Y. App. Div. 1992) ...............................................................15

*Ashland Management Inc. v. Janien*, 82 N.Y.2d 395 (1993) ..............................16

*Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251 (1946)...................................19

*Biotronik, A.G. v. Conor Medsystems Ireland, Ltd.*, 939 N.Y.S.2d 739, 2011
    WL 5385980 (N.Y. Sup. Ct. 2011).....................................................15

*Brushton–Moira Central School District v. Fred H. Thomas Associates P.C.*,
    91 N.Y.2d 256 (1998) ........................................................................10

*Chung v. Kaonohi Center Co.*, 618 P.2d 283 (Haw. 1980), *abrogated on
    other grounds*, *Francis v. Lee Enterprises, Inc.*, 971 P.2d 707 (Haw.
    1999) ...................................................................................................19

*Claremont Preparatory School, L.L.C. v. Long Island Swimming Pool
    Service*, No. 603886106, 2008 WL 5342215 (N.Y. Sup. Ct. Dec. 15,
    2008) ...................................................................................................15

*Contemporary Mission, Inc. v. Famous Music Corp.*, 557 F.2d 918 (2d Cir.
    1977) ........................................................................................ 1-2, 8, 18

*In re Food Management Group, LLC*, 372 B.R. 171 (Bankr. S.D.N.Y.
    2007) ..............................................................................................34, 35

*In re FRG, Inc.*, 121 B.R. 451 (Bankr. E.D. Pa. 1990)............................................7

*In re Harbin*, 486 F.3d 510 (9th Cir. 2007) .........................................................5, 6

*Hirschfeld v. IC Securities, Inc.*, 132 A.D.2d 332 (N.Y. App. Div. 1987)..............14

*In re Holm*, 931 F.2d 620 (9th Cir. 1991)...............................................................8

iii

U.S. Bankruptcy Court - Hawaii   #11-02371   Dkt # 990   Filed  05/01/12   Page 5 of 90

*Joseph v. Rubinstein Jewelry Manufacturing Co.,* 18 A.D.3d 615 (N.Y. App. Div. 2005) .......................................................................................................8

*Katz Communications, Inc. v. Evening News Ass'n*, 705 F.2d 20 (2d Cir. 1983) ......................................................................................................26

*Kenford Co. v. Erie County*, 76 N.Y.2d 257 (1986) ...............................................14

*Lundell v. Anchor Construction Specialists, Inc.*, 223 F.3d 1035 (9th Cir. 2000) .....................................................................................................7, 8

*In re Pizza of Hawaii, Inc.*, 761 F.2d 1374 (9th Cir. 1985) ..................................5, 6

*In re Pugh*, 157 B.R. 898 (BAP 9th Cir. 1993) .......................................................7

*R&I Electronics, Inc. v. Neuman*, 66 A.D.2d 836 (App. Div. 1978)...........22, 25, 26

*Smith v. Brown & Jones*, 633 N.Y.S.2d 436 (N.Y. Sup. Ct. 1995) ........................15

*Sole Resorts, S.A. de C.V. v. Allure Resorts Management, LLC*, No. 05 Civ. 0978 JSR, 2007 WL 646288 (S.D.N.Y. Feb. 26, 2007) ...................................19

*Spitz v. Lesser*, 302 N.Y. 490 (1951) ........................................................ 1, 18-19

*In re Smurfit-Stone Container Corp.*, 444 B.R. 111 (Bankr. D. Del. 2011)..............8

*In re TCI 2 Holdings, LLC*, 428 B.R. 117 (Bankr. D.N.J. 2010) ............................7

*Tractebel Energy Marketing, Inc. v. AEP Power Marketing, Inc.*, 487 F.3d 89 (2d Cir. 2007).................................................................................14

*Travellers International, A.G. v. Trans World Airlines, Inc.*, 41 F.3d 1570 (2d Cir. 1994)....................................................................................17

*Wakeman v. Wheeler & Wilson Manufacturing Co.*, 101 N.Y. 205 (1886)............16

*Wooten v. State*, 302 A.D.2d 70 (N.Y. App. Div. 2002) .........................................25

## STATUTES

11 U.S.C § 502(a) .................................................................................................7

## OTHER AUTHORITIES

Fed. R. Bankr. P. 3001(f) ......................................................................................7

U.S. Bankruptcy Court - Hawaii   #11-02371   Dkt # 990   Filed  05/01/12   Page 6 of 90

Glen Banks, *Lost Profits for Breach of Contract*, 74 Albany L. Rev. 637
(2011) ................................................................................................17, 18

Robert N. Jones & Stephen D. Roach, *Valuation of Long-Term Leases*, 57
Appraisal J. 451 (1989)................................................................20, 22

John W. O'Neill, *Hotel Occupancy: Is the Three-Year Stabilization
Assumption Justified*, 52(2) Cornell Hosp. Q. 176 (2011) ................................32

U.S. Bankruptcy Court - Hawaii   #11-02371   Dkt # 990   Filed  05/01/12   Page 7 of 90

Marriott Hotel Services, Inc. and Marriott International, Inc. (collectively, "Marriott") respectfully submit this post-hearing brief in connection with the estimation of Proof Of Claim No. 79.[1]

## INTRODUCTION

Debtor forcibly evicted Marriott from The Waikiki EDITION Hotel ("Hotel") after a mere eleven months of operation. Unhappy with the financial performance of the Hotel, Debtor ignored the reality that new luxury hotels ramp up over a multi-year period, and disregarded its agreement to give Marriott seven years to meet the parties' contractual performance test. Debtor now seeks to turn its precipitous breach of the parties' contract to its advantage, asserting that Marriott is entitled to only a small fraction of its claimed damages because it is allegedly uncertain that the Hotel would have performed better in the future, after becoming established in the marketplace, than it did in its first few months.

Debtor's arguments run counter to New York law, which does not "enable the wrongdoer to profit by his wrongdoing at the expense of his victim." *Spitz v. Lesser*, 302 N.Y. 490, 494 (1951) (quoting *Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251, 264-65 (1946)). Rather, "the burden of uncertainty as to the amount of damage is upon the wrongdoer." *Contemporary Mission, Inc. v. Famous Music*

---

[1] Marriott still has yet to receive any discovery from Aqua Hotels and has challenged Debtor's improper claim of privilege over numerous documents, which challenges may give rise to a motion to compel after the parties meet and confer. Marriott reserves the right to supplement this post-hearing brief upon receiving these additional documents.

U.S. Bankruptcy Court - Hawaii   #11-02371   Dkt # 990   Filed  05/01/12   Page 8 of 90

*Corp.*, 557 F.2d 918, 926 (2d Cir. 1977). Indeed, Debtor's argument that Marriott's damages must be cut off after seven years because Marriott allegedly would have failed the contractual performance test is entirely foreclosed by New York law. A party that repudiates an agreement cannot be heard to argue that the counterparty would have failed to satisfy a condition for performance in the future. *See* Pre-Hrg. Br. 44-46.[2]

Debtor's attempt to limit Marriott's damages is contrary not only to New York law, but also to Debtor's own statements made in the ordinary course of business and at the outset of this bankruptcy proceeding. For example, while Debtor asserts that the projections of future revenue for the Hotel offered by Marriott expert witness Bruce Baltin are too aggressive, Debtor's asset manager prepared a pro forma for the Hotel in January 2011 that predicted future revenues materially higher than Mr. Baltin's pro forma. *Compare* MHS 137[3] *with* Baltin Am. Decl. at 49-50.[4] Similarly, while Debtor now argues that Marriott's claim for lost management fees must be reduced by 35% to reflect costs that Marriott purportedly incurs to manage the Hotel, in a sworn affidavit supporting Debtor's First Day Motions, Debtor's manager stated that Marriott's management fees are

---

[2] Marriott Hotel Services, Inc. and Marriott International, Inc.'s Pre-Hearing Brief Regarding the Estimation of Marriott's Proof of Claim No. 79, dated Mar. 28, 2012.

[3] "MHS" refers to exhibits admitted into evidence by Marriott. "DX" refers to exhibits admitted into evidence by Debtor.

[4] Amended Declaration of Bruce Baltin, Mar. 24, 2012.

2

"pure profit." McKinney Decl. ¶ 15.[5] And while Debtor now offers Monday morning quarterbacking by Fred Kleisner, who takes issue with every aspect of Marriott's sales and marketing plans, in December 2010, Debtor's asset manager reviewed Marriott's sales and marketing plan and concluded that "the plan is good." MHS 227, 228; Herron Dep. 113;[6] Watson Dep. 99-101;[7] *see also* MHS 301, 258 & McKinney Dep. 115 (noting that the plan was "sound"); Watson Dep. 83-84 (conceding that the plan was "well thought out, well written"). Finally, while Debtor now claims that Marriott is entitled to a small fraction of its lost management fees, Debtor's asset manager valued Marriott's damages at $37.5 million when it advised Debtor in June 2011 concerning the financial ramifications of terminating Marriott prematurely. MHS 254; Guccini Dep. 88-90.[8]

Debtor's effort to retreat from these and other statements in an effort to challenge Marriott's claim is unavailing. Although Debtor asserts that Mr. Baltin's projections are too speculative, there is, in fact, very little dispute concerning the revenues that the Hotel would have earned in the future; and Marriott's base management fees are simply a percentage of these total revenues. The pro formas prepared by Mr. Baltin and Debtor expert James Hallstrom differ by only about

---

[5] Declaration of Damian McKinney, Sept. 2, 2012 (Dkt. No. 17).

[6] Deposition of Mark Herron, Mar. 23, 2012.

[7] Deposition of Robert Watson, Mar. 24. 2012.

[8] Deposition of Paul Guccini, Mar. 22, 2012.

3

10% in their estimation of the Hotel's room revenues (*see infra* at p. 11 & Table 1), and both are lower than Debtor's own January 2011 pro forma. Mr. Baltin's projections of *non-room* revenues (which account for approximately one-third of Marriott's lost management fees) are entirely undisputed.

Nor would it be proper to cut off Marriott's damages before the completion of the contract term on the basis that the long-term stream of revenue is speculative. Long-term contracts are common in the hotel industry, and unrebutted testimony by Marriott witness Ken Rehmann establishes that fewer than 1% of Marriott's long-term contracts are terminated before the end of the term. Rehmann Decl. ¶ 8.[9] Debtor's own expert, Mr. Hallstrom, conceded that he regularly prepares projections of 20, 30, and 40 years. 4/5/12 AM Tr. 67:6-13.[10] And it would be entirely unjustified to ignore the entire contract term when the use of a discount rate already accounts for any uncertainty of long-term revenue streams – especially where the discount rate employed by Mr. Baltin is conservative, and indeed higher than analogous rates employed by both Marriott *and* Debtor in the normal course of business outside the context of litigation.

The basic elements of Marriott's claim – breach by Debtor, Marriott's entitlement to a percentage of the Hotel's revenues, the fact that the Hotel would

---

[9] Declaration of Kenneth R. Rehmann, filed Mar. 24, 2012.

[10] All transcript ("Tr.") references are to the Transcript of Hearing on Motion to Determine Estimation of Marriott Claim #79, held on April 3-5, 2012 and April 17-18, 2012.

U.S. Bankruptcy Court - Hawaii  #11-02371  Dkt # 990  Filed  05/01/12  Page 11 of 90

earn very substantial revenues in the future, and the duration of the contract – are not materially in dispute here. In sum, this Court should estimate Marriott's lost management fees to be equal to $33,053,307.00, as set forth in Mr. Baltin's amended declaration, and its other damages to be equal to $5,747,830.34, as explained in Marriott's pre-hearing brief and below, for an estimated claim totaling $38,801,137.34 plus pre-judgment interest.

<b>ARGUMENT</b>

## I. BURDEN OF PROOF.

This estimation hearing arises out of Debtor's motion to estimate Marriott's Proof of Claim "solely for plan voting and feasibility purposes." Dkt. 537 at 2. The Court is being asked to make two determinations. The first is in the context of feasibility for purposes of satisfying Section 1129(a)(11), and the second involves temporary allowance for voting purposes under Rule 3018(a). Each context involves separate burdens of proof.

**Feasibility under Section 1129(a)(11)**. Debtor, as the plan proponent, bears the burden of proof to establish by a preponderance of the evidence that its plan is "feasible" under Section 1129(a)(11) of the Bankruptcy Code. *In re Harbin*, 486 F.3d 510, 517 (9th Cir. 2007); *In re Pizza of Hawaii, Inc.*, 761 F.2d 1374, 1377 (9th Cir. 1985). "To be feasible . . ., a plan must take into account the possibility that a potential creditor may, following confirmation, recover a large

5

judgment against the debtor." *Harbin*, 486 F.3d at 517. As a result, a "bankruptcy court cannot adequately determine a plan's feasibility for purposes of section 1129(a)(11) without evaluating whether a potential future judgment may affect the debtor's ability to implement its plan." *Id*. at 517-18. Failure to do so is clear error. *Id.*

While the bankruptcy court has discretion to make the necessary evaluation, it must do so to ensure the plan is not likely to be followed by further need for reorganization. If the Court's feasibility estimate proves too low, the reorganized Debtor will likely need further reorganization or face liquidation following entry of Marriott's judgment. Accordingly, as long as Marriott has a reasonable possibility of recovering the full value of its claim, Debtor bears the burden of demonstrating the feasibility of its plan in the event Marriott recovers that amount.[11] *See, e.g.*, *Pizza of Hawaii*, 761 F.2d at 1382 (holding "that the bankruptcy court's finding of feasibility was clearly erroneous because the plan failed to provide for the possibility that Shakey's would recover a large judgment in the civil case").

**Temporary Allowance for Voting Pursuant to Rule 3018(a)**. Debtor has separately classified Marriott as the lone claimant in Class 10. As a result, Marriott's "no" vote will carry the entire class regardless of the amount that it is

---

[11] Specifically, Debtor should either have to reserve the full amount of the claim or provide a bond or other adequate security to cover the difference between the Court's estimate and the full claim amount.

U.S. Bankruptcy Court - Hawaii  #11-02371  Dkt # 990  Filed 05/01/12  Page 13 of 90

temporarily allowed.  Estimation under Rule 3018(a) is most likely to impact confirmation if the Court finds there are two confirmable plans and must evaluate the preferences of creditors with respect to each plan pursuant to Section 1129(c) of the Bankruptcy Code.  *See, e.g.*, *In re TCI 2 Holdings, LLC*, 428 B.R. 117, 183-84 (Bankr. D.N.J. 2010) (considering claim amounts in weighing creditor preferences as to competing plans).

The allocation of burdens of proof under Rule 3018(a) is the same as it is in evaluating objections to proofs of claim.  *In re FRG, Inc.*, 121 B.R. 451, 456 (Bankr. E.D. Pa. 1990).  That is, all allegations set forth in a properly filed proof of claim are taken as true and, if the allegations set forth all facts necessary to establish a claim and are not self contradictory, the proof of claim constitutes prima facie evidence of the validity and amount of the claim.  11 U.S.C § 502(a); Fed. R. Bankr. P. 3001(f).

After an objection is raised, the objector bears the burden of producing evidence sufficient to negate the prima facie validity of the claim.  *In re Pugh*, 157 B.R. 898, 901 (BAP 9th Cir. 1993).  "To defeat the claim, the objector must come forward with sufficient evidence and 'show facts tending to defeat the claim by probative force equal to that of the allegations of the proofs of claim themselves.'" *Lundell v. Anchor Const. Specialists, Inc*., 223 F.3d 1035, 1039 (9th Cir. 2000) (quoting *In re Holm*, 931 F.2d 620, 623 (9th Cir. 1991)).  An objector fails to meet

7

that burden if it fails "to produce sufficient evidence that discredits at least one of the allegations essential to the claim's legal sufficiency." *In re Smurfit-Stone Container Corp.*, 444 B.R. 111, 117 (Bankr. D. Del. 2011); *Lundell*, 223 F.3d at 1040-41; *In re Holm*, 931 F.2d 620, 623 (9th Cir. 1991). If the objector can meet its burden of production, the burden of persuasion shifts to the claimant to demonstrate by a preponderance of the evidence that the claim deserves to share in the distribution of the debtor's assets. *In re Smurfit-Stone*, 444 B.R. at 117.

**Burden of Proof Under New York Law.** Under New York law, if the defendant claims that lost profits are too speculative to be awarded, it has the burden of establishing that contention. *Joseph v. Rubinstein Jewelry Mfg. Co.*, 18 A.D.3d 615, 616 (N.Y. App. Div. 2005); *see also Contemporary Mission*, 557 F.2d at 926 ("[T]he burden of uncertainty as to the amount of damage is upon the wrongdoer."). The standard for damages under New York law is discussed at greater length in Parts III.A and IV.A.

In this case, Marriott has established the prima facie validity of: (1) $33,053,307.00 in lost management fees stemming from Debtor's breach of the Management Agreement; (2) $4,314,496.45 in working capital loans advanced by Marriott for hotel operations; and (3) $1,433,333.89 in other damages as a result of Debtor's breach of contract, including severance, wages, customer chargebacks, and lost guest advance deposits. Debtor has failed to meet its burden of production

U.S. Bankruptcy Court - Hawaii   #11-02371   Dkt # 990   Filed  05/01/12   Page 15 of 90

with respect to each of these claims – and has not even attempted to do so with respect to certain of them.[12]  And even if Debtor had produced evidence of "probative force equal to that of the allegations of the proofs of claim themselves," *Holm*, 931 F.2d at 623, Marriott has demonstrated its entitlement to these claims by a preponderance of the evidence.

## II.     DEBTOR BREACHED THE MANAGEMENT AGREEMENT, AND MARRIOTT IS ENTITLED TO DAMAGES AS A RESULT.

The fact of breach is easily established, and Debtor has not disputed it.[13] The Management Agreement contains specific termination provisions that limit the circumstances under which the parties may lawfully terminate the contract, none of which were present here.  *See* Pre-Hrg. Br. 8-10; *id.* at 17-19 (citing cases holding that when parties agree to specific conditions for termination, they enjoy no extra-contractual termination rights).

Marriott is entitled to recover as general damages those damages that are "the natural and probable consequence of the breach."  *Am. List Corp. v. U.S. News & World Report, Inc.*, 75 N.Y.2d 38, 43 (1989).   Such damages are intended to give Marriott the benefit of its bargain by "plac[ing it] . . . in as good a position as

---

[12] These include management fees derived from non-room revenues as well as the vast majority of the working capital loans advanced by Marriott to the Hotel.

[13] Nor is there any claim for purposes of this estimation hearing that Marriott itself breached the contract.  Debtor agreed not to make any such argument in this estimation hearing. Debtor's Response in Opposition to Marriott's Motion to Limit Scope of Discovery and Hearing, Feb. 21, 2012, at 12-13; *see also* Scheduling Order (Dkt. 542), Jan. 20, 2012, at 4, ¶ 7 (outlining limited scope of estimation hearing); 3/5/12 e-mail from K. Hickox to L. Harrison (*see* Attach. A).

U.S. Bankruptcy Court - Hawaii   #11-02371   Dkt # 990   Filed  05/01/12   Page 16 of 90

it would have been had the contract been performed." *Brushton–Moira Cent.*

*School Dist. v. Fred H. Thomas Assocs., P.C.*, 91 N.Y.2d 256, 261 (1998).

## III. THE VALUE OF MARRIOTT'S LOST MANAGEMENT FEES IS EQUAL TO $33,053,307.00.

### A. There Is Substantial Agreement Concerning the Management Fees Marriott Would Have Earned Had It Continued to Manage the Hotel.

Despite all the conflicting testimony presented to the Court, there is in fact little dispute concerning the revenues the Hotel would have earned in the future, and thus little dispute over the base management fees that Marriott would have earned, which are merely a percentage of gross revenues.

Mr. Baltin's projections of non-room revenues for the Hotel, including food and beverage, valet parking, spa, and retail rental revenues, are entirely undisputed. Baltin Am. Decl. at 49-50 & ¶¶ 89-98. As for room revenues – which are equal to Revenue Per Available Room ("RevPAR") multiplied by the number of rooms in the Hotel (353) and by the number of days in the year – the difference between the two sides is modest. Mr. Hallstrom's projections differ from Mr. Baltin's by a *maximum* of 12.2% (in 2015).[14] That difference diminishes as time passes, for

---

[14] Mr. Nardozza did not prepare his own RevPAR projections, but instead cited Marriott's internal projections (4/17 AM Tr. 108), which assumed a 71% occupancy rate that Mr. Hallstrom and Mr. Baltin both rejected as too low. Declaration of James E. Hallstrom, Mar. 23, 2012, at 10; Baltin Am. Decl. ¶ 80; 4/18/12 Tr. 41-42 (Baltin). Marriott had arrived at that rate by averaging the occupancy rates for 2008-2010, the three worst years in history for the Hawaii market. Dana Jacobsohn, who created Marriott's projections, agreed that a 71% occupancy projection was unrealistically low. 4/17/12 PM Tr. 43-44. Mr. Hallstrom projects a 78%

example, to 10% in 2019 and to 6.4% in 2025.[15]

Table 1: Comparison of Hallstrom and Baltin RevPAR Projections.[16]

| Year | Hallstrom RevPAR Projection | Baltin RevPAR Projection | Percent Difference Between Hallstrom and Baltin |
|------|------|------|------|
| 2012 | $ 169.00 | $ 167.76 | -0.7% |
| 2013 | $ 200.20 | $ 210.72 | 5.3% |
| 2014 | $ 231.66 | $ 253.97 | 9.6% |
| 2015 | $ 249.36 | $ 279.88 | 12.2% |
| 2016 | $ 258.09 | $ 288.03 | 11.6% |
| 2017 | $ 267.12 | $ 296.91 | 11.2% |
| 2018 | $ 276.47 | $ 305.80 | 10.6% |
| 2019 | $ 286.14 | $ 314.68 | 10.0% |
| 2020 | $ 296.16 | $ 324.31 | 9.5% |
| 2021 | $ 306.53 | $ 333.93 | 8.9% |
| 2022 | $ 317.25 | $ 343.61 | 8.3% |
| 2023 | $ 328.36 | $ 353.58 | 7.7% |
| 2024 | $ 339.85 | $ 363.83 | 7.1% |
| 2025 | $ 351.75 | $ 374.38 | 6.4% |

Indeed, if Mr. Hallstrom's projections are extended out from the 14 years given in his Declaration to 25 years, inflating his annual stabilized RevPAR only by 3.5%, which is the year-on-year increase he assumes will take place once the Hotel's performance has stabilized (Hallstrom Decl. Ex. A at 9), the room revenue projections of Mr. Hallstrom and Mr. Baltin *converge* so that, by 2036, they are virtually identical.

occupancy rate for the Hotel (Hallstrom Decl. Ex. A at 9), and Mr. Nardozza projects a 79.3% occupancy rate for the competitive set (Declaration of Francis J. Nardozza, Mar. 23, 2012, at 17).

[15] If the Court credits Mr. Hallstrom's projections of room revenues over Mr. Baltin's, it must account for Mr. Baltin's revenue projections for other Hotel departments in calculating Marriott's lost management fees. Those revenues make up approximately one-third of Marriott's lost management fees, or a total of $10,505,548. *See* Baltin Am. Decl. at 49-50 (listing room revenues and non-room revenues). Debtor has not even attempted to rebut those non-room revenue projections, forgoing any attempt to meet its burden of production.

[16] Source: Hallstrom Decl. Ex. 13 and Baltin Am. Decl. pp. 49-50 & ¶¶ 77, 86.

U.S. Bankruptcy Court - Hawaii   #11-02371   Dkt # 990   Filed   05/01/12   Page 18 of 90

*Table 2: Comparison of Hallstrom and Baltin RevPAR Projections to 2036.*[17]



Furthermore, Debtor's own asset manager prepared projections for the Hotel in January 2011, in the usual course of business and prior to the onset of litigation, that show substantially *higher* RevPAR projections than either Mr. Baltin or Mr. Hallstrom.  *See* MHS 137; Guccini Dep. 48-50, 58.  The asset manager testified that those projections reflected a "realistic" valuation.[18]  Watson Dep. 143; *see also* Guccini Dep. 35, 37-39, 95-99 (testifying that he created the pro forma and his goal with all pro formas was to make them as accurate as possible).

In light of the fact that Mr. Baltin and Mr. Hallstrom's RevPAR projections are quite similar and lower than Debtor's own, Debtor's challenge to Mr. Baltin's pro forma is easily dismissed.  Debtor claims that Mr. Baltin's projected RevPAR

---

[17] Source: Hallstrom Decl. Ex. 13 and Baltin Am. Decl. pp. 49-50 & ¶¶ 77, 86.

[18] Notably, Debtor's expert Frank Nardozza admitted that he had not reviewed this projection. 4/17/12 PM Tr. 6-7; Deposition of Frank Nardozza, Mar. 29, 2012, 77, 136, 144-47.

12

for 2011-2015 amounts to an "astonishing" 23% compound annual growth rate (CAGR). Debtor's Pre-Hrg. Br. 4. There is nothing astonishing here. Mr. Baltin identified numerous other examples in which new hotels achieved similarly large (or larger) percentage increases in rate and RevPAR during their ramp-up periods, including The Andaz Hotel (West Hollywood), The Montage (Beverly Hills), The London Hotel (West Hollywood), The SLS Hotel (West Hollywood), The Lodge at Torrey Pines (San Diego), and the W Hotel (San Diego).[19] 4/5/12 AM Tr. 23; *see also* 4/17/12 PM Tr. 79 (Reigle) (discussing hotel with 70% and 66% RevPAR growth in its second and third years). That testimony is unrebutted.

Debtor notes that certain other hotels had a lower CAGR over a thirty-seven year period. Debtor Pre-Hrg Br. 4. But that comparison is grossly misleading; the Hotel is new and still undergoing its initial ramp-up, and thus is expected to increase occupancy and Average Daily Rate ("ADR") significantly over the course of the next four years, in contrast to the much more limited growth of mature hotels. 4/5/12 AM Tr. 61-62 (Hallstrom); 4/18/12 Tr. 56-57 (Baltin); *see also* Nardozza Dep. 21-22, 77-78, 163, 178-79.

Relatedly, Debtor appears to contend that, despite the experts' substantial

---

[19] The projected growth in RevPAR is particularly unsurprising given the low base from which the Hotel's ramp up started, for the variety of reasons discussed during the hearing, such as opening delays that interfered with group business, and the adverse publicity from Debtor's lawsuit. When starting from a low base, normal increases will appear higher in percentage terms than when starting from a higher base. *See* 4/5/12 AM Tr. 22-23 (noting that adding 2 to 2 is a 100 percent increase, while adding 2 to 8 is a 25 percent increase).

13

agreement and Debtor's own ordinary-course projections showing even higher room revenues, these projections lack the "reasonable certainty" that is required under New York law. That contention is flawed. As an initial matter, Debtor uses the wrong standard under New York law. As Marriott explained in its Pre-Hearing Brief (at 35-36), with respect to the recovery of general damages, certainty "refers to the *fact* of damage, not the amount." *Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc.*, 487 F.3d 89, 110 (2d Cir. 2007) (applying New York law). When the fact of damages is certain – as it is here – public policy requires that "the benefit of the doubt must be given to the innocent party, not the contract violator." *Hirschfeld v. IC Secs., Inc.*, 132 A.D.2d 332, 337 (N.Y. App. Div. 1987); *Tractebel*, 487 F.3d at 110 ("[T]he burden of uncertainty as to the amount of damage is upon the wrongdoer." ) (quoting *Contemp. Mission*, 557 F.2d at 926).

Debtor has cited *Kenford Co. v. Erie County*, 67 N.Y.2d 257, 261 (1986), in an effort to demonstrate that the *amount* of loss must also be reasonably certain, and not only the fact of loss. *Kenford*, however, involved consequential damages, not general damages, and as *Tractebel* explains, New York law treats them differently. *Tractebel*, 487 F.3d at 109-10; *see* Pre-Hrg. Br. 38-40.[20]

---

[20] *Kenford* involved a breach of contract for the construction of a new domed stadium. The plaintiff sought to recover consequential damages consisting of the profits it would have earned from managing the yet-to-be-constructed stadium, where it was speculative what events the stadium could attract and "there was only one other facility in this country to use as a basis of comparison." 67 N.Y.2d at 262. By contrast, here the experts' projections are based on the

14

While Debtor has asserted that *Tractebel* does not reflect New York law, the case was decided five years ago by a court well familiar with New York law and has been cited 90 times. New York courts have never questioned, let alone overturned, *Tractebel*, and in fact have favorably cited its distinction between general and consequential damages (*see Biotronik, A.G. v. Conor Medsys. Ir., Ltd.*, 939 N.Y.S.2d 739, 2011 WL 5385980 at \*13 (N.Y. Sup. Ct. 2011) (table decision)), and have reiterated without questioning its holding that a more lenient standard applies to the former, *see Claremont Prep. School, L.L.C. v. Long Island Swimming Pool Serv.*, 2008 WL 5342215, at \*18-19 (N.Y. Sup. Ct. Dec. 15, 2008).

Moreover, several post-*Kenford* New York cases involving general damages have relied on the seminal New York case cited by *Tractebel* – *Wakeman v. Wheeler & Wilson Mfg. Co.*, 101 N.Y. 205, 209 (1886) – in holding that "[a] person violating his contract should not be permitted entirely to escape liability because the amount of the damages which he has caused is uncertain." *Aqua Dredge, Inc. v. Stony Point Mar. & Yacht Club, Inc.*, 183 A.D.2d 1055, 1058 (3d Dep't 1992) (citing *Wakeman*); *see also, e.g.*, *Smith v. Brown & Jones*, 633 N.Y.S.2d 436, 442 (N.Y. Sup. Ct. 1995) (same, citing *Wakeman*).

In any event, even if Marriott did need to prove the amount of its damages with "reasonable certainty," it has easily satisfied that standard. As New York's

---

attributes and favorable reviews of a fully constructed and operational hotel as well as historical data for numerous comparable properties in a well-established marketplace.

15

highest court has explained, in a case on which Debtor has relied, that standard "does not require absolute certainty. Damages resulting from the loss of future profits are often an approximation. The law does not require that they be determined with mathematical precision. It requires only that damages be capable of measurement based upon known reliable factors without undue speculation." *Ashland Mgmt. Inc. v. Janien*, 82 N.Y.2d 395, 403 (1993).

Indeed, *Ashland Management* underscores that the two sides' revenue projections are sufficiently certain under New York law. That case *upheld* a damages claim for the lost profits of a new product. 82 N.Y.2d at 405-06; Pre-Hrg. Br. 40-43. In support of that conclusion, the court cited factors that apply equally in this case: the parties had made "carefully studied professional judgments of what they believed were realistic estimates" of future revenues, 82 N.Y.2d at 406; although the product at issue was new, the party responsible for marketing the product was experienced and had been highly successful, *id.*; and that party had a "ready reservoir of customers . . . because it intended to appeal not only to the market in general but also to its existing . . . customers." *Id.* Like the party in *Ashland*, Marriott has managed thousands of properties (Baltin Am. Decl. ¶¶ 26-27), and the type of projections prepared by Mr. Baltin are routinely prepared in the hospitality industry. Guccini Dep. 56; Nardozza Dep. 13; Watson Dep. 92-97; 4/5/12 AM Tr. 67 (Hallstrom); Baltin Am. Decl. ¶¶ 35-37.

U.S. Bankruptcy Court - Hawaii   #11-02371   Dkt # 990   Filed 05/01/12   Page 23 of 90

A law review article referred to by Debtor confirms that, under New York law, "[t]o satisfy [its] burden" a plaintiff need only "present a stable foundation for a *reasonable estimate* of its claimed lost profit damages."[21] This standard can be met by "historical data and actual operating statistics of a kind and type relied on by the parties in the conduct of their business."[22] That is precisely what both sides' experts rely on here – data and operating statistics for the competitive set that are routinely used for projections in the hotel industry. *See* Guccini Dep. 50-54, 56; Nardozza Dep. 13; Watson Dep. 93-97; 4/5/12 AM Tr. 67 (Hallstrom); Baltin Am. Decl. ¶¶ 35-37. And while the parties' projections for the *competitive set* differ to some degree, the similarity in their projections for *the Hotel* itself is striking, as discussed above. The article further observes that, under New York law, "[p]rojections prepared by [a] defendant can be used to establish lost profits."[23] As noted above, the Debtor's asset manager prepared projections that are significantly more optimistic than Mr. Baltin's. *See* MHS 137. Finally, the article confirms that "if the defendant claims lost profits are too speculative to be awarded, [*the defendant*] has the burden of establishing that contention," and that "in considering

---

[21] G. Banks, *Lost Profits for Breach of Contract*, 74 Albany L. Rev. 637, 661 (2011) (emphasis added) (citing *Freund v. Wash. Square Press, Inc.*, 34 N.Y.2d 379, 383 (1974)).

[22] *Id.* at 662 (quoting *Travellers Int'l, A.G. v. Trans World Airlines, Inc.*, 41 F.3d 1570, 1579 (2d Cir. 1994)). *Travellers International* upheld a damages award where "the statistical evidence presented at trial to establish damages was of the same type used and relied upon by the parties in conducting their own businesses." 41 F.3d at 1579.

[23] *Id.* at 662 (citing *Care Travel v. Pan Am. World Airways, Inc.*, 944 F.2d 983 (2d Cir. 1991)).

U.S. Bankruptcy Court - Hawaii   #11-02371   Dkt # 990   Filed   05/01/12   Page 24 of 90

the evidence, doubts are to be resolved against the breaching party."[24]

In sum, when both sides' experts produce roughly comparable projections of future revenues, and Debtor has generated an even more optimistic projection in the ordinary course of business prior to litigation, there is clearly a "stable foundation for a reasonable estimate" and that estimate is "reasonably certain."[25] Debtor points to no case limiting a party's damages in such circumstances.

## B. Marriott Is Entitled to Damages for the Full Length of the Contract Term.

Marriott is entitled to recover damages for the full length of its contract term. To hold otherwise would deny Marriott the full benefit of its bargain. Marriott did not negotiate for a 10- or 20-year contract. It negotiated for a 30-year contract with two 10-year extensions at Marriott's option. MHS 1, ¶ 2.01. Yet under Debtor's theory, Debtor can repudiate the agreement less than one year into its term and have no obligation to make Marriott whole for the full term that the parties negotiated. Such an outcome is grossly inequitable and inconsistent with New York law, which does not permit "the wrongdoer to profit by his wrongdoing at the expense of his victim." *Spitz*, 302 N.Y. at 494 (quoting *Bigelow*, 327 U.S. at

---

[24] *Id.* at 663-64 (citing *Joseph*, 18 A.D.3d at 616); *id.* at 664 (citing *Wakeman*, 101 N.Y. 205 (1886); *Contemp. Mission, Inc. v. Famous Music Corp.*, 557 F.2d 918, 926 (2d Cir. 1977)).

[25] Of course, as Mr. Baltin explained in his testimony, the results he projects are not absolutely certain. That is precisely why he applied a discount rate to reduce his projections. Baltin Am. Decl. ¶¶ 5, 125-36. If the Court were to further reduce Mr. Baltin's projections as part of this estimation process, the risk of not achieving the projections would be double counted.

18

264-65); *see also Sole Resorts, S.A. de C.V. v. Allure Resorts Management, LLC*, No. 05 Civ. 0978 JSR, 2007 WL 646288, at *2 (S.D.N.Y. Feb. 26, 2007) (affirming arbitration damages award involving breach of hotel management agreement where resort was not yet profitable, as "the only reason that Allure did not have more customers to offset its operational expenses was because of the breach, after only ten months, of the Management Agreement, before the new management could become well established").[26]

Debtor did not dispute Marriott's testimony that fewer than 1% of Marriott hotels leave the Marriott system before the end of their extension terms. Rehmann Decl. ¶ 8. And the Management Agreement cannot be terminated even if at some point in the future Debtor sold the Hotel or defaulted on its loans and faced foreclosure, as Marriott is protected by a non-disturbance agreement with the lender. 4/18/12 Tr. 45-46 (Baltin). The only basis on which the agreement can be terminated is a default by Marriott or failure of the performance test. *Id*. However, Debtor is foreclosed by law from contending that Marriott will not perform in the future, and in any event Debtor's argument on this point fails. *See* Part IV, *infra*.

Apart from the termination of the Management Agreement, the only way

---

[26] That legal principle is not unique to New York, but is recognized by numerous jurisdictions, including the U.S. Supreme Court. *See, e.g.*, *Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251, 264-65 (1946); *Chung v. Kaonohi Ctr. Co.*, 618 P.2d 283, 291 (Haw. 1980) ("[I]t would be grossly unfair to deny a plaintiff meaningful recovery for lack of a sufficient 'track record' where the plaintiff has been prevented from establishing such a record by defendant's actions."), *abrogated on other grounds*, *Francis v. Lee Enters., Inc.*, 971 P.2d 707 (Haw. 1999).

U.S. Bankruptcy Court - Hawaii   #11-02371   Dkt # 990   Filed  05/01/12   Page 26 of 90

suggested by Debtor that Marriott's management fees might end before the last year of the term is if the Hotel simply ceases operations. But that is a rarity in the Waikiki market; for example, the Halekulani opened in 1917; the Kahala in 1964; and the Moana Surfrider in 1901. Hallstrom Decl. Ex. 2; *see also* 4/18/12 AM Tr. 50 (Baltin) (testifying that a number of hotels in Hawaii, including the Royal Hawaiian, had been operating for fifty years or more.) To be sure, hotels may (and typically do) close for relatively brief periods of time to renovate, but they resume their former operations with the same or higher rates. 4/5/12 AM Tr. 55-56.

It is not surprising, therefore, that Debtor's own expert, Mr. Hallstrom, conceded that in the ordinary course of his business he projects revenues for hotels for periods of 40 years (4/5/12 AM Tr. 67). Hallstrom Decl. Ex. 13. Mr. Nardozza likewise testified in his deposition that management companies in the normal course of business value long-term management agreements, including those with 30-year terms. Nardozza Dep. 215. Indeed, appraisers frequently value long-term contracts of far longer than 50 years. *E.g.*, Jones & Roach, *Valuation of Long-Term Leases*, 57 Appraisal J. 451 (1989) (*see* Attach. B) (describing 20-year projection as "relatively short" and 80- to 90-year projections as "long-term").

There remains, then, only the issue of what level of revenues to project into the future. Consistent with industry practice, Mr. Baltin simply applied an inflation rate to the Hotel's ADR and RevPAR once it completed its ramp up and

U.S. Bankruptcy Court - Hawaii   #11-02371   Dkt # 990   Filed  05/01/12   Page 27 of 90

achieved stabilization. Baltin Am. Decl. ¶ 77. Mr. Hallstrom adopted the same methodology (4/5/12 AM Tr. 66-67; Hallstrom Decl. Ex. 13), and Mr. Nardozza testified that in the past he has done the same (Nardozza Dep. 22:11-17). The concept that over a long period of time room rates will on average keep pace with increases in the cost of living is both a commonly accepted and common sense proposition. Indeed, long-term projections are in a sense less risky than short-term projections; while in any given year rates might be higher or lower than the projections for that year, annual fluctuations will average out to a predictable number over a number of years. Baltin Am. Decl. ¶ 77; 4/18/12 Tr. 50 (Baltin) ("[B]ecause . . . the hotel business is cyclical . . . the length of time smoothes out the variances rather than . . . accentuates them, and therefore makes [the projections] better."); 4/5/12 AM Tr. 17 (Baltin).

Finally, to the extent that the Court has any uncertainty concerning the projection of management fees in later years of the contract, it could at most factor this in by increasing the discount rate for years 30 to 50 – although Mr. Baltin selected a discount rate *above* Marriott's internal 6.5% hurdle rate precisely in order to take into account all of the risks of the income stream, including the length of the agreement. Baltin Am. Decl. ¶ 136. Mr. Nardozza acknowledged that discount rates are used precisely to take such risk into account. 4/18/12 Tr. 78:1-8 (one can "project further out than [10 years] but the way you adjust for that is by

21

increasing the Discount Rate because of the uncertainty"); *id.* 78:13-14.[27]

### C. The Court Should Deduct Only Those Costs That Marriott Would Shed As a Result of the Breach.

Because contract damages are meant to place the non-breaching party where it would have been but for the breach, the non-breaching party must deduct "only such business costs as can reasonably be saved by reason of his breach." *R & I Elecs., Inc. v. Neuman*, 66 A.D.2d 836, 838 (N.Y. App. Div. 1978). "If the defendant's breach causes a reduction in the plaintiff's business but *does not require* the layoff or discharge of employees because they are needed to fulfill the plaintiff's other contracts, a proportional share of their salaries should *not* be deducted from plaintiff's expenses." *Id.* (emphasis added).

As Marriott's witnesses testified, other than certain travel costs, Marriott has not shed any costs as a result of no longer managing the Hotel. Miller Decl. ¶¶ 14-15;[28] 4/4/12 AM Tr. 85 (Miller). That is because the day-to-day operational expenses of the Hotel are paid for by Debtor, not Marriott, (Young Decl. ¶¶ 11-

---

[27] Because of the nature of discount rate calculations, the vast majority of Marriott's lost management fees are attributable to the first 30 years of the contract, not the final 20 years. For example, at a discount rate of 7.5%, projected income of $1,000,000 in 2029 would have a present value of $235,413, while the same income in 2052 would have a present value of $55,419. Thus, even if the Court were to apply a higher discount rate to years 30 to 50, there would be a minimal impact on the overall damages estimate. *See also* Jones & Roach, *supra*, at 455 ("Because so much of the present value of the cash flows is earned in the early years of the projection, the significance of possible error far in the future is drastically minimized.").

[28] Declaration of Tim Miller, filed Mar. 24, 2012.

U.S. Bankruptcy Court - Hawaii   #11-02371   Dkt # 990   Filed  05/01/12   Page 29 of 90

14;[29] McKinney Decl. ¶ 15), and because Marriott continues to incur the same

corporate-level costs notwithstanding Debtor's takeover. *See* Young Decl. ¶¶ 17-

18 (Marriott does not incur any additional Central Office costs or avoid any costs

when a single hotel enters or leaves the Marriott system); 4/4/12 PM Tr. 49-51

(same). In fact, notwithstanding the takeover of the Hotel, the EDITION corporate

budget for 2012 is roughly the same as for 2011.[30] That is because the EDITION

employees do not simply oversee existing hotels; most significantly, they work to

develop the EDITION brand worldwide, including the hotels under construction in

Miami, London, and New York, 4/4/12 AM Tr. 88 (Miller), as well as

development deals for new EDITION hotels in Los Angeles, Bangkok, Abu Dhabi,

Gurgaon, India and several other key cities. *See* Rehmann Decl. ¶ 25.

     Thus, as Mr. Miller and Ms. Young testified, the *only* costs shed as a result

of Debtor's breach were travel costs borne by Marriott for EDITION employees

conducting work for the benefit of the Hotel. That evidence is undisputed.

Marriott carefully estimated those costs at approximately $40,000 to $70,000 per

year (Miller Decl. ¶¶ 14-15), and Mr. Baltin's analysis even more conservatively

---

[29] Declaration of Catherine L. Young, filed Mar. 24, 2012.

[30] Debtor has suggested that EDITION's 2012 budget has eliminated several positions. That is
incorrect. In 2012, EDITION split its finances into two separate budgets – one for operations
and one for sales and marketing. The positions referred to by Debtor are reflected on the sales
and marketing budget (which Debtor apparently ignored), with the exception of one unbudgeted
position that is now being filled by a consultant and thus does not appear under payroll expense.
4/4/12 AM Tr. 86-87 (Miller); 4/18/12 Tr. 52 (Baltin); DX 180; MHS 186, 460.

U.S. Bankruptcy Court - Hawaii   #11-02371   Dkt # 990   Filed   05/01/12   Page 30 of 90

estimates those costs to be $100,000 per year (Baltin Am. Decl. ¶ 141).

Notably, Debtor's newly hatched theory that Marriott incurred substantial costs in managing the Hotel in connection with earning its management fees is directly contradicted by its statements to the Court in the affidavit of Mr. McKinney supporting its First Day Motions, which swore that Marriott's management fees are "pure profit" to Marriott with all costs borne by Debtor. McKinney Decl. ¶ 15.[31] That concession is fundamentally at odds with Debtor's current litigation position.[32] Indeed, although Mr. Nardozza claims Marriott should be required to deduct 35%-45% of its revenues as "costs," he cannot point to any costs that Marriott actually avoided, other than the travel costs just discussed. Nardozza Dep. 103-06; 4/17/12 PM Tr. 14:17 ("I don't know that they actually avoided costs ....").

Lacking any evidence that Marriott has shed corporate costs since its ousting

---

[31] Debtor cannot contend that it only recently became aware of how reimbursement works under the Management Agreement. The Agreement is clear on its face, Young Decl. ¶¶ 11-16 (and MHS 1 provisions cited therein), and there is no dispute that Debtor received accounting information from Marriott regarding the costs being assessed to Debtor, including direct access to various OFB bills during the books and records review Debtor conducted shortly before the takeover. 4/4/12 AM Tr. 32:21-34:6; MHS 452, 454; DX 76.

[32] This is not to suggest that Marriott has not invested in the Hotel. It is undisputed that Marriott invested nearly $5 million in the Hotel in key money. Young Decl. ¶ 21. To be clear, Marriott is not seeking return of its key money on top of its lost management fees because its key money was furnished in consideration for the Management Agreement and would not have been returned had Marriott continued to manage the Hotel for its full term. Moreover, merely returning Marriott's key money would not come close to making Marriott whole because it would not put Marriott in the same position it would have occupied had Debtor not prematurely ejected Marriott from the Hotel. Marriott's but-for damages are the profits it would have earned over the life of the contract, plus the damages discussed in Parts V and VI below.

24

from the Hotel (other than his erroneous reliance on just one of the two 2012 EDITION corporate budgets, *see supra* n.30), Mr. Nardozza's position amounts to an argument that Marriott *should have* avoided costs by cutting back on its efforts to globally develop the EDITION brand. *See* 4/17/12 PM Tr. 15:21-16:9 (testifying that the basic premise for his argument that Marriott could avoid costs is that it could have substantially cut back its support for the EDITION brand or shut it down entirely). New York law does not permit a breaching party to reduce a plaintiff's damages by contending that the plaintiff should change its fundamental business plan, let alone abandon a core business strategy.[33] Marriott is not required to eliminate brand-level positions, which are supporting the brand as a whole, merely because the Hotel is no longer under Marriott management. Because such costs have not and cannot reasonably be shed, under New York law they should not be deducted from damages. *R & I*, 66 A.D.2d at 838.

Mr. Nardozza attempts to support his arguments by relying on Marriott's internal accounting practice of allocating .9% of a Hotel's revenues to recovery of Marriott's corporate-level fixed costs. Nardozza Decl. 27. As Ms. Young explained, however, Marriott makes this allocation for internal budgeting purposes to make sure that its investments in hotels yield sufficient revenues to cover all of

---

[33] Debtor cannot argue that Marriott has failed to mitigate its damages because mitigation is an affirmative defense that is waived if not pled, and Debtor did not assert that defense in its Objection to Marriott's Claim. *Wooten v. State*, 302 A.D.2d 70, 73-74 (N.Y. App. Div. 2002).

U.S. Bankruptcy Court - Hawaii   #11-02371   Dkt # 990   Filed 05/01/12   Page 32 of 90

its fixed costs. 4/4/12 PM Tr. 49-51; Young Decl. ¶ 18; Miller Decl. ¶¶ 14-15. As Ms. Young put it, it is a "hypothetical" allocation because "the reality is for any individual hotel you don't . . . get rid of those costs or add those costs" by virtue of a decision to add or drop a hotel from the chain. 4/4/12 PM Tr. 50.[34] Regardless of the internal allocation methodology, the costs are still fixed – the company will bear them regardless of whether or not the Hotel is under Marriott management. And under New York law, it is improper to deduct fixed costs from lost profits in calculating damages. *See* Pre-Hrg. Br. 30; *R & I*, 66 A.D.2d at 838; *Katz Communications, Inc. v. Evening News Ass'n*, 705 F.2d 20, 27 (2d Cir. 1983); *Adams v. Linblad Travel, Inc.*, 730 F.2d 89, 93 (2d Cir. 1984).

Mr. Nardozza also contends that Marriott must deduct from its damages 25% of its lost management fees, representing the portion of those fees that it shares with Ian Schrager. However, under Marriott's contract with Mr. Schrager, Marriott will owe Mr. Schrager 25% of whatever lost management fees it recovers as damages from litigation against Debtor. 4/4/12 PM Tr. 51-52 (Young). Mr. Schrager has no basis to file a claim against Debtor because he has no contract with Debtor. He necessarily must rely on Marriott to collect the full amount of its management fees and then pay him his share. Thus, Marriott would be left less

---

[34] For the same reason, Debtor cannot rely on Marriott's internal valuation of the Management Agreement. Marriott's internal valuation assumes that properties are responsible for paying a certain portion of Marriott's fixed costs, in order to ensure that the agreements it enters will be profitable enough to cover the company's fixed costs. 4/4/12 PM Tr. 49-50 (Young).

26

than whole if 25% were deducted from the calculation of its damages, since Marriott will be required to pay one-quarter of the now-reduced damages award to Mr. Schrager. In other words, the cost of Marriott's obligation to Mr. Schrager has not been shed, and thus should not be deducted from Marriott's damages.[35] *See* 4/17/12 PM Tr. 19-20 (Nardozza admits that if Marriott must pay Mr. Schrager out of its damages award and Marriott's damages are reduced by that amount, Marriott would not be fully compensated for the breach under his calculation).

### D. A Discount Rate of 7.5% for a Relatively Safe Stream of Management Fee Income Is Conservative and Reasonable.

In order to calculate the present value of the management fees that Marriott would be owed in the future, accounting for both the time value of money and risk, Mr. Baltin applied a discount rate of 7.5%. Baltin Am. Decl. ¶ 136. That rate is approximately equal to Marriott's weighted average cost of capital (WACC), Nardozza Decl. 24, a figure that reflects the riskiness of all of Marriott's investments on the whole. Mr. Baltin's 7.5% rate is reasonable and conservative.

First, Mr. Baltin utilized a rate roughly equal to Marriott's *average* cost of capital even though the management fees to which the discount rate is being applied are among Marriott's least risky revenue streams. Baltin Am. Decl.

---

[35] Debtor may seek to argue that Marriott's contract with Mr. Schrager imposes no obligation of payment with respect to damages, but Marriott testified that it will owe the percentage payment to Mr. Schrager. Debtor cannot limit its own breach-of-contract liability by forcing on Marriott a skewed interpretation of Marriott's responsibility to a third party.

27

¶¶ 131, 133-34. Unlike incentive fees or returns achieved by Marriott as an owner of hotels, base management fees are calculated as a percentage of gross revenues and do not depend *at all* on a Hotel's profitability. *See* Guccini Dep. 91, 95-99.[36] They are thus generally less risky than Marriott's average revenue streams. Baltin Am. Decl. ¶¶ 6, 131, 133-34; 4/18/12 Tr. 42-43 (Baltin); Nardozza Dep. 28-30, 32-33, 37 (noting that it is atypical for base fees to be based on gross revenues).

Second, Mr. Baltin considered the critical (and undisputed) fact that the Management Agreement guarantees Marriott the right to continue to manage the Hotel even in the case of foreclosure or sale, thus significantly reducing the risk that Marriott would lose its stream of management fees prior to the end of the contract term. 4/18/12 Tr. 45-46 (Baltin); Baltin Am. Decl. ¶ 126. This provision renders the revenue stream here less risky than if Marriott bore the risk of foreclosure or sale and distinguishes this case from other situations Debtor has cited. *See* 4/5/12 AM Tr. 15, 19-20 (Baltin).

Third, a discount rate of 7.5% is even higher than the 6.5% "hurdle rate" that Marriott itself uses in the ordinary course of its business when calculating the value of long-term management agreements in which Marriott invests its own capital. The "hurdle rate" itself is intended to be conservative, in order to ensure that Marriott does not overstate the value of future earnings when projecting whether

---

[36] Mr. Baltin applied a higher rate to Marriott's incentive management fees, which do depend upon profitability. Baltin Am. Decl. ¶ 136.

U.S. Bankruptcy Court - Hawaii   #11-02371   Dkt # 990   Filed  05/01/12   Page 35 of 90

an investment will be profitable. 4/5/12 AM Tr. 24 (Baltin). Furthermore, that hurdle rate is applied to investments far riskier than management fees, *id.*, and it is applied to the full term of Marriott's long-term management deals, which tend to average between 20 and 30 years, with options to renew for up to an additional 30 years or more. Rehmann Decl. ¶ 6; *see also* Nardozza Decl. 25. And unlike Debtor's experts' exorbitantly high discount rates prepared solely for purposes of this litigation, Marriott's 6.5% hurdle rate is regularly used by Marriott in the ordinary course of business. Mr. Baltin's discount rate is doubly conservative because it exceeds the already conservative rate Marriott uses in the ordinary course for long-term management agreements. Baltin Am. Decl. ¶¶ 133, 136.[37]

Fourth, Mr. Baltin's discount rate is even higher than the rates utilized by Debtor itself in the ordinary course of business. In the pro forma prepared by Debtor's asset manager, Debtor employed a 5% capitalization rate – which measures risk in much the same way as a discount rate – for Debtor's net operating income ("NOI"). MHS 137; Guccini Dep. 14-15, 63, 65-66. Yet Debtor's *net* operating income is far riskier than Marriott's base management fees because

---

[37] In addition, Mr. Baltin's 7.5% rate is in line with various investment benchmarks, including net lease rates, which are similar to management fees in terms of risk because both net lease payments and management fees are paid out of revenues and thus lie at the top of the "waterfall" of payments. 4/18/12 Tr. 43 (Baltin). At the estimation hearing, Mr. Hallstrom testified that lease rates in Honolulu are 9%. 4/5/12 AM Tr. 80. However, Mr. Baltin responded that while that may be true on average, lease rates vary with the location of the property and the quality of the asset. The discount rate for a leased fee interest on an asset that Mr. Hallstrom believes is similar to the Hotel (the Hyatt) was only 6.5 to 7%. 4/18/12 Tr. 47-48.

U.S. Bankruptcy Court - Hawaii   #11-02371   Dkt # 990   Filed  05/01/12   Page 36 of 90

Debtor's NOI depends upon expenses as well as revenues; if, for example, energy or food costs rise, NOI will fall but base management fees will not.  Thus, the rate used to measure Marriott's risk of an income stream based on a percentage of gross revenues should be *lower*, not higher, than the rate used to measure Debtor's risk.

In contrast to Mr. Baltin's rate, Mr. Nardozza's proposed 9.6% to 12.6% discount rate (Nardozza Decl. 33) is unprincipled.  Although Mr. Nardozza starts with Marriott's WACC, he claims that it is necessary to add basis points in order "to reflect risks specific to Marriott's hotel management business" (Nardozza Decl. 29), which he defines, in part, as the risks outlined in Marriott's 10-K statement to the SEC (*id.*).  That logic is backwards.  As Mr. Nardozza conceded, the general risks to Marriott's hotel management business are *already* incorporated into Marriott's WACC.  4/17/12 PM Tr. 13 (Nardozza); 4/18/12 AM Tr. 44 (Baltin).[38]

Mr. Nardozza also refers to various risks associated with the EDITION brand (Nardozza Decl. 31), and notes that there was "No Brand Track Record" (*id.* at 32); but both Mr. Baltin and Mr. Hallstrom testified that their projections for the Hotel do not depend upon any assumption about the success of the EDITION brand.  Baltin Am. Decl. ¶ 128; 4/5/12 AM Tr. 39-40 (Hallstrom); *see also* Guccini Dep. 140 (Jan. 2011 pro forma by asset manager did not assume Hotel would be

---

[38] Mr. Nardozza conceded that, "[i]f the situation warranted it," it would be appropriate to *deduct* basis points from the WACC to set the discount rate for management fees and that it would not surprise him if, in the past, he had used discount rates of less than 8.5% for management fees based on revenues of a hotel.  4/17/12 PM Tr. 10:8-11:3.

30

part of a chain).[39]  It would be improper double-counting to use conservative

projections about the Hotel's future performance that do not predict *any* future

success for the EDITION brand, while at the same time using a higher discount

rate to account for the risk that the brand will not succeed.

Mr. Nardozza also identifies various supposed risks specific to "the subject

Management Agreement."  Nardozza Decl. 29.  These include, first, the Hotel's

performance in the first ten months after opening.[40]  Yet, as discussed at length in

Marriott's Pre-Hearing Brief (at 22-25), that is far too short a period to assess a

hotel's performance given that the normal ramp up period for a hotel is at least

three years (Guccini Dep. 135:11-15 (new hotels have "ramp up" of three to seven

years)), and given that the first ten months of performance were adversely affected

by a series of one-time phenomena.  4/5/12 AM Tr. 22-23 (Baltin); Baltin Am.

Decl. ¶¶ 60-61; Pre-Hrg Br. 22-25.  Moreover, the Hotel's performance improved

markedly over the course of 2011 despite these challenges.  Baltin Am. Decl. ¶ 81

(and following table); 4/18/12 Tr. 13-23 (Reigle).  Mr. Nardozza also references

Marriott's supposed "inability or unwillingness to market the hotel through its

regional or international marketing teams."  Nardozza Decl. 32.  This assumption

---

[39] Mr. Baltin explained that if the EDITION brand does achieve significant success, the revenues for the Hotel will likely be even higher than those he projected based solely on the Hotel's physical attributes and Marriott's management.  Baltin Am. Decl. ¶ 128.

[40] The Hotel was open for eleven months prior to Debtor's takeover, but there were only ten full months of financial data available.

31

is factually incorrect, *see* 4/5/12 PM Tr. 30-33 (Rock); Rehmann Decl. ¶ 32-33; 4/18/12 Tr. 16-17 (Reigle); MHS 162, 168, and ignores that it is entirely normal for the marketing strategy for a new hotel to be adjusted during its first few years of ramp-up. *See* 4/17/12 PM Tr. 78-80 (Reigle); Baltin Am. Decl. ¶¶ 56-57 (period of "shakeout" during ramp-up period, in which strategies are changed to meet demands of marketplace, is "normal").[41]

Mr. Nardozza also alleges that there is a high employee cost structure that "made profitability unlikely" (Nardozza Decl. 32), but this argument ignores that Marriott's base management fees (in contrast to its incentive management fees) depend *solely* on revenues, not on profitability. Mr. Nardozza then cites the existence of the performance termination provision (*id.*); yet, as further discussed below (Part IV.A, *infra*), New York law does not permit a breaching party to increase a discount rate to account for "the risk that plaintiff would be unable to perform the contract in the future" (*Am. List*, 75 N.Y.2d at 45), and in any event, Marriott would satisfy the performance test (*see* Part IV.B, *infra*). Furthermore, all or nearly all of Marriott's management agreements include a performance test, thus the WACC (and Mr. Baltin's discount rate) already account for the risk of performance termination. 4/18/12 Tr. 43 (Baltin). Thus the weight Mr. Nardozza

---

[41] *See also* O'Neill, *Hotel Occupancy: Is the Three-Year Stabilization Assumption Justified,* 52(2) Cornell Hosp. Q. 176 (2011) (*see* Attach. C) (based on statistical study of over 3,600 hotels, concluding that only 6.3% had stabilized in the first year; that on average hotels require slightly over three years to reach stabilized occupancy; and that luxury hotels stabilize more slowly than others).

U.S. Bankruptcy Court - Hawaii   #11-02371   Dkt # 990   Filed 05/01/12   Page 39 of 90

accords to the risk of performance termination is disproportionate relative to its empirical likelihood.

Last, Mr. Nardozza states that there is uncertainty surrounding revenue projections, particularly long-term projections. Nardozza Decl. 32. But as discussed above, experts from both sides project roughly comparable room revenues for the Hotel, and their projections converge over time. *See* Part III.A, *supra*. And, in any event, Marriott's WACC already accounts for that uncertainty. As discussed above, Part III.B, *supra*, long-term contracts are routine in the hotel industry, and are routinely valued through projected income streams. Marriott's business model is structured around long-term management agreements. Rehmann Decl. ¶¶ 6-8.[42] The company's WACC reflects the risk of the full range of Marriott's future revenue streams, of which management fees are among the least risky. Any such uncertainty is also necessarily built into Marriott's internal hurdle rate of 6.5% for management fees, as Marriott must determine the expected return on its investment over the full length of the contract term.

Finally, any uncertainty arising from the latter years of the Management Agreement cannot justify a higher discount rate for the entire contract term. To the contrary, even accepting Mr. Nardozza's premise, the solution would be to use a *lower* discount rate for the contract's initial term, followed by a higher discount

---

[42] Debtor did not dispute Marriott's testimony that its contracts are generally for terms of 20 to 30 years with renewal options of 30 years or more. Rehmann Decl. ¶ 6.

33

rate for the two extension terms.  *See supra* at pp. 21-22.

## IV.  DEBTOR MAY NOT RELY ON THE PERFORMANCE TEST TO LIMIT MARRIOTT'S DAMAGES.

### A.  New York Law Bars Debtor's Reliance on the Performance Test.

Debtor argues that Marriott's damages should be cut short because the Hotel would have failed the performance test.  The performance test requires that the Hotel generate a certain amount of net operating income and achieve a RevPAR that is equal to at least 90% of the contractual competitive set.  If Marriott fails the test for two consecutive years after the fifth year, Debtor may terminate, unless Marriott makes a cure payment.  Marriott may make two cure payments (each reflecting two years of shortfall) in any 15-year period.  MHS 1 § 2.02.

Debtor's effort to use the performance test to minimize Marriott's damages is foreclosed as a matter of New York law.  New York law is clear that a breaching party may *not* attempt to limit damages by arguing that the non-breaching party would have failed a condition of future performance.  *See* Pre-Hrg. Br. 44-46; *Am. List*, 75 N.Y. 2d at 44-45; *In re Food Mgmt. Group, LLC*, 372 B.R. 171, 190-94 (Bankr. S.D.N.Y. 2007) (applying New York law).  "[T]he breaching party is estopped to claim that its own breach does not matter because the counter-party could not have performed anyway."  *Food Mgmt.*, 372 B.R. at 191.  This is known as the doctrine of anticipatory repudiation or anticipatory breach.

In response, Debtor may argue that Marriott must prove with "reasonable

34

certainty" that it could pass the performance test in order for it to be able to recover damages for subsequent years. But regardless of whether Marriott must prove *the amount* of its damages with "reasonable certainty" (*see supra* at pp. 14-17), Debtor's position with regard to the performance test is not supported by *Kenford* or other cases to which it has referred, none of which address whether a non-breaching party, in order to recover damages, must show that it could have satisfied a condition of future performance. In fact, the doctrine of anticipatory breach applies even when there is uncertainty as to whether the non-breaching party would have been able to satisfy the condition of future performance. *Food Mgmt.*, 372 B.R. at 191 ("[W]here it may not be possible to know whether the counter-party would have been able to perform, anticipatory repudiation by the breaching party relieves the counter-party of the need to prove its ability to perform." (citing *G.G.F. Props., LLC v. Yu Mi Hong*, 284 A.D.2d 427, 455 (N.Y. App. Div. 2001)). Thus, Debtor may not invoke the performance test in an effort to cut short Marriott's damages.

Indeed, the doctrine of anticipatory breach prohibits Debtor even from arguing that a higher discount rate should apply to Marriott's damages because of the risk that Marriott would fail the performance test. As New York's highest court has held, it is improper for damages calculations to account for "the risk that plaintiff would be unable to perform the contract in the future." *Am. List*, 75

35

N.Y.2d at 45. "[T]he doctrine [of anticipatory breach] relieves the nonrepudiating party of its obligation of future performance and entitles that party to recover the present value of its damages from the repudiating party's breach of the total contract." *Id.* at 44.

**B.    Marriott Would Have Passed the Performance Test.**

Even leaving aside the established New York doctrine of anticipatory repudiation, Debtor's argument concerning the performance test would still fail. As Mr. Baltin has testified, the Hotel is projected to achieve, upon stabilization, a RevPAR of approximately 97% of the competitive set. Baltin Am. Decl. ¶¶ 118-21. Debtor offers three modes of analysis in an effort to dispute that conclusion. Each is flawed.

**1.    Mr. Hallstrom Errs in Concluding That the Hotel Could Not Compete With Its Contractual Competitive Set.**

Although Mr. Hallstrom and Mr. Baltin project roughly similar revenues for the Hotel, they reach different conclusions concerning how those revenues will compare to those achieved by the contractual competitive set. Mr. Baltin explains that, once the Hotel stabilizes, its average daily rates ("ADR") will be comparable to the upper-middle range of its contractual competitive set – below the Halekulani and Kahala, but roughly similar to or slightly above the Moana Surfrider and Royal Hawaiian, and above the J.W. Marriott and Waikiki Parc. Baltin Am. Decl. ¶ 44.

Mr. Hallstrom, in contrast, does not believe that the Hotel will ever be able

36

to achieve ADR equal to that of its contractual competitive set, no matter how well it is managed. Instead, Mr. Hallstrom believes the Hotel's true competitors are hotels such as the Sheraton, the Hyatt, the Embassy Suites, the Hawaiian Prince, and the Trump. 4/5/12 AM Tr. 36-43. These hotels – which he terms the "comparative set" – are (with the possible exception of the Trump) lower-rated than the contractual competitive set, and their primary common attribute is that they are located off the beach. *Id.*

This difference of opinion is critical, because as all of the experts agree, it is a well-accepted method for projecting a new hotel's future performance to identify the set of existing hotels to which it is most comparable, and to benchmark the subject hotel's future performance by reference to the current and anticipated performance of hotels with an established record in the market. Guccini Dep. 56; Nardozza Dep. 13; Baltin Am. Decl. ¶¶ 36-37; 4/5/12 AM Tr. 31 (Hallstrom). The fact that Mr. Hallstrom projected the Hotel's revenues by reference to his "comparative set" explains why his RevPAR projections for the Hotel run approximately 10 percent below those of Mr. Baltin in the early years of the contract. That difference alone, if corrected, would result in the Hotel passing the performance test, even accepting Mr. Hallstrom's projections for the competitive

37

set hotels.[43]

Mr. Hallstrom is literally alone in his view that the Hotel is incapable of competing with its contractual competitive set.  Mr. Kleisner stated that the Hotel is properly positioned at "two, three, or four" in its contractual competitive set. Kleisner Dep. 123:6-8 *see also id.* at 117, 119-22.  Paul Guccini, Debtor's asset manager, concluded the Hotel is properly positioned "below Halekulani, below The Kahala, and probably above the other members of the competitive set." Guccini Dep. 52:24-25; *see also* Watson Dep. 95 ("[W]ith this particular hotel, we knew we should be right in the middle.").  Finally, Mike Paulin, the Chairman of Aqua, told Debtor's representatives that the Hotel's "sweet spot" was "between Royal Hawaiian/Moana and Kahala/Halekulani."  MHS 455.  That is precisely Mr. Baltin's view.  Mr. Hallstrom is the outlier.[44]

Mr. Hallstrom underestimates the Hotel's ability to compete with other luxury properties in Waikiki because he fails to consider the Hotel's many competitive advantages, including the quality of the facility and unique design (Kleisner Dep. 126; Baltin Am. Decl. ¶¶ 43-44, 67); the high level of service (Kleisner Dep. 57; Baltin Am. Decl. ¶ 43); the destination food and beverage

---

[43] Mr. Hallstrom opines that the Hotel will miss the performance test by about 7 percent, once the Hotel is included in the competitive set, as the amended Management Agreement requires. 4/5/12 Tr. 67-68 (Hallstrom); MHS 1 (2d amend.).

[44] Notably, the current management team of the Hotel is utilizing the same competitive set.  As Mr. Watson put it, there was little debate over continuing to use the EDITION contractual competitive set because "[e]veryone agrees it was the proper set."  Watson Dep. 201.

38

outlets, which include one of Honolulu's top restaurants (Kleisner Dep. 125; Baltin Am. Decl. ¶¶ 43-44, 67); the city's third largest ballroom, which makes the Hotel an attractive destination for events and group meetings (4/5/12 Tr. AM 45, 53 (Hallstrom); Baltin Am. Decl. ¶ 67); the location, which allows "easy access" to the Hilton Lagoon and adjacent beach (Kleisner Dep. 38:23), as well as "convenience to the airport" (*id.* 39:3-4) and downtown (*id.* 54, 56; Baltin Am. Decl. ¶ 43); its two pools (Baltin Am. Decl. ¶ 67); and its room views, 94% of which are partial or full ocean view (*id.*; *see also* Kleisner Dep. 39:4-6).

Mr. Hallstrom also underestimates the Hotel's ability to compete with the contractual competitive set because he is doubtful whether there is a market in Hawaii for a lifestyle hotel. 4/5/12 AM Tr. 60. While such a hotel may not be Mr. Hallstrom's cup of tea – he "like[s] a night's sleep" (4/5/12 AM Tr. 54:2) – he is the only person in the case who is skeptical concerning that market. Mr. Hallstrom has essentially no experience with lifestyle hotels (4/5/12 AM Tr. 60), but others with a background in such hotels believe they have a place in Waikiki. For example, when Mr. Kleisner was asked at his deposition if he could identify "any reason . . . a lifestyle hotel that is managed well could not be successful in Hawaii," he testified, "I can think of none." Kleisner Dep. 21:10-16; *see also* 4/18/12 Tr. 37-38 (Baltin); Baltin Am. Decl. ¶ 63.

Conversely, Mr. Hallstrom ignored critical reasons why his "comparative"

39

set is a poor benchmark.  *See generally* 4/18/12 Tr. 28-35 (Baltin) (explaining why

Mr. Hallstrom's "comparative" set is not, in fact, comparative).  The Hotel has

received a four-diamond rating from AAA, while three of the hotels in Mr.

Hallstom's comparative set are three-diamond properties.[45]  4/5/12 AM Tr. 41-42

(Hallstrom); 4/18/12 Tr. 31-32 (Baltin).  Additionally, two of the hotels in Mr.

Hallstrom's comparative set – the Sheraton and the Hyatt – are enormous, with

1,636 and 1,230 rooms, respectively, in contrast to 353 for the Hotel.  4/18/12 Tr.

28-31 (Baltin).  As Mr. Baltin explained, it is very difficult for such a large hotel to

command a high ADR because it must sell to a wider array of market segments,

including those that pay significantly lower rates, in order to fill its rooms.  4/18/12

Tr. 30 (Baltin), 4/5/12 AM Tr. 43 (Hallstrom).[46]

Mr. Hallstrom's decision to compare the Hotel to hotels that are not in its

contractual competitive set appears to have been driven largely by the fact that the

Hotel is not directly on the beach.[47]  But the Hotel is merely a three to six minute

---

[45] Tellingly, Mr. Hallstrom failed to give any weight to the fact that the Hotel was accepted into Virtuoso, a consortium of luxury travel agents who pay top rates, showing that the market recognized the Hotel as a luxury product on par with its contractual competitive set.  Baltin Am. Decl. ¶ 63; Kleisner Dep. 159-62 (explaining that luxury consortia like Virtuoso are "very difficult to get into" and have "a high degree of importance to the Hotel and its revenues").

[46] And, because Smith Travel Reports uses a weighted average when it calculated the RevPAR of the comparative set, the Hyatt and Sheraton will dominate the numbers.  4/18/12 Tr. 31 (Baltin).

[47] Mr. Hallstrom testified that properties on the beach tend to achieve a 50 percent rate premium over properties located off the beach.  4/5/12 AM Tr. 76.  As Mr. Baltin explained, however, that statistic is grossly misleading, as Mr. Hallstrom confuses correlation with causation.  As a class, properties located off the beach are of poorer quality than properties located on the beach, so it is not surprising that they achieve lower rates.  The statistic says nothing about whether this

40

walk to the beach down an elevated ramp and alongside the Hilton lagoon.  A

guest need not cross any streets, and the view of the ocean is unimpeded by other

buildings.  4/17/12 PM Tr. 40-41 (Jacobsohn); 4/18/12 Tr. 29 (Baltin); 4/5/12 AM

Tr. 65-66 (Hallstrom).  As Mr. Kleisner acknowledged, the Hotel's location in

relation to the beach is a "speed bump" that can be overcome based on the

compensating advantages that the Hotel enjoys.  Kleisner Dep. 46:5, 48:15-16, 63-

64.[48]  Proving this point, the Trump has secured ADR comparable to the

competitive set (in the low $300's per room this year, per Mr. Hallstrom, 4/5/12

AM Tr. 49-50), despite being separated from the beach by other buildings and

despite lacking many of the subject Hotel's amenities (such as attractive and large

pool areas and banquet and meeting facilities).  4/18/12 Tr. 32-33 (Baltin).

Mr. Hallstrom's projections of the Hotel relative to its competitive set also

fail to account for the numerous one-time phenomena that negatively affected the

Hotel's financial performance in its first ten months.  As discussed in Marriott's

Pre-Hearing Brief (at 23-24) and in Mr. Baltin's Amended Declaration (at ¶¶ 60-

---

particular property – which is located across from the water and only a five-minute walk from the beach, and caters to the luxury segment – will be able to achieve rates equal to competitors who are located directly on the beach.  4/18/12 Tr. 36-37.

[48] Debtor makes much of a statement in the June 24, 2011 draft pro forma prepared by Dana Jacobsohn that a rate gap will remain between the Hotel and other Waikiki hotels due to its location.  But Ms. Jacobson testified that when she wrote that she had not seen the Hotel or talked to the operations team for the property.  She later learned that "the beach was really not such a big deal" because the Hotel is very close to the beach and "there were a lot of other excellent attributes that . . . would drive occupancy and rate for this Hotel . . . ."  4/17/12 PM Tr. 38-39 (Jacobsohn).

U.S. Bankruptcy Court - Hawaii   #11-02371   Dkt # 990   Filed  05/01/12   Page 48 of 90

61), the rates achieved by the Hotel in the first ten months of its operation were depressed by numerous factors, including construction delays that pushed back the "soft" opening date of the Hotel numerous times, thereby complicating pre-opening marketing and sales, and group sales in particular;[49] the inability to include the Hotel in group travel guides for 2011 due to the unavailability of photographs;[50] the Japanese tsunami in March 2011, which led competitors to lower prices in order to fill rooms left vacant when Japanese visitors cancelled;[51] and the initiation of litigation by Debtor in May 2011 publicly criticizing Marriott's management. *See, e.g.*, MHS 447 (press release describing Hotel as a "failure due to gross mismanagement"); Baltin Am. Decl. ¶¶ 60-61.[52]

If it is true that the Hotel, after completing its ramp-up, could compete with

---

[49] Guccini Dep. 133-36 (agreeing that it is "always the case" that delayed openings undermine group business); 4/17/12 AM Tr. 100 (admitting that groups are reluctant to book at a hotel if they are concerned about when the hotel will open); Nardozza Dep. 67-68 (admitting that he did not inquire about the impact of the opening delays in his analysis). At the hearing, Debtor attempted to argue that while there were construction delays, they did not necessarily delay opening. Debtor's counsel, however, explicitly acknowledged that "[t]here is no dispute that delays to the opening of the Hotel occurred" and objected to discovery on that issue on the ground that "[t]he *reasons* for the delay . . . have no bearing on whether or how such delays affected the performance of the Hotel." *See* Attach. D. Debtor therefore should be estopped from denying that there were delays to the opening of the Hotel that adversely affected its performance.

[50] 4/5/12 PM Tr. 8 (Rock) (lack of photos prolonged Hotel's ramp-up by "six months or a year" because Japanese wholesale brochures are annual or seasonal); 4/17/12 PM Tr. 72-73 (Reigle) (lack of photos delayed ramp-up by about one year).

[51] Miller Decl. ¶ 11; 4/5/12 PM Tr. 13 (Rock); Kleisner Dep. 170-71 (Hotel's competitors did not recover from the tsunami's impact until late 2011).

[52] Miller Decl. ¶ 12; 4/18/12 Tr. 9-10 (Reigle) (explaining that lawsuit would impact sales through loss of business from loyal Marriott customers who were uncertain about whether the Hotel would remain a Marriott hotel).

42

its contractual competitive set, then it does not matter whether an expert was bullish or conservative with respect to performance of the competitive set hotels over the next few years. Whether the competitive set hotels increase RevPAR by 5% or 15% in a given year, one would expect the Hotel to achieve roughly equivalent RevPAR (and thus pass the performance test) once it has completed its ramp-up and reached stabilization, assuming proper management. Baltin Am. Decl. ¶¶ 118-21; Guccini Dep. 58:17-20 (explaining that the pro forma he created (MHS 137) reflected an expectation that the Hotel should achieve "near 100 percent market penetration"); Kleisner Dep. 63-64 (agreeing that there is no reason the Hotel could not pass the performance test with effective marketing). And only Mr. Hallstrom assumes that the Hotel cannot compete with its competitive set.

### 2. Mr. Nardozza's Performance Test Analysis Is Methodologically Flawed.

Mr. Nardozza's analysis concerning whether Marriott would pass the performance test is premised on a comparison of Marriott's June 2011 projections for the Hotel with Mr. Nardozza's own projections for the competitive set. Notably, Mr. Nardozza did *not* prepare his own independent projections for the Hotel. 4/17/12 AM Tr. 108:14-24; Nardozza Dep. 156.

As Mr. Baltin explained, Mr. Nardozza's approach is methodologically flawed because it compares apples and oranges. 4/18/12 Tr. 41-42 (Baltin). Marriott's June 2011 projections for the Hotel are built upon certain assumptions

43

about how the market as a whole will perform.  DX 114 at 6; DX 116; 4/17/12 PM Tr. 43 (Jacobsohn).  For example, Ms. Jacobsohn projected a 71% occupancy rate for the Hotel based upon the market occupancy rate for 2008 through 2010, which included some of the worst years in the history of Hawaii's hotel industry.  *Id.*; 4/18/12 Tr. 41-42 (Baltin); DX 114 at 6; DX 116.  Yet Mr. Nardozza projects a 79.3% occupancy rate for the competitive set, based on a longer view of market occupancy rates.  Nardozza Decl. 17.

Because a rising tide lifts all boats – Mr. Nardozza conceded that there is a correlation between the performance of the competitive set and that of the Hotel (Nardozza Dep. 208:17-20) – it is completely illogical to compare projections for the Hotel that reflect one set of assumptions about the market's performance with projections for the competitive set that reflect completely different assumptions about the market's performance. Indeed, if one were to calculate the Hotel's projected RevPAR using Mr. Nardozza's estimated stabilized market occupancy rate along with Ms. Jacobsohn's June 28 ADR projections, and then compare the resulting projections to Mr. Nardozza's projections for the competitive set, Marriott would *pass* the performance test, as shown by the table below.[53]

---

[53] Mr. Nardozza also places significant weight on Marriott's June 24, 2011, pro forma, *see* DX 114 – even though its creator, Ms. Jacobsohn, testified that it was merely an initial "worst case" draft to serve as a basis for discussion, unrealistically assumed no substantial ramp-up beyond the depressed rates the Hotel received in its first months after opening, and reflected no information from the Hotel's management, who would have been able to place the Hotel's 2011 performance in context.  4/17/12 PM Tr. 37-40.  Even Mr. Hallstrom recognizes that the ADR

44

| Year | Nardozza's Stabilized Market Occupancy Rate | Marriott 6/28/11 projected ADR | Revised RevPAR (column 1 x column 2) | Nardozza's Projected RevPAR for competitive set | Hotel's RevPAR Index (column 3 / column 4) |
|------|------|------|------|------|------|
| 2015 | 79.3% | $358.07 | $283.95 | $ 314.81 | 90.2% |
| 2016 | 79.3% | $368.43 | $292.16 | $ 323.94 | 90.2% |
| 2017 | 79.3% | $379.14 | $300.66 | $ 333.33 | 90.2% |
| 2018 | 79.3% | $390.13 | $309.37 | $ 343.00 | 90.2% |
| 2019 | 79.3% | $401.45 | $318.35 | $ 352.95 | 90.2% |

**3.    Mr. Kleisner's Analysis Regarding Marriott's Likely Future Performance Is Without Factual Basis.**

Debtor's third theory is that Marriott will not pass the performance test five years from now because Marriott's sales and marketing strategies were flawed in 2010 and 2011.[55]  Kleisner Decl. ¶ 68.  As noted above, Mr. Kleisner agrees with Mr. Baltin that the Hotel could compete with its contractual competitive set if it were appropriately managed.  Kleisner Dep. 122-23.  Mr. Kleisner, however,

---

growth reflected in the June 24 projections is unrealistically low.  Hallstrom Decl. 10; *see also* Baltin Am. Decl. ¶¶ 80-81.  The June 24 pro forma was revised when more information was obtained and a new pro forma was circulated by Ms. Jacobsohn on June 28.  *See* DX 116.  To the extent that Debtor claims the June 24 pro forma was the "real" pro forma and the June 28 pro forma was ginned up for litigation purposes, that assertion has no basis whatsoever in fact and is belied by Ms. Young and Ms. Jacobsohn's uncontested testimony.  4/4/12 PM Tr. 46-49 (Young); 4/17/12 PM Tr. 41-45 (Jacobsohn).  Debtor's assertion also makes no sense: it is undisputed that both the June 24 draft and the June 28 revision were prepared purely for internal purposes to help Marriott assess how much it might spend funding the Hotel's working capital. 4/4/12 PM Tr. 48 (Young).  Even Mr. Nardozza concedes this fact.  4/17/12 AM Tr. 111.  Since the June 28 pro forma was intended to be an internal Marriott document, it obviously was a bona fide document unless Marriott intended to fool itself.

[54] Sources: Nardozza Decl. 17; DX 116.

[55] Contrary to Mr. Kleisner, Debtor and its asset manager concluded in 2010 that Marriott's sales and marketing plan was "sound."  MHS 301, 258 at DFT011645; McKinney Dep. 115; 4/17/12 AM Tr. 26-28 (McKinney); *see also supra* at p. 3.

45

asserts that the Hotel was badly managed, particularly with respect to sales and marketing. Mr. Kleisner's description of the Hotel's initial strategies, however, bears no resemblance to reality.[56] More fundamentally, Mr. Kleisner misses the point. Even assuming Marriott's strategies in the first eleven could have been improved, it is normal in the industry to adjust strategies during ramp-up (Baltin Am. Decl. ¶ 57; 4/17/12 PM Tr. 78-80 (Reigle); Nardozza Dep. 15), and Marriott had the contractual right to engage in a full ramp-up over the first seven years of the contract before the performance test would apply.

Sales and marketing for a new hotel "involves a lot of trial and error"

---

[56] Contrary to Mr. Kleisner's assertion (Kleisner Dep. 66), nothing in Mr. Schrager's agreement with Marriott gave him control over all marketing and PR. MHS 354. And as Mr. Rock explained, Mr. Schrager had "no role, whatsoever" in sales strategies, and Marriott had the "final say" on marketing strategies. 4/5/12 AM Tr. 100-01. Mr. Kleisner also claims he was told by an Aqua employee that a Marriott employee told her that Mr. Schrager told the Marriott employee that he did not target group and wholesale business. Kleisner Decl. ¶ 37; Kleisner Dep. 130-31; 4/17/12 AM Tr. 61-62. This multi-layered hearsay is unsubstantiated, as Mr. Kleisner conveniently destroyed the notes of his interviews before they could be produced. 4/17/12 AM Tr. 65. His assertion is also flatly contradicted by the evidence. *See, e.g.*, MHS 155 at MHS00616468 ("Three extremely important segments for us are wholesale (Eastbound and Westbound) as well as Group."); DX 55 at MHS00151512 (Hotel's strategy in 2011 "to impact financial results" was "to pursue aggressive occupancy, layering group, wholesale and online travel agency segments and allowing rate premium to grow as demand builds."); 4/5/12 AM Tr. 101-04 (Rock) (describing importance of group business to strategy to "shrink the Hotel"); 4/3/12 AM Tr. 73-74 (Rehmann) (describing Marriott's efforts to grow group business).

Mr. Kleisner's remaining assertions regarding the marketing of the Hotel (*see, e.g.*, Kleisner Decl. ¶¶ 16, 19, 33, 35, 36, 38, 48, 51, 52, 56) are equally false. *See* 4/5/12 AM Tr. 92-95 (Rock) (sales were driven from Hawaii and California); *id.* at 96-99 (Marriott focused on California and the Midwest, not New York); *id.* 109-10 (describing Marriott's senior Japanese-speaking sales executive dedicated to Japan); *id.* 111-14 (Marriott sent photos to Japanese wholesalers); 4/5/12 PM Tr. 15-16 (Marriott aggressively pursued luxury customers); *id.* at 45-46 (Marriott had personnel dedicated to the wholesale market); 4/17/12 PM Tr. 73-77 (Reigle) (Marriott had segment-by-segment plans).

U.S. Bankruptcy Court - Hawaii   #11-02371   Dkt # 990   Filed  05/01/12   Page 53 of 90

(4/17/12 PM Tr. 78), and Marriott had already made numerous adjustments that laid a strong foundation for future success.[57] Marriott deployed an array of new tactics to boost occupancy (4/5/12 PM Tr. 9-15 (Rock)), such as increasing utilization of Marriott and Ritz-Carlton sales channels (*id.* at 30-33; Rehmann Decl. ¶ 32-33; 4/18/12 Tr. 16-17 (Reigle); MHS 162, 168).[58] The fruits of these adjustments would take time to realize, but they had begun to yield results when Marriott was ousted, notwithstanding the extremely negative publicity against Marriott and the Hotel generated by Debtor. 4/18/12 Tr. 13-22 (Reigle). The Hotel booked two large groups in July and November of 2011 at very high ADRs of $597 and $477, respectively – putting the lie to Mr. Kleisner's claim that Marriott's discounting strategies precluded a ramp-up in rates. DX 120 at MHS00609289. Group business sharply increased in the second half of 2011.[59] This type of ramp-up is common. Marriott's expert Julie Reigle explained that

---

[57] 4/18/12 Tr. 11-13, 22 (Reigle); MHS 155 at MHS00616469-70 (listing numerous "Action Items" to adjust strategies).

[58] In mid-2011, the Ritz-Carlton Global Sales Organization, funded by the owners of those hotels, began to proactively promote the Hotel. MHS 168; 4/5/12 PM Tr. 19-20, 32. The Hotel initially did not participate in the GSO because the Owners of the Hotel "agreed they would not fund it." 4/5/12 PM Tr. 20-22; MHS 162. When the Hotel began to participate in the GSO, Marriott took the extraordinary step of absorbing the cost. 4/5/12 PM Tr. 32.

[59] The average monthly group room nights forecasted for September 2011 through December 2011 was *94% higher* than the average monthly group room nights from opening through August 2011, with most of the increase reflecting business "on the books." MHS 37-46, 433; 4/18/12 AM Tr. 17-21 (Reigle). In the week before the takeover, Marriott forecasted the Hotel's overall occupancy to reach 68% in October 2011 and 66% in November 2011 (4/18/12 AM Tr. 19; MHS 433), contradicting Mr. Kleisner's assertion that Marriott expected the Hotel to revert to "the 50% occupancy range" after August 2011 (Kleisner Decl. ¶ 39).

47

hotels frequently adjust strategies in response to lower-than-expected initial results and achieve long-term success as a result. 4/17/12 PM Tr. 78-80; *see also* Baltin Am. Decl. ¶ 57; Nardozza Dep. 15 ("I have firsthand experience with hotels that have taken on new-type strategies as the market conditions change."); 4/17/12 AM Tr. 108 (Nardozza) (conceding he has no idea what sales and marketing strategies Marriott would have deployed had it been permitted to manage the Hotel more than one year).

## V.    MARRIOTT IS ENTITLED TO $4,314,496.45 IN PRE-PETITION COSTS ARISING FROM WORKING CAPITAL-RELATED AND OTHER OPERATIONAL EXPENSES OF THE HOTEL.

Marriott is also entitled to recover approximately $4,314,496 in working capital that Marriott loaned to Debtor by foregoing payment of operational expenses Marriott incurred on behalf of the Hotel. These undisputed expenses appear on Owner Franchise Billing statements ("OFB bills") and aging reports, which were used in the ordinary course of operating the Hotel.[60]

### A.    Debtor Is Contractually Obligated To Fund Working Capital and Other Operational Expenses.

If the Hotel did not generate enough revenues on its own to fund expenses, Owner was obligated to pay them: "Owner shall . . . advance any additional funds

---

[60] *See* Young Decl. ¶ 27. The amount owed has changed since the filing of the Proof of Claim because OFB bills are generated periodically and the aging reports tied to those bills change in order to account for both new expenses that have not yet been paid and previously outstanding expenses that have been paid. Declaration of Roula McCann, filed March 24, 2012 ("McCann Decl.") ¶ 8; 4/3/12 PM Tr. 39:1-7; 4/4/12 AM Tr. 30:4-10.

48

(over and above those required pursuant to the [TSA]) necessary to maintain Working Capital at levels reasonably determined by [Marriott] to be necessary to satisfy the needs of the Hotel." MHS 1, ¶ 4.09. In the event Owner fails to do so, Marriott may "lend to Owner such amount from [Marriott's] own funds" at an interest rate of three points above prime. *Id.* Despite Debtor's initial payment of the funds needed for the first few months of the Hotel's operation, Debtor ceased making such payments in mid to late April 2011. McCann Decl. ¶ 11.

Between April and August 2011, Marriott made numerous requests for additional working capital, but these requests went unheeded. McCann Decl. ¶ 11; Young Decl. ¶ 22, 24-25. On July 19, 2011, Marriott notified Debtor that it was in default for failing to advance the $5,387,585 necessary to meet the Hotel's then-current (past and forward-looking) working capital needs.[61] Debtor refused to pay the requested amount.[62] As a result, Marriott forewent reimbursement of expenses that it had incurred on behalf of the Hotel, which were itemized on OFB bills (McCann Decl. ¶ 12), and advised Debtor that Marriott deemed the amounts "paid from [Marriott's] own fund . . . a loan from [Marriott] in accordance with Section 4.09(ii) of the Management Agreement." MHS 11.

Having incurred the expenses itemized on unpaid OFB bills, which Debtor

---

[61] *See* MHS 11 (7/19/11 Letter from Marriott to M Waikiki, LLC); *see also* MHS 10 (6/29/11 Letter from Marriott to M Waikiki LLC).

[62] *See* MHS 12 (7/25/11 Letter from M Waikiki LLC to James P. Connelly).

49

was contractually obligated to pay, Marriott is entitled to recover the total amount paid from its own funds, together with interest at the rate of prime plus three percent: "Prior to . . . Termination, Owner shall repay to [Marriott] the amounts, if any, that [Marriott] has funded through such date pursuant to the provisions of Section 4.09(ii) and that remain outstanding and payable to [Marriott] (plus any interest due thereon)." MHS 1, ¶ 11.11(I)

As of the date of the takeover, Marriott had funded the following amounts pursuant to Section 4.09: (1) $3,013,889.48 for expenses itemized on unpaid OFB statements dated July 15, 2011, August 12, 2011, and August 15, 2011 (*see* McCann Decl. ¶ 13); (2) approximately $1,190,732 for additional operational expenses incurred during the month of August (*see id.* ¶ 14); and (3) $69,953.58 and $34,976.78 for August management fees and marketing fees, respectively, plus all applicable tax ($4,944.32). *See id.* Marriott is therefore entitled to recover $4,314,496.45 plus interest equal to the prime rate plus 3%.

### B. Debtor Previously Conceded Its Contractual Obligation to Fund Working Capital and Other Operational Expenses.

Although Debtor now disclaims any obligation to reimburse Marriott for working capital funded by Marriott on the Hotel's behalf, Debtor's internal documents make clear that it understood this obligation. In September 2010, Mr. Guccini admitted that ████████████████████████████████████

████████████████████████████████████████████████

50

███████████ MHS 310.  Approximately two weeks before the filing of

Debtor's lawsuit against Marriott, Mr. Guccini advised his fellow asset manager,

Robert Watson, that ████████████████████████████████████

████████████████████████████ MHS 450.  Mr. Guccini explained that

█████████████████████████████████████████████████████████

████████████████ *Id*.  Mr. Watson pleaded with Debtor's representatives ███

█████████████████████████████ (MHS 449) and

admitted that ████████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████████████████████████████

*Id*.  ████████████████ he asserted, would █████████████████████

████████████████████████████████████ *Id*.

While Debtor may have believed that by filing the lawsuit, it would gain

leverage to negotiate for Marriott to absorb some of the Hotel's operating losses,

Debtor was not absolved of its contractual obligation to fund the working capital

necessary to cover the Hotel's operating losses.  And Debtor knew that:  Nearly

two months after the lawsuit was filed – and in connection with Marriott's July 19,

2011 letter notifying Debtor that it was in default for failing to supply the

$5,387,585 in working capital – Mr. Watson asked Mr. Guccini ███████████

██████████████████████████████████████████████████████████

51

MHS 452 (emphasis added).  Mr. Guccini responded that █████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████ *Id.*

The amount Mr. Guccini identified matches the June 30, 2011 EDITION aging

report precisely, demonstrating that – even by Debtor's account – the aging reports

and underlying OFB bills are an accurate measure of the operational amounts owed

by Debtor at any given point in time.[63]  In light of the foregoing, Debtor cannot

credibly contend that it is not obligated to fund the amounts claimed.

Accordingly, Marriott is entitled to recover $4,314,496.45 in unreimbursed

working capital and operational expenses incurred pre-petition.

## VI. DEBTOR IS ALSO OBLIGATED TO PAY AT LEAST $1,433,333.89 IN COSTS OUTLINED ON POST-PETITION OFB BILLS.

Marriott is entitled to recover an additional $1,433,333.89 in costs reflected

on post-petition OFB bills and incurred as a direct consequence of Debtor's

breach.[64]  These amounts reflect (i) costs that could only have been incurred for

pre-petition activity and (ii) post-petition expenses that would not have been

incurred but for the takeover.  Both are appropriately included in any estimation of

---

[63] *See* MHS 454 (as of June 30, 2011, the unreimbursed costs incurred by Marriott on behalf of the Hotel and reflected on unpaid OFB bills totaled $3,903,205.53).

[64] The amount is the sum of the amounts owed post-petition for Marriott Rewards, severance and wage payments, guest accident claims, chargebacks, and other advanced deposit related losses, less $281,884 in credits ($1,715,217.89 - $281,884 = $1,433,333.89).

52

Marriott's claim.[65]

**Marriott Rewards Expenses**. Debtor owes Marriott $643,302.10 for Marriott Rewards expenses reflected on post-petition OFB bills. The Hotel was credited a specified amount on the OFB bills for each room night redeemed with Marriott Rewards points. 4/3/12 PM Tr. 28:18-25. In issuing such credits for new hotels, Marriott establishes a rate based on the hotel's anticipated RevPAR, which is periodically adjusted to reflect the hotel's average 12-month rolling RevPAR. *Id.* 28:5-11. Depending on actual performance, Marriott provides a true-up in the form of additional credits or charges. *See id.* Because Marriott recognized that the Hotel was new and needed time to ramp up, it agreed to defer the first Marriott Rewards true-up until late 2012. *Id.* 28:12-13, 31:9-24. This was intended to permit the Hotel additional time to boost its RevPAR so as to defer and hopefully minimize the effect of a negative true-up on the Hotel's bottom line. *Id.* 31:9-32:12 By seizing the Hotel prior to a true-up, Debtor obtained Marriott Rewards credits to which it was not entitled. Because Debtor deprived Marriott of the ability to undertake the true-up in late 2012, Marriott trued up the Marriott Rewards rate as of the date of the takeover. *Id.* 28:12-17. That true-up hit the Hotel's January 27, 2012 OFB bill and is reflected in a charge of $652,300.62,

---

[65] Accordingly, the $281,884 credit provided by Marriott to Debtor for refunded EDITION corporate expenses can be applied to the pre- or post-petition amounts owed. 4/4/12 AM Tr. 32:3-20.

U.S. Bankruptcy Court - Hawaii   #11-02371   Dkt # 990   Filed  05/01/12   Page 60 of 90

which reflects the difference between the reimbursement rate employed using the Hotel's projected RevPAR and the actual rate of reimbursement to which the Hotel was entitled. 4/4/12 AM Tr. 17:3-6; MHS 31. This charge is appropriate, because but for the unlawful ouster, Debtor would have incurred the true-up in the normal course of business.[66] Further, the Management Agreement specifically requires Debtor "to reimburse [Marriott] for all costs and expenses incurred by Marriott (a) that may accrue after Termination, but that result or relate to [Marriott]'s operation and management of the Hotel prior to Termination." M.A. § 11.11(G)(a). The total of Marriott Rewards charges owed by Debtor is $643,302.10.[67]

**Severance and Pro-rated Bonus Payments**. Marriott is entitled to recover $560,987.78 in severance pay, severance-related benefits, and pro-rated 2011 bonus payments made to Hotel employees affected by the takeover.[68] Upon their

---

[66] Indeed, Marriott afforded Debtor $225,220.61 in Marriott Rewards credits in calculating the $4,314,496.45 Debtor owed as of the date of the takeover. Ms. McCann identifies the net charge for Marriott Rewards credits and charges across all outstanding OFB bills, whether pre-petition or post-petition. *See* McCann Decl. ¶ 26. That amount ($418,081.49) represents the sum of the $225,220.61 pre-petition credit and the $643,302.10 charge reflected on post-petition OFB bills. *See* 4/4/12 AM Tr. 17:3-13. Because Marriott deducted the credit the Hotel is owed ($225,220.61) in calculating the total amount Marriott is owed, it would be a perverse result to afford Debtor the credit without also requiring Debtor to incur the corresponding charges.

[67] The individual amounts that comprise the $643,302.10 are: $6,105.67 (MHS 26, Oct. 7, 2011 OFB bill); -$15,988.66 (MHS 27, Nov. 4, 2011 OFB bill); $635.24 (MHS 28, Dec. 2, 2011 OFB bill); $249.23 (MHS 30, Dec. 30, 2011 OFB bill); and $652,300.62 (MHS 31, Jan. 27, 2011 OFB bill).

[68] Debtor is contractually required to "reimburse [Marriott] for all costs and expenses incurred by [Marriott] . . . in terminating its employees at the Hotel, such as severance pay, unemployment compensation, employment relocation, and other employee liability costs arising out of the termination of employment of [Marriott's] employees at the Hotel." MHS 1, ¶ 11.11(G)(b).

54

separation from Marriott, hourly Hotel employees were given one week of exit pay, approximately two weeks of health benefits, and any accrued paid time off ("PTO").[69] Supervisors and managers with one year or less of Marriott service were given one week of pay, approximately two weeks of health benefits, and any accrued PTO.[70] All other supervisors and managers were paid severance ███ ████████████████████████████████████████████ health benefits through the Friday after their final severance payment, and any accrued PTO.[71] Bonus-eligible employees were paid the 2011 bonuses they earned on a pro-rata basis.[72] These payments, which are reflected on the Hotel's post-petition OFB bills, totaled $560,987.78. McCann Decl. ¶¶ 22-23.[73] Marriott is entitled to

---

[69] *See* MHS 459 at 1-2 (excerpted representative separation letter for hourly Hotel employees); 4/5/12 PM Tr. 49:19-23.

[70] *See* MHS 457 at 1 (excerpted representative separation letter for managerial Hotel employees); MHS 458 at 1 (excerpted representative separation letter for supervisory Hotel employees).

[71] MHS 457 at 1; MHS 458 at 1.

[72] *See* MHS 457 at 2. Debtor may argue that it was unreasonable to pay bonuses to employees given the Hotel's financial performance; however, their terms of employment provided that a portion of their compensation would be paid as bonus. *See* 4/3/12 PM Tr. 81:22-82:4. And the Management Agreement afforded Marriott exclusive discretion to set the terms of employment for Hotel employees. MHS 1, ¶ 1.06.

[73] The separation letters made clear that ████████████████████████████████████ ██████████████████████████████████████████████████████ ████████████████ MHS 457 at 1; MHS 458 at 1; 4/3/12 PM Tr. 27:9-19 (noting that the Hotel's General Manager, who transferred to another Marriott property after the takeover, did not receive severance). Similarly, ████████████████████████████████████████████ ███████████████ MHS 457 at 1-2; MHS 458 at 1-2.

Debtor's suggestion that Marriott is not entitled to some part of these amounts because some hourly employees were rehired by the new manager is without merit. Debtor elected not to

55

recover these amounts as they would not have been paid but for Debtor's breach.

**Wages**. In addition to amounts Debtor owes for severance and pro-rated bonus payments, Debtor owes $400,151.51 for post-petition wage and benefit payments incurred in connection with Marriott's efforts to wind up the affairs of the Hotel. Marriott could not simply walk away from the Hotel following the bankruptcy filing without finalizing payroll, attempting to relocate displaced supervisors and managers, conducting ordinary de-flagging procedures (including attempting to retrieve proprietary information), ensuring that all outstanding charges were properly accounted for and billed, and otherwise closing the Hotel's books. 4/3/12 PM Tr. 21:4-24; 4/5/12 PM Tr. 50:9-22. Completing these tasks required time and personnel. A small number of managers were therefore retained post-takeover for a period of time sufficient to wind up the Hotel's affairs. 4/5/12 PM Tr. 50:9-22. Had Debtor undertaken a negotiated transfer of operational control with Marriott, these wind-up activities would have occurred before the cessation of operations and there would be no dispute as to the validity of the payroll expenses. As Marriott was required to wind up the Hotel's affairs in this manner only because Debtor breached the parties' agreement and ousted Marriott

provide Marriott any post-takeover information as to which employees were or were not rehired by its new management company and under what terms. 4/4/12 AM Tr. 29:13-23. Lacking such information, Marriott took reasonable steps to protect hourly Hotel employees who had unexpectedly been severed from the Hotel's payroll by continuing health benefits for nearly two weeks and pay for one week. Young Decl. ¶ 29; MHS 459. Having chosen to conduct an unannounced takeover rather than a coordinated transition, Debtor cannot now be heard to complain about Marriott's reasonable response to Debtor's unexpected actions.

56

from the Hotel without notice and a transition (*see* 4/5/12 PM Tr. 50:23-24),

Marriott is entitled to recover $400,151.51 for post-takeover wage expenses.

**Other Recoverable Expenses.**  As discussed in testimony and in Marriott's

Pre-Hearing Brief, Marriott is entitled to recover (1) $57,466 for chargebacks and

other advanced deposit losses Marriott incurred as a result of the takeover, *see*

McCann Decl. ¶¶ 16-19 & MHS 21-25; Young Decl. ¶¶ 31-35; Pre-Hrg. Br. at 50-

51; and (2) $53,310.50 for guest accident claims relating to pre-takeover Hotel

incidents.  *See* McCann Decl. ¶ 24; Young Decl. ¶ 36; Pre-Hrg. Br. at 49.  There is

no merit to Debtor's apparent contention that Marriott is not entitled to these

amounts because some guests who disputed charges on their credit cards or

requested that their deposits be refunded may have relocated to other Marriott

hotels.  Absent access to the Hotel's operating account, Marriott funded the

claimed chargebacks and deposits while Debtor retained funds in the Hotel's

operating account that should have been used for this purpose.  McCann Decl. ¶¶

16-18.  That a guest may have relocated to another Marriott property is irrelevant.

## VII.  THE COURT SHOULD NOT DEDUCT PRE-OPENING EXPENSES OR AMOUNTS OWED BY THIRD PARTIES FROM THE TOTAL OWED TO MARRIOTT.

### A.  Debtor Was Properly Held Responsible for Pre-Opening Expenses.

Because Debtor was contractually obligated to fund pre-opening expenses

and conceded that it owed $1.9 million in pre-opening expenses as recently as July

U.S. Bankruptcy Court - Hawaii   #11-02371   Dkt # 990   Filed  05/01/12   Page 64 of 90

2011, the Court should not deduct pre-opening expenses that Debtor failed to pay but that were repaid from the Hotel's working capital accounts from the amounts Debtor owes Marriott. The TSA provides that "Pre-Opening Expenses shall be borne *solely* by Owner." DX 12, § 5.4 (emphasis added). Consistent with this plain language, Debtor has conceded its obligation to pay pre-opening expenses – including any "overages" – on multiple occasions. Debtor included $1.9 million in pre-opening expenses in the amount it concluded it would be obligated to pay upon 10 days' notice if Marriott so requested.[74] Although Debtor wanted this amount to be forgiven (MHS 452), Debtor clearly understood its contractual obligation to pay it. Debtor's *desire* for Marriott to absorb those costs is irrelevant.

Any suggestion that Debtor may avoid repayment of $1.977 million in pre-opening expenses because Marriott exceeded the pre-opening budget is also meritless. Marriott obtained Debtor's approval on a $7.48 million pre-opening budget tied to a September 21, 2011 opening date.[75] Although the final amount of

---



[74] *See* MHS 450 (noting that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮); MHS 449 (noting that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮; MHS 452 (noting, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

[75] *See* MHS 259; DX 76. Debtor's suggestion that Marriott is bound by the TSA's $3.7 million pre-opening budget is incorrect. That budget was tied to a July 1, 2009 opening date, *see* DX 12 § 5.1, and did not include expenses for certain "critical departments." 4/3/12 PM Tr. 49:12-14. Because the Hotel did not open for more than a year after the opening date contemplated in the TSA, Debtor can hardly claim that the $3.7 million budget controls. *See, e.g.*, DX 12, § 5.3.

U.S. Bankruptcy Court - Hawaii   #11-02371   Dkt # 990   Filed 05/01/12   Page 65 of 90

pre-opening expenses exceeded the budgeted amount by $1,182,178 (Debtor Ex.

76), Debtor failed to pay *$1.977* million in pre-opening expenses (4/3/12 PM Tr.

13-20). There can be no dispute that – at a minimum – Debtor is liable for the

$794,822 representing the difference between the $1,182,178 overage and the

$1.977 million in unpaid expenses. In addition, Debtor is plainly responsible for

the portion of the overage attributable to opening delays during which the pool tile

construction was being completed ($300,000).[76] This leaves only $882,178 in

overages, which the parties' agreement obligated Debtor to pay.[77]

###    B.    Debtor Must Pursue Collection of the Hotel's Accounts Receivable with the Responsible Entities, Not Marriott.

To the extent Debtor asserts that any amount it owes Marriott should be

offset by the amounts that the Hotel has not yet collected from Morimoto, the

Istanbul EDITION, or any other third party, the argument should be rejected

because it improperly seeks to hold Marriott liable for the debts of others. Marriott

---

[76] *See* DX 12, § 5.3 (noting that increases in pre-opening expenses attributable to delays are to be borne by the Owner); Herron Dep. 67-70 (conceding that Marriott expressed concern about the increased costs caused by opening delays).

[77] To the extent the Court concludes otherwise, Marriott was at least entitled to $1,094,822 of the $1.9 million in pre-opening expenses. This amount is calculated by adding the $794,822 Debtor owed apart from the pre-opening overage to the $300,000 attributable to the one-week opening delay between September 21 and September 28, 2010. Finally, there is no merit to Debtor's apparent contention that the amounts it owes Marriott should be offset by $400,000 because Marriott discussed the *possibility* of contributing that amount to pre-opening expenses. Debtor can show no agreement (written or oral) requiring Marriott to contribute this amount.

U.S. Bankruptcy Court - Hawaii   #11-02371   Dkt # 990   Filed  05/01/12   Page 66 of 90

does not own Morimoto or The Istanbul EDITION.[78]  The Hotel's decision to invoice those establishments for any amounts owed should therefore function no differently from its decision to invoice any other third party.  The amounts invoiced – like all amounts invoiced – were registered on the Hotel's accounts receivable.  The parties who were invoiced – not Marriott – became liable for the amounts billed.  *See, e.g.*, 4/4/12 AM Tr. 23:25-24:8, 25:20-23.  Debtor inherited any accounts receivable when it assumed control of the Hotel, and there is no basis for deducting those amounts from the amount Marriott is entitled to recover.

## CONCLUSION

For the foregoing reasons, this Court should estimate Marriott's claim to be worth a total of $38,801,137.34.

---

[78] As with the Waikiki EDITION, Marriott serves as the *operator* of the Istanbul EDITION.  The Hotel itself is owned by a third party.  That party, not Marriott, is responsible for paying the Istanbul EDITION's operating expenses, just as Debtor is responsible for paying The Waikiki EDITION's operating expenses.

DATED:  Honolulu, Hawaii, April 30, 2012.


/s/ Susan Tius
SUSAN TIUS
Attorney for MARRIOTT
INTERNATIONAL, INC. and
MARRIOTT HOTEL SERVICES,
INC.


DATED:  Los Angeles, California, April 30, 2012.


/s/ Alan M. Feld
ALAN M. FELD
Attorney for MARRIOTT
INTERNATIONAL, INC. and
MARRIOTT HOTEL SERVICES,
INC.


DATED:  Washington, DC, April 30, 2012.


/s/ Lindsay C. Harrison
LINDSAY C. HARRISON
Attorney for MARRIOTT
INTERNATIONAL, INC. and
MARRIOTT HOTEL SERVICES,
INC.


61

# ATTACHMENT A

**Harrison, Lindsay C.**

| | |
|---|---|
| **From:** | Ken Hickox [KZH@bickelbrewer.com] |
| **Sent:** | Monday, March 05, 2012 2:41 PM |
| **To:** | Harrison, Lindsay C. |
| **Cc:** | Michael Gardner; Michael Collins; sklevanksy@kplawhawaii.com; dbuncher@neliganlaw.com; jmuenker@neliganlaw.com; pneligan@neliganlaw.com |
| **Subject:** | Estimation Hearing |

Lindsay,

Debtor does not intend to argue at the hearing that Marriott's claim should be estimated at zero because it breached the Management Contract, nor will Debtor seek, in connection with the Estimation Hearing, a finding that Marriott breached the Management Contract.

Kenneth N. Hickox, Jr.
Bickel & Brewer
4800 Comerica Bank Tower
1717 Main Street
Dallas, TX 75201
214 653-4011

The information contained in this e-mail message, including any attachments, is attorney privileged and/or confidential information intended only for the use of the individual or entity named as addressee. The review, dissemination, distribution, or copying of this communication by or to anyone other than the intended addressee is strictly prohibited. If you have received this communication in error, please immediately notify the sender by reply e-mail and destroy all copies of the original message. Thank you.

1

# ATTACHMENT B

*Robert N. Jones, MAI, and Stephen D. Roach, MAI*

# Valuation of Long-Term Leases

In this article, the valuation of leases extending beyond the term of most "paper" investments, such as treasury or corporate bonds, is addressed. Support is given for using bonds as financial indicators when analyzing a lease of almost 80 years. The contribution of each year's income over the remaining life of the lease is used to demonstrate that the relative significance of income to be received more than 30 years in the future is minor. It is concluded that discount rates extracted from shorter term instruments can be applied to very long-term leases with confidence.

A problem that most appraisers eventually face can be found in treatment of long-term lease income. When addressing future income streams, an appraiser is faced with two critical questions—what will be the pattern of this income stream in the future, and what is the appropriate rate to use when discounting this future income to a present value estimate? When the term of the lease is relatively short, say under 20 years, adequate information is generally available to assist the appraiser in projecting the income over the life of the lease and in estimating the discount rate. However, leases extending 90 years or more are not uncommon. Where can an appraiser turn for guidance

in valuing an extremely long-term income stream?

Long-term income streams are often tied to a published index such as the Consumer Price Index (CPI); this requires that the appraiser predict the future pattern for this index. The CPI is revised periodically, however, to reflect changes in lifestyles and available goods. For example, the CPI figures for 1920 do not reflect the cost of color televisions, computers, airline travel, or frozen dinners. As such, the applicability of the index is limited beyond a certain period of time. When projecting an 80-year income stream that is linked to the CPI, the applicability of that index drops considerably after, say, 40

**Robert N. Jones, MAI,** is co-owner of Jones & Roach, Inc., of San Diego, California. Mr. Jones received his BS in business management and an MS in real estate from San Diego State University. He is a contingent faculty member for the American Institute of Real Estate Appraisers' course, Capitalization Theory and Techniques, Part A.

**Stephen D. Roach, MAI,** is co-owner of Jones & Roach, Inc. Mr. Roach received a BS in real estate from San Diego State University. Prior to forming Jones & Roach, Inc., he was affiliated with Andrew A. Smith, MAI, in El Cajon, California. He is also a contingent faculty member for the Appraisal Institute's course, Capitalization Theory and Techniques, Part B.

Copyright © 2001. All Rights Reserved.

U.S. Bankruptcy Court - Hawaii #11-02371 Dkt # 990 Filed 05/01/12 Page 72 of 90

*When valuing long-term leases, many appraisers run into difficulty during the discounting process because most long-term investment vehicles do not extend beyond 30 years. It is therefore difficult to estimate a reasonable discount rate for an income stream that is three times that length.*

years. If an index is only reliable for the past 40 years, what can one rely on to project beyond a similar period in the future?

A second hurdle facing the appraiser concerns the discounting process. When most long-term investment vehicles do not extend beyond 30 years, how is one to estimate a reasonable discount rate for an income stream three times that length? A review of bond yields indicates that instruments of different lengths typically return different yields to the investor. This is plausible because there is more risk in obligating money for 30 years than for ten years, and longer term investments generally provide a higher yield to compensate for this commitment. With no published information on yield rates for instruments over 30- or 40-year terms, what rate should an appraiser use in discounting extremely long-term income streams? Fortunately, the data offer the solution.

Our staff was recently asked on two occasions to value leased fee interests subject to long-term leases, both extending beyond 80 years. After a careful analysis of the patterns of the income streams, we realized that the answer was in the data. Although the two leases were slightly different, the pattern of the income related to the issues was remarkably similar. Only one of the leases will be discussed in this article.

## LEASE TERMS

The property appraised was the common area of a condominium project in San Diego County, California, which was leased by the developer to the homeowners association. The common area consists of streets, sidewalks, parking areas, and recreational facilities. When the project was begun in

1963, the developers were to retain ownership of the common area and lease it to the homeowners association; this is no longer permissible in California.

The project was developed in 15 phases, and each phase had a separate common area lease. The leases in the earlier phases were for a period of 99 years at a rental of $15 per home per month with no rental adjustments throughout the lease period. The later leases also began at $15 per month but provided for cost-of-living increases after 20 years, followed by every ten years. Because the flat leases do not present the projection problem discussed earlier, only one of the leases with cost-of-living increases will be analyzed. The lease used is for phase 7, which includes 62 homes. The lease began on December 1, 1967, and will expire on November 30, 2066 (99 years later).

The homeowners association is responsible for monthly payment of the total rent due. To collect the rent, the association assesses its members. Because the lease is a direct obligation of the homeowners association, default or foreclosure of a single unit would not affect the payment of rent to the lessor. The lease is absolutely net; the lessee is responsible for payment of all expenses.

One major assumption in the analysis that must be addressed is that the lease will stay in effect until it expires. Although it is unreasonable to assume that the homes composing the subject development have an economic life of 99 years, the fact that the rent provides an extremely low return on the underlying land value means that the lessee is likely to try to extend the life of the lease for as long as possible. Another possibility is for the lessee to redevelop the property; with almost 80 years remaining on the lease, the lessee

Copyright © 2001. All Rights Reserved.

U.S. Bankruptcy Court - Hawaii  #11-02371   Dkt # 990   Filed 05/01/12   Page 73 of 90

could wait 30 years to redevelop the property and still have nearly 50 years to amortize the new improvements. For these reasons, a proper analysis of this lease required the assumption that it would remain in effect for its entire remaining term.

In addition to the rent payments to be received under the lease, the lessor is entitled to possession of the property at the end of the lease term. The current fee value of the underlying land was estimated at $20,000 per unit. This is only a cursory estimate, but the reversion value is an insignificant component of the total present value of the leased fee interest.

## INCOME PATTERN

Because the rent is tied to the CPI, projecting the income stream from the lease requires information on actual increases in the index and projection of the index into the future. The index that has been accepted by the parties to the lease is the San Diego Consumer Price Index for Urban Wage Earners and Clerical Workers.

One method of estimating a probable inflation rate for a given period in the future is to analyze a historic period of similar length. However, no CPI data were found covering a period of almost 80 years. The longest period that was found was the national annual averages for 1913 through 1987, a period of 74 years. Based on the current index (1982–1984 = 100), the 1913 index was 10.1. The 1987 index was 112.5, which equates to an average compound annual rate of increase of 3.31%. Because the basis of the index has changed so many times in the intervening period, the relevance of this calculation is questionable unless it can be supported by additional information.

Another long period that can be analyzed is from January 1949 through November 1988, just under 40 years. For this analysis, the national CPI for All Urban Consumers (1967 = 100) was used. The January 1949 index was 72.0; the November 1988 index was 360.5. This increase is an annual compound rate of 4.12%. This period included four years in which the inflation rate was above 10%, which tends to raise the average, plus two years with net deflation. The 74-year period above included these periods as well, along with two world wars and a major economic depression.

In the six years since December 1982, the average inflation rate (as measured by the same index) has been 3.55% per year. This period is more reflective of recent fiscal policy and does not reflect the unusual years of 1974 and 1979 to 1981, which are included in the longer periods. The effect of these unusual years is demonstrated when the inflation rates in 1949 to 1988 are compared with the 23-year period from 1949 to 1972. The average inflation rate for the earlier period was approximately 2.4% per year, which contrasts sharply with the 4.12% rate for the longer period.

It is unreasonable to project inflation over a very long period without anticipating at least one inflationary cycle. From historical information, it can be inferred that the average inflation rate will be between approximately 3.5% and 4.0% during the remaining term of the lease. Recent inflation rates suggest that future inflation will be closer to the upper end of the historical range than the low end. Based on this information, we formed the opinion that historical trends support an estimate of the future long-term inflation rate of approximately 4% per year. This

*One method of estimating a probable inflation rate for a given period in the future is to analyze a historical period of similar length. It is unreasonable, though, to project inflation over a very long period without anticipating at least one inflationary cycle.*

Copyright © 2001. All Rights Reserved.

U.S. Bankruptcy Court - Hawaii   #11-02371   Dkt # 990   Filed 05/01/12   Page 74 of 90

rate was used to project rent payable under the lease when CPI escalation clauses become effective.

## RATE SELECTION PROCESS

The rate used to discount the cash flows to the present was based on a number of factors. The yields for 30-year treasury bonds, the longest issued, were considered as a base measure. Although much shorter than the subject lease, 30 years is also considered to be a long-term investment. The yields on these bonds reflect what investors in government securities are anticipating over the next 30 years. Current yields on 30-year government bonds are slightly over 9%.

Advantages of these bonds over real estate are their liquidity (ease of sale) and government backing, both of which are very significant features. An investor considering purchasing real estate that cannot be developed for almost 80 years needs a higher return to compensate for the possible changes in the surrounding neighborhood and the inferior liquidity of the investment.

Yields on long-term corporate bonds were also examined as a benchmark. Examples are a 38-year AT&T bond, currently yielding approximately 9.8%, and lower-quality bonds that are in the 10% to 11% range.

Data specific to investor expectations for real estate yields are published in several national investor surveys, including those conducted by Real Estate Research Corporation and Cushman & Wakefield, Inc. In these published surveys, it was indicated that current expected pretax equity yields for the property types generally purchased by the major investors surveyed ranged from 10.5% to 12.5%, with the lower anticipated yields applying to "showcase" properties such as regional shopping centers. Yield requirements

for investments such as the subject are typically considerably higher.

There are a number of features of the subject investment that would require adjustments to the yields of more conventional investments. One positive feature of the subject is that default by several owners would not affect the cash flow.

There are, however, more negative than positive features such as:

- For the phases with escalation clauses (such as the lease being analyzed), rent levels are relatively high, especially when added to typical homeowners association dues. That the purchase price of the home would be lower to compensate for the lease payments that must be made would probably not be perceived in the market.

- The underlying real estate consists of a large parcel that is not separately usable. The property is interspersed with many small fee ownerships and cannot be redeveloped or used until all ownerships are combined. This factor is less significant because the reversion is far in the future.

- The investment extends for an extremely long time period; the remaining term of the lease is 78 years.

- An atypical property investment such as the subject is not easily financed, meaning that it would have to be purchased with all cash or a higher interest rate loan. This would remove much of the potential for leveraging the investment.

- The unusual and complicated nature of the investment and the very long time period make it relatively illiquid; this property cannot easily be sold in the market.

- The investment has very poor inflation protection. The rent

*The rate used to discount the cash flows to the present was based on a number of factors. The yields for 30-year treasury bonds were considered as a base measure.*

454

Copyright © 2001. All Rights Reserved.

U.S. Bankruptcy Court - Hawaii  #11-02371  Dkt # 990  Filed 05/01/12  Page 75 of 90

is adjusted only every ten years.

- The underlying real estate consists only of land. Because no depreciable improvements are included, the potential for tax shelter is significantly lower than for typical income properties.

Based on analysis of the leased fee interest, it was concluded that a reasonable discount rate for this investment was approximately 14%. Although relatively high by most investment standards, this rate is lower than the yield on many junk bonds. From analysis of the discount rates for various types of real estate investments and the factors noted above, it was indicated that this rate should be sufficient to attract capital to this investment.

## CALCULATIONS

The cash flow analysis in Table 1 is divided into seven columns. In column 1, the specific year of the projection is shown. These years end on November 30 of the year given. Column 2 is the year of the projection. The entries in this column start at one and rise to 78, the remaining length of the lease. Shown in column 3 are the projected income to be collected in each year based on the terms of the lease and the assumed change in the CPI. The entries in this column begin at $37,984, the current annual income, and change every ten years. As of the date of the analysis, nine years remained until the next rental adjustment.

Column 4 is the present value factor for the lump sum to be received at the end of each projection year. This factor, rounded to six decimal places, was calculated using the concluded discount rate of 14%. Column 5 is the present value of the cash flow projected for each year. It is calculated by multiplying the rent (column 3) by the present value factor (column 4) for each year. Column 6 is the sum of the present values of the cash flow in each projection year and all preceding years. The first entry is the present value of only the first year's cash flow; the second entry is the present value of the cash flows for the first two years, and so on. The final entry in this column is $338,700, the present value of all projected cash flows, including the reversion.

Column 7 is labeled "Cumulative % of Present Value." The entry in this column was calculated by dividing the corresponding entry in column 6 by the total present value. The first entry is 9.84%, which shows that the present value of the first cash flow ($33,319) is 9.84% of the total present value of the cash flows of $338,700. By the second year, the cash flows have accounted for 18.47% of the present value. The significant factor in this column is how quickly the majority of the present values of the cash flows accumulates. Over 50% of the present values of the cash flows results from only the first eight years of income, over 75% results from the first 15 years of income, over 90% from the first 25 years of income, and over 95% from the first 33 years of income. In fact, almost 97% of the total present value of the cash flows results from the projected income in the first half of the remaining lease period, 39 years. Figure 1 is a graphic analysis of this cash flow accumulation with the number of years shown on the horizontal axis and the percentage of total present value accumulated shown on the vertical axis.

Because so much of the present value of the cash flows is earned in the early years of the projection, the significance of possible error far in the future is drastically minimized. It can also be assumed that

*Almost 97% of the total present value of the cash flows results from the projected income in the first half of the remaining lease period, 39 years.*

Copyright © 2001. All Rights Reserved.

U.S. Bankruptcy Court - Hawaii  #11-02371  Dkt # 990  Filed 05/01/12  Page 76 of 90

TABLE 1  Cash Flow Study

| Column 1<br>Year Ending<br>November 30 | Column 2<br>Year | Column 3<br>Annual<br>Income<br>($) | Column 4<br>Present<br>Value<br>Factor | Column 5<br>Present<br>Value<br>($) | Column 6<br>Cumulative<br>Present Value<br>($) | Column 7<br>Cumulative %<br>of Present<br>Value |
|---|---|---|---|---|---|---|
| 1989 | 1  | 37,984  | 0.877193 | 33,319 | 33,319  | 9.84  |
| 1990 | 2  | 37,984  | 0.769468 | 29,227 | 62,546  | 18.47 |
| 1991 | 3  | 37,984  | 0.674972 | 25,638 | 88,184  | 26.04 |
| 1992 | 4  | 37,984  | 0.592080 | 22,489 | 110,673 | 32.68 |
| 1993 | 5  | 37,984  | 0.519369 | 19,727 | 130,401 | 38.50 |
| 1994 | 6  | 37,984  | 0.455587 | 17,305 | 147,705 | 43.61 |
| 1995 | 7  | 37,984  | 0.399637 | 15,180 | 162,885 | 48.09 |
| 1996 | 8  | 37,984  | 0.350559 | 13,315 | 176,201 | 52.02 |
| 1997 | 9  | 37,984  | 0.307508 | 11,680 | 187,881 | 55.47 |
| 1998 | 10 | 56,225  | 0.269744 | 15,166 | 203,047 | 59.95 |
| 1999 | 11 | 56,225  | 0.236617 | 13,304 | 216,351 | 63.88 |
| 2000 | 12 | 56,225  | 0.207559 | 11,670 | 228,021 | 67.32 |
| 2001 | 13 | 56,225  | 0.182069 | 10,237 | 238,258 | 70.34 |
| 2002 | 14 | 56,225  | 0.159710 | 8,980  | 247,237 | 73.00 |
| 2003 | 15 | 56,225  | 0.140096 | 7,877  | 255,114 | 75.32 |
| 2004 | 16 | 56,225  | 0.122892 | 6,910  | 262,024 | 77.36 |
| 2005 | 17 | 56,225  | 0.107800 | 6,061  | 268,085 | 79.15 |
| 2006 | 18 | 56,225  | 0.094561 | 5,317  | 273,402 | 80.72 |
| 2007 | 19 | 56,225  | 0.082948 | 4,664  | 278,065 | 82.10 |
| 2008 | 20 | 83,227  | 0.072762 | 6,056  | 284,121 | 83.89 |
| 2009 | 21 | 83,227  | 0.063826 | 5,312  | 289,433 | 85.45 |
| 2010 | 22 | 83,227  | 0.055988 | 4,660  | 294,093 | 86.83 |
| 2011 | 23 | 83,227  | 0.049112 | 4,087  | 298,180 | 88.04 |
| 2012 | 24 | 83,227  | 0.043081 | 3,585  | 301,766 | 89.10 |
| 2013 | 25 | 83,227  | 0.037790 | 3,145  | 304,911 | 90.02 |
| 2014 | 26 | 83,227  | 0.033149 | 2,759  | 307,670 | 90.84 |
| 2015 | 27 | 83,227  | 0.029078 | 2,420  | 310,090 | 91.55 |
| 2016 | 28 | 83,227  | 0.025507 | 2,123  | 312,213 | 92.18 |
| 2017 | 29 | 83,227  | 0.022375 | 1,862  | 314,075 | 92.73 |
| 2018 | 30 | 123,196 | 0.019627 | 2,418  | 316,493 | 93.44 |
| 2019 | 31 | 123,196 | 0.017217 | 2,121  | 318,614 | 94.07 |
| 2020 | 32 | 123,196 | 0.015102 | 1,861  | 320,474 | 94.62 |
| 2021 | 33 | 123,196 | 0.013248 | 1,632  | 322,106 | 95.10 |
| 2022 | 34 | 123,196 | 0.011621 | 1,432  | 323,538 | 95.52 |
| 2023 | 35 | 123,196 | 0.010194 | 1,256  | 324,794 | 95.89 |
| 2024 | 36 | 123,196 | 0.008942 | 1,102  | 325,896 | 96.22 |
| 2025 | 37 | 123,196 | 0.007844 | 966    | 326,862 | 96.50 |
| 2026 | 38 | 123,196 | 0.006880 | 848    | 327,710 | 96.76 |
| 2027 | 39 | 123,196 | 0.006035 | 743    | 328,453 | 96.97 |

| Assumptions | |
|---|---|
| Number of units | 62 |
| Starting monthly rent per unit | $15 |
| CPI on December 1, 1967 | 101.6 |
| CPI on November 30, 1987 | 345.8 |
| Projected inflation rate | 4% |
| Discount rate | 14% |
| Basis for reversion calculation (per unit) | $20,000 |

| Conclusions | |
|---|---|
| Present value of cash flows | $337,749 |
| Present value of reversion | 951 |
| Total present value | $338,700 |

Copyright © 2001. All Rights Reserved.

U.S. Bankruptcy Court - Hawaii  #11-02371  Dkt # 990  Filed  05/01/12  Page 77 of 90

| Column 1 Year Ending Nov. 30 | Column 2 Year | Column 3 Annual Income ($) | Column 4 Present Value Factor | Column 5 Present Value ($) | Column 6 Cumulative Present Value ($) | Column 7 Cumulative % of Present Value |
|---|---|---|---|---|---|---|
| 2028 | 40 | 182,360 | 0.005294 | 965 | 329,418 | 97.26 |
| 2029 | 41 | 182,360 | 0.004644 | 847 | 330,265 | 97.51 |
| 2030 | 42 | 182,360 | 0.004074 | 743 | 331,008 | 97.73 |
| 2031 | 43 | 182,360 | 0.003573 | 652 | 331,660 | 97.92 |
| 2032 | 44 | 182,360 | 0.003135 | 572 | 332,231 | 98.09 |
| 2033 | 45 | 182,360 | 0.002750 | 501 | 332,733 | 98.24 |
| 2034 | 46 | 182,360 | 0.002412 | 440 | 333,173 | 98.37 |
| 2035 | 47 | 182,360 | 0.002116 | 386 | 333,559 | 98.48 |
| 2036 | 48 | 182,360 | 0.001856 | 338 | 333,897 | 98.58 |
| 2037 | 49 | 182,360 | 0.001628 | 297 | 334,194 | 98.67 |
| 2038 | 50 | 269,937 | 0.001428 | 385 | 334,580 | 98.78 |
| 2039 | 51 | 269,937 | 0.001253 | 338 | 334,918 | 98.88 |
| 2040 | 52 | 269,937 | 0.001099 | 297 | 335,214 | 98.97 |
| 2041 | 53 | 269,937 | 0.000964 | 260 | 335,475 | 99.05 |
| 2042 | 54 | 269,937 | 0.000846 | 228 | 335,703 | 99.12 |
| 2043 | 55 | 269,937 | 0.000742 | 200 | 335,903 | 99.17 |
| 2044 | 56 | 269,937 | 0.000651 | 176 | 336,079 | 99.23 |
| 2045 | 57 | 269,937 | 0.000571 | 154 | 336,233 | 99.27 |
| 2046 | 58 | 269,937 | 0.000501 | 135 | 336,368 | 99.31 |
| 2047 | 59 | 269,937 | 0.000439 | 119 | 336,487 | 99.35 |
| 2048 | 60 | 399,573 | 0.000385 | 154 | 336,641 | 99.39 |
| 2049 | 61 | 399,573 | 0.000338 | 135 | 336,776 | 99.43 |
| 2050 | 62 | 399,573 | 0.000296 | 118 | 336,894 | 99.47 |
| 2051 | 63 | 399,573 | 0.000260 | 104 | 336,998 | 99.50 |
| 2052 | 64 | 399,573 | 0.000228 | 91 | 337,089 | 99.52 |
| 2053 | 65 | 399,573 | 0.000200 | 80 | 337,169 | 99.55 |
| 2054 | 66 | 399,573 | 0.000176 | 70 | 337,239 | 99.57 |
| 2055 | 67 | 399,573 | 0.000154 | 62 | 337,301 | 99.59 |
| 2056 | 68 | 399,573 | 0.000135 | 54 | 337,355 | 99.60 |
| 2057 | 69 | 399,573 | 0.000118 | 47 | 337,402 | 99.62 |
| 2058 | 70 | 591,465 | 0.000104 | 62 | 337,463 | 99.63 |
| 2059 | 71 | 591,465 | 0.000091 | 54 | 337,517 | 99.65 |
| 2060 | 72 | 591,465 | 0.000080 | 47 | 337,565 | 99.66 |
| 2061 | 73 | 591,465 | 0.000070 | 41 | 337,606 | 99.68 |
| 2062 | 74 | 591,465 | 0.000062 | 37 | 337,643 | 99.69 |
| 2063 | 75 | 591,465 | 0.000054 | 32 | 337,675 | 99.70 |
| 2064 | 76 | 591,465 | 0.000047 | 28 | 337,702 | 99.71 |
| 2065 | 77 | 591,465 | 0.000042 | 25 | 337,727 | 99.71 |
| 2066 | 78 | 591,465 | 0.000036 | 21 | 337,749 | 99.72 |
| 2066 | 78 | 26,425,435 | 0.000036 | 951 | 338,700 | 100.00 |

Copyright © 2001. All Rights Reserved.

**FIGURE 1   Graphic Analysis of Accumulating Cash Flows**



the market-derived base discount rates for 30-year U.S. Treasury Bonds and 38-year corporate bonds are quite relevant in analyzing the investment, even though it extends for 78 years.

## CONCLUSION

It is obvious from the analyses in Table 1 and Figure 1 that income to be received in more than 30 years has little effect on the present value of the income stream. The significant time frame will change with changes in the discount rate or the magnitude of the reversion relative to the cash flows. In this analysis, the present value of the reversion ($951) contributes very little to the total present value.

The relative effect of income received in the early years is considerable. Care must be taken to consider that portion of the income stream accordingly—any specific assumptions relating to those years will have a greater effect on the value conclusion.

It can be appropriate to use CPI indications from the past to project income streams of greater length. It is important to understand that this conclusion does not imply that the actual income will follow the predicted pattern. The chance for error in applying indications extracted from, say, 40 years of data to 80 years of income is high. Nevertheless, the effect of that error on the value indication will be minimal, as shown by the minor contribution of the latter income streams to the present value of the cash flows.

Discount rates can be based on the patterns found in bond yields or other appropriate instruments. This does not mean that the rates will be the same, but the published rates can be used as the basis for estimating the discount rate for the income from the real estate. From the study, it can be inferred that, although yield rates tend to rise when the income is received over a longer period, this trend is not likely to continue beyond 30 years because of the minimal contribution of the later income.

Changes in inflation and discount rates affect the pattern of

458

Copyright © 2001. All Rights Reserved.

U.S. Bankruptcy Court - Hawaii  #11-02371   Dkt # 990   Filed 05/01/12   Page 79 of 90

present value buildup over the remaining lease period. A higher discount rate translates into faster buildup of present value and even less significance for cash flows further in the future. A lower discount rate has the opposite effect.

These conclusions are based on payments that will be adjusted periodically over the life of the lease, a common income pattern. Leases are sometimes written, however, with level payments for the entire lease term. In such a case, the reversion will typically comprise a higher percentage of the total present value. This is because the present value of the income stream accumulates more slowly than as shown in the example. Therefore, one must carefully examine the pattern of the income stream and the relative magnitude of the reversion in applying the findings of this article.

Using the techniques described, with the understanding that the pattern varies depending on the specific lease terms, an appraiser can examine the effect of future cash flows on present value and analyze the significance of the cash flow to be received in each year of the investment.

*The relative effect of income received in the early years is considerable; any specific assumptions relating to those years will have a greater effect on the value conclusion.*

Copyright © 2001. All Rights Reserved.

U.S. Bankruptcy Court - Hawaii  #11-02371  Dkt # 990  Filed 05/01/12  Page 80 of 90

# ATTACHMENT C

# Hotel Occupancy: Is the Three-Year Stabilization Assumption Justified?

Cornell Hospitality Quarterly
52(2) 176–180
© The Author(s) 2011
Reprints and permission:
sagepub.com/journalsPermissions.nav
DOI: 10.1177/1938965510393733
http://cqx.sagepub.com
**⑤SAGE**

## By John W. O'Neill

### Abstract

Corporate and private hotel developers, appraisers, and consultants must make an assumption regarding the period of time it will take a new hotel to reach a stabilized occupancy level. Historically, most developers of future hotel occupancy estimates have assumed a three-year build-up period, although empirical research has not tested this assumption. This research project tests that assumption by analyzing the actual occupancy rates of 3,699 hotels that opened during the previous economic cycle. In addition, this project evaluates the stabilization period based on hotel type, location, size, and service level. This exploratory study develops guidance for analysts of hotel occupancies by evaluating the absolute level of stabilized occupancy by hotel type in an effort to assist with refining the accuracy of prospective financial analyses for new hotels. While this project finds support for the use of a three-year occupancy build-up, it concludes that certain hotel types and locations stabilize more slowly or more quickly, whereas hotel size and service level are not significant determinants of stabilization period. Also, this project finds that certain hotel types stabilize at significantly higher occupancy rates than others.

### Keywords

hotel development, feasibility analysis, stabilized occupancy

Feasibility studies for many different types of proposed commercial real estate projects include an assumption regarding the period of time it will take the project to reach a stabilized operating level (Eckenstahler 1994).[1] Stabilized operating level is usually considered to be that level of operating volume at which the occupancy percentage ceases to increase year over year (Eckenstahler 1994). Feasibility studies for new hotels generally include prospective financial analyses that assume the proposed property will build up to a stabilized level of occupancy in three years (Rushmore and Baum 2001; Andrew and Schmidgall 1993; Overstreet 1989a), meaning occupancy is expected to stabilize during the third year of operation, although sometimes a two-year (Overstreet 1989a) or four-year build-up may be assumed (Ransley and Ingram 2004). This exploratory study endeavors to provide guidance to analysts of hotel occupancies, such as corporate and private hotel developers, appraisers, and consultants, by empirically examining the actual occupancy rates of 3,699 hotels that opened during the previous economic cycle. In so doing, this study analyzes actual specific hotel property stabilization periods.

Anticipated hotel occupancy levels are customarily developed from a penetration analysis whereby a hotel is expected to capture a percentage of its fair share of lodging demand in various market segments (e.g., commercial, leisure, and group), taking into account historical and anticipated

levels of demand and demand growth in each of those market segments (Ransley and Ingram 2004; Rushmore and Baum 2001). Fair share is a percentage expressed as the subject hotel's number of guest rooms divided by the number of guest rooms available in the subject hotel's competitive market. Penetration represents the extent (expressed as a percentage) to which the subject hotel achieves its fair share within each market segment. Within a penetration analysis, the subject hotel's penetration rates are normally assumed to experience annual increases (and possibly intermittent decreases) until stabilization occurs within each market segment. Generally, a new property is projected to have penetration factors that start below the long-term average and increase during the first few years of operation as a property captures an increasing share of market demand. This level of stabilization of penetration of lodging demand, along with anticipated stabilization of lodging demand available in the competitive market, results in an anticipated level of occupancy stabilization for the subject hotel. Thus, one can assume that the number of years required for the subject property to reach its stabilization of penetration will also typically be the number of years required for it to reach stabilized occupancy. In some cases, when market occupancy is anticipated to change in years subsequent to the subject hotel's expected stabilized penetration, the subject hotel will reach stabilized occupancy after it reaches stabilized penetration.

Downloaded from cqx.sagepub.com at PENNSYLVANIA STATE UNIV on April 28, 2011

Historically, the concept of stabilized occupancy has generally excluded from consideration any abnormal relationships between supply and demand (Rushmore and Baum 2001), such as latent demand due to circumstances that may have been unforeseen at the time the prospective financial analyses were prepared. Stabilized hotel operating performance is generally considered to be a point of equilibrium when it is not logical to assume continuing increases in occupancy. This situation occurs if lodging demand continues to grow, other new hotel rooms are eventually expected to enter the market, thus limiting occupancy increases of any individual hotel (Ransley and Ingram 2004). Assumptions regarding future occupancy estimates are important because the feasibility and financial success of hotels are extremely sensitive to occupancy (Overstreet 1989b). However, although it has been suggested that factors such as a hotel's location may influence its stabilized level of occupancy (Rushmore 1992), there appears to be no empirical research that has tested long-held assumptions regarding the period of time it may take a hotel to reach a stabilized operating level.

Hotel feasibility studies would benefit from rigorous research regarding the typical assumptions they contain (Beals 1994). More sophisticated analyses regarding the period of time hotels take to reach their stabilized operating level could not only result in more accurate operating forecasts, but more sophisticated analyses could also potentially help to reduce hotel restructurings and foreclosures brought on in part by inadequately supported prospective financial analyses (Beals 1994).

## Analyses of Data

The purpose of this article is to analyze the actual occupancy build-up of new hotels in the United States over the past several years. To do so, this research project makes use of what is probably the most complete data base of U.S. hotel performance, namely, the Smith Travel Research (STR) database. For this study, STR graciously provided data regarding annual occupancy levels for consecutive years during the seven-year economic cycle of 2002 through 2008 for 3,699 newly opened hotels.

For this exploratory study, stabilized occupancy was considered to be the first high point in annual occupancy percentage when occupancy rate no longer increased by at least one percentage point versus the previous year, and stabilized year was considered to be the first year the hotel reached its stabilized occupancy level. Since this definition required a full year of stabilized operating performance, and because STR data represent full calendar years, the analysis could determine the stabilized year in half-year increments. This was possible because the STR data also included the month and year that each hotel opened. Since

it was necessary to examine multiple consecutive years of performance to determine the stabilized year, hotels that opened between 2001 and 2006 were considered. For the purposes of this study, each hotel's first calendar year of operation was considered to be a year only if it opened during the first quarter of the year (i.e., January through March). Hotels that opened during the middle two quarters of the year (April through September) were considered to have a half-year of operation during their first calendar year. If hotels opened during the final quarter of the year (October through December), their first calendar year (or stub year) was not considered to be an operating year. The average property had 107 guest rooms (standard deviation [$SD$] = 93 rooms) with a mean stabilized occupancy percentage of 71.96 percent ($SD$ = 9.96 percent).

## Is the Three-Year Occupancy Build-Up Supported?

An analysis of the data indicated that the typical 3-year occupancy build-up assumption was supported because the average hotel stabilized in 3.08 years ($SD$ = 1.41 years; range = 1-8 years). Occupancy at a total of 61.9 percent of hotels stabilized between 2 and 4 years. Only 6.3 percent of hotels stabilized in 1 year (i.e., their first year of operation), and a mere 0.2 percent of hotels took 8 years to stabilize.

The average hotel achieved an annual occupancy percentage of 55.31 percent in its first full year of operation, 65.54 percent in its second year, and 71.96 percent in its third year. Stated another way, the average hotel achieved 76.86 percent of its long-term average occupancy during its first year of operation (and hence 76.86 percent of its long-term penetration mathematically based on a long-term penetration of 100.00 percent), 91.08 percent in its second year, and 100.00 percent in its third year. The first, second, and third years represent many different calendar years for different hotels in the study. Thus, these figures account for hotel performance during the different economic conditions occurring in the multiple years of study. Exhibit 1 presents average occupancy by year.

Exhibit 2 presents a histogram of stabilized years for the sample. Exhibit 2 indicates that although the mean stabilization period was 3.08 years, many hotels stabilized more quickly or slowly. Therefore, subsequent analyses focused on examination of stabilization period by hotel type.

## Hotel Type Matters

The STR data indicate each hotel's scale type as in luxury, upper upscale, upscale, midscale with food and beverage, midscale without food and beverage, economy (based on the relative guest room pricing level of each hotel chain), and independent. An analysis of variance (ANOVA) indicated

Downloaded from cqx.sagepub.com at PENNSYLVANIA STATE UNIV on April 26, 2011

U.S. Bankruptcy Court - Hawaii   #11-02371   Dkt # 990   Filed  05/01/12   Page 83 of 90

**Exhibit 1:**
Average Occupancy by Year



**Exhibit 2:**
Year of Stabilized Occupancy



there were significant differences in the length of time it took hotels to stabilize based on scale ($F = 5.57, p < .001$). Based on post hoc statistical tests (Tukey tests), stabilization of luxury hotels (3.31 years), upper upscale hotels (3.35 years), and independent hotels (3.32 years) was significantly slower than that of upscale hotels, which stabilized quicker than any other hotel type with a mean of 2.88 years. In other words, upscale hotel brands, such as Courtyard by Marriott and Hilton Garden Inn, reached their stabilized occupancy quicker than their more luxurious counterparts. A number of explanations could exist for this difference. For example, hotels typically appealing to more affluent travelers may take more time to build their reputations and customer bases within their local markets. Other

explanations could be based on the number of luxurious hotels located in the market or based on the flags or affiliations of those luxurious hotels.

Another way STR data indicate hotel type is based on whether the hotel is an extended-stay property (a hotel catering to long-term guests). Of the 3,699 hotels in the sample, 546 were classified as extended-stay (such as Residence Inns or Homewood Suites) and 3,153 were not extended-stay hotels. A *t*-test indicated that extended-stay hotels stabilized significantly more quickly than conventional properties. Specifically, Levene's test for equality of variances was significant ($F = 17.98, p < .001$), and the average conventional hotel stabilized in a mean of 3.13 years, while the average extended-stay hotel stabilized in only 2.75 years.

### The Effects of Hotel Location

Hotels in this study were classified by STR as having location types that were either city, suburban, highway, airport, or resort locations. An ANOVA indicated that location was a significant predictor of stabilization period ($F = 2.60, p < .05$). Based on post hoc Tukey tests, airport hotels stabilized significantly more rapidly (2.98 years) than city hotels (3.23 years).

Hotels were also classified by nine different U.S. regions. An ANOVA concluded that region was a significant predictor of the period of time it took properties to stabilize ($F = 5.09, p < .001$). Based on post hoc Tukey tests, hotels located in the heavily populated Mid-Atlantic region (New York, Pennsylvania, and New Jersey) stabilized significantly more quickly (2.94 years) than hotels located in the east north central region (Michigan, Wisconsin, Illinois, Indiana, and Ohio), which took an average of 3.23 years to stabilize. Hotels in the east north central region stabilized significantly more slowly than hotels in virtually every other U.S. region.

Hotels were additionally classified based on whether they were located in one of the top twenty-five (largest) markets in the United States. An ANOVA indicated that this factor was a significant predictor of stabilization period ($F = 13.30, p < .001$). Based on post hoc Tukey tests, hotels located in the top twenty-five markets stabilized significantly more quickly (3.03 years) than hotels in the smaller market areas (3.36 years). It appears that hotels may stabilize more quickly in more heavily populated, higher-trafficked areas. Future research could endeavor to explain why hotels located in such areas appear to stabilize more rapidly than those located outside such areas.

Variables that did not appear to make a difference in the time it took hotels to reach their stabilized occupancy included hotel size in number of guest rooms in the subject hotel property ($p > .05$) and property service level, that is, whether or not the hotel had any food and beverage outlets ($p > .05$).

These results are summarized in Exhibit 3.

Downloaded from cqx.sagepub.com at PENNSYLVANIA STATE UNIV on April 26, 2011

U.S. Bankruptcy Court - Hawaii   #11-02371   Dkt # 990   Filed  05/01/12   Page 84 of 90

**Exhibit 3:** Summary of Results

| Variable | F-Statistic | Significance |
|---|---|---|
| Scale type | 5.57 | <.001 |
| Extended stay | 17.98 | <.001 |
| Location type | 2.60 | <.05 |
| U.S. region | 5.09 | <.001 |
| Top 25 markets | 13.30 | <.001 |
| Hotel size | 0.61 | n.s. |
| Service level | 1.42 | n.s. |

**Exhibit 4:**
**Stabilized Occupancy by Stabilized Year**



## Occupancy Levels

The absolute stabilized occupancy levels were analyzed to determine whether there were any significant differences in occupancies based on the period of time required for stabilization. Exhibit 4 presents mean stabilized occupancy percentages by stabilized years.

A linear regression analysis ($df = 1, 3,697$) indicated that there was a systematic correlation where hotels stabilizing later in their operating life stabilized with relatively higher occupancies ($F = 5.40, p < .05$). However, in observing the data, it also appears that hotels stabilizing much later, that is, after seven to eight years, stabilized at relatively lower occupancy rates. Therefore, a quadratic (curvilinear) equation was tested ($df = 2, 3,696$), and this curvilinear equation was a superior representation of the data ($F = 5.77, p < .01$) This test indicated that hotels stabilizing after a moderate number of years of operation, in this case, three to six years, stabilized at relatively higher occupancy rates. These results suggest that the relatively unusual hotels not stabilizing within three to six years are affected by negative factors not affecting most other properties. Such factors could include branding issues, poor locations, or overbuilt markets.

A $t$-test indicated that extended-stay hotels stabilized at significantly higher occupancy rates than conventional hotels ($F = 48.20, p < .001$). While conventional hotel stabilized occupancies were a mean 70.87 percent, extended-stay hotel stabilized occupancies averaged 78.25 percent. It appears

that the extended-stay hotel concept may continue to present a compelling business model to hotel developers, at least due to its relatively high occupancy level.

An ANOVA was conducted to evaluate the effects of hotel room prices on stabilized occupancy level. This analysis used the STR pricing levels of luxury, upscale, midprice, economy, and budget, which were determined based on each hotel's relative average daily rate within its respective marketplace. This ANOVA was significant ($F = 11.42$, $p < .001$). Based on post hoc Tukey tests, hotels priced at both the upper (luxury hotels had a mean stabilized occupancy of 73.65 percent) and lower ends (budget hotels had a mean stabilized occupancy of 73.31 percent) of the spectrum of prices stabilized at significantly higher occupancy rates than hotels in the middle of the spectrum (midprice hotels had a mean stabilized occupancy rate of 70.38 percent). This analysis suggests that although previous research concluded that a problem with midprice hotels is that they tend to perform relatively poorly due to being older and more obsolete than higher- and lower-priced properties (O'Neill 2003), even new midprice hotels appear to achieve comparatively low occupancy levels.

## Guidance for Developing Prospective Financial Analyses

From this exploratory study, a number of points of guidance can be provided regarding considerations that should be made by those who are charged with estimating the future occupancies of new hotels. It is important to note that this guidance is not intended as a substitute for model-driven analyses of lodging supply and demand conditions for making forecasting decisions. Guidance is as follows:

- In general, the assumed 3-year build-up of occupancies of new hotels is supported by this research. In recent years, the average U.S. hotel stabilized in 3.08 years, and 61.9 percent of hotels stabilized in between 2 and 4 years.
- Luxury, upper upscale, and independent hotels generally appear to stabilize significantly more slowly than upscale hotels.
- Extended-stay hotels stabilize significantly more quickly than conventional hotels. In addition, extended-stay hotels stabilize at significantly higher occupancy rates than conventional hotels.
- Hotels located in downtown areas stabilize significantly more slowly than those located near airports.
- Hotels located in the heavily populated Mid-Atlantic region stabilize significantly more quickly than hotels in the east north central region, which stabilize significantly more slowly than hotels in virtually every other U.S. region. Furthermore, properties located in major metropolitan areas

Downloaded from cqx.sagepub.com at PENNSYLVANIA STATE UNIV on April 26, 2011

U.S. Bankruptcy Court - Hawaii  #11-02371  Dkt # 990  Filed  05/01/12  Page 85 of 90

stabilize more rapidly than those in less populated areas.

- Hotel size (number of guest rooms) and service level (specifically whether it has food and beverage outlets) appear to be unrelated to the period of time it takes the property to stabilize.
- Hotels stabilizing relatively quickly (or slowly) do not appear to stabilize at relatively higher occupancy levels. Hotels stabilizing in three to six years report the highest stabilized occupancy rates.
- Hotels priced at both the upper and lower ends of the spectrum of guest room prices within their markets stabilize at significantly higher occupancy rates than those in the middle of that spectrum.

## Conclusions

While it may not be surprising to discover that the assumed three-year hotel stabilization period is supported by this research project, it is surprising that hotels stabilizing relatively quickly do not appear to stabilize at higher occupancy levels. In other words, it is not necessarily a "good" thing for hotels to stabilize quickly. This project found that in general, the most luxurious hotels build their occupancy and stabilize more slowly than hotels in the upscale classification. Furthermore, extended-stay hotels are unique in that they stabilize relatively quickly and they do so at relatively high occupancy rates.

It is important to note that while the subject study involved analyzing hotel occupancies during a relatively long and recent period of time (2002 though 2008), its conclusions are limited based on the time period studied. Its conclusions may or may not apply to any other time period. However, it is important to point out that within the available sample, hotels reached a level of stabilized occupancy during each of the seven different years between 2002 and 2008, indicating that stabilization was achieved during a variety of different economic circumstances. During that time there was high national occupancy growth, modest national occupancy growth, national occupancy stabilization, modest national occupancy decline, and high national occupancy decline. Similarly, there was significant variance in the period of time each hotel in the sample reached stabilization. Therefore, there appear to be many factors other than the effects of national occupancy trends that affect the occupancies of hotels, and those factors certainly include the variables within the hotels themselves.

Hotels located in the Mid-Atlantic region, in major metro areas, and particularly those near airports stabilize more quickly; whereas those in the north central region and in downtown areas stabilize more slowly. Ultimately, the stabilization period for new hotels depends on the specifics of that hotel project. Clearly, each project's location, property type, and price level are primary considerations

that estimators of future hotel operating performance should consider when developing estimates of future performance, and this study provides to such analysts guidance to consider that hopefully can have the effect of improving the accuracy of prospective financial analyses and potentially reducing restructurings and foreclosures brought on in part by inadequately supported financial analyses.

### Declaration of Conflicting Interests

The author(s) declared no conflicts of interest with respect to the authorship and/or publication of this article.

### Funding

The author received no financial support for the research or authorship of this article other than the assistance of Smith Travel Research who graciously provided the data cited herein.

### Note

1. Such documents prepared by public accounting firms, or for transactions regulated by the Securities and Exchange Commission, may be referred to as "market studies with prospective financial analyses."

### References

Andrew, W. P., and R. S. Schmidgall. 1993. *Financial management for the hospitality industry*. East Lansing, MI: Educational Institute of the American Hotel & Motel Association.

Beals, P. 1994. Rehabilitating hotel feasibility studies. *Real Estate Review* 24 (1): 58-61.

Eckenstahler, C. R. 1994. Generating effective market and feasibility studies from your real estate consultant. *Economic Development Review* 12 (3): 80-83.

O'Neill, J. W. 2003. ADR rule-of-thumb: Validity and suggestions for its application. *Cornell Hotel and Restaurant Administration Quarterly* 44 (4): 7-16.

Overstreet, G. A. 1989a. Profiles in hotel feasibility: A case study of Charlottesville, Virginia. *Cornell Hotel and Restaurant Administration Quarterly* 29 (4): 8-19.

Overstreet, G. A. 1989b. Profiles in hotel feasibility: The consequences of overbuilding. *Cornell Hotel and Restaurant Administration Quarterly* 30 (1): 10-18.

Ransley, J., and H. Ingram. 2004. *Developing hospitality properties & facilities*. Oxford, UK: Elsevier Butterworth-Heinemann.

Rushmore, S. 1992. *Hotels and motels: A guide to market analysis, investment analysis, and valuations*. Chicago, IL: Appraisal Institute.

Rushmore, S., and E. Baum. 2001. *Hotels & motels: Valuations and market studies*. Chicago, IL: Appraisal Institute.

### Bio

**John W. O'Neill**, Ph.D., is an associate professor in the School of Hospitality Management at The Pennsylvania State University (jwo3@psu.edu).

Downloaded from cqx.sagepub.com at PENNSYLVANIA STATE UNIV on April 26, 2011

U.S. Bankruptcy Court - Hawaii   #11-02371   Dkt # 990   Filed  05/01/12   Page 86 of 90

# ATTACHMENT D

| | |
|---|---|
| **From:** | Michael Gardner [mgardner@bickelbrewer.com] |
| **Sent:** | Tuesday, March 20, 2012 11:59 PM |
| **To:** | Harrison, Lindsay C. |
| **Cc:** | Handzo, David A; Epstein, Jerome L; Simon Klevansky; Doug Buncher; AFeld@sheppardmullin.com |
| **Subject:** | Re: In re M Waikiki - Debtor's Interrogatory Responses |
| **Attachments:** | Gardner, Michael.vcf |

Lindsay,

I am writing in response to your e-mail to me regarding Debtor's responses to Marriott's First Set of Interrogatories in Connection with the Estimation of Marriott's Claim.

1. Debtor properly objected to Interrogatory No. 6 because the number of, and reasons for, the delay in the opening of the Hotel are not relevant to the estimation of Marriott's claim. There is no dispute that delays to the opening of the Hotel occurred. The *reasons* for the delay, however, have no bearing on whether or how such delays affected the performance of the Hotel. Further, contrary to your e-mail, although the subject matter of the delayed opening was discussed at the depositions of Tim Miller and Michael Rock, it was raised by the deponents, not us.

2. With respect to Interrogatory Nos. 1-5 and 7, Debtor did not withhold any information based on its objections. Of course, and as stated in its responses, Debtor reserved the right to amend and/or supplement its responses to those interrogatories.

Michael

---

Michael S. Gardner
BICKEL & BREWER
1717 Main Street
Suite 4800
Dallas, Texas 75201
Direct: (214) 653-4843
Main: (214) 653-4000
Fax: (214) 653-1015
>>> On 3/19/2012 at 2:26 PM, in message
<8955ABC2474835449F80D4067E3D3F5D6A46FB6C90@CLMSEXMBX1.Internal.Jenner.com>, "Harrison, Lindsay C."
<LHarrison@jenner.com> wrote:

Michael,

I am writing concerning Debtor's 3/12/2012 responses to Marriott's First Set of Interrogatories in Connection with the Estimation of Marriott's Claim.

First, Debtor refused to answer Interrogatory 6, which asked Debtor to identify every planned opening date for the Hotel prior to the actual Opening Date, and for each planned opening date, state all of the reasons you contend the Hotel did not open on that date. As it did in response to all of Marriott's other interrogatories, Debtor objected that this interrogatory was not relevant to Claim Estimation. However, unlike the other interrogatories, Debtor did not provide any response to this interrogatory. Now that we have had numerous depositions relating to estimation, it should be clear that the delayed opening date of the Hotel is highly relevant to the estimation of Marriott's Claim. In

U.S. Bankruptcy Court - Hawaii  #11-02371  Dkt # 990  Filed  05/01/12  Page 88 of 90

particular, Debtor asked both Tim Miller and Michael Rock numerous questions about the effect of the delayed Opening Date on the performance of the hotel over its first eight months of operation. Both witnesses testified that the delayed Opening Date had significant detrimental effects over the first eight months that would have dissipated over time. The connection of this issue to the estimation hearing should be evident to the Debtor – if there were external factors affecting the Hotel's performance over the first months of operation that would not have persisted over time, those external factors are highly relevant to projections of the Hotel's performance over time. Given that the depositions taken *by the Debtor* in connection with the Estimation Hearing have gone into significant detail about the issue of the delayed Opening Date of the Hotel, Debtor should withdraw its objection to Interrogatory No. 6 and respond to that interrogatory immediately. Please advise me by 3 pm EST tomorrow, March 20, 2012, whether Debtor withdraws its objection to Interrogatory No. 6. If not, we will need to seek relief from the Court on very short notice given that the close of discovery is imminent.

Second, with respect to the interrogatories to which the Debtor objected but went on to answer (1-5, 7), it is unclear from the face of Debtor's answers whether they purport to be complete responses or whether Debtor is withholding information on the basis of Debtor's objections to those interrogatories. Please confirm by 3 pm EST tomorrow, March 20, 2012, that Debtor has provided complete answers to those interrogatories and has not withheld information responsive to those interrogatories on the basis of Debtor's objections to those interrogatories.

We reserve the right to raise additional issues stemming from Debtor's responses, but request that you address these issues immediately.

Thank you,
Lindsay

---

**Lindsay C. Harrison**
Jenner & Block LLP
1099 New York Avenue, N.W.
Suite 900
Washington, DC 20001-4412
Tel (202) 639-6865
Fax (202) 661-4956
LHarrison@jenner.com
www.jenner.com

CONFIDENTIALITY WARNING: This email may contain privileged or confidential information and is for the sole use of the intended recipient(s). Any unauthorized use or disclosure of this communication is prohibited. If you believe that you have received this email in error, please notify the sender immediately and delete it from your system.

---

The information contained in this e-mail message, including any attachments, is attorney privileged and/or confidential information intended only for the use of the individual or entity named as addressee. The review, dissemination, distribution, or copying of this communication by or to anyone other than the intended addressee is strictly prohibited. If you have received this communication in error, please immediately notify the sender by reply e-mail and destroy all copies of the original message. Thank you.

**CERTIFICATION OF DOCUMENT LENGTH**

Pursuant to LBR 9013-2(a)(2), I certify that the foregoing post-hearing brief is 60 pages, not including cover pages, table of contents, table of authorities, and signature blocks.

Dated: April 30, 2012

<u>/s/ Lindsay C. Harrison</u>