# UNITED STATES BANKRUPTCY COURT

## DISTRICT OF HAWAII

| | |
|---|---|
| In re | Case No. 11-02371 |
| | Chapter 11 |
| M WAIKIKI, LLC, | |
| Debtor. | Re: Docket No. 537 |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW
## ON ESTIMATION OF MARRIOTT CLAIM

The debtor, M Waikiki LLC (the "Debtor"), filed a motion (docket no. 537) to estimate, for purposes of voting and feasibility, Claim No. 79 filed by Marriott Hotel Services, Inc. and Marriott International, Inc. (collectively "Marriott"). The court conducted an evidentiary hearing on April 3-5 and 17-18, 2012. The appearances of counsel were noted on the record. Closing briefs were filed on May 1, 2012, and the final list of stipulated exhibits was filed on May 9, 2012.

Based on the evidence, the court makes the following

## FINDINGS OF FACT

1.     The Debtor owns a hotel (the "Hotel") located at 1775 Ala Moana Boulevard, in Waikiki.

2.     Marriott is one of the largest and most successful hotel management companies in the world.

3.     The Debtor purchased the Hotel in July 2006.  In late 2006, the Debtor closed the Hotel for extensive renovations.

4.     In or around 2007, Marriott inaugurated a new hotel brand called EDITION.   Marriott intended to develop EDITION as a chain of "lifestyle" hotels.  The "lifestyle" hotel concept is somewhat elusive, but it appears to refer to a hotel with the quality of service, rooms, dining, and amenities of a traditional luxury hotel, combined with chic, modern design and features.  EDITION is Marriott's first foray into the lifestyle hotel market.  Marriott is developing the EDITION brand in cooperation with Ian Schrager and his company, I.S. International, LLC (collectively "Schrager").  Schrager is a noted designer of boutique hotels and nightclubs.

5.     The Debtor and Marriott Hotel Services, Inc., entered into a Management Agreement, dated as of July 9, 2008.  The key terms of the Management Agreement (as amended) are summarized as follows:

a.     The Debtor engaged Marriott "to supervise, direct and control the management and operation of the Hotel" for a thirty-year period beginning on July 9, 2008, and for two additional ten-year periods unless Marriott gives timely notice of nonrenewal.  The Management Agreement would survive any sale of the Hotel or the foreclosure of any mortgage on the Hotel.

2

b.      The Hotel would be part of "the chain of full-service boutique hotels operated by Marriott . . . under the . . . mark EDITION Hotels."

c.      Marriott is entitled to receive a Base Management Fee and an Incentive Management Fee.  Briefly summarized, the Base Management Fee is three percent of gross Hotel revenues (without deducting any expenses) from the opening date through the fourth fiscal year[1], three and one-half percent of gross Hotel revenues in fiscal years five through eight, and four percent of gross Hotel revenues from the ninth fiscal year through the end of the term.  The Incentive Management Fee (also briefly summarized) is twenty-five percent of operating profits of the Hotel in excess of $19,425,000.  (Marriott may also be entitled to certain marketing fees, but Marriott has not proved the amount of any such fee for purposes of this estimation.)

d.      All expenses of operating the Hotel are to be paid out of Hotel revenues or by the Debtor.  If Marriott advances any money to pay operating expenses or provide working capital, the Debtor must repay Marriott with interest.

e.      The Debtor has the option to terminate the Management Agreement if, during any two consecutive fiscal years after the fifth fiscal year,

---

[1]The "fiscal year" is Marriott's fiscal year, which ends on the last Friday of each calendar year.  The fiscal year therefore almost coincides with the calendar year.

3

U.S. Bankruptcy Court - Hawaii   #11-02371   Dkt # 1154   Filed 05/29/12   Page 3 of 24

(1) the operating profit (as defined) falls below certain threshold amounts, (2) the Hotel's revenue per available room ("RevPAR") is less than ninety percent of the RevPAR earned by six identified competitive hotels in Honolulu, and (3) the failure of the Hotel to satisfy these tests is not attributable to certain specified causes. If the Debtor exercises the option and gives notice of termination to Marriott, Marriott has the option to avoid termination by paying the Debtor the difference between the applicable threshold operating profit and the actual operating profit of the Hotel during the two fiscal years in question. Marriott can only exercise this option to avoid termination twice in any fifteen-year period.

      f.     New York law controls.

6.     All parties concede that the Management Agreement is valid and enforceable.

7.     The agreement between Marriott and Schrager provides that Schrager "shall be entitled to receive [a specified percentage] of the management fees [including base and incentive fees] earned by Marriott under each Operating Agreement" for hotels in the EDITION chain.

8.     The Hotel opened as the Waikiki EDITION on or about September 28, 2010. The Hotel was the first EDITION hotel.

9.     The Hotel did not perform as well as either the Debtor or Marriott

4

expected. The Hotel suffered an operating loss (disregarding debt service) of about $8.4 million from September 2010 through August 2011. This was substantially worse than Marriott had projected.

10. On August 28, 2011, the Debtor physically removed Marriott's employees from the Hotel and placed another management company in charge.

11. On August 31, 2011, the Debtor commenced this chapter 11 case.

12. Marriott filed Proof of Claim No. 79, asserting a claim of not less than $72,000,000. (Although Marriott has not amended its proof of claim, Marriott's closing brief asks the court to estimate the claim at $38,801,137.34.) The claim consists of (a) profits that Marriott would have earned during the remaining term of the Management Agreement, (b) harm to Marriott's reputation and good will, (c) expenses and damages, such as employee claims, arising from Marriott's ouster, (d) unpaid working capital loans, (e) misappropriation of proprietary information, and (f) customer chargebacks. Marriott did not offer evidence of any damages in categories (b) and (e), so I estimate the amount of those claims at zero (without prejudice to the ultimate allowance of Marriott's claims).

13. For purposes of this decision, I assume (without deciding) that the Debtor either (a) committed a total breach of the Management Agreement on

5

August 28, 2011, or (b) will reject the Management Agreement, in which case Marriott would have a claim against the Debtor, pursuant to 11 U.S.C. § 365(g), based on a deemed total breach of the Management Agreement on August 31, 2011. The difference in dates does not materially affect the estimated amount of Marriott's claim.

14.     The Debtor's breach of the Management Agreement caused Marriott to suffer damages.

15.     This estimation addresses only Marriott's affirmative claims against the Debtor. For purposes of this decision, I assume (without prejudice to the ultimate determination of the claims of the Debtor and Marriott against each other) that the Debtor has no claims against Marriott that would reduce Marriott's claims against the Debtor.

16.     As set forth in more detail in Attachment 1, Marriott probably would have earned Base Management Fees during the term of the Management Agreement in the total amount of $198,412,982.95.

17.     To estimate the Base Management Fees, I have considered and weighed all of the evidence, but I find certain evidence more reliable.

        a.      For the average daily rate ("ADR"), I relied most heavily on a set of projections prepared by Marriott on June 28, 2011. I find these projections

6

most credible because they were prepared by Marriott's internal staff, on whose work Marriott relies when conducting its business and investing millions of dollars, rather than by paid testifying experts. Additionally, the projections were not prepared with a view to being introduced in litigation, and therefore were not biased by a persuasive impulse. I also note that they are generally in line with the testimony of the expert witnesses at trial.

b. For occupancy rates, I relied primarily on the expert testimony at trial, which was nearly uniform on this point. The Marriott internal projections used a slightly lower rate of occupancy, but the experts' opinions are more consistent with historical performance of comparable hotels in Waikiki.

c. For nonroom revenues, I relied on the unrebutted testimony of Mr. Baltin.

18. As set forth in Attachment 2, Marriott probably would have earned Incentive Management Fees during the term of the Management Agreement in the total amount of $68,554,606.44.

19. To estimate the Incentive Management Fees, I have considered and weighed all of the evidence. I used the room revenue and nonroom revenue figures stated above, and deducted the expenses estimated by Mr. Baltin, whose testimony on this point was unrebutted.

7

20.     The Debtor suggests that any estimate of management fees over a period of decades is too uncertain to support an award of damages.  I disagree.  I find that the figures set out in this decision have been proven with reasonable certainty and that there is a stable foundation for a reasonable estimate of Marriott's future damages.  In some respects, a longer projection period is more reliable than a shorter period because the longer period tends to even out inevitable variability from year to year.

21.     The Debtor argues that Marriott's claim for management fees should be reduced by about thirty-five to forty-five percent for overhead expenses.  I disagree with this argument.

a.      The only expense which Marriott could reasonably avoid because of the termination of the Management Agreement is the travel expense for periodic visits to the Hotel by Marriott's central office staff.  Mr. Baltin's estimate of this expense at $1,988,493 is reasonable and unrebutted and I therefore accept it.

b.      Marriott could not avoid any additional expenses without terminating or substantially curtailing its development of the EDITION brand.  Marriott's decision to continue the development of that brand is reasonable under the circumstances.

8

c.     The figure of thirty-five to forty-five percent appears to be the amount of overhead expense which is allocable to a particular management contract for cost accounting purposes.  This is the wrong standard.  Cost accounting requires the allocation of all costs, avoidable or not, among a business' revenue streams.  Only avoidable costs are deducted when calculating damages.

22.     The Debtor argues that Marriott's claim should be reduced by the amount of Schrager's share of the management fees.  I disagree.  Based on the written agreement between Marriott and Schrager, it is more likely than not that Schrager would be entitled to receive the specified percentage of any damages recovered by Marriott that represent unpaid management fees.

23.     The Debtor argues that Marriott's performance would have failed the performance test under the Management Agreement, and that therefore Marriott's claim should not include any amounts earned after the seventh year of the Management Agreement (when the Debtor might first have the option to terminate the Management Agreement under the performance test).  I find that Marriott probably would pass the performance test, although the margin of passage would probably be fairly small and the question is subject to significant uncertainty. Although Marriott's performance in the initial months of the Management Agreement was subpar, I find that Marriott probably could have drawn upon its

9

enormous experience and resources to make the Hotel as competitive as the parties expected by the time the performance test becomes effective. (The uncertainty concerning the performance test is best addressed by adjusting the discount rate, as discussed below.)

24.     In order to calculate the damages to which Marriott is entitled, the stream of fee income, minus avoidable expenses, must be reduced to present value by applying a discount rate.

a.     7.5 percent is an appropriate discount rate to apply to the Base Management Fees for the first seven years of the Management Agreement.

i.     Marriott's receipt of those fees is subject to relatively little risk. The fees are based upon the Hotel's gross income, not profits, and not subject to reduction due to any expenses. Marriott has a contractual right to the fees even if the Hotel is sold or foreclosed.

ii.     Marriott's weighted average cost of capital ("WACC") is approximately 6.5 percent. Although WACC is a reasonable starting point in determining a proper discount rate, WACC must be adjusted upwards because the Base Management Fees are more risky than Marriott's aggregate stream of income. The behavior of a large set (in this case, all of Marriott's management fee streams) is inherently more predictable than the behavior of an individual member

10

of that set (in this case, the Hotel).  Further, Marriott's aggregate revenue stream

includes a very large number of established hotels, under seasoned brands and

long-standing management agreements.  In contrast, the Hotel is new (as a

practical matter, due to its extensive renovation and rebranding), the EDITION

brand is new, and the lifestyle hotel concept is new to Waikiki.

       b.    13.5 percent is an appropriate discount rate to apply to the Base

Management Fees for the last forty-three years of the Management Agreement.

Marriott's fee income after the performance test comes into effect are substantially

more uncertain than for the period before the performance test.  I find that Marriott

would probably have passed the performance test, likely avoiding a possible

termination by the Debtor.  But this finding is not free from doubt.  Even a

relatively small variation in the Hotel's performance would trigger the Debtor's

right to terminate the Management Agreement,  requiring Marriott either to accede

to termination or make a potentially sizable cure payment to the Debtor.

Therefore, the fee income for the period after the performance test is triggered

should be subject to a significantly higher discount rate.

       c.    13.5 percent is an appropriate discount rate to apply to the

Incentive Management Fees.  The poor performance of the Hotel during its initial

months under Marriott's management illustrates the uncertainty of hotel profits.

U.S. Bankruptcy Court - Hawaii   #11-02371   Dkt # 1154   Filed  05/29/12   Page 11 of 24

Mr. Baltin opined that this rate is appropriate and there is no evidence to the contrary.

        d.    Using these discount rates, the present value of Marriott's claim for management fees is $13,620,886.25.

    25.    Marriott contends that the Debtor is obligated to repay working capital loans and reimburse Marriott for various expenses totaling $5,759,570.05.[2] The Debtor objects to portions of this claim on several grounds.

        a.    The Debtor argues that $560,987.78 in pro-rated bonus and severance payments and $400,151.51 in post-petition wages and benefits paid to Marriott employees are post-petition expenses which Marriott was not authorized to incur and which did not benefit the Debtor.  I agree with the Debtor only in part. The Debtor's breach of the Management Agreement left Marriott with employees for whom it had no work.  Marriott was obligated to pay those employees until Marriott could terminate them and then to pay those employees whatever

---

[2] Marriott's behavior has made it more difficult to estimate its claim for working capital loans and expenses.  Months after the ouster, Marriott continues to adjust the amount as additional expenses and credits flow through Marriott's accounting system.  Marriott's litigation conduct has also made it more difficult for the Debtor to evaluate this portion of the claim. Marriott's primary witness on this portion of its claim is Roula McCann.  By agreement, the Debtor took Ms. McCann's deposition on March 21, 2012.  At the deposition, Ms. McCann repeatedly stated that she had worked for several months on the working capital loans but had not yet finalized her analysis.  The very next day, March 22, 2012, Marriott filed Ms. McCann's written direct testimony, in which she testified about the working capital loans in detail.  It is hard to believe that Ms. McCann's analysis completely crystalized in a single day.

U.S. Bankruptcy Court - Hawaii   #11-02371   Dkt # 1154   Filed  05/29/12   Page 12 of 24

severance and other amounts they were owed under their employment agreements. Those expenses are a direct, foreseeable result of the Debtor's breach of the Management Agreement.

        i.     It is not relevant that the Debtor's new manager hired some of the employees to work at the Hotel. Marriott had to terminate them from its employ and was obligated to pay whatever severance was due.

        ii.    It is not relevant that Marriott rehired some of the employees to work at other Marriott-managed hotels. Marriott's severance letters to the employees said that they would no longer be eligible for severance payments if and when Marriott rehired them at another hotel. Marriott apparently carried out this policy, at least with respect to the general manager.

        iii.   An unspecified portion of the post-petition wages was related to the preparation of Marriott's claim against the Debtor and other tasks (such as "attempting to retrieve proprietary information") which arguably constitute litigation support, not services for which Marriott may charge the Debtor under the Management Agreement. Therefore, although most of Marriott's claim for wages and the like is probably a proper item of damage, Marriott has not proven the amount of that claim with sufficient certainty. Therefore, for purposes of estimation, I will reduce Marriott's reimbursement claim by $400,151.51.

13

b.     The Debtor objects to Marriott's claim for a Marriott Rewards "true-up."[3] Marriott Rewards is a customer loyalty program under which members earn points which they can redeem for free or discounted stays at Marriott managed hotels. During the year, Marriott pays each hotel for room nights obtained using Marriott Rewards points at a rate which is estimated to equal the hotel's RevPAR. Periodically, the estimated RevPAR is compared with the hotel's actual RevPAR, and the hotel is charged for or credited with the difference. Although Ms. McCann was unable to explain how the "true-up" amount for the Hotel was calculated, it appears that the charge was calculated in the ordinary course of Marriott's business, so I will accept it for purposes of estimation.

c.     The Debtor objects to Marriott's claim for $28,471 in "customer chargebacks" for "disputed advance deposit charges and other overcharges or administrative errors" and $28,975 in customer deposit refunds. The latter charges represent deposits for group stays which Marriott refunded after the takeover. The Debtor points out that the groups ended up staying at other Marriott hotels and implies that Marriott should have kept the deposits. This is

---

[3]According to Ms. McCann's written direct testimony, the amount of this claim is $418,081.49. According to Marriott's closing brief and Ms. McCann's oral testimony, the amount increased to $643,302.10 as a result of a January 27, 2012 invoice. As far as I can tell, Marriott did not adjust the total amount of its reimbursement claim to reflect this increase, and neither will I.

14

unavailing.  Marriott would have had to credit the account of the other hotels'

owners for deposits which that owner never received.  Therefore, I accept this

portion of Marriott's claim for purposes of estimation.

        d.     The Debtor objects to a charge of $56,500 for guest accident

claims.  Marriott has not actually incurred those costs and did not explain how it

calculated the amount.  For purposes of estimation, I will reduce Marriott's

reimbursement claim by $56,500.

        e.     The Debtor argues that the claim should be reduced by

$450,000 to reflect expenses which Ms. McCann testified should not have been

charged to the Hotel.  I agree and will reduce the estimation of Marriott's claim by

that amount.

        f.     The Debtor argues that the claim should be reduced to the

extent that the preopening expenses were unreasonable or in excess of the budget.

Marriott argues that the expenses were reasonable, and that the expenses exceeded

the budgeted amount because the Hotel's opening was delayed.  For purposes of

this estimation, I will not address the Debtor's objection because the Debtor

agreed that it would not contend that Marriott breached the Management

Agreement.

        g.     Accordingly, I estimate Marriott's reimbursement claims at

15

$4,852,919.

Based on these findings of fact, the court makes the following:

## CONCLUSIONS OF LAW

26.     This estimation proceeding is a core proceeding in bankruptcy over which this court has jurisdiction.  28 U.S.C. §§ 1334, 157(b)(2)(A), (O).   Venue is proper.  28 U.S.C. §§ 1408, 1409.

27.     The burden of proof for estimating a claim under rule 3018(a) is the same as for an objection to the claim.  In re FRG, Inc., 121 B.R. 451, 456 (Bankr. E.D. Pa. 1990).  A properly filed proof of claim is deemed allowed unless a party objects under 11 U.S.C. § 502(a), and constitutes prima facie evidence of the validity and amount of the claim.  Fed. R. Bankr. P. 3001(f).  An objecting party bears the burden of producing sufficient evidence to negate the prima facie validity of the claim.  In re Pugh, 157 B.R. 898, 901 (B.A.P. 9th Cir. 1993).   If the objecting party comes forward with evidence sufficient to negate one or more facts in the proof of claim, the burden reverts to the claimant to prove the validity of the claim by a preponderance of the evidence.  Lundell v. Anchor Const. Specialists, Inc., 223 F.3d 1035, 1039 (9th Cir. 2000).

28.     The Debtor filed an objection to Marriott's Proof of Claim.  Dkt. no. 505.  The Debtor has put forth sufficient evidence to negate one or more facts in

16

the proof of claim. This is consistent with the fact that Marriott itself has requested far less than the initial claim. Marriott has the burden of persuasion by a preponderance of the evidence to prove the validity of its claim.

29.    As the Management Agreement specifies, New York law controls.

30.    Marriott, as the  non-breaching party, seeks to recover general damages. These damages include money that the breaching party agreed to pay under the contract. Tractebel Energy Marketing, Inc. v. AEP Power Marketing, Inc., 487 F.3d 89, 109 (2d Cir. 2007) (citing Am. List Corp. v. U.S. News & World Report, Inc., 75 N.Y.2d 38, 44, 549 N.E.2d 1161 (1989)); see also Kenford Co. v. County of Erie, 73 N.Y.2d 312, 319, 537 N.E.2d 176 (Ct. App. 1989) ("[T]he nonbreaching party may recover general damages which are the natural and probable consequence of the breach.").

31.    In order to place Marriott, the non-breaching party, in the same position it would have occupied had the contract been performed, damages must include Marriott's lost profits (unpaid management fees minus expenses avoided or reasonably avoidable). Tractebel, 487 F.3d at 109-10.

32.    Damages "must be not merely speculative, possible, and imaginary, but they must be reasonably certain and such only as actually follow or may follow from the breach of the contract. Tractebel, 487 F.3d at 110 (quoting Wakeman v.

17

Wheeler & Wilson Mfg. Co., 101 N.Y. 205, 4 N.E. 264, 266 (1886)).

33.     The parties disagree about the legal standard for certainty of future damages.  According to the Debtor, future losses must be proven with reasonable certainty.  According to Marriott, once the fact of damage is established with reasonable certainty, the plaintiff "need only show a 'stable foundation for a reasonable estimate'" of the damage incurred as a result of the breach.  Id.; Freund v. Washington Square Press, Inc., 34 N.Y.2d 379, 383, 314 N.E.2d 419 (1974).

34.     Neither the "reasonable certainty" nor the "stable foundation" test is precise or easy to implement.  About all one can say is that the "stable foundation" test is meant to make it easier for claimants to recover future damages.  In theory, there ought to be cases where there is a "stable foundation for a reasonable estimate" of future damages, but such damages cannot be determined with "reasonable certainty."  The verbal formulations of the two tests are too vague to permit one to determine with any certainty or stability what cases would fall in this gap.

35.     I need not decide this legal issue because I have found that Marriott has proved its lost management fees with reasonable certainty.

36.     Marriott argues that its claim should not be reduced based on the possibility that Marriott might fail the performance test, because the Debtor's

18

termination of Marriott caused the uncertainty.  I need not address this issue squarely because I have found that Marriott probably would have passed the performance test.  The Debtor's breach does not relieve Marriott of its obligation to prove its future losses with the requisite certainty and does not require the court, when choosing a proper discount rate, to ignore all uncertainties in those losses.

## CONCLUSION

As set forth in Attachment 3, the estimated amount of Marriott's claims against the estate, for purposes of feasibility and voting, is $18,473,805.25.

*/s/ Robert J. Faris*
**United States Bankruptcy Judge**
Dated: **05/29/2012**

19

# Attachment 1

## Summary of Estimated Marriott Base Management Fees

| Year | ADR | Occupancy | RevPar | Room Revenue | Non-Room Revenue | Total Revenue[1] | Marriott Base Management Fee[2] | Base Management Fee Revenue[3] |
|---|---|---|---|---|---|---|---|---|
| 2011 | | | | | | $ 25,270,674.00 | 3.0% | $ 253,000.00 |
| 2012 | $ 250.34 | 59% | $ 147.70 | $ 19,030,483.81 | 13,319,000.00 | $ 32,349,483.81 | 3.0% | $ 970,484.51 |
| 2013 | $ 285.05 | 64% | $ 182.43 | $ 23,505,451.04 | 14,958,000.00 | $ 38,463,451.04 | 3.0% | $ 1,153,903.53 |
| 2014 | $ 326.23 | 70% | $ 228.36 | $ 29,423,173.04 | 16,294,000.00 | $ 45,717,173.04 | 3.1% | $ 1,417,232.36 |
| 2015 | $ 358.07 | 75% | $ 268.55 | $ 34,601,646.86 | 16,783,000.00 | $ 51,384,646.86 | 3.5% | $ 1,798,462.64 |
| 2016 | $ 368.45 | 75% | $ 276.34 | $ 35,604,705.19 | 17,335,000.00 | $ 52,939,705.19 | 3.5% | $ 1,852,889.68 |
| 2017 | $ 379.50 | 75% | $ 284.63 | $ 36,672,846.34 | 17,805,000.00 | $ 54,477,846.34 | 3.5% | $ 1,906,724.62 |
| 2018 | $ 390.89 | 75% | $ 293.17 | $ 37,773,031.73 | 18,340,000.00 | $ 56,113,031.73 | 3.6% | $ 2,020,069.14 |
| 2019 | $ 402.62 | 75% | $ 301.96 | $ 38,906,222.69 | 18,890,000.00 | $ 57,796,222.69 | 4.0% | $ 2,311,848.91 |
| 2020 | $ 414.69 | 75% | $ 311.02 | $ 40,073,409.37 | 19,510,000.00 | $ 59,583,409.37 | 4.0% | $ 2,383,336.37 |
| 2021 | $ 427.13 | 75% | $ 320.35 | $ 41,275,611.65 | 20,041,000.00 | $ 61,316,611.65 | 4.0% | $ 2,452,664.47 |
| 2022 | $ 439.95 | 75% | $ 329.96 | $ 42,513,880.00 | 20,642,230.00 | $ 63,156,110.00 | 4.0% | $ 2,526,244.40 |
| 2023 | $ 453.15 | 75% | $ 339.86 | $ 43,789,296.40 | 21,261,496.90 | $ 65,050,793.30 | 4.0% | $ 2,602,031.73 |
| 2024 | $ 466.74 | 75% | $ 350.06 | $ 45,102,975.29 | 21,899,341.81 | $ 67,002,317.10 | 4.0% | $ 2,680,092.68 |
| 2025 | $ 480.74 | 75% | $ 360.56 | $ 46,456,064.55 | 22,556,322.06 | $ 69,012,386.61 | 4.0% | $ 2,760,495.46 |
| 2026 | $ 495.17 | 75% | $ 371.37 | $ 47,849,746.48 | 23,233,011.72 | $ 71,082,758.21 | 4.0% | $ 2,843,310.33 |
| 2027 | $ 510.02 | 75% | $ 382.52 | $ 49,285,238.88 | 23,930,002.07 | $ 73,215,240.95 | 4.0% | $ 2,928,609.64 |
| 2028 | $ 525.32 | 75% | $ 393.99 | $ 50,763,796.04 | 24,647,902.14 | $ 75,411,698.18 | 4.0% | $ 3,016,467.93 |
| 2029 | $ 541.08 | 75% | $ 405.81 | $ 52,286,709.93 | 25,387,339.20 | $ 77,674,049.13 | 4.0% | $ 3,106,961.97 |
| 2030 | $ 557.31 | 75% | $ 417.99 | $ 53,855,311.22 | 26,148,959.38 | $ 80,004,270.60 | 4.0% | $ 3,200,170.82 |
| 2031 | $ 574.03 | 75% | $ 430.52 | $ 55,470,970.56 | 26,933,428.16 | $ 82,404,398.72 | 4.0% | $ 3,296,175.95 |
| 2032 | $ 591.25 | 75% | $ 443.44 | $ 57,135,099.68 | 27,741,431.00 | $ 84,876,530.68 | 4.0% | $ 3,395,061.23 |
| 2033 | $ 608.99 | 75% | $ 456.74 | $ 58,849,152.67 | 28,573,673.93 | $ 87,422,826.60 | 4.0% | $ 3,496,913.06 |
| 2034 | $ 627.26 | 75% | $ 470.45 | $ 60,614,627.25 | 29,430,884.15 | $ 90,045,511.40 | 4.0% | $ 3,601,820.46 |
| 2035 | $ 646.08 | 75% | $ 484.56 | $ 62,433,066.06 | 30,313,810.68 | $ 92,746,876.74 | 4.0% | $ 3,709,875.07 |
| 2036 | $ 665.46 | 75% | $ 499.10 | $ 64,306,058.05 | 31,223,225.00 | $ 95,529,283.04 | 4.0% | $ 3,821,171.32 |
| 2037 | $ 685.43 | 75% | $ 514.07 | $ 66,235,239.79 | 32,159,921.75 | $ 98,395,161.53 | 4.0% | $ 3,935,806.46 |

[1] Mr. Baltin opined that revenues would increase at 3.0 percent annually beginning in the year 2022, and continuing each year thereafter for the duration of the Management Agreement. This opinion was undisputed and is incorporated herein.

[2] Marriott's base management fee percentage is calculated pursuant to section 1.03B and section 11.13D of the Management. For the precise percentages by year, Mr. Baltin's calculations were not disputed, and are incorporated herein.

[3] To calculate management fee revenue for 2011, Mr. Baltin's formula was undisputed and is incorporated herein. The revenues are calculated at (4/12) of annual revenues representing the months September, October, November, and December.

U.S. Bankruptcy Court - Hawaii   #11-02371   Dkt # 1154   Filed   05/29/12   Page 20 of 24

| Year | $ | | 75% | $ | $ | $ | 4.0% | $ |
|---|---|---|---|---|---|---|---|---|
| 2038 | 705.99 | 75% | 529.49 | 68,222,296.98 | 33,124,719.40 | 101,347,016.38 | 4.0% | 4,053,880.66 |
| 2039 | 727.17 | 75% | 545.38 | 70,268,965.89 | 34,118,460.98 | 104,387,426.87 | 4.0% | 4,175,497.07 |
| 2040 | 748.98 | 75% | 561.74 | 72,377,034.87 | 35,142,014.81 | 107,519,049.68 | 4.0% | 4,300,761.99 |
| 2041 | 771.45 | 75% | 578.59 | 74,548,345.91 | 36,196,275.25 | 110,744,621.17 | 4.0% | 4,429,784.85 |
| 2042 | 794.60 | 75% | 595.95 | 76,784,796.29 | 37,282,163.51 | 114,066,959.80 | 4.0% | 4,562,678.39 |
| 2043 | 818.43 | 75% | 613.83 | 79,088,340.18 | 38,400,628.42 | 117,488,968.60 | 4.0% | 4,699,558.74 |
| 2044 | 842.99 | 75% | 632.24 | 81,460,990.38 | 39,552,647.27 | 121,013,637.65 | 4.0% | 4,840,545.51 |
| 2045 | 868.28 | 75% | 651.21 | 83,904,820.10 | 40,739,226.69 | 124,644,046.78 | 4.0% | 4,985,761.87 |
| 2046 | 894.32 | 75% | 670.74 | 86,421,964.70 | 41,961,403.49 | 128,383,368.19 | 4.0% | 5,135,334.73 |
| 2047 | 921.15 | 75% | 690.87 | 89,014,623.64 | 43,220,245.59 | 132,234,869.23 | 4.0% | 5,289,394.77 |
| 2048 | 948.79 | 75% | 711.59 | 91,685,062.35 | 44,516,852.96 | 136,201,915.31 | 4.0% | 5,448,076.61 |
| 2049 | 977.25 | 75% | 732.94 | 94,435,614.22 | 45,852,358.55 | 140,287,972.77 | 4.0% | 5,611,518.91 |
| 2050 | 1,006.57 | 75% | 754.93 | 97,268,682.65 | 47,227,929.31 | 144,496,611.95 | 4.0% | 5,779,864.48 |
| 2051 | 1,036.77 | 75% | 777.58 | 100,186,743.13 | 48,644,767.19 | 148,831,510.31 | 4.0% | 5,953,260.41 |
| 2052 | 1,067.87 | 75% | 800.90 | 103,192,345.42 | 50,104,110.20 | 153,296,455.62 | 4.0% | 6,131,858.22 |
| 2053 | 1,099.91 | 75% | 824.93 | 106,288,115.78 | 51,607,233.51 | 157,895,349.29 | 4.0% | 6,315,813.97 |
| 2054 | 1,132.90 | 75% | 849.68 | 109,476,759.26 | 53,155,450.51 | 162,632,209.77 | 4.0% | 6,505,288.39 |
| 2055 | 1,166.89 | 75% | 875.17 | 112,761,062.03 | 54,750,114.03 | 167,511,176.06 | 4.0% | 6,700,447.04 |
| 2056 | 1,201.90 | 75% | 901.42 | 116,143,893.89 | 56,392,617.45 | 172,536,511.34 | 4.0% | 6,901,460.45 |
| 2057 | 1,237.95 | 75% | 928.47 | 119,628,210.71 | 58,084,395.97 | 177,712,606.68 | 4.0% | 7,108,504.27 |
| 2058 | 1,275.09 | 75% | 956.32 | 123,217,057.03 | 59,826,927.85 | 183,043,984.88 | 4.0% | 7,321,759.40 |
| 2059 | 1,313.35 | 75% | 985.01 | 126,913,568.74 | 61,621,735.69 | 188,535,304.43 | 4.0% | 7,541,412.18 |
| 2060 | 1,352.75 | 75% | 1,014.56 | 130,720,975.81 | 63,470,387.76 | 194,191,363.56 | 4.0% | 5,178,695.28[4] |
| | | | | | | **Total Base Mngt Fee** | $ | 198,412,982.95 |
| | | | | | | *D.R. 2011-2017 (7.5%)* | $ | 6,667,835.43 |
| | | | | | | *D.R. 2018-2060 (13.5%)* | $ | 8,393,992.61 |
| | | | | | | **Discounted Value** | $ | 15,061,828.04 |

[4] For the purpose of the base management fee calculation, revenues for the year 2060 are calculated at (8/12) of annual revenues representing the first eight months and the expiration of the 50-year management contract on or about September 2060.

## Summary of Estimated Marriott Incentive Management Fees

| Year | Total Revenue | Expenses | FF&E Reserve % | FF&E Reserve | Expenses, FF&E, & Base Mngt Fee | Net Operating Income[5] | NOI Threshold | NOI After Owner's Priority | Incentive Fee (25%) |
|---|---|---|---|---|---|---|---|---|---|
| 2012 | $ 32,349,483.81 | $ 32,498,000.00 | 2.2% | $ 711,688.64 | 34,180,173.16 | $ (1,830,689.35) | $ 19,425,000.00 | $ (21,255,689.35) | $ 0.00 |
| 2013 | $ 38,463,451.04 | $ 34,435,000.00 | 3.0% | $ 1,153,903.53 | 36,742,807.06 | $ 1,720,643.98 | $ 19,425,000.00 | $ (17,704,356.02) | $ 0.00 |
| 2014 | $ 45,717,173.04 | $ 36,004,000.00 | 3.1% | $ 1,417,232.36 | 38,838,464.73 | $ 6,878,708.32 | $ 19,425,000.00 | $ (12,546,291.68) | $ 0.00 |
| 2015 | $ 51,384,646.86 | $ 36,903,000.00 | 3.2% | $ 1,644,308.70 | 40,345,771.34 | $ 11,038,875.52 | $ 19,425,000.00 | $ (8,386,124.48) | $ 0.00 |
| 2016 | $ 52,939,705.19 | $ 37,709,000.00 | 4.0% | $ 2,117,588.21 | 41,679,477.89 | $ 11,260,227.30 | $ 19,425,000.00 | $ (8,164,772.70) | $ 0.00 |
| 2017 | $ 54,477,846.34 | $ 38,761,000.00 | 4.0% | $ 2,179,113.85 | 42,846,838.48 | $ 11,631,007.87 | $ 19,425,000.00 | $ (7,793,992.13) | $ 0.00 |
| 2018 | $ 56,113,031.73 | $ 39,923,000.00 | 4.0% | $ 2,244,521.27 | 44,187,590.41 | $ 11,925,441.32 | $ 19,425,000.00 | $ (7,499,558.68) | $ 0.00 |
| 2019 | $ 57,796,222.69 | $ 41,123,000.00 | 4.0% | $ 2,311,848.91 | 45,746,697.81 | $ 12,049,524.87 | $ 19,425,000.00 | $ (7,375,475.13) | $ 0.00 |
| 2020 | $ 59,583,409.37 | $ 42,441,000.00 | 4.3% | $ 2,562,086.60 | 47,386,422.98 | $ 12,196,986.39 | $ 19,425,000.00 | $ (7,228,013.61) | $ 0.00 |
| 2021 | $ 61,316,611.65 | $ 43,627,000.00 | 5.0% | $ 3,065,830.58 | 49,145,495.05 | $ 12,171,116.60 | $ 19,425,000.00 | $ 7,253,883.40 | $ 0.00 |
| 2022 | $ 63,156,110.00 | $ 44,935,810.00 | 5.0% | $ 3,157,805.50 | 50,519,859.90 | $ 13,894,344.20 | $ 19,425,000.00 | $ 5,530,655.80 | $ 0.00 |
| 2023 | $ 65,050,793.30 | $ 46,283,884.30 | 5.0% | $ 3,252,539.66 | 52,138,455.70 | $ 14,311,174.53 | $ 19,425,000.00 | $ (5,113,825.47) | $ 0.00 |
| 2024 | $ 67,002,317.10 | $ 47,672,400.83 | 5.0% | $ 3,350,115.85 | 53,702,609.37 | $ 14,740,509.76 | $ 19,425,000.00 | $ (4,684,490.24) | $ 0.00 |
| 2025 | $ 69,012,386.61 | $ 49,102,572.85 | 5.0% | $ 3,450,619.33 | 55,313,687.65 | $ 15,182,725.05 | $ 19,425,000.00 | $ (4,242,274.95) | $ 0.00 |
| 2026 | $ 71,082,758.21 | $ 50,575,650.04 | 5.0% | $ 3,554,137.91 | 56,973,098.28 | $ 15,638,206.81 | $ 19,425,000.00 | $ (3,786,793.19) | $ 0.00 |
| 2027 | $ 73,215,240.95 | $ 52,092,919.54 | 5.0% | $ 3,660,762.05 | 58,682,291.23 | $ 16,107,353.01 | $ 19,425,000.00 | $ (3,317,646.99) | $ 0.00 |
| 2028 | $ 75,411,698.18 | $ 53,655,707.13 | 5.0% | $ 3,770,584.91 | 60,442,759.96 | $ 16,590,573.60 | $ 19,425,000.00 | $ (2,834,426.40) | $ 0.00 |
| 2029 | $ 77,674,049.13 | $ 55,265,378.34 | 5.0% | $ 3,883,702.46 | 62,256,042.76 | $ 17,088,290.81 | $ 19,425,000.00 | $ (2,336,709.19) | $ 0.00 |
| 2030 | $ 80,004,270.60 | $ 56,923,339.69 | 5.0% | $ 4,000,213.53 | 64,123,724.04 | $ 17,600,939.53 | $ 19,425,000.00 | $ (1,824,060.47) | $ 0.00 |
| 2031 | $ 82,404,398.72 | $ 58,631,039.88 | 5.0% | $ 4,120,219.94 | 66,047,435.77 | $ 18,128,967.72 | $ 19,425,000.00 | $ (1,296,032.28) | $ 0.00 |
| 2032 | $ 84,876,530.68 | $ 60,389,971.08 | 5.0% | $ 4,243,826.53 | 68,028,858.84 | $ 18,672,836.75 | $ 19,425,000.00 | $ (752,163.25) | $ 0.00 |
| 2033 | $ 87,422,826.60 | $ 62,201,670.21 | 5.0% | $ 4,371,141.33 | 70,069,724.60 | $ 19,233,021.85 | $ 19,425,000.00 | $ (191,978.15) | $ 0.00 |
| 2034 | $ 90,045,511.40 | $ 64,067,720.32 | 5.0% | $ 4,502,275.57 | 72,171,816.34 | $ 19,810,012.51 | $ 19,425,000.00 | $ 385,012.51 | $ 96,253.13 |
| 2035 | $ 92,746,876.74 | $ 65,989,751.93 | 5.0% | $ 4,637,343.84 | 74,336,970.83 | $ 20,404,312.88 | $ 19,425,000.00 | $ 979,312.88 | $ 244,828.22 |
| 2036 | $ 95,529,283.04 | $ 67,969,444.48 | 5.0% | $ 4,776,464.15 | 76,567,079.96 | $ 21,016,442.27 | $ 19,425,000.00 | $ 1,591,442.27 | $ 397,860.57 |
| 2037 | $ 98,395,161.53 | $ 70,008,527.82 | 5.0% | $ 4,919,758.08 | 78,864,092.36 | $ 21,646,935.54 | $ 19,425,000.00 | $ 2,221,935.54 | $ 555,483.88 |
| 2038 | $ 101,347,016.38 | $ 72,108,783.65 | 5.0% | $ 5,067,350.82 | 81,230,015.13 | $ 22,296,343.60 | $ 19,425,000.00 | $ 2,871,343.60 | $ 717,835.90 |
| 2039 | $ 104,387,426.87 | $ 74,272,047.16 | 5.0% | $ 5,219,371.34 | 83,666,915.58 | $ 22,965,233.91 | $ 19,425,000.00 | $ 3,540,233.91 | $ 885,058.48 |
| 2040 | $ 107,519,049.68 | $ 76,500,208.58 | 5.0% | $ 5,375,952.48 | 86,176,923.05 | $ 23,654,190.93 | $ 19,425,000.00 | $ 4,229,190.93 | $ 1,057,297.73 |
| 2041 | $ 110,744,621.17 | $ 78,795,214.83 | 5.0% | $ 5,537,231.06 | 88,762,230.74 | $ 24,363,816.66 | $ 19,425,000.00 | $ 4,938,816.66 | $ 1,234,704.16 |
| 2042 | $ 114,066,959.80 | $ 81,159,071.28 | 5.0% | $ 5,703,347.99 | 91,425,097.66 | $ 25,094,731.16 | $ 19,425,000.00 | $ 5,669,731.16 | $ 1,417,432.79 |
| 2043 | $ 117,488,968.60 | $ 83,593,843.42 | 5.0% | $ 5,874,448.43 | 94,167,850.59 | $ 25,847,573.09 | $ 19,425,000.00 | $ 6,422,573.09 | $ 1,605,643.27 |
| 2044 | $ 121,013,637.65 | $ 86,101,658.72 | 5.0% | $ 6,050,681.88 | 96,992,886.11 | $ 26,623,000.28 | $ 19,425,000.00 | $ 7,198,000.28 | $ 1,799,500.07 |

[5]  For the purpose of net operating income, Mr. Baltin calculated an annual increase each year equal to 22.0 percent of total revenues beginning in the year 2022, and continuing each year thereafter for the duration of the Management Agreement. This calculation was undisputed and is incorporated herein.

| Year | | | | | | | | Total Incentive Fee | |
|---|---|---|---|---|---|---|---|---|---|
| 2045 | $124,644,046.78 | $88,684,708.48 | 5.0% | $6,232,202.34 | 99,902,672.69 | 27,421,690.29 | $19,425,000.00 | 7,996,690.29 | $1,999,172.57 |
| 2046 | $128,383,368.19 | 91,345,249.74 | 5.0% | 6,419,168.41 | 102,899,752.87 | 28,244,341.00 | 19,425,000.00 | 8,819,341.00 | 2,204,835.25 |
| 2047 | $132,234,869.23 | 94,085,607.23 | 5.0% | 6,611,743.46 | 105,986,745.46 | 29,091,671.23 | 19,425,000.00 | 9,666,671.23 | 2,416,667.81 |
| 2048 | $136,201,915.31 | 96,908,175.45 | 5.0% | 6,810,095.77 | 109,166,347.82 | 29,964,421.37 | 19,425,000.00 | 10,539,421.37 | 2,634,855.34 |
| 2049 | $140,287,972.77 | 99,815,420.71 | 5.0% | 7,014,398.64 | 112,441,338.26 | 30,863,354.01 | 19,425,000.00 | 11,438,354.01 | 2,859,588.50 |
| 2050 | $144,496,611.95 | 102,809,883.33 | 5.0% | 7,224,830.60 | 115,814,578.41 | 31,789,254.63 | 19,425,000.00 | 12,364,254.63 | 3,091,063.66 |
| 2051 | $148,831,510.31 | 105,894,179.83 | 5.0% | 7,441,575.52 | 119,289,015.76 | 32,742,932.27 | 19,425,000.00 | 13,317,932.27 | 3,329,483.07 |
| 2052 | $153,296,455.62 | 109,071,005.23 | 5.0% | 7,664,822.78 | 122,867,686.23 | 33,725,220.24 | 19,425,000.00 | 14,300,220.24 | 3,575,055.06 |
| 2053 | $157,895,349.29 | 112,343,135.38 | 5.0% | 7,894,767.46 | 126,553,716.82 | 34,736,976.84 | 19,425,000.00 | 15,311,976.84 | 3,827,994.21 |
| 2054 | $162,632,209.77 | 115,713,429.44 | 5.0% | 8,131,610.49 | 130,350,328.32 | 35,779,086.15 | 19,425,000.00 | 16,354,086.15 | 4,088,521.54 |
| 2055 | $167,511,176.06 | 119,184,832.33 | 5.0% | 8,375,558.80 | 134,260,838.17 | 36,852,458.73 | 19,425,000.00 | 17,427,458.73 | 4,356,864.68 |
| 2056 | $172,536,511.34 | 122,760,377.30 | 5.0% | 8,626,825.57 | 138,288,663.32 | 37,958,032.50 | 19,425,000.00 | 18,533,032.50 | 4,633,258.12 |
| 2057 | $177,712,606.68 | 126,443,188.62 | 5.0% | 8,885,630.33 | 142,437,323.22 | 39,096,773.47 | 19,425,000.00 | 19,671,773.47 | 4,917,943.37 |
| 2058 | $183,043,984.88 | 130,236,484.27 | 5.0% | 9,152,199.24 | 146,710,442.91 | 40,269,676.67 | 19,425,000.00 | 20,844,676.67 | 5,211,169.17 |
| 2059 | $188,535,304.43 | 134,143,578.80 | 5.0% | 9,426,765.22 | 151,111,756.20 | 41,477,766.97 | 19,425,000.00 | 22,052,766.97 | 5,513,191.74 |
| 2060 | $194,191,363.56 | 138,167,886.17 | 5.0% | 9,709,568.18 | 153,056,149.63 | 28,495,640.69 | 12,950,647.50 | 15,544,993.19 | 3,886,248.30[6] |
| | | | | | | | **Total Incentive Fee** | $68,557,810.60 | |
| | | | | | | | *Discount Rate* | *13.5%* | |
| | | | | | | | *Discounted Value* | $ *547,551.21* | |

[6] For the purpose of the incentive management fee calculation, revenues for the year 2060 are calculated at (8/12) of annual revenues representing the first eight months and the expiration of the 50-year management contract on or about September 2060.

**Attachment 3**

**Summary of Total Estimated Marriott Claim**

| | |
|---|---|
| Total Base Management Fees | $198,412,982.95 |
| Discount Rate (Years 2011-2017) | 7.5% |
| Discount Rate (Years 2018-2060) | 13.5% |
| Present Value | $15,061,828.04 |
| | |
| Total Incentive Management Fees | $68,557,810.60 |
| Discount Rate | 13.5% |
| Present Value | $547,551.21 |
| | |
| Total Present Value of Management Fees | $15,609,379.25 |
| | |
| Avoided Costs | ($1,988,493.00) |
| | |
| *Total Present Value of Lost Profits* | *$13,620,886.25* |
| *Total Reimbursement Claim* | *$4,852,919.00* |
| | |
| **Total Estimated Marriott Claim** | **$18,473,805.25** |